## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| ELIZABETH P. WILLIS and SAM H. PEARSON, Individually and On Behalf of All Others Similarly Situated, | ) Civil Action No. ) ) **CLASS ACTION** |
| Plaintiffs, | ) ) **COMPLAINT FOR VIOLATION OF** ) **THE FEDERAL SECURITIES LAWS** |
| vs. | ) ) |
| MORGAN KEEGAN & COMPANY, INC., MORGAN ASSET MANAGEMENT, INC., REGIONS FINANCIAL CORPORATION, MORGAN KEEGAN SELECT FUND, INC., RMK MULTI-SECTOR HIGH INCOME FUND, INC., MK HOLDING, INC., CARTER E. ANTHONY, ALLEN B. MORGAN, JR., JOSEPH C. WELLER, JAMES STILLMAN R. McFADDEN, ARCHIE W. WILLIS, III, MARY S. STONE, W. RANDALL PITTMAN, J. KENNETH ALDERMAN, BRIAN B. SULLIVAN, J. THOMPSON WELLER, CHARLES D. MAXWELL, JAMES C. KELSOE, JR., DAVID H. TANNEHILL, MICHELE F. WOOD, JACK R. BLAIR, ALBERT C. JOHNSON and PRICEWATERHOUSECOOPERS LLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |
| | ) **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the shares of certain mutual funds offered by Morgan Keegan Select Fund Inc. ("MK Select"), including the Regions Morgan Keegan Select High Income Fund (the "High Income Fund"), the Regions Morgan Keegan Select Intermediate Fund (the "Intermediate Fund") and the Regions Morgan Keegan Select Short Term Bond Fund (the "Short Term Fund") (collectively the "Select Funds"), or shares of the RMK Multi-Sector High Income Fund, Inc. (the "RHY Fund") (hereinafter the Select Funds and the RHY Fund are collectively referred to as the "Funds"), pursuant and/or traceable to MK Select's and the RHY Fund's false and misleading Registration Statements and Prospectuses, against the Funds' registrants, the Funds' administrator, Morgan Keegan & Company, Inc. ("Morgan Keegan"), and the Funds' adviser, Morgan Asset Management, Inc., and certain of Morgan Keegan's officers and/or directors for violations of the Securities Act of 1933 ("1933 Act").

2.      MK Select is an open-ended management investment company.  It consists of three portfolios which invest in fixed income securities, each with its own investment objectives.  Each of these portfolios offers three classes of shares: Class A shares, Class C shares and Class I shares.  The portfolios are as follows:

(a)      High Income Fund – This fund was initially an open-ended fund but was subsequently closed to new investors as of November 1, 2005.  This fund seeks a high level of income by investing in below investment grade bonds (commonly referred to as "junk bonds"); capital growth is a secondary consideration.  It invests primarily in junk bonds.  The types of securities the High Income Fund may purchase include corporate bonds, mortgage-backed and asset-backed securities and other structured finance vehicles, convertible debt securities, U.S. government securities and municipal and foreign government obligations. The fund may invest up to 15% of its

total assets in foreign debt and foreign equity securities and up to 25% of its total assets in domestic equity securities, including common and preferred stocks. Such securities may include common stocks of real estate investment trusts and utilities. The average effective maturity of the fund's portfolio will generally be between three and fifteen years.

(b)     Intermediate Fund – This is an open-ended fund. This fund seeks a high level of income by investing in intermediate maturity, investment grade bonds; capital growth is a secondary consideration. It invests primarily in investment grade bonds. The type of securities that the Intermediate Fund may purchase include U.S. government securities, corporate bonds, debentures, notes, preferred stock, mortgage-backed and other asset-backed securities. The fund may also invest up to 35% of its assets in below investment grade bonds, convertible securities and common stocks. The average effective maturity of the fund's portfolio will generally be between three and ten years.

(c)     Short Term Fund – This is an open-ended fund. This fund seeks a high level of current income consistent with preservation of capital. It invests primarily in investment grade bonds. The types of securities that the Short Term Fund may purchase include bonds of U.S. corporate and governmental issuers, U.S. dollar-denominated bonds of foreign issuers, mortgage-backed and other asset-backed securities, and preferred stock. The fund may also invest in collateralized mortgage obligations, repurchase agreements, adjustable rate securities and payable in-kind bonds. The average effective maturity of the fund's portfolio will generally be three years or less.

3.     RHY Fund – This is a closed-ended fund. This fund operates as a diversified, closed-end investment company seeking a high level of current income with capital appreciation as a secondary investment objective. The RHY Fund invests in a wide range of debt securities, including corporate bonds, mortgage-backed and asset-backed securities, convertible debt securities, distressed

securities, including securities of companies in bankruptcy reorganization proceedings or otherwise in the process of debt restructuring, U.S. government and municipal obligations and foreign government obligations, and invests up to 30% of its total assets in equity securities of both domestic and foreign issuers and up to 15% of its total assets in a combination of foreign debt and foreign equity securities.

4.       Morgan Asset Management, Inc. ("Morgan Asset" or the "Adviser") is the investment adviser to the Funds.  The Adviser is an affiliate of Morgan Keegan, a regional investment banking, securities brokerage, trust and asset management firm.

5.       Part of the Funds' portfolios have been invested in collateralized debt obligations ("CDOs"), including CDOs backed by subprime mortgages to higher-risk borrowers.  CDOs are a type of asset-backed security and structured credit product.  CDOs repackage bonds, mortgages and other assets into new securities and then use the income from the underlying debt to pay investors. CDOs are secured or backed by a pool of bonds, loans or other assets, where investors buy slices classified by varying levels of debt or credit risk.

6.       Mutual funds are required to value their portfolios everyday in order to determine the appropriate share value.  For securities that trade on an open market exchange, the fair market value of the securities would simply involve the closing price of the security on a given day.  Nonetheless, when more exotic securities like CDOs are involved it is a much more complex process because they do not trade on an exchange making determining the valuation of the securities a more difficult process.

7.       For years, shares of the Funds traded within narrow ranges.  Then in early March 2007, as the subprime crisis began to emerge, the Funds began to trend lower as the market learned of their exposure to the subprime market.  Nonetheless, the shares of the Funds continued to trade at artificially inflated prices as the full extent of the Funds' exposure had not yet been revealed.

8.     As late as the summer of 2007, as the housing and credit crisis deepened, MK Select and the RHY Fund continued to play down and conceal the Funds' growing exposure to the problems in the subprime market.  As a result of these positive but false statements, the Funds' shares continued to be artificially inflated.

9.     Beginning in early July 2007, the Funds began to acknowledge serious problems in their portfolios related to the Funds' exposure to the subprime market and began to reveal important and detailed portfolio information.  MK Select and the RHY Fund further acknowledged that the Funds were having difficulty determining the fair value of many of their assets due to the illiquid nature of many of the assets held by the Funds and further admitted that it was necessary for the Funds to retain a consultant in order to determine the fair value.

10.    Finally, on November 7, 2007, Portfolio Manager James C. Kelsoe ("Kelsoe") wrote a letter to investors, stating in part:

> Since my last communication on August 10, 2007 the credit markets have remained under pressure as spreads continue to widen, and economic uncertainty, driven by the deteriorating housing market and high energy prices, weighs on investors minds. Over recent weeks the major rating agencies have cut ratings on various investments backed by mortgages as the housing picture becomes more and more uncertain. Also, during the last few weeks many investment banks and commercial banks have taken large write downs of their real estate related holdings to reflect these deteriorating conditions.
>
> Certainly some sectors have been more affected than others; one example in the headlines are CDO's. A key component that drives CDO pricing is the likelihood that future cash flows will continue to be received by various credit layers of the CDO in a timely manner. Certain events, such as downgrades, can cause a CDO manager or trustee to view the likelihood of cash flows to be lower than previously expected. This potential loss of cash flow to the lower-rated tranches will obviously be a catalyst for weaker prices of the bonds from these tranches. And when these events take place in an already illiquid market, such as the current one, the downward pressure on market pricing is considerably magnified.
>
> With all this as a backdrop, our portfolios have been pressured across the board. Many of our holdings are in the form of structured finance created with real-estate related securities as collateral; other areas of structured finance categories include corporate bonds and loans, equipment leases and commercial real estate. Even the asset classes that are performing well have been severely devalued due to

- 4 -

the CDO packaging. We have no crystal ball of what the future holds but continue to diligently manage the portfolios in the difficult environment.

In an effort to publish information beneficial to our shareholders in this uncertain time below we have provided information to general questions related to the funds:

**What exactly do you invest in?**

Our investment objectives are clearly stated in the prospectus of each fund, but in general, we have always invested a large portion of our portfolios in "structured finance" fixed income securities. Without going into great detail explaining structured finance, it is a fair assumption to say the weakness in the portfolios relates to this area of investment. A large portion of structured finance securities are created with mortgage related securities as the underlying collateral. In the current market, uncertainty regarding real estate has caused these securities to decline in value. To compound the problem the secondary market in which these securities trade has become very illiquid.  The primary market makers in this space had been the large "wire house" broker/dealers. In the current environment the dealers are long (own) enormous amounts of these deals that they are still trying to sell. Suffice it to say, the main participants in the secondary market are all sellers at this point.

**The net asset values of the funds appear to decline everyday. Can you explain?**

Part of the explanation is in our answer above. The worries regarding the real estate market are weighing on the perceived value of the securities we hold. The illiquidity of the secondary market for many of the securities we hold also is a contributing factor to the declining net asset value. Like all financial markets there must be a buyer for every seller. In the current market, many of the normal dealers (many have been in the news taking write-downs on their balance sheets) that typically provide the trading liquidity of these securities are no longer providing such liquidity. In many cases where there is no trading activity, bonds fall into a vacuum and are valued based on models projecting future cash flows. There are no optimistic projections at this time!

\*        \*        \*

**How much of the portfolio's are related to subprime?**

Below is the actual exposure to subprime mortgage related investments for each portfolio as of September 30, 2007:

| MKHIX | MKIBX | MSTBX | RMH | RSF | RMA | RHY |
|---|---|---|---|---|---|---|
| 14.1% | 16.9% | 5.1% | 8.4% | 10.4% | 10.5% | 11.4% |

11.     As a result of these disclosures, the price of the Select Funds' shares collapsed.  The

High Income Fund Class A shares closed at $4.53 per share on November 8, 2007, a decline of 51%

from early July 2007.  Likewise, the Intermediate Fund Class A shares closed at $5.88 per share on November 8, 2007, a decline of 38% from early July 2007.  Additionally, the Short Term Fund Class A shares closed at $8.84 per share on November 8, 2007, a decline of 12% from early August 2007.

12.     Prior to any negative disclosures, each of these funds traded within a narrow band. From December 2004 through early March 2007, the High Income Fund traded between $10.10 per share and $10.83 per share with an average trading price of $10.35 per share.  In contrast, by the end of November 2007, the fund closed at $3.91 per share.  Likewise, the Intermediate Fund traded between $9.81 per share and $10.11 per share with an average trading price of $9.93 per share during this same period, while in contrast, by the end of November 2007, the fund closed at $5.06 per share.  Additionally, from December 2004 through early March 2007, the Short Term Fund traded between $9.96 per share and $10.17 per share with an average trading price of $10.04 per share.  In contrast, by the end of November 2007, the fund closed at $8.54 per share.  Note the following charts:







13.     As a result of the November 7, 2007 disclosures, the price of the RHY Fund shares also collapsed.  The RHY Fund shares closed at $5.41 per share on November 8, 2007, a decline of 63% from early July 2007.

14.     Similar to the Select Funds, prior to any negative disclosures, the RHY Fund traded within a narrow band.  From January 2006 through early March 2007, the RHY Fund traded between $15.45 per share and $17.75 per share with an average trading price of $16.37 per share.  In contrast, by the end of November 2007, the fund closed at $5.93 per share.  Note the following chart:



15.     The true facts which were omitted from the Registration Statements/Prospectuses were as follows:

(a)     The Funds lacked adequate controls and hedges to minimize the risk of loss from mortgage delinquencies which affected a large part of their portfolios;

(b)     The Funds' portfolios were materially misstated due to their failure to properly value CDOs;

(c)     The Funds' valuation of underlying assets was misstated;

(d)     The extent of the Funds' liquidity risk due to the illiquid nature of a large portion of the Funds' portfolios was omitted;

(e)     The extent of the Funds' risk exposure to mortgage-backed assets was misstated; and

(f)    The extent to which the Funds' portfolios were subject to fair value procedures was misstated.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

18.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

19.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

20.    (a)    Plaintiff Elizabeth P. Willis purchased Intermediate Fund shares as described in the attached certification and was damaged thereby.

(b)    Plaintiff Sam H. Pearson purchased RHY Fund and Intermediate Fund shares as described in the attached certification and was damaged thereby.

21.    Defendant Morgan Keegan & Company, Inc. ("Morgan Keegan") is a regional investment banking, securities brokerage, trust and asset management firm.  Morgan Keegan is, and at all relevant times was, the Funds' administrator.  Defendant Morgan Keegan acts as the investment and securities brokerage, trust and asset management division of defendant Regions Financial Corporation.

22.    Defendant Morgan Asset  is, and at all relevant times, was, Adviser and manager to the Funds.

23.      Defendant Regions Financial Corporation ("Regions") is one of the nation's largest full-service providers of consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services.  Regions marketed, offered and sold shares of the Funds.

24.      Defendant MK Holding, Inc. ("Holding"), is a wholly owned subsidiary of Regions.

25.      Defendant MK Select is, and at all relevant times was, a diversified open-end investment company managed by Morgan Asset.

26.      Defendant RHY Fund is a diversified closed-end management investment company, which primarily invests in debt securities and equity securities.   RHY Funds' portfolio of investments include investments in corporate bonds, home equity loans, commercial loans, franchise loans, equipment leases, manufactured housing, common stock, CDOs, certificate-backed obligations, collateralized mortgage obligations, and government agency securities.

27.      Defendant Carter E. Anthony ("Anthony") was a director, President and Chief Executive Officer ("CEO") of MK Select until November 2006.   Additionally, Anthony was President and Chief Investment Officer of Morgan Asset.  Defendant Anthony signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates:  October 29, 2003, September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005, September 1, 2005, October 31, 2005 and August 31, 2006.  Furthermore, Anthony signed the Registration Statement and Prospectus for the RHY Fund.

28.      Defendant Allen B. Morgan, Jr. ("Morgan") founded Morgan Keegan in 1969. Morgan is, and at all relevant times was, a director of the Company, and was Chairman of the Board of Morgan Keegan and Vice Chairman of Regions.  Defendant Morgan signed the pre-effective amendment to the Select Funds' Registration Statement dated January 21, 1999.  Defendant Morgan signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates:  October 28, 1999, June 6, 2000, June 30, 2000, August 17, 2000, August 18,

2000, August 25, 2000, October 30, 2000, November 7, 2000, October 26, 2001, October 28, 2002,

October 29, 2003, September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004,

February 11, 2005, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006 and

October 29, 2007.  Furthermore, Morgan signed the Registration Statement and Prospectus for the

RHY Fund.

29.    Joseph C. Weller ("Weller") co-founded Morgan Keegan.  Weller was, at all relevant

times, Vice Chairman of Morgan Keegan and Treasurer of the Funds until November 2006.  Weller

also served as Chief Financial Officer ("CFO") of Morgan Keegan, Vice President, CFO and

Treasurer of MK Select, and was responsible for the Funds' false statements.  Defendant Weller

signed the pre-effective amendment to the Select Funds' Registration Statement dated January 21,

1999.  Defendant Weller signed the post-effective amendments to the Select Funds' Registration

Statement and Prospectus on the following dates:  October 28, 1999, June 6, 2000, June 30, 2000,

August 17, 2000, August 18, 2000, August 25, 2000, October 30, 2000, November 7, 2000, October

26, 2001, October 28, 2002, October 29, 2003, September 10, 2004, October 28, 2004, November

23, 2004, December 13, 2004, February 11, 2005, September 1, 2005, October 31, 2005, August 31,

2006, October 30, 2006 and October 29, 2007.  Furthermore, Weller signed the Registration

Statement and Prospectus for the RHY Fund.

30.    Defendant James Stillman R. McFadden ("McFadden") was, at all relevant times, a

director of the Company.  Defendant McFadden signed the pre-effective amendment to the Select

Funds' Registration Statement dated January 21, 1999.  Defendant McFadden signed the post-

effective amendments to the Select Funds' Registration Statement on the following dates:  October

28, 1999, June 6, 2000, June 30, 2000, August 17, 2000, August 18, 2000, August 25, 2000, October

30, 2000, November 7, 2000, October 26, 2001, October 28, 2002, October 29, 2003, September 10,

2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005, September 1,

2005, October 31, 2005, August 31, 2006, October 30, 2006 and October 29, 2007.  Furthermore, McFadden signed the Registration Statement and Prospectus for the RHY Fund.

31.     Defendant Archie W. Willis, III ("Willis") is, and at all relevant times was, a director of MK Select.  Defendant Willis signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates:  October 28, 1999, June 6, 2000, June 30, 2000, August 17, 2000, August 18, 2000, August 25, 2000, October 30, 2000, November 7, 2000, October 26, 2001, October 28, 2002, October 29, 2003, September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006 and October 29, 2007.  Furthermore, Willis signed the Registration Statement and Prospectus for the RHY Fund.

32.     Defendant Mary S. Stone ("Stone") is, and at all relevant times was, a director of MK Select.  Defendant Stone signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates:  October 29, 2003, September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006 and October 29, 2007.  Furthermore, Stone signed the Registration Statement and Prospectus for the RHY Fund.

33.     Defendant W. Randall Pittman ("Pittman") is, and at all relevant times was, a director of MK Select.  Defendant Pittman signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates:  October 28, 1999, June 6, 2000, June 30, 2000, August 17, 2000, August 18, 2000, August 25, 2000, October 30, 2000, November 7, 2000, October 26, 2001, October 28, 2002, October 29, 2003, September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006 and October 29, 2007.  Furthermore, Pittman signed the Registration Statement and Prospectus for the RHY Fund.

34.     Defendant J. Kenneth Alderman ("Alderman") is, and at all relevant times was, a director of MK Select.  Additionally, Alderman has served as President of Regions Morgan Keegan Trust and CEO of Morgan Asset since 2002, and Executive Vice President of Regions since 2000. Defendant Alderman signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates:  October 28, 1999, June 6, 2000, June 30, 2000, August 17, 2000, August 18, 2000, August 25, 2000, October 30, 2000, November 7, 2000, October 26, 2001, October 28, 2002, October 29, 2003, September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005, September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006 and October 29, 2007.  Furthermore, Alderman signed the Registration Statement and Prospectus for the RHY Fund.

35.     Defendant Brian B. Sullivan ("Sullivan") has served as President and Chief Investment Officer of Morgan Asset since 2006.  Defendant Sullivan signed the post-effective amendment to the Select Funds' Registration Statement and Prospectus dated October 29, 2007.

36.     Defendant J. Thompson Weller ("JT Weller") is, and at all relevant times was, Managing Director and Controller of Morgan Keegan.  JT Weller has served in this capacity since 2001.  Previously, JT Weller served in various executive positions at Morgan Keegan since joining the company in 1992.  Defendant JT Weller signed the post-effective amendment to the Select Funds' Registration Statement and Prospectus dated October 29, 2007.

37.     Defendant Charles D. Maxwell ("Maxwell") has served as Executive Managing Director, CFO, Treasurer and Secretary of Morgan Keegan since 2006.  Previously, Maxwell served in various executive positions with Morgan Keegan since joining the company in 1995.  Defendant Maxwell signed the pre-effective amendment to the Select Funds' Registration Statement and Prospectus dated October 27, 1998.

38.     Defendant James C. Kelsoe, Jr. ("Kelsoe") is, and at all relevant times was, Senior Portfolio Manager of the Funds and Morgan Asset.

39.     Defendant David H. Tannehill ("Tannehill") is, and at all relevant times was, Portfolio Manager of the Select Funds and Morgan Asset.

40.     Defendant Michele F. Wood ("Wood") is, and at all relevant times was, Chief Compliance Officer of the Funds, Chief Compliance Office of Morgan Asset and Senior Vice President of Morgan Keegan.

41.     Defendant Jack R. Blair ("Blair") is, and at relevant times was, a director/trustee of the Funds since 2006. Defendant Blair signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates: August 31, 2006 and October 29. 2007. Blair signed the Registration Statement and Prospectus for the RHY Fund.

42.     Defendant Albert C. Johnson ("Johnson") is, and at relevant times was, a director of the Funds since 2006. Defendant Johnson signed the post-effective amendments to the Select Funds' Registration Statement and Prospectus on the following dates: August 31, 2006 and October 29. 2007. Johnson signed the Registration Statement and Prospectus for the RHY Fund.

43.     The defendants referenced above in ¶¶27-42 are referred to herein as the "Individual Defendants."

44.     Defendant PricewaterhouseCoopers LLP ("PwC") is a firm of CPAs who provide industry-focused assurance, tax and advisory services for public and private clients primarily in four areas: corporate accountability; risk management; structuring and mergers and acquisitions; and performance and process improvement. PwC was engaged by the Funds to provide independent auditing and accounting services. As a result of the far-reaching scope of services provided by PwC and the close relationship with the Funds' management, PwC personnel were intimately familiar with the Funds' business, including MK Select's accounting for the valuation of the Funds' assets.

## THE FALSE AND DEFECTIVE REGISTRATION
## STATEMENTS AND PROSPECTUSES

45.     MK Select started the High Income Fund and the Intermediate Fund in March 1999.

The Short Term Fund (formerly Regions Morgan Keegan Select LEADER Short Term Bond Fund)

was started in January 2001 and became a part of the MK Select portfolio in February 2005.  MK

Select filed its initial prospectus included as part of an SEC Form N-1A Registration Statement on

October 27, 1998, and on January 31, 1999 filed an amendment to the Registration Statement and

Prospectus.  The initial Registration Statement relating to the funds became effective May 22, 1999.

Thereafter MK Select amended the Registration Statement and Prospectus on the following dates:

October 28, 1999, June 6, 2000, June 30, 2000, August 17, 2000, August 18, 2000, August 25, 2000,

October 30, 2000, November 7, 2000, October 26, 2001, October 28, 2002, October 29, 2003,

September 10, 2004, October 28, 2004, November 23, 2004, December 13, 2004, February 11, 2005,

September 1, 2005, October 31, 2005, August 31, 2006, October 30, 2006 and October 29, 2007.

46.     On January 23, 2006, Morgan Keegan accomplished the offering of the RHY Fund,

which raised $405 million for the closed-end fund managed by the Adviser.  Morgan Keegan served

as lead manager for the offering.  The offering was accomplished pursuant to a Form N-2

Registration Statement and Prospectus.

47.     MK Select's Registration Statement and amendments thereto did not provide detailed

and adequate disclosures concerning the Funds' risks related to their exposure to mortgage-backed

and asset-backed securities and the Funds' liquidity risk.  Further, MK Select's financial results as

contained in the Registration Statement and amendments thereto were materially false and

misleading due to the Select Funds' failure to properly value many of their assets.  Many of the

Select Funds' assets were assets that did not trade on an open market exchange and thus had to be

valued at fair value.  Nonetheless, the Select Funds had difficulty determining the true fair value of

many of their assets.  Indeed, the CDOs and mortgage-backed securities could only be valued by

requesting bids from trading desks and defendants' supposed "good faith" valuations were not reflective of the underlying weakness in those assets.

48.     The RHY Fund Registration Statement had similar omissions in that it did not provide proper disclosures and provided financial statements that were materially false and misleading due to their over-valuation of assets.

49.     On July 13, 2007, Morgan Keegan hosted its "Annual Meeting for Shareholders of RMK Closed-End Funds," at which defendant Kelsoe made the following comments:

> The fiscal year ending March 31, 2007, proved to be a challenging year for the four closed-end funds (RMH, RSF, RMA and RHY). There were three key influences that impacted the overall performance of the funds.
>
> –     Rising short term interest rates
>
> –     Extremely tight spreads in credit markets
>
> –     Volatility in sub-prime mortgage markets
>
> *      *      *
>
> Clearly the most dramatic factor impacting the last quarter was the volatility in the sub-prime mortgage market. As late as calendar year-end 2006, the sub-prime market appeared to be liquid and orderly. By mid-February, the outlook was getting shaky and, by March, the market underwent a tremendous shock as sub-prime, home equity, and all collateralized lending came under stress because of the slowing housing market. Much of what is now occurring in the mortgage-backed securities market is reminiscent of what occurred in the corporate bond market five to six years ago when the corporate implosions of Enron, WorldCom, HealthSouth, Adelphia and the like had a ripple effect throughout the entire corporate bond sector. Part of the sub-prime volatility is to be expected, but I believe the volatility has been exacerbated by the ABX index trading in connection with sub-prime bonds. We have seen dramatically wider spreads in all mortgage-related securities.
>
> *      *      *
>
> Our funds are unique to other closed-end funds as each have, since their inception, traded at substantial premiums over net asset value. A high premium to NAV, i.e. 20-30%, does increase the likelihood of market price volatility
>
> On the bright side, I am happy to tell you that earnings have improved since last year. Late last year our earnings were slightly below our dividend rate, but this year earnings are back up to and in some cases slightly above the dividend rate. We have been able to improve our earnings by redeploying cash in this buyer's market.

- 17 -

We have not experienced an elevated or unusually high level of defaults. With high yielding investing, some defaults are always to be expected. That is the nature of the types of investments we hold. We simply can not get a high dividend yield by buying Treasuries. Defaults have not been a problem thus far, cash flows continue to look promising, and earnings continue to come in at or above our expectations to date.

\*       \*       \*

**Have you experienced a higher than normal default rate on the securities in the funds' portfolios?**

We have somewhere around a 2% default rate now in our portfolio – that is within a normal, expected range for a high yield portfolio. Today, Treasuries are yielding 5% while our funds are yielding 11-12%, so you should understand that we have to take some risks to create those levels of income.

\*       \*       \*

**Do you feel confident that dividends will remain at current levels?**

I see our monthly cash flows, and we are earning the $0.14 dividend. During calendar year 2007, earnings have covered the dividend payouts, and I expect that to continue. The Board will meet next month to declare the dividends for September, October and November. While I can not tell you what will happen next month, I will say our earnings for the year are on track with expectations.

\*       \*       \*

**What opportunities do you see in the coming year?**

Anytime you see an asset class sell off or run way up, it generally creates buying or selling opportunities. That's just the sort of situation we try to capitalize on.

More specifically, one area that has held up well but come under pressure as of late is the corporate sector. I see opportunity in some CDOs (collateralized debt obligations which may include any type of debt instrument). We will be looking at collateral that we are comfortable with, perhaps 2003, 2004, or even 2005 issues, but nothing in 2006 or later. Also, the 2001-2002 vintages are selling at substantial discounts to par. I think that much of the risk has now been priced in, so we are looking for corporate or secured loans in a CDO format that have gotten really beaten up.

50.    Then, on August 10, 2007, Kelsoe wrote a letter to investors, stating in part:

Because the investment environment is changing so rapidly, I felt it appropriate to provide our shareholders with an update on the impact these conditions are having on the four RMK closed end funds, as well as the RMK Select High Income and Intermediate open end funds.

- 18 -

\*       \*       \*

In my opinion, the de-leveraging, or sell-off of securities, by hedge funds and other financial institutions has created an excessive supply of all types of fixed income securities. This oversupply has pressured the balance sheets of all of Wall Street such that bid/offer spreads have widened and liquidity has dramatically declined over the last 30 to 60 days. Not only is supply higher than demand, but it exceeds the capacity to take these fixed income securities. Additionally, the rating agencies' sudden and drastic actions in downgrading securities have exacerbated these problems by triggering covenant violations and margin calls and creating even more supply in a very thin market.

\*       \*       \*

Unlike stocks that trade openly on exchanges and whose value can easily be determined at any point of the day, mortgage-related securities and CDOs trade via individual bids and offers made on trading desks across Wall Street. As I mentioned earlier, the spreads between bid and offer prices continue to widen.

The lower valuations are no longer just showing up in the sub-prime mortgage securities as we have seen the pressure move further up the credit ladder to impact even AAA-rated bonds. Every fixed income security is subject to being devalued in this market, without regard to credit quality. Even bonds which continue to meet their payment schedules are under pricing pressure now. Commercial and corporate credit are feeling the crunch, and it is even beginning to touch stock values.

51.     On August 13, 2007, MK Select filed on behalf of the High Income Fund a supplement to its Prospectus dated November 1, 2006 on a Form 497 with the SEC. The supplement provided updated information concerning the liquidity and valuation of the fund's portfolio securities. The disclosure stated in part:

Recent instability in the markets for fixed income securities, particularly mortgage-backed and asset-backed securities, has affected the liquidity of the Fund's portfolio. In addition, the Fund has experienced significant net redemptions of its shares. It is uncertain how long and to what extent these conditions will continue.

Under current market conditions, many of the Fund's portfolio securities may be difficult to sell at a fair price when necessary to pay for redemptions from the Fund and for other purposes. This illiquidity of portfolio securities may result in the Fund incurring greater losses on the sale of some portfolio securities than under more stable market conditions. Such losses can adversely impact the Fund's net asset value per share. The Adviser and its affiliates may periodically purchase shares of the Fund or take other steps to provide liquidity but are not required to do so. Moreover, there is no assurance that these measures would be sufficient to avoid adverse impact on the Fund.

The current market instability has also made it more difficult to obtain realistic values for the Fund's portfolio securities based on market quotations. In the absence of reliable market quotations, portfolio securities are valued by the Adviser at their "fair value" under procedures established and monitored by the Fund's Board of Directors. Fair valuation procedures are currently being used to value a substantial portion of the assets of the Fund. The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process. In light of the market instability and the complexity of fair value judgments, the Board of Directors has retained an independent valuation consultant to assist in determining the fair value of certain of the Fund's portfolio securities.

52.    A nearly identical Form 497 was also filed on August 13, 2007 on behalf of the Intermediate Fund.

53.    On August 14, 2007, the RHY Fund filed a Form 8-K with the SEC announcing that the fund had retained a valuation consultant to "assist in determining the fair value of certain portfolio securities."  The disclosure stated in part:

Recent instability in the markets for fixed income securities, particularly mortgage-backed and asset-backed securities, has made it more difficult to obtain realistic values for some of the Fund's portfolio securities.  In the absence of reliable market quotations, portfolio securities  are valued by the Fund's investment adviser at their "fair value" under procedures established and monitored by the Fund's Board of Directors. The "fair value" of securities may be difficult to determine and thus judgment plays a greater role in this valuation process.  Fair valuation procedures have been used to value a substantial portion of the assets of the Fund with input from the valuation consultant and these valuations are reflected in the daily net asset value of the Fund's shares.

54.    On August 30, 2007, MK Select filed a Form NT-NCSR, Notice of Late Filing, with the SEC, stating it was unable to file its annual certified shareholders report for the fiscal year ended June 30, 2007, stating in part:

Registrant, with respect to Regions Morgan Keegan Select High Income Fund, Regions Morgan Keegan Select Intermediate Bond Fund and Regions Morgan Keegan Select Short Term Bond Fund (the "Funds"), is unable to complete its Form N-CSR and to transmit its annual report to shareholders for the fiscal year ended June 30, 2007 within the prescribed time periods without unreasonable effort or expense. Recent instability in the markets for fixed income securities has necessitated a more extensive process for verification of the values of certain of the portfolio securities held by the Funds at the June 30 fiscal year-end in order to assure that this information will be accurately reflected in the Funds' audited financial statements.

55.     A nearly identical Form NT-NSAR was also filed on August 30, 2007, announcing that MK Select would be unable to timely file its annual report for management companies for the fiscal year ending June 30, 2007.

56.     On October 4, 2007, MK Select filed its annual report on behalf of the Short Term Fund, the Intermediate Fund and the High Income Fund, providing detailed financial and operating results for the Select Funds.

57.     The following day, on October 5, 2007, in an article entitled "Mutual Fund Opens a Subprime Window – Regions Morgan Keegan Says One Is Down 35%; Pinch of Net Redemptions," *The Wall Street Journal* reported as follows:

> The annual report filed yesterday for the Regions Morgan Keegan Select High Income Fund offers a rare window into how mutual-fund firms are reporting and valuing their holdings in the wake of this summer's subprime-mortgage crisis.

> Few funds have been hit harder than the High Income Fund since troubles surfaced with subprime mortgages a few months ago. The fund focuses on junk-rated issues and makes investments in areas like corporate bonds, mortgage-backed securities and other structured finance vehicles. Its big stake in lower-rated home-equity and mortgage-related asset-backed securities came under particular stress this summer as bond markets were roiled with concerns over such investments.

> Yesterday's filing provides details on how fair values were determined on certain assets, which became necessary as trading for them dried up over the summer. Factors like types of securities, cost at the date of purchase, interest-rate changes, and collateral quality were considered.

> The filing was delayed and an independent valuation consultant was retained to help with the determinations. Estimates for securities making up about 60% of the High Income Fund's net assets and 50% of the Regions Morgan Keegan Select Intermediate Bond Fund's net assets had to be based on fair value, since market values weren't readily available.

> The annual report that covers these funds also outlines some important steps taken by the funds' adviser and affiliates to help cope with recent losses. These include stepping in to buy about $55.2 million in shares of the High Income Fund and $30 million in the Intermediate Bond Fund from the beginning of July to the end of August to help provide liquidity.

> The High Income Fund is down about 35% this year, and is at the bottom of the junk-bond fund category for the one-, three- and five-year annual performance

periods, illustrating how recent events are starting to tarnish even manager Jim Kelsoe's impressive long-term record.

"What was an ocean of liquidity has quickly become a desert," Mr. Kelsoe writes in a discussion of fund performance.

He says that while the fund's use of mortgage-backed and other structured finance instruments has generally served it well since its 1999 inception, now "basic credit measures have eroded to varying degrees" and prices for the securities have declined sharply. The report includes financial results for the year through June for three funds and updates on certain events since then.

Net redemptions have been a main challenge for the fund and could hurt the "possibility of a meaningful recovery" if it has to sell troubled positions at lowered prices, according to a recent Morningstar analysis. The High Income Fund has about $420 million in assets, from over $1 billion earlier this year, according to Morningstar.

"These conditions have presented the best opportunities to buy assets" since the fund's inception, Mr. Kelsoe writes. But he notes that the fund's first goals include reducing volatility and redeploying cash into investments that can help it regain some net asset value.

58.    Finally, on November 7, 2007, defendant Kelsoe wrote a letter to investors, stating in part:

Since my last communication on August 10, 2007 the credit markets have remained under pressure as spreads continue to widen, and economic uncertainty, driven by the deteriorating housing market and high energy prices, weighs on investors minds. Over recent weeks the major rating agencies have cut ratings on various investments backed by mortgages as the housing picture becomes more and more uncertain. Also, during the last few weeks many investment banks and commercial banks have taken large write downs of their real estate related holdings to reflect these deteriorating conditions.

Certainly some sectors have been more affected than others; one example in the headlines are CDO's. A key component that drives CDO pricing is the likelihood that future cash flows will continue to be received by various credit layers of the CDO in a timely manner. Certain events, such as downgrades, can cause a CDO manager or trustee to view the likelihood of cash flows to be lower than previously expected. This potential loss of cash flow to the lower-rated tranches will obviously be a catalyst for weaker prices of the bonds from these tranches. And when these events take place in an already illiquid market, such as the current one, the downward pressure on market pricing is considerably magnified.

With all this as a backdrop, our portfolios have been pressured across the board. Many of our holdings are in the form of structured finance created with real-estate related securities as collateral; other areas of structured finance categories

include corporate bonds and loans, equipment leases and commercial real estate. Even the asset classes that are performing well have been severely devalued due to the CDO packaging. We have no crystal ball of what the future holds but continue to diligently manage the portfolios in the difficult environment.

In an effort to publish information beneficial to our shareholders in this uncertain time below we have provided information to general questions related to the funds:

**What exactly do you invest in?**

Our investment objectives are clearly stated in the prospectus of each fund, but in general, we have always invested a large portion of our portfolios in "structured finance" fixed income securities. Without going into great detail explaining structured finance, it is a fair assumption to say the weakness in the portfolios relates to this area of investment. A large portion of structured finance securities are created with mortgage related securities as the underlying collateral. In the current market, uncertainty regarding real estate has caused these securities to decline in value. To compound the problem the secondary market in which these securities trade has become very illiquid.  The primary market makers in this space had been the large "wire house" broker/dealers. In the current environment the dealers are long (own) enormous amounts of these deals that they are still trying to sell. Suffice it to say, the main participants in the secondary market are all sellers at this point.

**The net asset values of the funds appear to decline everyday. Can you explain?**

Part of the explanation is in our answer above. The worries regarding the real estate market are weighing on the perceived value of the securities we hold. The illiquidity of the secondary market for many of the securities we hold also is a contributing factor to the declining net asset value. Like all financial markets there must be a buyer for every seller. In the current market, many of the normal dealers (many have been in the news taking write-downs on their balance sheets) that typically provide the trading liquidity of these securities are no longer providing such liquidity. In many cases where there is no trading activity, bonds fall into a vacuum and are valued based on models projecting future cash flows. There are no optimistic projections at this time!

\*          \*          \*

**How much of the portfolio's are related to subprime?**

Below is the actual exposure to subprime mortgage related investments for each portfolio as of September 30, 2007:

| MKHIX | MKIBX | MSTBX | RMH | RSF | RMA | RHY |
|-------|-------|-------|-----|-----|-----|-----|
| 14.1% | 16.9% | 5.1% | 8.4% | 10.4% | 10.5% | 11.4% |

59.     As a result of these disclosures, the price of the Select Funds shares collapsed.  The High Income Fund Class A shares closed at $4.53 per share on November 8, 2007, a decline of 51% from early July 2007.  Likewise, the Intermediate Fund Class A shares closed at $5.88 per share on November 8, 2007, a decline of 38% from early July 2007.  Additionally, the Short Term Fund Class A shares closed at $8.84 per share on November 8, 2007, a decline of 12% from early August 2007.

60.     Prior to any negative disclosures, each of these funds traded within a narrow band. From December 2004 through early March 2007, the High Income Fund traded between $10.10 per share and $10.83 per share with an average trading price of $10.35 per share.  In contrast, by the end of November 2007, the fund closed at $3.91 per share.  Likewise, the Intermediate Fund traded between $9.81 per share and $10.11 per share with an average trading price of $9.93 per share during this same period, while in contrast, by the end of November 2007, the fund closed at $5.06 per share.  Additionally, from December 2004 through early March 2007, the Short Term Fund traded between $9.96 per share and $10.17 per share with an average trading price of $10.04 per share.  In contrast, by the end of November 2007, the fund closed at $8.54 per share.







61.     As a result of the November 7, 2007 disclosures, the price of the RHY Fund shares also collapsed.  The RHY Fund shares closed at $5.41 per share on November 8, 2007, a decline of 63% from early July 2007.

62.     Similar to the Select Funds, prior to any negative disclosures, the RHY Fund traded within a narrow band.  From January 2006 through early March 2007, the RHY Fund traded between $15.45 per share and $17.75 per share with an average trading price of $16.37 per share.  In contrast, by the end of November 2007, the fund closed at $5.93 per share.



63.     The true facts which were omitted from the Registration Statements/Prospectuses were as follows:

(a)     The Funds lacked adequate controls and hedges to minimize the risk of loss from mortgage delinquencies which affected a large part of their portfolios;

(b)     The Funds' portfolios were materially misstated due to their failure to properly value CDOs;

(c)     The Funds' valuation of underlying assets was misstated;

(d)     The extent of the Funds' liquidity risk due to the illiquid nature of a large portion of the Funds' portfolios was omitted;

(e)     The extent of the Funds' risk exposure to mortgage-backed assets was misstated; and

(f)     The extent to which the Funds' portfolios were subject to fair value procedures was misstated.

## THE FUNDS' GAAP VIOLATIONS

64.     The Funds' annual reports contained false financial reports through improper accounting entries, which inflated the Funds' reported asset valuations.  The financial statements, including the footnote disclosures, contained in the Select Funds' annual reports were incorporated by reference into the post-effective amendments to the Registration Statement and Prospectus.  The financial statements, including the footnote disclosures, contained in the RHY Fund's annual reports were incorporated by reference into its Registration Statement and Prospectus.

65.     The Funds' financial statements were not a fair presentation of their results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

66.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

67.     Under GAAP, mutual funds are required to value their portfolios at fair value.  For securities that trade on an open market exchange, the fair value of the securities would simply involve the fair market value of the securities based upon the closing price of a security on a given day.  Nonetheless, when more exotic securities like CDOs are involved, it is a much more complex process in determining fair value of the assets given the assets do not trade on an open-market

exchange and thus fair market value is not as readily available or apparent.  Accordingly, one of MK

Select's most significant accounting policies is its investment valuations.  In MK Select's 2006

N-CSR[1], it described its valuation policy as follows:

> Investments in securities listed or traded on a securities exchange are valued at the last quoted sales price on the exchange where the security is primarily traded as of close of business on the New York Stock Exchange, usually 4:00 p.m. Eastern Time, on the valuation date. Equity securities traded on the NASDAQ National Market System are valued at the NASDAQ Official Closing Price, usually 4:00 p.m., Eastern Time, on the valuation date. Securities traded in the over-the-counter market and listed securities for which no sales were reported for that date are valued at the last-quoted bid price. Equity and debt securities issued in private placements shall be valued on the bid side by a primary market dealer. Long-term debt securities, including U. S. government securities, listed corporate bonds, other fixed income and asset-backed securities, and unlisted securities and private placement securities, are generally valued at the latest price furnished by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of more than sixty days for which market quotations are readily available shall be valued by an independent pricing service or primary market dealer. Short-term debt securities with remaining maturities of sixty days or less shall be valued at cost with interest accrued or discount accreted to the date of maturity unless such valuation, in the judgment of Morgan Asset Management, Inc., the Adviser, does not represent market value. Investments in open-end registered investment companies are valued at net asset value as reported by those investment companies. Investments for which market quotations are not readily available, or available quotations which appear to not accurately reflect the current value of an investment, are valued at fair value as determined in good faith by the Adviser's Valuation Committee using procedures established by and under the direction of the Company's Board of Directors. The values assigned to fair valued investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, those estimated values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

68.    Nonetheless, in violation of GAAP and its own stated policy, MK Select failed to

properly value CDOs, thus overstating the Select Funds' assets.  In fact, the CDOs and mortgage-

---

[1]    SEC Form N-CSR is a Certified Shareholder Report for registered management investment companies.  It is filed on a semiannual basis.

backed securities could only be valued by requesting bids from trading desks and defendants' supposed "good faith" valuations were not reflective of the underlying weakness in those assets.

69.     In its annual report for the year ending June 30, 2007, filed on October 4, 2007, MK Select admitted that large portions of the Select Funds' portfolios were comprised of illiquid assets, including: $624.9 million or 59% of the High Income Fund's portfolio, $514.9 million or 51% of the Intermediate Fund's portfolio, and $26.1 million or 29% of the Short Term Fund's portfolio.  As there was no readily available market for these assets or the available quotations did not reflect the true market value, these securities had to be valued at fair value using special procedures.

70.     Similarly, the RHY Fund failed to properly value CDOs thus overstating its net asset value in violation of GAAP and its own stated policy.

71.     Furthermore, the Select Funds' Registration Statement and Prospectus failed to provide adequate disclosures concerning the Select Funds' exposure to the subprime market and the risks associated with owning shares of the funds.  The Registration Statement failed to disclose the full extent of the Select Funds' risk to mortgage-backed assets and further omitted to disclose liquidity risk as a principal risk.  In MK Select's Prospectus filed November 6, 2006, it described its Principal Risks as follows:

> The fund's investment performance is subject to a variety of risks, including the following principal risks:
>
> *       *       *
>
> MORTGAGE-BACKED AND ASSET-BACKED SECURITIES RISK. Mortgage-backed and asset-backed securities are subject to prepayment risk. When interest rates decline, unscheduled prepayments can be expected to accelerate, and the fund would be required to reinvest the proceeds of the prepayments at the lower interest rates then available.  Unscheduled prepayments would also limit the potential for capital appreciation on mortgage-backed and asset-backed securities. Conversely, when interest rates rise, the values of mortgage-backed and asset-backed securities generally fall.  Since rising interest rates typically result in decreased prepayments, this could lengthen the average lives of such securities, and cause their value to decline more than traditional fixed-income securities.

72.     The Prospectus failed to identify liquidity risk as a principal risk.

73.     In its Prospectus filed on November 5, 2007, the following were listed as principal

risks:

> MORTGAGE-BACKED  AND ASSET-BACKED  SECURITIES RISK.
> Mortgage-backed and asset-backed securities are subject to prepayment risk. When
> interest rates decline, unscheduled prepayments can be expected to accelerate, and
> the fund would be required to reinvest the proceeds of the prepayments at the lower
> interest rates then available. Unscheduled prepayments would also limit the potential
> for capital appreciation on mortgage-backed and asset-backed securities.
> Conversely, when interest rates rise, the values of mortgage-backed and asset-backed
> securities generally fall. Since rising interest rates typically result in decreased
> prepayments, this could lengthen the average lives of such securities, and cause their
> value to decline more than traditional fixed-income securities. If the fund purchases
> mortgage-backed or asset-backed securities that are "subordinated" to other interests
> in the same pool, the fund as a holder of those securities may only receive payments
> after the pool's obligations to other investors have been satisfied. For example, an
> unexpectedly high rate of defaults on the mortgages held by a mortgage pool may
> limit substantially the pool's ability to make payments of principal or interest to the
> fund as a holder of such subordinated securities, reducing the values of those
> securities or in some cases rendering them worthless; the risk of such defaults is
> generally higher in the case of mortgage pools that include so-called "subprime"
> mortgages.

> LIQUIDITY RISK. The liquidity of individual bonds may vary considerably.
> Below investment grade bonds generally are less liquid than investment grade bonds.
> Instability in the markets for fixed income securities, particularly mortgage-backed
> and asset-backed securities, may affect the liquidity of the fund's portfolio, which
> means that some of the fund's portfolio securities may be difficult to sell at a fair
> price when necessary to pay for redemptions from the fund and for other purposes.
> This illiquidity of portfolio securities may result in the fund incurring greater losses
> on the sale of some portfolio securities than under more stable market conditions.
> Such losses can adversely impact the fund's net asset value per share.

74.     Similarly, the RHY Fund's financial reports, including its Registration Statement and

Prospectus, failed to provide adequate disclosures concerning the RHY Fund's exposure to the

subprime market and the risk associated with owning shares of the fund.

75.     Due to these accounting improprieties, the Funds presented their financial results and

statements in a manner which violated GAAP, including the following fundamental accounting

principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

76.    Further, the undisclosed adverse information is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## PRICEWATERHOUSECOOPERS' PARTICIPATION IN THE FALSE E AND DEFECTIVE REGISTRATION STATEMENTS AND PROSPECTUSES

77.    PwC, a firm of certified public accountants, was engaged by MK Select to provide independent auditing and accounting services for the Select Funds.  PwC provided auditing services to MK Select regarding MK Select's annual and semi-annual reports for the Select Funds filed with the SEC, which falsely overstated the Select Funds' valuation of their assets.  PwC examined and opined on the financial statements of the High Income Fund, the Intermediate Fund and the Short Term Fund.  PwC further provided auditing services to the RHY Fund regarding the RHY Fund's annual and quarterly reports filed with the SEC, which falsely overstated the fund's valuation of its assets.  PwC examined and opined on the financial statements of the RHY Fund.

78.     In connection with its audit and review of the Funds' finances and operations, PwC had virtually unlimited access to information in the companies' books and records:

- PwC was present at Morgan Keegan's headquarters and key operating divisions frequently between 2001 and 2007.

- PwC regularly communicated with top management of Morgan Keegan and Morgan Asset, including the Individual Defendants, via face-to-face meetings and telephone calls.

- PwC had frequent conversations with management and employees about the Funds' operations and financial statements.

79.     PwC reviewed the quarterly and year-end results of the Funds, advised and/or opined upon the accuracy and bona fides of the Funds' financial filings and had intimate knowledge of the nature of the Funds' business and operations.  PwC also attended the meetings and advised MK Select and the RHY Fund in connection with the existing internal financial and accounting controls. As a result of its intimate knowledge of the Funds' business and operations, PwC knew or should have known about the misstatement of the Funds' investment valuations.

80.     PwC consented to the inclusion of its unqualified opinions on the Funds' financial statements, including their annual reports filed with the SEC, which reports PwC knew, or should have known, were materially false.  Despite PwC's duty to exercise reasonable care and competence in performing its services to the Funds by allowing the overstatement in asset valuation, the Boards of Directors refused to terminate PwC as the "independent" auditor.

81.     With respect to the Select Funds' financial statements for the fiscal year ending June 30, 2004, PwC represented, in a report dated August 16, 2004, included in MK Select's N-CSR filing on September 3, 2004, the following:

In our opinion, the accompanying statements of assets and liabilities, including the schedules of investments, and the related statements of operations and of changes in net assets and the financial highlights present fairly, in all material respects, the financial position of Regions Morgan Keegan Select Intermediate Bond Fund and Regions Morgan Keegan Select High Income Fund (funds within Morgan Keegan Select Fund, Inc., hereafter referred to as the "Funds") at June 30, 2004, the results of each of their operations for the year then ended, the changes in each of

- 34 -

their net assets for each of the two years in the period then ended and the financial
highlights for each of the three years in the period then ended, in conformity with
accounting principles generally accepted in the United States of America. These
financial statements and financial highlights (hereafter referred to as "financial
statements") are the responsibility of the Funds' management; our responsibility is to
express an opinion on these financial statements based on our audits. We conducted
our audits of these financial statements in accordance with the standards of the Public
Company Accounting Oversight Board (United States), which require that we plan
and perform the audit to obtain reasonable assurance about whether the financial
statements are free of material misstatement. An audit includes examining, on a test
basis, evidence supporting the amounts and disclosures in the financial statements,
assessing the accounting principles used and significant estimates made by
management, and evaluating the overall financial statement presentation. We believe
that our audits, which included confirmation of securities at June 30, 2004 by
correspondence with the custodian and brokers, provide a reasonable basis for our
opinion. The financial highlights for each of the fiscal periods presented on and prior
to June 30, 2001 were audited by other auditors whose report, dated July 27, 2001,
expressed an unqualified opinion on those statements.

82.    PwC further issued an unqualified opinion for the fiscal year ending June 30, 2005, in

an opinion dated August 19, 2005, included in MK Select's N-CSR filing on September 8, 2005.

PwC's opinion related to the financial statements for the High Income Fund, the Intermediate Fund

and the Short Term Fund.

83.    PwC further issued an unqualified opinion for the Select Funds for the fiscal year

ending June 30, 2006, in an opinion dated August 21, 2006, included in MK Select's N-CSR filing

on September 6, 2006.

84.    Additionally with respect to the Select Funds' financial statements for the fiscal year

ending June 30, 2004, PwC represented, in a report dated August 16, 2004, included in MK Select's

NSAR[2] filing on August 30, 2004, the following:

> In planning and performing our audit of the financial statements of Morgan
> Keegan Select Funds, Inc. (hereafter referred to as the "Company") for the period
> ended June 30, 2004, we considered its internal control, including control activities
> for safeguarding securities, in order to determine our auditing procedures for the

---

[2]    SEC Form NSAR is an Annual Report for registered management investment companies. It
is filed on a semiannual basis.

purpose of expressing our opinion on the financial statements and to comply with the requirements of Form N-SAR, not to provide assurance on internal control.

The management of the Company is responsible for establishing and maintaining internal control. In fulfilling this responsibility, estimates and judgments by management are required to assess the expected benefits and related costs of controls. Generally, controls that are relevant to an audit pertain to the entity's objective of preparing financial statements for external purposes that are fairly presented in conformity with generally accepted accounting principles. Those controls include the safeguarding of assets against unauthorized acquisition, use or disposition.

Because of inherent limitations in internal control, errors or fraud may occur and not be detected. Also, projection of any evaluation of internal control to future periods is subject to the risk that controls may become inadequate because of changes in conditions or that the effectiveness of their design and operation may deteriorate.

Our consideration of internal control would not necessarily disclose all matters in internal control that might be material weaknesses under standards established by the Public Company Accounting Oversight Board (United States). A material weakness, for purposes of this report, is a condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that misstatements caused by error or fraud in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions. However, we noted no matters involving internal control and its operation, including controls for safeguarding securities, that we consider to be material weaknesses as defined above as of June 30, 2004.

85.    PwC further issued a similar opinion concerning MK Select's internal controls for the fiscal year ending June 30, 2005, in an opinion dated August 19, 2005, included in MK Select's NSAR filing on August 30, 2005.

86.    PwC further issued a similar opinion concerning MK Select's internal controls for the fiscal year ending June 30, 2006, in an opinion dated August 21, 2006, included in MK Select's NSAR filing on August 30, 2006.

87.    The financial statements including the footnote disclosures contained in the Select Funds' annual reports were incorporated by reference into the post-effective amendments to the Registration Statement and Prospectus. PwC consented to the incorporation of its reports into the amendments to the Registration Statement.

88.     With respect to the RHY Fund's financial statements, PwC made similar representations concerning the RHY Fund's financial statements, issuing unqualified opinions as to the fund's financial statements and attesting to the fund's internal controls.  PwC further consented to its opinions being incorporated by reference into the RHY Fund Registration Statement and Prospectus.

89.     PwC's report represented its audit was in conformity with the PCAOB.  Had PwC actually performed the audit according to PCAOB standards, the deterioration in the value of the investments would have been evident such that an unqualified report could not have been issued.  It would have been evident that the Funds' financial statements and associated information were materially false and misleading because, among other things, they were not prepared in accordance with GAAP.  Nevertheless, PwC provided unqualified opinions that the Funds' financial statements were valid and accurate.

90.     PwC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue, leading to false and misstated financial statements.  Due to PwC's false statements and failure to identify and modify its reports to identify the Funds' false financial reporting, PwC violated the following GAAS standards:

(a)     The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors.

(b)     The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement.

(c)     The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report.

(d)     The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised.

(e)     The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed.

(f)     The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit.

(g)     The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP.

(h)     The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed.

(i)     The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report.

(j)     The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

## COUNT I

### Violations of Section 11 of the 1933 Act
### Against All Defendants

91.     Plaintiffs incorporate ¶¶1-90 by reference.

92.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

93.     The Registration Statements for the offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

94.     MK Select is the registrant for the High Income Fund, the Intermediate Fund and the Short Term Fund.  The RHY Fund is the registrant for itself.  The defendants named herein were responsible for the contents and dissemination of the Registration Statements.

95.     As issuer of the shares, MK Select and the RHY Fund are strictly liable to plaintiffs and the Class for the misstatements and omissions.

96.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

97.     By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

98.     Plaintiffs acquired the Funds' shares pursuant to the Registration Statements.

99.     Plaintiffs and the Class have sustained damages.  The value of the Funds' shares has declined substantially subsequent to and due to defendants' violations.

100.     At the times plaintiffs purchased the Funds' shares, plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to July 13, 2007.  Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiffs filed this Complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time a complaint was filed alleging the violations.

## COUNT II

### Violations of Section 12(a)(2) of the 1933 Act
### Against All Defendants

101.     Plaintiffs incorporate ¶¶1-100 by reference.

102.    This Count is brought pursuant to §12(a)(2) of the 1933 Act on behalf of the Class, against all defendants.

103.    Defendants were sellers and offerors and/or solicitors of purchasers of the shares offered pursuant to the Select Funds and RHY Fund Prospectuses.

104.    The High Income Fund, the Intermediate Fund and the Short Term Fund Prospectuses and the RHY Fund Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.   The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectuses and participating in road shows to market the Funds to investors.

105.    Defendants owed to the purchasers of the Funds' shares, including plaintiffs and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the offering materials, including the Select Funds Prospectuses and the RHY Fund Prospectus, contained therein, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the offering materials as set forth above.

106.    Plaintiffs and other members of the Class purchased or otherwise acquired the Funds' shares pursuant and/or traceable to the defective Select Funds Prospectuses and RHY Fund Prospectus.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectuses.

107.    Plaintiffs, individually and representatively, hereby offer to tender to defendants those securities which plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities

together with interest thereon.  Class members who have sold their Funds shares are entitled to rescissory damages.

108.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, §12(a)(2) of the 1933 Act.  Accordingly, plaintiffs and members of the Class who hold the Funds' shares purchased in the offerings have the right to rescind and recover the consideration paid for their shares and hereby elect to rescind and tender their shares to the defendants sued herein.  Plaintiffs and Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### Violations of Section 15 of the 1933 Act
### Against the Individual Defendants

109.     Plaintiffs incorporate ¶¶1-108 by reference.

110.     This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants.

111.     Each of the Individual Defendants was a control person of the Funds by virtue of their positions as a director and/or senior officer of the Funds.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of the Funds.

112.     Each of the Individual Defendants was a culpable participant in the violations of §§11 and 12(a)(2) of the 1933 Act as alleged in Counts I and II above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the Funds' offerings to be successfully completed.

## CLASS ACTION ALLEGATIONS

113.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares of the Select

Funds and the RHY Fund pursuant and/or traceable to the false and misleading Registration Statements and Prospectuses and who were damaged thereby (the "Class"). Excluded from the Class are defendants.

114.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  The Funds have tens of millions of shares outstanding, owned by hundreds if not thousands of persons.

115.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)    whether the 1933 Act was violated by defendants;

    (b)    whether statements made by defendants to the investing public in the Registration Statements misrepresented material facts about the  Funds;

    (c)    whether defendants concealed the Funds' exposure to mortgage related investments made by defendant Kelsoe; and

    (d)    the extent of damage sustained by Class members and the appropriate measure of damages.

116.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

117.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

118.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiffs and the members of the Class damages, including interest;

C.      Awarding rescission or a rescissory measure of damages;

D.      Awarding plaintiffs' reasonable costs and attorneys' fees; and

E.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


DATED:  December 21, 2007            **GLASSMAN, EDWARDS, WADE**
                                       **& WYATT, P.C.**
                                     B.J. WADE, #5182
                                     DALE TUTTLE #2159


                                     _____
                                             B.J. WADE

                                     26 N. Second Street Building
                                     Memphis, TN  38103
                                     Telephone:  901/527-4673
                                     901/521-0940 (fax)
                                     bwade@gewwlaw.com
                                     dtuttle@gewwlaw.com

**OF COUNSEL:**

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@csgrr.com
davew@csgrr.com
katek@csgrr.com

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@csgrr.com
drosenfeld@csgrr.com

Attorneys for Plaintiffs

S:\CptDraft\Securities\Cpt Morgan Keegan3_Sec 11.doc