IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| IN RE REGIONS MORGAN KEEGAN | ) | No. 2:09-md-02009-SHM |
| SECURITIES, DERIVATIVE and ERISA | ) | |
| LITIGATION | ) | |
| | ) | |
| This Document Relates to: | ) | |
| | ) | |
| *In re Regions Morgan Keegan Closed-End* | ) | |
| *Fund Litigation*, | ) | |
| | ) | |
| No. 2:07-cv-02830-SHM-dkv | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
FILED BY MORGAN ASSET MANAGEMENT, INC.,
MORGAN KEEGAN & COMPANY, INC., AND MK HOLDING, INC.**

Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
BASS BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-6200


Shepherd D. Tate
Michael A. Brady
BASS BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, Tennessee 38103-3672
(901) 543-5900


*Attorneys for Morgan Asset Management,
Inc., Morgan Keegan & Company, Inc., and
MK Holding, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iv

INDEX OF EXHIBITS AND ABBREVIATIONS .................................. xi

PRELIMINARY STATEMENT ..................................................... 1

STATEMENT OF FACTS ......................................................... 4

I.      The Funds and Plaintiffs' Allegations ............................................ 4

II.     The Parties ................................................................... 7

PROCEDURAL HISTORY .......................................................... 7

STANDARD OF REVIEW .......................................................... 8

ARGUMENT ..................................................................... 11

I.      The 1934 Act's Statute of Limitations Bars Plaintiffs' §§ 10(b) and 20(a) Claims. ........ 11

        A.      Plaintiffs' 1934 Act Claims Are Untimely on Their Face and the Limitations
                Period Has Not Been Tolled. .......................................... 11

                1.      American Pipe Does Not Apply to Subsequently-Filed Class Actions. ... 12

                2.      American Pipe Does Not Apply Absent Identity of Claims. .................. 13

                3.      Voluntarily Dismissed Actions Do Not Toll the Statute of Limitations
                        Under American Pipe. ........................................... 14

        B.      American Pipe Does Not Apply Absent Identity of Parties. ............................... 14

        C.      Plaintiffs' Allegations Establish that the TAL Subclass Discovered or Should
                Have Discovered their Allegations More Than Two Years Prior to Filing of the
                Daniels Actions. ................................................... 15

II.     Plaintiffs' 1933 Act Claims Are Barred by the Applicable Statutes of Limitations and
        Repose. ..................................................................... 17

        A.      Plaintiffs' 1933 Act Claims Are Time-Barred and Not Subject to American Pipe
                Tolling. ....................................................... 18

        B.      The Only Prior Putative Class Action to Assert Similar 1933 Act Claims Was
                Likewise Untimely. .............................................. 19

III.   Plaintiffs' 1934 Act Claims Fail to Plead Facts Showing a Strong Inference of Scienter
       and Fail as a Matter of Law. ....................................................................................... 21

       A.   The Most Plausible Inference Is that Defendants Failed to Anticipate the Global
            Credit Crisis. ..................................................................................................... 23

       B.   Plaintiffs Have Failed to Plead Specific Allegations of Scienter With Respect to
            the Funds and the Officer Defendants and Rely on Insufficient Allegations of
            Group Pleading. ................................................................................................. 24

       C.   Plaintiffs Fail to Allege Motive and Opportunity to Commit Securities Fraud. .... 26

       D.   Plaintiffs Otherwise Fail to Plead Particularized Facts Demonstrating Conscious
            Misbehavior or Reckless Conduct on the Part of the Funds or the Officer
            Defendants Relating to any of the Alleged Misrepresentations or Omissions. .... 28

            1.   Plaintiffs' Allegations Regarding Valuation Fail to Show a Strong
                 Inference of Scienter. .............................................................................. 28

            2.   Plaintiffs' Allegations Regarding Concentration Fail to Show a Strong
                 Inference of Scienter. .............................................................................. 30

            3.   The Funds' Choice of a Benchmark Index Fails to Show a Strong
                 Inference of Scienter. .............................................................................. 32

            4.   Allegedly Inadequate Due Diligence Fails to Show a Strong Inference of
                 Scienter. ................................................................................................. 33

       E.   Plaintiffs' "Confidential Witness" Allegations Must Be Rejected. ..................... 33

IV.    Plaintiffs Fail to Establish that Any of the Funds' Public Filings Contained Actionable
       Misrepresentations or Omissions. ................................................................................. 34

       A.   Plaintiffs' Claims Fail to Satisfy the Pleading Requirements of Rule 9(b) and the
            PSLRA. ............................................................................................................. 35

       B.   The Funds' Offering Documents Disclosed that the Funds Were High Risk
            Investments. ...................................................................................................... 37

       C.   The Funds Disclosed Their Respective Investments in ABSs and MBSs. ........... 40

            1.   Plaintiffs Misconstrue the Funds' Investment Restrictions. .................... 42

            2.   The Funds Disclosed Their Asset Concentration Quarterly Throughout the
                 Class Period. ........................................................................................... 43

       D.   The Funds Disclosed the Uncertainty Inherent in the Valuation of Certain
            Portfolio Securities. ........................................................................................... 44

1.      The Valuations at Issue Are Subjective and Amount to Expressions of Judgment. ................................................................................................ 44

2.      Plaintiffs Fail to Demonstrate that the Funds' Issued Materially Incorrect Valuations.................................................................................................... 46

E.      Plaintiffs Fail to Allege Facts that Would Establish that the Funds' Choice of a Benchmark Index Supported a Claim under the Federal Securities Laws. .......... 47

V.      Plaintiffs Allege Non-Actionable Corporate Mismanagement. ..................................... 48

A.      Failure to Disclose Corporate Mismanagement is Not Actionable Under the Federal Securities Laws. ....................................................................................... 48

B.      The Court Should Follow the Decision of the Alabama Supreme Court in Rice v. Regions Fin. Corp. .............................................................................................. 49

VI.     Plaintiffs' Allegations Fail to Show Loss Causation. ..................................................... 51

A.      Plaintiffs' 1934 Act Claims Fail Because Plaintiffs Do Not Establish that Defendants' Alleged Fraud Caused Their Losses. .............................................. 51

B.      Plaintiffs' 1933 Act Claims Fail to Plead Loss Causation and Must Be Dismissed. ............................................................................................................... 55

VII.    Plaintiffs Have Failed to Plead Facts Demonstrating that Either Morgan Keegan, MAM or MK Holding Was a Control Person. .......................................................................... 56

VIII.   Plaintiffs Fail to Adequately Plead that Morgan Keegan Is a "Statutory Seller" under Section 12(a)(2) of the 1933 Act. .................................................................................... 58

IX.     The Trustee ad Litem Lacks Standing to Assert Claims on behalf of Anyone Other than Trusts and Custodial Accounts. ..................................................................................... 59

CONCLUSION ........................................................................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Pipe & Const. Co. v. Utah*,
    414 U.S. 538 (1974)................................................................................passim

*Anderson v. Aon Corp.*,
    614 F.3d 361 (7th Cir. 2010)........................................................... 50

*Anderson v. Unisys Corp.*,
    47 F.3d 302 (8th Cir. 1995).............................................................. 19

*Andrews v. Orr*,
    851 F.2d 146 (6th Cir. 1988)........................................................13, 18

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
    505 F. Supp. 2d 662 (D. Colo. 2007)................................................ 48

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton*,
    597 F.3d 330 (5th Cir. 2010)........................................................52, 53, 55

*Argiropoulos v. Kopp*,
    2007 U.S. Dist. LEXIS 22351 (D. Md. March 26, 2007).................48, 49

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009)................................................................. 8, 9

*Asher v. Unarco Material Handling, Inc.*,
    596 F.3d 313 (6th Cir. 2010)........................................................... 15

*Azzolini v. CorTS Trust II*,
    2005 U.S. Dist. LEXIS 31853 (E.D. Tenn. Sept. 16, 2005) ................. 57

*Azzolini* v. *CorTS Trust II*,
    2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) ................................ 51

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................... 9

*Brumbaugh v. Princeton Partners*,
    985 F.2d 157 (4th Cir. 1993)........................................................... 16

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)...................................................................... 58

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983)................................................................................................12, 15

*D.E. & J Ltd. P'ship v. Conaway*,
    284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd* 133 Fed. Appx. 994 (6th Cir. 2005).....4, 52, 57

*Daniels v. Morgan Keegan & Co., Inc.*,
    2009 U.S. Dist. LEXIS 76152 (W.D. Tenn. Aug. 26, 2009) ................................................. 8

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...........................................................................................51, 52, 53

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)..................................................................................................... 17

*Ex parte Regions Fin. Corp.*,
    2010 Ala. LEXIS 183 (Ala. Sept. 30, 2010) .................................................................49, 50

*Fait v. Regions Fin. Corp.*,
    712 F. Supp. 2d 117 (S.D.N.Y. 2010) .........................................................................44, 45

*Footbridge Ltd. Trust v. Countrywide Financial Corp.*,
    2011 WL 907121 (S.D.N.Y. March 16, 2011)................................................................. 18

*Fraternity Fund, Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007) ........................................................................... 44

*Freidus v. ING Groep N.V.*,
    736 F. Supp. 2d 816 (S.D.N.Y. 2010) .........................................................................18, 19

*Great Plains Trust Co. v. Union Pac. Ry. Co.*,
    492 F.3d 986 (8th Cir. 2007)......................................................................................... 14

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995)..................................................................................................... 36

*Hensley Mfg., Inc. v. ProPride, Inc.*,
    579 F.3d 603 (6th Cir. 2009)........................................................................................... 9

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998)......................................................................................... 47

*In re AEP ERISA Litig.*,
    2009 WL 614951 (S.D. Ohio Mar. 6, 2009) ................................................................... 14

*In re Barclays Bank PLC Sec. Litig.*,
    2011 WL 31548 (S.D.N.Y. Jan. 5, 2011) .................................................................20, 21, 45

*In re Bridgestone Sec. Litig.*,
    430 F. Supp. 2d 728 (M.D. Tenn. 2006) ....................................................... 4

*In re Century Bus. Servs. Sec. Litig.*,
    2002 WL 32254513 (N.D. Ohio June 27, 2002) ........................................ 57

*In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.*,
    467 F. Supp. 227 (W.D. Tex. 1979) ...................................................13, 15

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................... 10

*In re Dot Hill Sys. Corp. Sec. Litig.*,
    594 F. Supp. 2d 1150 (S.D. Cal. 2008) ................................................... 34

*In re First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ..................................................... 54

*In re Huffy Corp. Sec. Litig.*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008) ...............................................25, 35

*In re Huntington Bancshares Inc. Sec. Litig.*,
    674 F. Supp. 2d 951 (S.D. Ohio Dec. 4, 2009) ...................................... 48

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010) ................................................... 14

*In re Lord Abbett Mut. Funds Fee Litig.*,
    407 F. Supp. 2d 616 (D.N.J. 2005) ........................................................ 48

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................... 56

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 429 (S.D.N.Y. 2003) ................................................... 56

*In re Merrill Lynch & Co, Inc. Research Reports Sec. Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003) .........................................................10, 36

*In re MRU Holdings Sec. Litig.*,
    2011 WL 650792 (S.D.N.Y. Feb. 17, 2011) ......................................... 24

*In re NVidia Corp. Sec. Litig.*,
    2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ....................................... 54

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) .................................................................. 52

*In re Orion Sec. Litig.*,
    2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009) ..................................................... 59

*In re Regions Morgan Keegan Closed-End Fund Litig.*,
    2010 U.S. Dist. LEXIS 132902 (W.D. Tenn. Dec. 15, 2010)................................ 8

*In re Regions Morgan Keegan Closed-End Fund Litig.*,
    No. 2:07-cv-02830, Order................................................................................ 8

*In re Regions Morgan Keegan Open-End Fund Litig.*,
    743 F. Supp. 2d 744 (W.D. Tenn. 2010), *recons. den.*,
    WL 5464792 (W.D. Tenn. Dec. 30, 2010) .................................................*passim*

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    351 F. Supp. 2d 334 (D. Md. 2004)................................................................... 59

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
    441 F. Supp. 2d 579 (S.D.N.Y. 2006) ............................................................... 55

*In re SCB Computer Tech., Inc. Sec. Litig.*,
    149 F. Supp. 2d 334 (W.D. Tenn. 2001)......................................................... 9, 10

*In re Sec. Capital Assur., Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. March 31, 2010)............................................... 51

*In re Societe Generale Sec. Litig.*,
    2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ................................................... 24

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996)............................................................................. 15

*In re Telxon Corp. Sec. Litig.*,
    133 F. Supp. 2d 1010 (N.D. Ohio 2000)........................................................... 57

*In re USEC Sec. Litig.*,
    190 F. Supp. 2d 808 (D. Md. 2002)............................................................16, 21

*Johnson v. Railway Express Agency, Inc.*,
    421 U.S. 454 (1975)....................................................................................... 13

*Karpov v. Insight Enter., Inc.*,
    2010 WL 2105448 (D. Ariz. Apr. 30, 2010)...................................................... 34

*Konkol v. Diebold, Inc.*,
    590 F.3d 390 (6th Cir. 2009)........................................................22, 26, 32, 34

*La Pietra v. RREEF Am., LLC*,
    738 F. Supp. 2d 432 (S.D.N.Y. 2010) ........................................................27, 35, 38

*La. Sch. Emp. Ret. Sys. v. Ernst & Young LLP*,
    622 F.3d 471 (6th Cir. 2010) ............................................................. 23

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................... 55

*Lewis v. ACB Bus. Servs., Inc.*,
    135 F.3d 389 (6th Cir. 1998) ............................................................. 12

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976) ............................................................... 10

*Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Fund v. Fifth
    Third Bancorp*,
    731 F. Supp. 2d 689 (S.D. Ohio 2010) ......................................... passim

*Lormand v. U.S. Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ............................................................. 51

*Lubin v. Skow*,
    2010 U.S. App. LEXIS 12140 (11th Cir. June 14, 2010) ................... 50

*Magruder v. Halliburton Co.*,
    2009 WL 854656 (N.D. Tex. March 31, 2009) ................................... 53

*Melder v. Morris*,
    27 F.3d 1097 (5th Cir. 1994) ............................................................... 9

*Merck & Co., Inc. v. Reynolds*,
    130 S. Ct. 1784 (2010) ........................................................... 11, 17, 21

*Nat'l Junior Baseball League v. Pharmanet Devp't Group Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ................................................... 53

*Olkey v. Hyperion 1999 Term Trust, Inc*,
    98 F.3d 2 (2d Cir. 1996) .................................................................... 48

*P.R. Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ..................................................... passim

*P. Stolz Family P'ship LP v. Daum*,
    355 F.3d 92 (2d Cir. 2004) ............................................................... 19

*Pinter v. Dahl*,
    486 U.S. 622 (1988) .......................................................................... 58

*Rauch v. Day & Night Mfg. Corp.*,
    576 F.2d 697 (6th Cir. 1978) ............................................................. 56

*Recupito v. Prudential Sec.*,
    112 F. Supp. 2d 449 (D. Md. 2000)................................................................. 38

*Rubke v. Capital Bancorp Ltd.*,
    460 F. Supp. 2d 1124 (N.D. Cal. 2006), *aff'd* 551 F.3d 1156 (9th Cir. 2009)........................ 9

*San Diego County Employees Ret. Ass'n v. Maounis*,
    2010 U.S. Dist. LEXIS 25501 (S.D.N.Y. Mar. 15, 2010) ...............................................49, 50

*Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*,
    973 F.2d 474 (6th Cir. 1992)................................................................. 57

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)................................................................. 48

*Smith v. Am. Nat'l Bank & Trust Co.*,
    982 F.2d 936 (6th Cir. 1992)................................................................. 58

*Smith v. Pennington*,
    352 F.3d 884 (4th Cir. 2003)................................................................. 15

*Stephenson v. Citco Group Ltd.*,
    2010 U.S. Dist. LEXIS 32321 (S.D.N.Y. March 31, 2010)................................................................. 48

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)................................................................25, 32

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................4, 22, 23

*Waterford Township Gen. Emp. Ret. Sys. v. SunTrust Banks, Inc.*,
    2010 WL 3368922 (N.D. Ga. Aug. 19, 2010)................................................................. 54

*Weston v. AmeriBank*,
    265 F.3d 366 (6th Cir. 2001)................................................................15, 19

*Whirlpool Fin. Corp. v. GN Holdings, Inc.*,
    67 F.3d 605 (7th Cir. 1995)................................................................. 16

*Woodward v. Raymond James Fin., Inc.*,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010) ................................................................. 24

*Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*,
    2003 WL 25861087 (N.D. Ohio June 4, 2003), *aff'd* 413 F.3d 553 (6th Cir. 2005) ..13, 14, 19

**STATUTES**

15 U.S.C. §§ 77k ...................................................................................................35, 36, 51

15 U.S.C. § 77l ....................................................................................................35, 36, 58

15 U.S.C. § 77m .......................................................................................................17, 19

15 U.S.C. § 78u-4 .....................................................................................................21, 25

15 U.S.C. § 80a-5 ........................................................................................................... 4

28 U.S.C. § 1658(b)(1) ................................................................................................. 11

Ala. Code. § 19-3B-816(24) ........................................................................................ 60

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b)...............................................................................................passim

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 8

Disclosure of Mut. Fund Performance & Portfolio Managers,
    Inv. Co. Act Rel. No. 19,382, 1993 SEC LEXIS 780 (Apr. 6, 1993) .................................... 32

## INDEX OF EXHIBITS AND ABBREVIATIONS

| Exhibit Letter | Exhibit Title | Abbreviation |
|---|---|---|
| A | RMK High Income Fund, Inc. Prospectus, dated June 24, 2003 | RMH Prosp. |
| B | RMK High Income Fund, Inc. Statement of Additional Information, dated June 24, 2003 | RMH SAI |
| C | RMK Strategic Income Fund, Inc. Prospectus, dated March 18, 2004 | RSF Prosp. |
| D | RMK Strategic Income Fund, Inc. Statement of Additional Information, dated March 18, 2004 | RSF SAI |
| E | RMK Advantage Income Fund, Inc. Prospectus, dated November 8, 2004 | RMA Prosp. |
| F | RMK Advantage Income Fund, Inc. Statement of Additional Information, dated November 8, 2004 | RMA SAI |
| G | RMK Multi-Sector High Income Fund, Inc. Prospectus, dated January 19, 2006 | RHY Prosp. |
| H | RMK Multi-Sector High Income Fund, Inc. Statement of Additional Information, dated January 19, 2006 | RHY SAI |
| I | Consolidated Annual Report for RMA, RMH, and RSF Funds, for the period ended March 31, 2005 | 2005 Consol. Ann. Rpt. |
| J | Consolidated Annual Report for RMA, RMH, RHY, and RSF Funds, for the period ended March 31, 2006 | 2006 Consol. Ann. Rpt. |
| K | Consolidated Semi-Annual Report for RMA, RMH, RHY, and RSF Funds, for the period ended September 30, 2006 | Sept. 2006 Consol. Semi-Ann. Rpt. |
| L | Consolidated Annual Report for RMA, RMH, RHY, and RSF Funds, for the period ended March 31, 2007 | 2007 Consol. Ann. Rpt. |
| M | Consolidated Semi-Annual Report for RMA, RMH, RHY, and RSF Funds, for the period ended September 30, 2008 | Sept. 2008 Consol. Semi-Ann. Rpt. |
| N | Consolidated Semi-Annual Report for RMA, RMH, RHY, and RSF Funds, for the period ended September 30, 2009 | Sept. 2009 Consol. Semi-Ann. Rpt. |
| O | RMH Fund, Form N-Q (dated March 1, 2005) | RMH Fund N-Q (dated March 1, 2005) |
| P | RSF Fund, Form N-Q (dated March 1, 2005) | RSF Fund N-Q (dated March 1, 2005) |
| Q | RMA Fund, Form N-Q (dated March 1, 2005) | RMA Fund N-Q (dated March 1, 2005) |
| R | RHY Fund, Form N-Q (dated June 30, 2006) | RHY Fund N-Q (dated August 29, 2006) |

| S | Alan Greenspan, "The Roots of the Mortgage Crisis," *Wall Street Journal*, December 12, 2007 | A. Greenspan, "The Roots of the Mortgage Crisis" |
|---|---|---|
| T | SEC Form N-2 | Form N-2 |
| U | *Rice v. Regions Fin. Corp.*, cv-2009-900689.00, Second Amended Complaint dated March 18, 2010 (Circuit Court of Jefferson County, Alabama) | *Rice* Sec. Am. Complaint |
| V | Appendix of Relevant Disclosures | Appx. of Disclosures |

| In re Regions Morgan Keegan Closed-End Fund Litigation,, 2:08-cv-02830-SHM-dkv Pending Actions | | | | | |
|---|---|---|---|---|---|
| **Action** | **Date Filed** | **Closed-End Funds** | **Claims** | **Status** | **Class Period** |
| *Willis v. Morgan Keegan*, No. 07-cv-02830 | Dec. 21, 2007 | RHY | §§ 11, 12(a)(2), 15 | Pending | Unstated |
| *Hartman v. Morgan Keegan*, No. 08-cv-02071 | Feb. 4, 2008 | RHY | §§ 11, 12(a)(2), 15 | Pending | Dec. 6, 2004 Nov. 7, 2007 |
| *Gregory v. Morgan Keegan*, No. 08-cv--2078 | Feb. 6, 2008 | RSF RMH RMA | § 11, 12(a)(2), 15 | *Voluntarily Dismissed* Dec. 3, 2008 | Dec. 6, 2004 Feb. 6, 2008 |
| *Massey v. Morgan Keegan*, No. 08-cv-02127 | Feb. 26, 2008 | RSF RMH RMA | § 11, 12(a)(2), 15 | *Voluntarily Dismissed* May 9, 2008 | Dec. 6, 2004 Feb. 6, 2008 |
| *DeJoseph v. Morgan Keegan*, No. 08-cv-2212 | Apr. 4, 2008 | RSF RMH RMA | §§10(b), 20(a) | *Voluntarily Dismissed* Feb. 18, 2010 | Dec. 8, 2006 Dec. 5, 2007 |
| *Daniels v. Morgan Keegan*, No. 08-cv-02452 ("*Daniels* RMH") | July 11, 2008 | RMH | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Daniels v. Morgan Keegan*, No. 08-cv-2453 ("*Daniels* RMA") | July 11, 2008 | RMA | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Daniels v. Morgan Keegan*, No. 08-cv-2455 ("*Daniels* RSF") | July 11, 2008 | RSF | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Daniels v. Morgan Keegan*, No. 08-cv-2456 ("*Daniels* RHY") | July 11, 2008 | RHY | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Jones v. Morgan Keegan*, No. 10-cv-02248 | Apr. 8, 2010 | RSF RMH RMA RHY | **All Funds:** §§ 10(b), 20(a) **RHY:** §§ 11, 12(a)(2), 15 | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Palmour v. Morgan Keegan*, No. 10-cv-02380 | May 19, 2010 | RSF RMH RMA RHY | **All Funds:** §§ 10(b), 20(a) | Pending | June 6, 2005 July 14, 2009 |
| *Consolidated Class Action Compl.* | Feb. 22, 2010 | RSF RMH RMA RHY | **All Funds:** §§ 10(b), 20(a) **RHY:** §§ 11, 12(a)(2), 15 | Pending | Various Periods |

Morgan Keegan & Company, Inc. ("Morgan Keegan"), Morgan Asset Management, Inc. ("MAM"), and MK Holding, Inc. ("MK Holding," and collectively with the foregoing, "Defendants"), respectfully submit this memorandum in support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("CAC").[1]

## PRELIMINARY STATEMENT

Plaintiffs seek to recover losses stemming from investments in four closed-end investment funds, RMK High Income Fund, Inc. ("RMH Fund"), RMK Strategic Income Fund, Inc. ("RSF Fund"), RMK Advantage Fund, Inc. ("RMA Fund"), and RMK Multi-Sector High Income Fund, Inc. ("RHY Fund") (collectively the "Funds").[2]  The Funds' investment strategy was to hold significant percentages of below investment grade debt securities, also known as "junk bonds."  In addition to other warnings and disclosures, the Funds specifically warned investors in bold and on the first page of each of the Funds' Prospectuses, that the Funds' investment strategy "***involve[d] a high degree of risk***," and warned that **"*Stockholders can lose some or all of their investment.*"**  Essentially ignoring these disclosures, Plaintiffs assert their losses were caused by Defendants' and the Funds' alleged fraud and not the sudden and unprecedented crisis that caused the global credit markets to collapse in mid-2007, which Plaintiffs remarkably describe as "ordinary market forces."  (CAC ¶ 262.)

Since inception, each of the Funds has held varying percentages of asset-backed securities ("ABS") and mortgage-backed securities ("MBS") in its respective portfolio.  Such holdings were entirely consistent with their investment parameters disclosed to investors in the

---

[1]      To the extent relevant to this motion, Morgan Keegan, MAM, and MK Holding incorporate the arguments set forth in the separate motions to dismiss made by Regions and the Individual Defendants.

[2]      The name of the Funds in this action changed on July 11, 2008, upon shareholder approval of Hyperion Brookfield Asset Management, Inc., as investment adviser to the Funds.  *See* Curley Dec. Ex. M (Sept. 2008 Consol. Semi-Ann. Rpt. at 1).  On October 1, 2009, the Funds' investment advisor Hyperion Brookfield Asset Management, Inc. changed its name to Brookfield Investment Management, Inc.  *See* Curley Dec. Ex. N (Sept. 2009 Consol. Semi-Ann. Rpt. at 1.)

Funds' Offering Documents.[3]  For approximately four years, the Funds provided investors with returns generally superior to other fixed income funds with similar objectives.  In the wake of the global credit crisis in mid-2007, an event that virtually no one anticipated, the market for ABS, MBS, and other similar securities evaporated overnight.  The Funds consequently suffered significant losses, as the value of the assets held by the Funds declined sharply.  The Funds' losses were similar to those suffered worldwide by investors in the same asset classes.

Plaintiffs assert five claims.  Counts I-III include claims under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act"), regarding purported misrepresentations and omissions contained in the RHY Fund's Offering Documents.  Counts IV-V include claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), relating to the annual, semi-annual, and quarterly reports filed by all four Funds.  Each claim fails as a matter of law.

First, Plaintiffs' claims are time-barred.  The allegations in Plaintiffs' CAC demonstrate that Plaintiffs discovered, or should have discovered by the exercise of reasonable diligence, the facts giving rise to their allegations prior to the expiration of the applicable limitations periods.  Plaintiffs' 1933 Act claims are also barred by the statute of repose.  Because Plaintiffs failed to timely assert these claims on behalf of the class pleaded in the CAC and no basis exists to toll the applicable limitations and repose periods, Plaintiffs' claims are time-barred.

Second, the CAC alleges nothing more than a fraud-by-hindsight theory of liability premised on the Funds' ultimate performance.  Plaintiffs fail to allege specific substantive misconduct by Morgan Keegan, MAM or MK Holding, as they are required to do.  Plaintiffs also fail to plead facts giving rise to a strong inference of scienter as required by the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure.

---

[3]     "Offering Documents" refers to the Funds' Registration Statements, including, without limitation, Prospectuses, Statements of Additional Information, and any information incorporated by reference therein.

2

Third, Plaintiffs fail to allege any actionable material misstatements or omissions to support their claims.  The Funds' Offering Documents and other public filings plainly disclosed the Funds' investment objectives and strategies, the nature of the investments each Fund would and did make, the Funds' pricing and valuation procedures, and the reasonably foreseeable risks associated with an investment in the Funds, including the risks that ultimately materialized when the credit markets collapsed.  The Funds' portfolio composition was also publicly disclosed on a regular basis in several of these public filings, which expressly refutes Plaintiffs' allegations that the Funds and Defendants omitted material information regarding the Funds' holdings.  At most, Plaintiffs' allegations amount to a claim of mismanagement, which will not support a claim under the federal securities laws.

Fourth, Plaintiffs' allegations demonstrate a lack of loss causation, which bars Plaintiffs from recovering damages on their claims under either the 1934 Act or the 1933 Act.  To the contrary, Plaintiffs' allegations affirmatively establish that their losses resulted not from the revelation of any false statements or omissions, but from the global credit crisis, which had an industry-wide impact on the value of securities held by the Funds.

Finally, Plaintiffs' claims against Morgan Keegan as one of the Funds' underwriters under §§ 11 and 12(a)(2) of the 1933 Act for misrepresentations and omissions in the RHY Fund's Offering Documents fail as a matter of law.  The remaining claims against Defendants are not premised on primary violations of the federal securities laws, but instead on allegations that Defendants were "control persons" responsible for the conduct of the Funds.  These claims must be dismissed because Plaintiffs have failed to establish a primary violation of the securities laws by *any* Defendant and offer only conclusory allegations to support their claims for control person liability.

<u>**STATEMENT OF FACTS**</u>

**I.**     **The Funds and Plaintiffs' Allegations[4]**

The Funds had their initial public offerings on June 24, 2003 (RMH Fund); March 18, 2004 (RSF Fund); November 8, 2004 (RMA Fund); and January 19, 2006 (RHY Fund), respectively.[5]  The Funds' Offering Documents set forth their investment strategy, which was to invest "the majority of [their] total assets in below investment grade debt securities," which are "commonly referred to as 'junk bonds.'"  *See* Curley Dec. Exs. E (RMA Prosp. Cover Page); A (RMH Prosp. Cover Page); C (RSF Prosp. Cover Page); G (RHY Prosp. Cover Page).

Each Fund disclosed that it could invest up to 100% of its assets in below investment grade securities and distressed securities.[6]  Specific types of debt securities in which the Funds could invest included, among others, ABS and MBS.  *See, e.g.*, Curley Dec. Exs. A (RMH Prosp. at 15-20); B (RMH SAI at 2-26); D (RSF SAI at 2-27);  F (RMA SAI at 3-28); H (RHY SAI at 2-37).  Each Fund warned investors of the risks associated with any investment in it, including the risks associated with securities in which the Funds would invest.

---

[4]     In considering a motion to dismiss, "courts must consider the complaint in its entirety, as well as other . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Such documents include "the full text of securities filings, the company prospectus, analysts' reports, and statements integral to a complaint," as well as documents that are "referred to in the complaint and are central to the plaintiff's claim." *In re Bridgestone Sec. Litig.*, 430 F. Supp. 2d 728, 732 (M.D. Tenn. 2006).  Courts may also take notice of market trends and relevant media reports. *See D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 n.26 (E.D. Mich. 2003), *aff'd* 133 F. App'x 994 (6th Cir. 2005).

[5]     Closed-end investment companies, such as the Funds at issue in this action, do not continuously offer and redeem new securities like open-end investment companies (i.e., mutual funds).  Rather, the Funds' shares are traded on the secondary market after an initial public offering and share prices are dictated by market forces.  Unlike shareholders of mutual funds, shareholders of closed-end investment companies do not have redemptive rights once shares have been purchased. *See* 15 U.S.C. § 80a-5.

[6]     *See* Curley Dec. Exs. A (RMH Prosp. at 14) (100% in below investment grade debt and 10% in distressed securities), E (RMA Prosp. at 15) (same); G (RHY Prosp. at 16) (stating that the RHY Fund anticipated investing at least 50% of its assets in below investment grade debt and could invest up to 20% in distressed securities), C (RSF Prosp. at 15) (stating that the RSF Fund could invest up to 65% of its assets in below investment grade debt).

To this end, each Fund disclosed, *on the cover page* of each prospectus, that "**[t]he Fund's strategy of investing the majority of its total assets in below investment grade debt securities and its expected use of leverage involve a high degree of risk. Stockholders could lose some or all of their investment.**"  Curley Decl. Ex. E (RMA Prosp. Cover Page); *see also id.* Exs. A, C, G, (RMH, RSF, & RHY Prosp. Cover Pages) (same).[7]  Each Fund's Prospectus then reemphasized that: "Because the Fund expects to invest a majority of its assets in below investment grade debt securities, *investment in the Fund's common shares involves a high degree of risk. . . . Due to uncertainty in all investments, there can be no assurance that the Fund will achieve its investment objectives.*"  Curley Dec. Ex. G (RHY Prosp. at 6) (emphasis supplied); *see also* Curley Dec. Exs. A (RMH Prosp. at 5); E (RMA Prosp. at 5); C (RSF Prosp. at 5-6).

In mid-2007, the well-documented financial crisis caused the market for fixed-income debt securities, such as the ABS and MBS in which the Funds invested, to disappear.  As former Federal Reserve Chairman Alan Greenspan explained, "[o]n August 9, 2007, and the days immediately following, financial markets in much of the world seized up.  Virtually overnight, the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged."  Curley Dec. Ex. S (A. Greenspan, "The Roots of the Mortgage Crisis").  As a result, securities such as those in which the Funds invested became illiquid overnight.  The downturn caused sharp and immediate reductions in the prices at which such securities could be sold, resulting in a drop in each Fund's NAV, and a sharp decline in the Funds' share price.  The Funds' decline was commensurate with the drop in values of many other global asset classes.  And the credit crisis was an event that was virtually unforeseen by almost everyone.

---

[7]     The Funds also disclosed that "[u]nder adverse market or economic conditions, the secondary market for below investment grade securities could contract . . . and these instruments may become illiquid. . . . Factors having an adverse impact on the market value of below investment grade securities may have an adverse effect on the Fund's net asset value and the market value of its common shares."  *See, e.g.*, Curley Dec. Ex. A (RMH Prosp. at 25).

Plaintiffs nonetheless seek to hold Defendants responsible for failing to anticipate these unforeseen events.  Despite the unprecedented collapse of the credit markets and extensive disclosures emphasizing the risk associated with an investment in the Funds, Plaintiffs claim that they were defrauded.  Plaintiffs allege that Defendants: (i) over-concentrated the Funds' assets in ABSs and MBSs, thereby violating the Funds' investment guideline prohibiting concentration in a single "industry" (CAC ¶¶ 15-16); (ii) misclassified certain assets, thereby understating the Funds' holdings of ABSs and MBSs (*id.* ¶¶ 17-18); (iii) selected an inappropriate benchmark index against which to compare the Funds' returns (*id.* ¶¶ 26-28); and (iv) failed to exercise adequate due diligence prior to purchasing securities for the Funds (*id.* ¶¶ 24-25).

Plaintiffs claim that this alleged mismanagement of the Funds should have been disclosed in the Funds' consolidated Annual, Semi-Annual, and Quarterly Reports and in the RHY Fund's Offering Documents.  (*Id.* ¶¶ 185-256.)  Plaintiffs assert that "[i]nvestors suffered substantial losses when the true risks presented by the Funds' assets were finally revealed to the public through a series of corrective disclosures starting in July 2007."  (*Id.* ¶ 29.)

The "corrective disclosures" cited in the CAC, however, do not reveal fraud or even simple negligence; rather, they accurately explain that the Funds lost value due to a "breakdown in the market for hard-to-value debt-backed securities," not due to the market's reaction to previously undisclosed material facts.  (*Id.* ¶ 269.)  When these "corrective disclosures" are considered in light of similar disclosures by the Funds (and cited in the CAC), what emerges from Plaintiffs' own allegations is the antithesis of fraud.  Plaintiffs' allegations demonstrate contemporaneous disclosure, by Defendants and others, of the "unprecedented liquidity issue [that affected] the broader financial markets" in mid-2007.  In all other respects, the premise of Plaintiffs' claims is their hindsight assertion that the Funds' management made unwise investment choices.  This does not state a claim under the federal securities laws.

II.     **The Parties**

Plaintiffs purport to represent the following putative classes:

(1)     All persons and entities that purchased or otherwise acquired shares of (1) the
        RMH Fund between June 24, 2003 and July 14, 2009, (2) the RSF Fund between
        March 18, 2004 and July 14, 2009, (3) the RMA Fund between November 8, 2004
        and July 14, 2009, or (4) the RHY fund between January 19, 2006, and July 14,
        2009 or pursuant or traceable to the Fund's registration statement and prospectus
        of January 19, 2006 (CAC ¶ 308) (the "Class"); and

(2)     A subclass of all trusts and custodial accounts for which Regions Bank is or was a
        trustee or a directed trustee, custodian, or agent that purchased or otherwise
        acquired securities of the Funds during the class period for each respective Fund
        (the "TAL Subclass") (*id.* ¶ 309).

Morgan Keegan is a registered broker-dealer with 400 offices in 19 states and more than

4500 employees.  Morgan Keegan acted as one of the underwriters and as a distributor of the

Funds' shares.  Morgan Keegan also provided the Funds with administrative and accounting

services pursuant to a Fund Accounting Services Agreement.  (*See, e.g.,* CAC ¶ 7.)  MAM is a

registered investment adviser that served as the Funds' investment adviser pursuant to an

Investment Advisory Agreement until July 29, 2008.  (*Id.* ¶¶ 1 n.1, 7, 54)  MAM employee

James Kelsoe served as the Funds' portfolio manager.  (*Id.* ¶ 7)  MAM is a wholly owned

subsidiary of MK Holding.  (*Id.* at ¶ 4.)  Both MK Holding and Morgan Keegan are subsidiaries

of Regions Financial Corporation, a publicly held bank holding company. (*Id.* at ¶¶ 52-54.)

Other Defendants include certain officers and directors of the various corporate entities named in

this action, including officers and directors of the Funds, MAM and/or Morgan Keegan.

## <u>PROCEDURAL HISTORY</u>

The procedural history of the actions pending before the Court, which have been

consolidated as part of *In re Regions Morgan Keegan Closed-End Fund Litigation*, is relevant to

this motion.  Several putative class actions were commenced before the CAC was filed, but these

previously filed actions did not involve identical classes asserting the same claims against the

same Funds.   Moreover, a number of those actions were voluntarily dismissed before any
meaningful activity occurred.[8]

By Order entered on September 23, 2008, this Court consolidated certain putative class
actions into two separate actions.  *In re Regions Morgan Keegan Closed-End Fund Litig.*, No.
2:07-cv-02830, Order (Docket No. 94).  On August 26, 2009, the Court entered another order
consolidating the actions filed by a trustee *ad litem* on behalf of certain trusts and custodial
accounts holding shares in the Funds (the "*Daniels* Actions") with the consolidated proceedings.
*Daniels v. Morgan Keegan & Co.*, 2009 U.S. Dist. LEXIS 76152, at *4 (W.D. Tenn. Aug. 26,
2009); *see also In re Regions Morgan Keegan Closed-End Fund Litig.*, No. 2:07-cv-02830,
Order (Docket No. 158) (denying motion to sever).   On December 15, 2010, the Court
consolidated *Jones* and *Palmour* and appointed lead plaintiffs in this consolidated action.  *In re
Regions Morgan Keegan Closed-End Fund Litig.*, 2010 U.S. Dist. LEXIS 132902 (W.D. Tenn.
Dec. 15, 2010).  Plaintiffs filed the CAC on February 22, 2011.

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain
sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Ashcroft v.
Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570
(2007)).  While the well-pleaded factual allegations in a complaint must be construed in favor of
Plaintiffs, the court need not accept as true legal conclusions or unwarranted factual inferences.
*See id.* at 1949.  "[O]nly a complaint that states a plausible claim for relief survives a motion to
dismiss."  *Id.* at 1950.  A complaint has "facial plausibility" when it contains "factual content
that allows the court to draw the reasonable inference that the defendant is liable for the

---

[8]     The chart set forth *supra* at p. (xiii) identifies each of the actions pending before the Court
concerning the Funds, the putative class on whose behalf those actions were filed, and the status of those
actions.

misconduct alleged." *Id.* at 1949. The inference of a "mere possibility of misconduct" is insufficient. *Id.* at 1950; *see also Hensley Mfg., Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009). The Complaint must include more than "labels and conclusions," and must plead facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Because Plaintiffs have brought claims for fraud, Plaintiffs must satisfy the requirements of the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure.[9] Rule 9(b) requires that all averments of fraud or mistake be pleaded with particularity. As this Court explained in *Regions Morgan Keegan Open-End Mutual Fund Litigation*, "[t]his heightened pleading standard mandates that plaintiffs alleging fraud 1) specify which statements were fraudulent, 2) identify the defendant(s) who spoke the fraudulent statements, 3) describe when and where the statements were made and 4) explain why the statements were fraudulent." 743 F. Supp. 2d at 754 (quotation marks and citation omitted).

The PSLRA imposes two heightened pleading requirements for securities fraud claims beyond the requirements of Rule 9(b). First, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 344 (W.D. Tenn. 2001) (quoting 15 U.S.C. § 78u-4(b)(1)).

---

[9]  Plaintiffs must meet the heightened pleading requirements with respect to their 1933 Act claims because they have chosen to premise their claims on allegations of fraudulent conduct. *See In re Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d 744, 759 (W.D. Tenn. 2010) (citing *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 948 (6th Cir. 2009)), *recons. den.*, 2010 WL 5464792 (W.D. Tenn. Dec. 30, 2010).

Plaintiffs incorporate allegations of fraud into each of their claims, notwithstanding boilerplate disclaimers to the contrary. (*See* CAC ¶¶ 317, 332, 343.) Accordingly, each claim sounds in fraud. *See, e.g., Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994) (holding that a "complaint's wholesale adoption of [fraud] allegations" under non-fraud claims for relief subjects a complaint to the requirements of Rule 9(b)); *Rubke v. Capital Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1135-36 (N.D. Cal. 2006) (same) (quotation omitted), *aff'd* 551 F.3d 1156 (9th Cir. 2009). For this reason, Plaintiffs must satisfy Rule 9(b)'s requirement with respect to their 1933 Act claims as well.

Second, "the complaint shall, with respect to each act or omission . . . state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).  "[T]he PSLRA mandates that district courts 'shall on the

motion of any defendant, dismiss the complaint if the requirements of [§§ 78u-4(b)(1) and (2)]

are not met.'"  *Id.*  (quoting 15 U.S.C. § 78u-4(b)(3) (alterations in original)); *see also Regions*

*Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 754-755.

Plaintiffs may not satisfy their pleading burden by repeating mere allegations made in

other proceedings.[10]  Allegations in regulatory proceedings are nothing more than allegations;

they are not facts, have not been tested by any court, are immaterial, and cannot, as a matter of

law, salvage an otherwise deficient Complaint.  *See In re Merrill Lynch & Co. Research Reports*

*Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003); *see also Ryan v. Morgan Asset Mgmt., Inc., et*

*al.*, No. 2:08-cv-02162-SHM-dkv (W.D. Tenn. Dec. 15, 2009), Order at 2 (Docket Entry No. 58)

("This Court has no duty to examine a separate complaint filed [in another case] and determine

exactly what additional claims for relief Plaintiff intends to plead in this case." (quotation marks

and citation omitted)).[11]  The CAC must rise and fall on its own merit, irrespective of generalized

allegations made in other proceedings.

Finally, as discussed further *infra*, the regulatory proceedings cited by Plaintiffs involve

mutual funds not at issue in this action.  None of the allegations cited by Plaintiffs is specific to

---

[10]      *See* CAC ¶¶ 175-176 (repeating allegations contained in the SEC's Cease and Desist Order); *id.*
¶¶ 177-178 (repeating allegations made in the State Task Force Proceeding); ¶ 179 (repeating allegations
made by FINRA); *see also id.* ¶¶ 138-142, 144-150, 152-153 (with respect to each allegation, citing to
paragraphs contained in the SEC Cease & Desist Order and prefacing allegations with "as alleged by the
SEC."  Plaintiffs have attached copies of the SEC and State Task Force pleadings as Exhibits D and V to
the CAC.

[11]      *See also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding that
references to a complaint filed by the SEC was improper, and that "neither a complaint nor references to a
complaint which results in a consent judgment may properly be cited in the pleadings under the facts of
this case"); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (striking
portions of plaintiff's paragraph relying on SEC complaint as factual support for plaintiff's allegations).

any of the Funds at issue here.  This makes reliance on the allegations in those proceedings entirely inappropriate under Rule 9(b) and the PSLRA.

## ARGUMENT

**I.     The 1934 Act's Statute of Limitations Bars Plaintiffs' §§ 10(b) and 20(a) Claims.**

Plaintiffs' 1934 Act claims concerning the Funds are barred by the applicable two-year statute of limitations.  *See* 28 U.S.C. § 1658(b)(1).  Those claims do not, as a matter of law, relate back to any previously-filed action and must be dismissed.

### A.     Plaintiffs' 1934 Act Claims Are Untimely on Their Face and the Limitations Period Has Not Been Tolled.

"[T]he [two-year] limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation' – whichever comes first."  *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798 (2010).  Here, Plaintiffs discovered or should have discovered the facts underlying their 1934 Act claims more than two years prior to asserting those claims on behalf of the Class.  For example, Plaintiffs' allegations demonstrate that they discovered their allegations against Defendants more than two years before the filing of *Jones* (April 8, 2010) and *Palmour* (May 19, 2010) and were on notice as of 2007 and early 2008:

- "This article further disclosed the extent to which the Funds had invested a 'huge slug of money in subprime paper' and reinforces the fact that <u>investors did not find out until</u> the <u>summer of 2007</u> how Kelsoe ran the Funds." (CAC ¶ 283) (emphasis supplied);

- "This October 15, 2007 article disclosed to investors . . . the extent to which the Funds used fair value accounting to price their securities." (*id.* ¶ 274);

- "The October 17, 2007 article . . . shed additional light on the extent to which Kelsoe flooded the Funds' portfolios with low-priority ABS." (*id.* ¶ 276);

- "For example, on January 21, 2008, . . . The article . . . explained that the 'statements of claim allege fraud, misrepresentations and omissions  . . .'" (*id.* ¶ 289); and

11

- "The PTS23 securities were reclassified as ABS in a Form N-CSR dated March 31, 2008. The PTS23 securities . . . were falsely classified as corporate bonds by the Defendants during the Class Period." (*id.* ¶ 108).

Furthermore, Plaintiffs were on notice of their claims no later than the filing of *DeJoseph* on April 4, 2008—an action which asserted §§ 10(b) and 20(a) claims concerning the RSF, RMH, and RMA Funds.  Because more than two years elapsed after the filing of *DeJoseph* before Plaintiffs asserted their 1934 Act claims on behalf of the Class, those claims are time-barred.

Although previously-filed class actions can toll a statute of limitations under certain circumstances, those circumstances do not apply here.[12]  First, previously-filed class actions toll limitations periods only for subsequently-filed individual actions and not for subsequently-filed class actions.  Further, tolling does not apply where:  (1) there is no identity of claims between the subsequent and previously-filed actions (*Willis* and *Hartman*); (2) the previously-filed class actions were voluntarily dismissed (*Massey, Gregory,* and *DeJoseph*); and (3) the subsequent action involves different parties than the previously-filed actions (*Daniels* Actions).

### 1.     *American Pipe* Does Not Apply to Subsequently-Filed Class Actions.

In *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552-53 (1974), the Supreme Court held that "the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status."  The Supreme Court explained in *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983), "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.  At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action."  *Id.* at 354.

---

[12]     Consolidated actions are not merged into a single action and do not change the rights of parties or make those who are parties in one action parties to another action.  *See Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 412 (6th Cir. 1998).

*American Pipe*, however, applies only to individual actions, not subsequently-filed class actions.  *Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir. 1988) (holding that *American Pipe* "does not toll the limitations period for additional class actions by putative members of the original asserted class").  Accordingly, *American Pipe* does not allow any previously-filed class action to toll the limitations period with respect to the 1934 Act claims asserted on behalf of the Class for the first time in the subsequently-filed *Jones* and *Palmour* class actions.

### 2.    *American Pipe* Does Not Apply Absent Identity of Claims.

Even if *American Pipe* applied to subsequently-filed class actions, the doctrine would be inapplicable here because the CAC asserts different claims from those asserted in any previously-filed actions.  "Only where there is complete identity of the causes of action will the protections [against the running of the limitations period] necessarily exist." *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 467 & n.14 (1975) (declining to apply *American Pipe* even though the subsequently-filed action was based on the same set of facts).

Four of the previously-filed class actions (*Willis, Hartman, Massey* and *Gregory*) did not assert 1934 Act claims concerning the Funds in question.  The absence of an identity of claims between those actions and the Plaintiffs' 1934 Act claims asserted in the CAC precludes application of *American Pipe* with respect to those actions.  *See, e.g., Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 2003 WL 25861087, at *17-19 (N.D. Ohio June 4, 2003) (§ 18 claim based on allegedly false and misleading statements was not sufficiently similar to § 10(b) claim asserted in an earlier action), *aff'd* 413 F.3d 553 (6th Cir. 2005); *In re Commonwealth Oil/Tesoro Petroleum Corp. Sec. Litig.*, 467 F. Supp. 227, 259-60 (W.D. Tex. 1979) (*American Pipe* did not toll the statute of limitations on a § 11 claim based on the earlier filing of a § 10(b) claim).

13

### 3. Voluntarily Dismissed Actions Do Not Toll the Statute of Limitations Under *American Pipe.*

Plaintiffs likewise cannot rely upon voluntarily dismissed actions (*DeJoseph*, *Massey* and *Gregory*) to toll the statute of limitations.  A "voluntarily dismissed complaint does not toll the statute of limitations."  *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 504 (S.D.N.Y. 2010).  The "law treats a voluntarily dismissed complaint as if it never had been filed."  *Id.* (citations omitted); *see also Great Plains Trust Co. v. Union Pac. Ry. Co.*, 492 F.3d 986, 997 n.3 (8th Cir. 2007) ("observing that a dismissal without prejudice and a voluntary dismissal . . . . does not include the typical circumstances that trigger the *American Pipe* rule"); *In re AEP ERISA Litig.*, 2009 WL 614951, at *5 (S.D. Ohio Mar. 6, 2009) (tolling inapplicable after the dismissal of an earlier action).

### B. *American Pipe* Does Not Apply Absent Identity of Parties.

Finally, for *American Pipe* to apply, a prior class action must have involved the same parties.  The two previously-filed actions asserting 1934 Act claims concerning the Funds (*DeJoseph* and *Daniels*) do not involve an identity of parties.

*DeJoseph* does not toll 1934 Act claims concerning the RHY Fund, as that action did not assert 1934 Act claims against the RHY Fund, or involve the RHY Fund at all.  *See Wyser-Pratte Mgmt. Co. v. Telxon Corp.*,  413 F.3d 553, 567 (6th Cir. 2005) ("*American Pipe* tolling did not apply to claims against a defendant that was not named in a prior class action.").

The *Daniels* Actions asserting 1934 Act claims likewise do not toll applicable limitations periods.  These Actions were brought on behalf of different putative classes than the claims asserted in the CAC, namely, a limited class of trusts and custodial accounts for which Regions Bank served as trustee and which invested in the Funds (now the "TAL Subclass").  The Class

on whose behalf Plaintiffs assert 1934 Act claims is significantly broader than the TAL Subclass and includes all purchasers of shares of the Funds during a much longer class period.[13]

*American Pipe* only applies where an earlier action was brought on behalf of "all members of the putative class." *Crown, Cork & Seal Co.*, 462 U.S. at 354; *see also Smith v. Pennington*, 352 F.3d 884, 895 (4th Cir. 2003) (unless the parties were within the "narrow class definition . . . and thus were entitled to equitable tolling of the statute of limitations on their claims for at least that period, the statute of limitations . . . would have run"); *In re Syntex Corp. Sec. Litig.*, 95 F.3d at 936 ("[E]quitable tolling doctrine only tolls the statute of limitations for asserted class members" and not "for all those who might subsequently participate in the suit."); *In re Commonwealth Oil*, 467 F. Supp. at 260, n.20 (*American Pipe* does not "sweep so broadly as to toll the statute for nonmembers as well as for members of the class"); *cf. Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010) ("[A]n amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations." (quotation omitted)). Accordingly, the *Daniels* Actions do not toll Plaintiffs' 1934 Act claims on behalf of the Class defined in the CAC.

### C. Plaintiffs' Allegations Establish that the TAL Subclass Discovered or Should Have Discovered their Allegations More Than Two Years Prior to Filing of the *Daniels* Actions.

The claims asserted on behalf of the TAL Subclass are likewise time-barred because they do not relate back to the *Daniels* Actions, as Plaintiffs' allegations establish that the TAL Subclass claims were time-barred as of the filing of the *Daniels* Actions. *See Weston v. AmeriBank*, 265 F.3d 366, 368-369 (6th Cir. 2001). As set forth below, public documents,

---

[13]     The CAC includes an expanded putative class of members that were not members of earlier actions. For example, the CAC asserts claims on behalf of a class of shareholders who purchased or acquired Fund shares between June 24, 2003 and July 14, 2009. The earlier consolidated actions end their putative classes in 2007 or early 2008. *See, e.g., Hartman* (class ending on Nov. 7, 2007); *Daniels* Actions (class ending on Feb. 6, 2008); *Jones* Actions (class ending on Feb. 6, 2008). The expansion of the putative class precludes application of *American Pipe*. *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 936 (9th Cir. 1996).

available to Plaintiffs as of March 2006 and which form the basis of the TAL Subclass claims in both actions, alerted Plaintiffs to the very information they now allege Defendants concealed.[14]

The Funds' 2003, 2004, 2005, and 2006 Offering Documents, annual, semi-annual, and quarterly reports disclosed the risks, investments, and valuation information with respect to each of the Funds that Plaintiffs allege was misrepresented or omitted by Defendants.[15]  For example, Plaintiffs spend numerous paragraphs in the CAC discussing alleged false classifications of the Funds' portfolio securities.  (*See* CAC ¶¶ 83-112.)  The specific holdings and asset allocations of each Fund, however, were disclosed on an annual and quarterly basis since each Fund's inception and as early as 2005.[16]  The access to this information afforded Plaintiffs every opportunity to reach their own conclusions regarding these disclosures more than two years prior to July 11, 2008, the date when the *Daniels* Actions were filed.

---

[14]     Plaintiffs are charged with notice of the information contained in the Funds' Offering Documents and other public filings.  *See, e.g.*, *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) (financial statements placed plaintiff on inquiry notice of claims); *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162-63 (4th Cir. 1993) ("[W]hen a prospectus sufficiently discloses the risks inherent in an investment, the investor is on inquiry notice of his claims and the limitations period begins to run from the date of sale on claims of fraud in that prospectus."); *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 819 (D. Md. 2002).

[15]     *See, e.g.*, Curley Dec. Exs. A (RMH Prosp. at 13-29); C (RSF Prosp. at 14-31); E (RMA Prosp. at 14-31); G (RHY Prosp. at 15-33); *see also* Curley Dec. Exs. J (2006 Consol. Ann. Rpt. at 3, 19, 37, 51 (discussing the Funds investment objectives, strategies and risks)); O (RMH Fund N-Q (dated March 1, 2005)); P (RSF Fund N-Q (dated March 1, 2005)); Q (RMA Fund N-Q (dated March 1, 2005)); R (RHY Fund N-Q (dated August 29, 2006)).

[16]     *See, e.g.*, Curley Dec. Ex. I (2005 Consol. Ann. Rpt. at 4, 6-14 (RMA Fund), at 18, 21-30 (RMH Fund), and at 34, 37-41 (RSF Fund)); J (2006 Consol. Ann. Rpt. at 40, 43-50 (RHY Fund)).  The Funds' Annual Report identifies, among other things, percentages of asset allocations, credit quality distribution of assets, NAV and market price history, fund performance and a breakdown of Fund holdings.  *See also* Curley Dec. Exs. J (2006 Consol. Ann. Rpt. at 40-50 (same)).  The Funds also each filed Form N-Qs after the first and third fiscal quarters (opposite the filing of the Funds' Annual Report and Semi-Annual Reports), which provided a schedule of the Funds' investments by description and percentage.  *See, e.g.*, Curley Dec. Exs. O (RMH Fund N-Q (dated March 1, 2005)); P (RSF Fund N-Q (dated March 1, 2005)); Q (RMA Fund N-Q (dated March 1, 2005)); R (RHY Fund N-Q (dated August 29, 2006)); J (2006 Consol. Ann. Rpt. at 103 (informing shareholders regarding how to obtain copies of the Form N-Q filed by the Funds)).

As part of the TAL Subclass claims, Plaintiffs allege misrepresentations and omissions concerning the fair valuation procedures of the Funds and the use of a particular benchmark index.  (*See* CAC ¶¶ 113-153, 161-171.)  Again, Plaintiffs were on notice of the risks associated with the Funds' holdings of the particular assets, including price volatility and the difficulty of valuing such assets well before March 2006.[17]  And, by March 2006, Plaintiffs were apprised of the fact that MAM's judgment played a greater role in the valuation process in connection with illiquid securities.[18]  The Funds also specifically warned investors of the limits of comparisons stemming from the chosen benchmark index by March 2006.[19]

As set forth in the Funds' disclosures detailed *supra* nn. 17-19, the foregoing information was available to the Funds' investors by no later than March 2006, more than two years prior to the filing of the *Daniels* Actions.  As such, the claims asserted on behalf of the TAL Subclass do not relate back and are time-barred.  *See Merck*, 130 S. Ct. at 1796-98.

## II.    Plaintiffs' 1933 Act Claims Are Barred by the Applicable Statutes of Limitations and Repose.

Plaintiffs' 1933 Act claims concern only the RHY Fund.  (*See* CAC ¶¶ 317-352.)  These claims are also time-barred by the 1933 Act's one-year statute of limitations and three-year statute of repose.  *See* 15 U.S.C. § 77m; *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210 (1976).  "Claims under [§§] 11 and 12(2), and 15 of the Securities Act must be 'brought within

---

[17]    *See, e.g.*, Curley Dec. Exs. A (RMH Prosp. at Cover Sheet) (explaining that the Funds "will be concentrated in below investment grade debt securities" and accordingly have "greater risk of loss, are subject to greater price volatility and are less liquid . . ."); C (RSF Prosp. at Cover Sheet) (same); E (RMA Prosp. at Cover Sheet) (same); G (RHY Prosp. at Cover Sheet) (same).

[18]    *See, e.g.*, Curley Dec. Exs. A (RMH Prosp. at 28); B (RMH SAI at 15 ("Illiquid securities are also more difficult to value and thus the Adviser's judgment plays a greater role in the valuation process.")); C (RSF Prosp. at 29-30) (same); D (RSF SAI at 16-17) (same); F (RMA SAI at 16-17) (same); H (RHY SAI at 18) (same); *see also id.* Exs. E (RMA Prosp. at 20); G (RHY Prosp. at 21-22).

[19]    *See, e.g.*, Curley Dec. Exs. B (RMH SAI at 48) (warning of the limitations of comparing the Fund to indices and other benchmarks); D (RSF SAI at 51) (same); F (RMA SAI at 54) (same); H (RHY SAI at 66) (same); J (2006 Consol. Ann. Rpt. at 4) (noting that the "prospectus gives the management team latitude to look at sectors that are not in the index").

one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.'" *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 827 (S.D.N.Y. 2010) (citations omitted). The repose period is "an absolute limitation" and expires three years after the effective date of the RHY Fund's registration statement. *Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 2011 WL 907121, at *3, 7 (S.D.N.Y. March 16, 2011) (citation and quotations omitted).

Here, Plaintiffs' claims are clearly time-barred because a putative class action making similar allegations concerning the same Fund was filed more than a year prior to Plaintiffs bringing their own action, thereby placing them on notice of their claims. Furthermore, *American Pipe* does not apply to a subsequently filed class action and does not toll a statute of repose. Finally, even if *American Pipe* were to apply, the prior class action that included 1933 Act claims involving the RHY Fund was itself time-barred by the statute of limitations.

### A. Plaintiffs' 1933 Act Claims Are Time-Barred and Not Subject to *American Pipe* Tolling.

Plaintiffs were on notice of their claims as of the filing of *Willis* (Dec. 21, 2007), which was the first putative class action to assert 1933 Act claims concerning the RHY Fund. Plaintiffs did not assert their 1933 Act claims on behalf of the CAC's Class until the filing of *Jones* (April 8, 2010). These claims are clearly barred by the statute of limitations. As *American Pipe* applies only to subsequent *individual* actions, *Willis* does not toll the limitations period for Plaintiffs' 1933 Act claims brought on behalf the CAC's Class. *Andrews*, 851 F.2d 146 at 149.

Moreover, *American Pipe* does not apply to the 1933 Act's statute of repose. *Footbridge Ltd.*, 2011 WL 907121, at *1 (holding that "the class action tolling rule of *American Pipe* has no application to the '33 Act's statute of repose"). The repose period expired three years after the initial public offering of the RHY Fund on January 19, 2006. Because the 1933 Act claims

18

asserted on behalf of the CAC's Class were not filed until the filing of *Jones* (April 8, 2010), the

repose period bars Plaintiffs' claims.  *See* 15 U.S.C. § 77m; Curley Dec. Ex. G (RHY Prosp.).[20]

**B.      The Only Prior Putative Class Action to Assert Similar 1933 Act Claims Was
          Likewise Untimely.**

Even if Plaintiffs' 1933 Act claims could relate back to the date *Willis* was filed, the 1933

Act claims filed in *Willis* itself were time-barred.  Plaintiffs' own allegations and the RHY

Fund's public filings establish that Plaintiffs were aware of the facts giving rise to their claims

more than one year prior to December 21, 2007, the date of the filing of *Willis*, which made

similar allegations based on the same Fund's public filings.  As discussed, *American Pipe* does

not apply when the initial class action already was time-barred when filed.  *See, e.g.*, *Weston*,

265 F.3d at 368-369 (claims asserted in a subsequent action were not entitled to tolling under

*American Pipe* because the prior action "was filed after the . . . statute of limitations had run").[21]

The 1933 Act limitations period begins to run "after the plaintiff obtains actual

knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of

reasonable diligence, would have led to actual knowledge." *See Freidus*, 736 F. Supp. 2d at 827.

"'It is well established . . . that the facts placing one on inquiry notice need not detail every

aspect of the alleged fraudulent scheme, but only enough in the totality of the circumstances to

---

[20]      Plaintiffs have declined to assert 1933 Act claims concerning the RMH, RSF, and RMA Funds.
Before the filing of Plaintiffs' CAC, *Daniels* (Nos. 2:08-cv-02452, -02453, -2455), *Massey* and *Gregory*
asserted 1933 Act claims with respect to the RMH, RSF and RMA Funds.  As Plaintiffs' CAC  tacitly
acknowledges, such claims are barred by the 1933 Act's statute of repose.  *See* 15 U.S.C. § 77m; Curley
Dec. Ex. A (RMH Prosp.) (dated June 24, 2003); C (RSF Prosp.) (dated March 18, 2004); E (RMA
Prosp.) (dated Nov. 8, 2004); *see also P. Stolz Family P'ship LP v. Daum*, 355 F.3d 92, 99 (2d Cir. 2004)
("effective date of the security's registration statement" triggers the repose period).

[21]      *See also Anderson v. Unisys Corp.*, 47 F.3d 302, 308 (8th Cir. 1995) ("The *American Pipe* rule
does not operate to revive stale claims, but rather tolls the limitations period on viable claims while the
trial court determines the parameters of the class in any possible class action."); *Wyser-Pratte Mgmt. Co.*,
2003 WL 25861087, at *8 (observing that "*Weston* stands for the unremarkable proposition that an
individual plaintiff cannot use an earlier-filed class action complaint and *American Pipe* tolling to
resurrect claims that were untimely when the class action complaint was originally filed").

establish a probability of the alleged claim.'"  *In re Barclays Bank PLC Sec. Litig.*, 2011 WL 31548, at *6 (S.D.N.Y. Jan. 5, 2011) (citing *Freidus*, 736 F. Supp. 2d at 829).

Plaintiffs allege that the RHY Fund's Offering Documents contained misstatements and omissions regarding: (1) the diversification of the RHY Fund's portfolio, (2) the RHY Fund's investment in low-priority tranches of ABSs and the associated risk; (3) the RHY Fund's use of fair value accounting to price portfolio securities; (4) the Funds' reliance on similar investment strategies; and (5) the RHY Fund's use of a particular benchmark index.  (*See* CAC ¶ 256.)

The RHY Fund's public filings disclosed the RHY Fund's investment strategies, that other similar Funds existed and that the RHY Fund might hold securities identical to those held by the other Funds, the actual securities held by the RHY Fund, including specific investments in lower tranches of particular types of securities, the risks associated with such investments and information required to determine whether the Funds' invested more than 25% of their assets in a particular industry.  Indeed, Plaintiffs had access to a complete list of securities held by the RHY Fund for over one year prior to the filing of *Willis*.  (*See supra* nn. 16-19.)  The RHY Fund also disclosed the limitations associated with the use of the selected benchmark index.[22]  While the sufficiency of these disclosures as a matter of law is discussed in more detail below, Plaintiffs' allegations and the RHY Fund's public filings establish that the content of these disclosures placed Plaintiffs on notice of their 1933 Act claims concerning the RHY Fund no later than June 2006, more than one year prior to date on which *Willis* was filed.

---

[22]    *See* Curley Dec. Ex. H (RHY SAI at 66) ("Performance information for the Fund or for other [RMK Funds] may also be compared to various unmanaged indices or to other benchmarks, some of which may not be available for direct investment.  Any performance information . . . should be considered in light of the Fund's investment objectives and policies, the characteristics and quality of the Fund, and the market conditions during the time period indicated, and it should not be considered to be representative of what may be achieved in the future."); Ex. J (2006 Consol. Ann. Rpt. at 39 n.1 ("The index is unmanaged, and unlike the fund, is not affected by cashflows or trading and other expenses.  It is not possible to invest directly in an index.").

"Once a plaintiff is on inquiry [notice] of an alleged misstatement or omission, 'a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such inquiry.'" *In re USEC Sec. Litig.*, 190 F. Supp. 2d at 819 (quoting *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)).  "Where . . . the underlying facts are undisputed, the issue of whether a plaintiff has been put on notice can be decided as a matter of law." *Id.* (citing *Brumbaugh*, 985 F.2d at 162).[23]  As the RHY Fund's Offering Documents and public filings put at issue by Plaintiffs' own allegations make clear, Plaintiffs were on notice of their claims more than one year prior to the filing of *Willis*.  Accordingly, even tolling from the date of the filing of *Willis* would not save Plaintiffs' 1933 Act time-barred claims concerning the RHY Fund.

## III.    Plaintiffs' 1934 Act Claims Fail to Plead Facts Showing a Strong Inference of Scienter and Fail as a Matter of Law.

Plaintiffs assert claims under § 10(b) and Rule 10b-5 against the Funds and "Officer Defendants."  (*See* CAC Count IV.)  With respect to the balance of the Defendants, including Morgan Keegan and MAM, Plaintiffs assert only claims for control person liability under § 20(a).  Because Plaintiffs have failed to meet the PSLRA's pleading standard with respect to the Funds and Officers Defendants—the alleged primary violators of § 10(b)—Plaintiffs' control person liability claims against Morgan Keegan and MAM fail as a matter of law.

The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "That 'particular state of mind' is known as scienter and requires a plaintiff to show that a defendant's intention was 'to deceive, manipulate, or defraud.'"  *Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 754 (quoting *Tellabs v. Makor Issues & Rights, Ltd.*,

---

[23]    The Supreme Court's recent decision in *Merck* does not change the "inquiry notice" standard under the Securities Act of 1933.  *See, e.g.*, *In re Barclays*, 2011 WL 31548, at *6.  Even if this Court were to apply the standard in *Merck* to Plaintiffs' 1933 Act claims, a "reasonably diligent investor would have noticed the alleged discrepancy" in earlier public filings to trigger the limitations period under the *Merck* standard.  *See In re Barclays*, 2011 WL 31548, at *7.

551 U.S. 308, 314 (2007)).  A strong inference of scienter is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

To survive a motion to dismiss, Plaintiffs must plead facts demonstrating that the Funds and the Officer Defendants acted intentionally or recklessly.  As this Court recently explained, "[t]he Sixth Circuit defines recklessness as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'"  *Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 755 (quotation and citation omitted); *see also Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th Cir. 2009).

> The Sixth Circuit has identified nine factors probative of a strong inference of scienter:
>
> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 756-57 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001), *abrogated in part* by *Tellabs*).

Plaintiffs' efforts to show scienter with respect to the Funds and the Officer Defendants fail as a matter of law for a number of reasons.  First, as a number of courts have recognized, based on the facts pleaded by Plaintiffs, the most compelling inference is that the Funds suffered sharp declines as a result of the global economic crisis, not as the result of fraud by these Defendants.  Second, Plaintiffs may not rely on "group pleading" to show scienter; rather, Plaintiffs must plead facts showing that each of these Defendants acted with the requisite intent.

Finally, the complaint fails to allege facts showing that each of these Defendants had a motive and opportunity to commit securities fraud or otherwise engaged in conscious or reckless misbehavior.  As such, the § 10(b) claims against the Funds and the Officer Defendants fail as a matter of law.

A.   **The Most Plausible Inference Is that Defendants Failed to Anticipate the Global Credit Crisis.**

Under *Tellabs*, "'[t]he Court must take into account plausible opposing inferences.'"  *La. Sch. Emp. Ret. Sys. v. Ernst & Young LLP*, 622 F.3d 471, 479 (6th Cir. 2010) (quoting *Tellabs*, 551 U.S. at 323).  Rather than showing fraud, Plaintiffs' allegations suggest a much more plausible inference that must be drawn from the facts pleaded in the CAC.  Namely, that the alleged statements or "omissions" at issue stem from the consequences of the global credit crisis and its impact on the Funds, rather than misconduct evidencing a strong inference of scienter.

The Funds' disclosures support this inference because they disclosed the risk associated with an investment in the Funds and details of the Funds' investment strategy.  (*See infra* Part IV.)  Importantly, each Fund's prospectus explicitly warned that "[a]n investment in the common shares represents an indirect investment in the securities owned by the Fund.  The value of these securities, like other market investments, may move up or down, sometimes rapidly and unpredictably."  Curley Dec. Exs. A (RMH Prosp. at 5, 23); C (RSF Prosp. at 6, 24); E (RMA Prosp. at 5-6, 25); G (RHY Prosp. at 6, 26).

In addition to the Funds' disclosures, it is undisputed that the Funds' share price declined sharply in value in the wake of the global credit crisis and that this crisis impacted the market for debt securities—including the market for ABSs and MBSs—in an unprecedented manner.  As former  Federal Reserve Chairman Alan Greenspan observed, the collapse of the credit markets occurred "virtually overnight," as global demand for risky investments "abrupt[ly]" and

"unexpectedly" evaporated.   Curley Dec. Ex. S (A. Greenspan, "The Roots of the Mortgage Crisis").

It is certainly a much more plausible inference that the Funds' losses were the result of the impact of the global credit crisis, than fraudulent misconduct.  Indeed, in cases following the financial crisis, courts have recognized that "it is much more likely that Defendants . . . underestimated the magnitude of the coming economic crisis and believed that they were taking adequate risk management and cautionary measures to account for any future downturn." *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010); *see also In re Societe Generale Sec. Litig.*, 2010 WL 3910286, *7 (S.D.N.Y. Sept. 29, 2010) (same); *In re MRU Holdings Sec. Litig.*, 2011 WL 650792, *14 (S.D.N.Y. Feb. 17, 2011) (discussing "'the opposing and compelling inference'" that defendants engaged in bad business judgments (quotations and citations omitted)).   At most, Plaintiffs in this action have alleged that Defendants possibly mismanaged the Funds by failing to anticipate market developments.  Even if this were true, such allegations do not give rise to an inference of scienter.  *Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 719 (S.D. Ohio 2010).

### B. Plaintiffs Have Failed to Plead Specific Allegations of Scienter With Respect to the Funds and the Officer Defendants and Rely on Insufficient Allegations of Group Pleading.

Regardless of whether the global credit crisis provides an inference more compelling than fraud, Plaintiffs plead no facts specific to either the Funds or the Officer Defendants showing that these Defendants acted with the requisite scienter.  While Plaintiffs allege in conclusory fashion that the Funds' Offering Documents and other public filings contained false statements (discussed below), Plaintiffs fail to tie any of the Officer Defendants to these statements or allege facts establishing scienter.  (*See* Ind. Def. Mem. Part I.B.).

24

With respect to the Funds, Plaintiffs include *no* allegations giving rise to any inference of the Funds' scienter. This dooms their § 10(b) claim concerning the Funds. *See P.R. Diamonds, Inc. v. Chandler*, 364 F.3d 671, 697-698 (6th Cir. 2004).[24]   With respect to the Officer Defendants, Plaintiffs rely nearly exclusively on "group pleading" in asserting that the Officer Defendants' positions as "Officers" of the Funds render these Defendants responsible for all statements in the Funds' Offering Documents and other public filings by virtue of their positions.

The Court should reject Plaintiffs' reliance on group pleading as sufficiently alleging scienter.  Group pleading is counter to the PSLRA's mandate that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2); *see also Fifth Third Bancorp.*, 731 F. Supp. 2d at 720; *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984-87 (S.D. Ohio 2008); *but see Regions Morgan Keegan Mut. Fund Litig.*, 743 F. Supp. 2d at 756.  The Court should not endorse its use here.

With the exception of Mr. Kelsoe (discussed below), Plaintiffs do not plead *any* facts demonstrating that any Officer Defendant knowingly made false or misleading statements.  (*See* CAC ¶¶ 294-298.)  Plaintiffs merely allege that "[o]wing to their positions with the Funds . . . [the Officer Defendants] knew or should have known about the failure to conduct due diligence, the inappropriate and inaccurate NAV calculations, the deficiencies in risk management, and the

---

[24]     To plead scienter as to a corporation, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Plaintiffs have pleaded no facts demonstrating that any individual whose intent could be imputed to the Funds acted with the requisite scienter.  Plaintiffs rely nearly exclusively on allegations addressing Mr. Kelsoe's purported conduct.  Mr. Kelsoe, however, was not an employee of the Funds; rather, he was an employee of MAM, whose relationship with the Funds was contractual.  Plaintiffs' allegation that Mr. Kelsoe was employed by the Funds as "money manager" is conclusively disproven by the Funds' Offering Documents and public filings (all of which are incorporated by reference into the CAC).  *See, e.g.,* Curley Dec. Exs. G (RHY Prosp. at 34 ("Day-to-day management of the Fund's portfolio will be the responsibility of a team led by James C. Kelsoe, Jr., CFA.  The following individuals *at the Adviser* share primary responsibility for the management of the Fund.")); H (RHY SAI at 48-50 (discussing how Messrs. Kelsoe and Tannehill are compensated by MAM, and how they serve as portfolio managers for other funds managed by MAM)); L (2007 Consol. Ann. Rept. at 4, 22, 39, 58 (Mr. Kelsoe signed Management Discussion of Fund Performance as an employee of MAM)).

failure to follow pricing and risk assessment policies during the Class Period."  (CAC ¶ 304; *see also id.* ¶ 299.)  This is insufficient.  "[S]cienter . . . cannot be inferred merely because of the defendants' positions in the company or the fact that they had access to the company's financial information.  Instead, 'the [c]omplaint must allege specific facts and circumstances suggestive of their knowledge.'"  *Fifth Third Bancorp.*, 731 F. Supp. 2d at 726 (quoting *PR Diamonds, Inc.*, 364 F.3d at 688); *see also Konkol*, 590 F.3d at 397.

Where "[t]here are no factual allegations . . . that Defendants actually read or reviewed information available . . . and that their review of the available information was sufficiently comprehensive to appreciate the alleged" misstatements or omissions, a complaint fails to allege a strong inference of scienter.  *See Fifth Third Bancorp*, 731 F. Supp. 2d at 726.  Plaintiffs' bare allegations that the Officer Defendants knew, or should have known, of the alleged fraud "simply from their review of [information] and their service on committees is tantamount to an allegation of fraud by hindsight and thus is insufficient to establish scienter."  *Id.* at 726.

## C.     Plaintiffs Fail to Allege Motive and Opportunity to Commit Securities Fraud.

With respect to the Officer Defendants, Plaintiffs do not allege that these Defendants engaged in insider trading or had a self-interested motivation aside from their jobs or salaries.[25] Plaintiffs allege that "[Officer Defendants] had an incentive to maximize the reported NAVs of the Funds" in order to increase MAM's 0.65% advisory fee, paid pursuant to the Funds' Investment Advisory Agreements.  (CAC ¶ 71.)  Further, Plaintiffs assert that the Officer Defendants "each received a base salary and an annual cash bonus equal to as much as 50% of their annual base salaries as determined by investment management results compared to the Funds' Benchmark Index.  Kelsoe, Anthony and Sullivan each earned 50% of their bonuses by

---

[25]     Failure to allege that insider trading occurred "goes a long way towards concluding that a strong inference of scienter has not been pled."  *Fifth Third Bancorp*, 731 F. Supp. 2d at 727; *see also P.R. Diamonds*, 364 F.3d at 691 ("the absence of stock sales by the Individual Defendants works against . . . an inference of scienter").

meeting target returns and 75% by meeting maximum returns (the remaining 25% was determined by a Bonus Plan Committee), and thus had a further incentive to maximize the Funds' reported NAVs."  (CAC ¶ 71; *see also id.* ¶ 21 ("Higher NAVs earned [Defendants] higher annual bonus compensation and kept the [RMK Fund] Complex flying high.").)

Allegations of a general motive to increase corporate profit and, therefore, an executive's bonus compensation tied to performance fail to support a strong inference of scienter.  "When analyzing the self-interest factor, a court must differentiate between 'motives common to corporation and executives generally' and "'motives to commit fraud.'"  *Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 758 (quoting *PR Diamonds*, 364 F.3d at 690).  "[S]ome motives[] are insufficient as a matter of law to establish scienter, such as a desire for the company to appear successful and an executive's desire to protect his position in the company and increase his compensation."  *Fifth Third Bancorp.*, 731 F. Supp. 2d at 720; *see also La Pietra v. RREEF Am., LLC*, 738 F. Supp. 2d 432, 443-45 (S.D.N.Y. 2010) (same).

Apart from these two paragraphs—which simply regurgitate details of the Officer Defendants' compensation published in the Funds' disclosures—Plaintiffs provide no other details demonstrating that each Officer Defendant had a motive to commit fraud.  For example, Plaintiffs have pleaded no facts regarding the ultimate amount of Kelsoe's and the other Officers' compensation, and whether the method of compensation was unique to the industry— as opposed to being standard industry practice.  This Court has rejected such allegations where Plaintiffs "do not allege that . . . [Defendants] ever received a bonus or how much they received, requiring the Court to discount these allegations . . . ."  *Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 758.  Plaintiffs fail to plead any facts showing that the alleged "fraud" materially increased compensation.  And, as discussed below, while Plaintiffs allege that

Mr. Kelsoe inflated the values of certain securities, they plead no facts explaining whether these valuations materially impacted the Funds' overall performance.

> **D.      Plaintiffs Otherwise Fail to Plead Particularized Facts Demonstrating Conscious Misbehavior or Reckless Conduct on the Part of the Funds or the Officer Defendants Relating to any of the Alleged Misrepresentations or Omissions.**

Plaintiffs' remaining allegations pertain largely to Mr. Kelsoe but do not demonstrate intentional or conscious misbehavior, and are insufficient as a matter of law to show a strong inference of scienter.

> **1.      Plaintiffs' Allegations Regarding Valuation Fail to Show a Strong Inference of Scienter.**

The CAC includes allegations copied from a regulatory complaint filed by the SEC, alleging that Mr. Kelsoe "manipulated" and/or "screened" price quotations from broker-dealers, and submitted "phony 'price adjustments' to the Fund Accounting Department" that he knew were being used to calculate the Funds' NAV. (CAC ¶¶ 137-153.) Even assuming this parroting of such allegations is a proper pleading technique—which it is not—these allegations do not give rise to a strong inference of scienter with respect to the Funds or the Officer Defendants.

The CAC alleges that "Morgan Keegan's Fund Accounting Department was responsible for the calculation of the Funds' NAVs and for pricing portfolio securities," and "MAM's Valuation Committee . . . oversaw the Fund Accounting Department's processes." (*Id.* ¶ 133.) But rather than pleading fraudulent intent, such allegations support the more compelling inference that Mr. Kelsoe was *not* responsible for the final valuation of the Funds' assets, only for providing his input into the valuation process. (*See* CAC ¶¶ 127-136.)

Similarly, according to the very valuation policies cited by Plaintiffs, Mr. Kelsoe could question a quotation and/or provide proposed adjustments to Fund Accounting if he had a "reasonable basis to believe that the price provided [did] not accurately reflect the fair value of the portfolio security." (*Id.* ¶ 133.) These allegations likewise support the more compelling

28

inference that broker-dealer quotes submitted to the Funds used in verifying the price of securities were not determinative of the values assigned to the securities.

Under Plaintiffs' theory, Plaintiffs must plead particularized facts demonstrating that Mr. Kelsoe sent price adjustments to Fund Accounting that he did not believe accurately reflected a security's value, while also *knowing* that Fund Accounting was failing to take any action to verify his adjustments.[26]  Plaintiffs' factual allegations fail to make this connection.

To survive a motion to dismiss, Plaintiffs must have pleaded facts demonstrating that the Officer Defendants and the Funds consciously disregarded duties regarding the valuation of the Funds' securities, *knowing* that there were no other valuation safeguards in place, and that any resulting valuations would necessarily be fraudulent.  The CAC contains no particularized factual allegations to that effect.  Merely alleging that "[h]ad the Fund Accounting Department followed stated policies and procedures, it would have discovered that the price Kelsoe provided was false" is insufficient.  (CAC ¶ 145.)  At most, these generalized assertions suggest possible mismanagement on the part of the entities responsible for managing the Funds pursuant to a contractual arrangement, not fraud on the part of the Funds or the Officer Defendants.[27]

Plaintiffs' allegation that Mr. Kelsoe interfered with due diligence to conceal his "fraud" is unsupported by *any* factual allegations.  (*See* CAC ¶¶ 154, 137-160 (alleging that Mr. Kelsoe

---

[26]  Similarly, merely regurgitating the SEC's allegations that Mr. Kelsoe pressured broker-dealers to increase the quoted prices of certain securities does not establish fraud.  (*See* CAC ¶¶ 143-153.)  Plaintiffs fail to explain why asking a broker-dealer to increase a quote that a portfolio manager thought was incorrect would be "fraudulent," especially where the Funds' valuation guidelines authorized the use of multiple sources of information to verify prices, and where another entity was responsible for verifying any proposed adjustments.

[27]  In another example, Plaintiffs allege that Kelsoe tardily informed Fund Accounting of an impending asset devaluation, coupled with the assertion that the delayed report was "deliberate."  This assertion likewise fails to plead scienter, especially where Plaintiffs acknowledge that Mr. Kelsoe informed Fund Accounting of the quotation prior to March 31, 2007, the date the broker-dealer was scheduled to deliver it.  This date appears to coincide with the publication of the Funds' quarterly asset schedule, undercutting any inference that Mr. Kelsoe intentionally withheld information required to be included in those disclosures.  (CAC ¶¶ 151-153.)

"stalled [Kim Escue, a Morgan Keegan WMS analyst], ignored her calls, and tried to persuade her that a telephonic meeting might suffice" in order to conceal "his lack of professional management, as well as his manipulation of the Funds' NAV and portfolio securities' prices").) Plaintiffs fail to allege that the due diligence in question even related to the Funds at issue in this litigation, as opposed to the Open-End Funds.  (*See* Stranch Decl., Ex. T, E-mail from K. Escue ("I was told that *the Intermediate Fund* had experienced no defaults and *the High Yield product* had experienced no more defaults than what would be expected . . . .") (emphasis supplied).)[28]

Finally, Plaintiffs' allegations regarding valuation concern only Mr. Kelsoe, and plead no significant facts concerning the Funds or any other Officer Defendant against whom a § 10(b) claims has been asserted.  For instance, Plaintiffs allege that "Weller was a member of the 'Valuation Committee' that purportedly oversaw the Funds' accounting processes and evaluated the prices assigned to securities," but rely entirely on his service on the committee as evidence of scienter.  (CAC ¶¶ 298.)  As set forth above, such allegations do not show scienter.

### 2. Plaintiffs' Allegations Regarding Concentration Fail to Show a Strong Inference of Scienter.

Plaintiffs allege that the Officer Defendants intentionally "conceal[ed] significant risks— including a lack of diversification—resulting from the concentration of the Funds' portfolio securities in ABS."  (CAC ¶ 14.)  This allegation defies logic.  The Funds' concentration of their respective investments was disclosed to investors at all relevant times.  *See*, *e.g.*, Curley Dec. Exs. I-R (Consol. Ann., Semi-Ann., and Quarterly Rpts. (containing a schedule of Fund portfolio assets broken down as a percentage of total investments and total net assets)).

---

[28]     Plaintiffs' assertion that Ms. Escue "determined that it was in Morgan Keegan's best interest to 'drop coverage' of the Funds" is contradicted by the contents of the materials submitted by Plaintiffs in support of the CAC.  For example, Morgan Keegan dropped WMS analyst coverage of *all* proprietary products, not just the unspecified funds to which Escue refers in her e-mails.  (*See* Stranch Decl., Ex. U, E-mail from K. Escue (discussing how "Wealth Management dropp[ed] coverage of all proprietary products").

More importantly, Plaintiffs have pleaded no facts to support their theory that statements of the Funds' concentration policy and the alleged failure to disclose subsequent violations thereof were "fraudulent."   The Funds disclosed each and every asset contained in their portfolios on a quarterly basis, each of which unequivocally disclosed that the Funds' invested more than 25% of their assets in ABSs.  This disclosure entirely undermines Plaintiffs' theory of scienter.  *See Fifth-Third Bancorp*, 731 F. Supp. 2d at 727 (actual disclosure of allegedly concealed information "cut[s] strongly against a finding of scienter").

For the same reason, Plaintiffs' allegation that the Funds misclassified assets in "a deliberate effort to cover up the Funds' concentration in ABS (particularly subprime mortgage-related ABS) and to create the appearance of proper diversification," fails to show scienter.  (*See* CAC ¶ 99.)   Plaintiffs have pleaded no facts alleging the Funds or the Officer Defendants intentionally misclassified assets.  (*See* CAC ¶¶ 98-99.)  Instead, Plaintiffs rely entirely on the argument that the alleged misclassifications "involve[] basic financial concepts that were (or should have been) well-within the portfolio managers' knowledge or expertise."  (CAC ¶ 98.)

Such allegations fall well short of pleading scienter and Plaintiffs' own allegations undermine any inference of scienter.  Plaintiffs argue that the allegedly misclassified securities "were like apples and oranges" and "cannot be confused."  (*See* CAC ¶ 98.)  If true, it would be entirely inconsistent with a strong inference of scienter for the Funds or the Officer Defendants to misclassify securities and then disclose the misclassification in the Funds' filings, where it would have been obvious to all—including analysts, regulators, investors, and other investment advisors considering investments in the Funds—that such securities had been misclassified.

Plaintiffs also argue that "Defendants have still not explained how the false classifications came about or how they were not the result of intentional conduct."  (CAC ¶ 98.) Neither the Funds, nor the Officer Defendants bear the burden of providing a non-fraudulent

explanation.  To the contrary, the Sixth Circuit "has never held that a securities-fraud defendant must proffer a nonfraudulent explanation" and has expressly declined to do so.  *See Konkol*, 590 F.3d at 403.  Here, Plaintiffs plead no facts supporting the conclusion that even a single allegedly erroneous misclassification was fraudulent.  They plead no details of the alleged fraud, including but not limited to, the participants in the alleged fraud and a plausible motive the participants might have had for engaging in fraudulent misconduct regarding the misclassification of assets.[29] The assertion that "[i]t simply does not happen by accident" is a woeful substitute for actual factual allegations to support Plaintiffs' theory that there was "a systematic effort to hide the Funds' concentration" in ABSs and MBSs.  (CAC ¶ 17.)

### 3. The Funds' Choice of a Benchmark Index Fails to Show a Strong Inference of Scienter.

Plaintiffs have pleaded no facts alleging that the Funds' choice of a benchmark index was "fraudulent," or that any of the Officer Defendants played a role in selecting the index.  (*See* CAC ¶¶ 26-28; 161-173.)   When a fund selects a benchmark index, that choice involves a considerable degree of discretion by the Funds.  *See* Disclosure of Mut. Fund Performance & Portfolio Managers, Inv. Co. Act Rel. No. 19,382, 1993 SEC LEXIS 780, at *17 (Apr. 6, 1993) (Funds are afforded "considerable flexibility in selecting a broad-based index that [the fund] believes best reflects the market(s) in which it invests").  Plaintiffs' plead no facts supporting an inference that the Funds or any of the Officer Defendants knowingly or recklessly chose an incorrect index so as to misrepresent the content of the Funds' portfolios.  Plaintiffs' allegations

---

[29]     Indeed, Plaintiffs provide an alternative explanation other than fraud.  Plaintiffs allege that Al Landers, a MAM analyst—not a Fund employee or a Defendant named in this action—failed to perform adequate due diligence on securities purchased for the Funds.  If true, it is a *more* likely explanation that the Funds asset schedules relied on this erroneous or incomplete information regarding the types of securities in the Funds' portfolios, as opposed to the Funds or the Officer Defendants engaging in a convoluted fraudulent scheme to conceal a concentration in asset-backed securities that had already been disclosed to the investing public.  *See Dynex Capital, Inc.*, 531 F.3d at 197.

of fraud depend entirely upon the vague and conclusory assertions of "CW1," which, as discussed below, must be disregarded.[30]

### 4. Allegedly Inadequate Due Diligence Fails to Show a Strong Inference of Scienter.

Plaintiffs allege that the Funds and Officer Defendants failed to perform adequate due diligence on the Funds' investments.   (*See* CAC ¶¶ 24-25; 113-114.)  Such allegations do not equate to fraud.  At most, inadequate due diligence is negligence or mismanagement.  In any event, Plaintiffs have failed to plead facts demonstrating that the Funds or the Officer Defendants made knowing or recklessly false statements regarding the extent of MAM's due diligence.

Plaintiffs also rely on insufficient allegations of a confidential witness (discussed below) and a set of e-mails purportedly demonstrating that Mr. Landers, "a MAM portfolio analyst who was known to be Kelsoe's confidant," made belated requests for information to broker dealers about securities that had already been purchased by the Funds.  (*See, e.g.*, *id.* ¶¶ 115-126.)  Nowhere, however, do Plaintiffs state that the Funds or Officer Defendants knew that Mr. Landers was not performing adequate diligence.   These speculative allegations certainly do not give rise to a strong inference of scienter.

### E. Plaintiffs' "Confidential Witness" Allegations Must Be Rejected.

Plaintiffs attempt to bolster their allegations by including the statements of "Confidential Witness Number 1" ("CW1").  To support a strong inference of scienter, Plaintiffs must plead basic information showing that CW1 was in a position know about the allege fraud, including, "dates of employment, job description, employment location or sector, or which Defendants

---

[30]   Plaintiffs also cite an e-mail written by Gary Stringer, who served as head of Morgan Keegan's Wealth Management department and is not a Defendant in this action.  This e-mail exchange does not mention the benchmark index or even address the Funds at issue.  (*See* CAC ¶ 165-66.)  Nevertheless, Plaintiffs extrapolate that "[Stringer] knew that the Funds were even more glutted with low-priority ABS than the Intermediate Bond Fund, [and] he therefore must have known that the Funds themselves were even less appropriate investments for Mr. and Mrs. Jones." (*Id.*)  Such speculation regarding the state of mind of a non-defendant who was not a Fund employee does not show scienter.  Nor can Plaintiffs rely on the Funds' underperformance relative to the chosen index to show scienter.  (CAC ¶¶ 169-173.)

interacted with [the witness]."   *Konkol*, 590 F.3d at 399.   "[G]eneralized statements cannot

substitute for *specific* facts through which a factfinder can strongly infer that the Defendants

themselves knew of or recklessly disregarded the falsity of the . . . statements . . . ."  *Id.* at 401.

Plaintiffs cite no facts to bolster the credibility of CW1, such as details of his position

(other than the fact that he was a "broker" who is no longer with Morgan Keegan), or instances

in which he observed any of the conduct alleged or interacted with any of the Defendants.   CW1

supposedly alleges that Kelsoe "admitted that he was too busy to do research on the securities

purchased for the Funds' portfolios and that he did not have time to conduct pre-purchase

diligence."  (CAC ¶ 114.)   Similarly, Plaintiffs state that "[a]ccording to CW1, Defendants used

the Benchmark Index to lure investors who understood what corporate bonds and preferred stock

were, but not the intricacies of Structured Finance products."  (*Id.* ¶ 164.)    Plaintiffs, however,

plead no facts about the context of these alleged "admissions," when these statements were

made, or even whether the statements were actually made to CW1 or some other party.

Plaintiffs acknowledge that they have failed to plead facts sufficient to confirm the

reliability of CW1 and propose instead to make an *in camera* submission.  (*See* CAC ¶ 114 n. 23

(admitting that Plaintiffs failed to plead such information).)   Such facts, however, must be

included in the Complaint.  *See Karpov v. Insight Enter., Inc.*, 2010 WL 2105448, *8 (D. Ariz.

Apr. 30, 2010) (offering *in camera* submission inadequate); *In re Dot Hill Sys. Corp. Sec. Litig.*,

594 F. Supp. 2d 1150, 1162 (S.D. Cal. 2008) (same).   Accordingly, Plaintiffs' allegations based

on alleged statements of "CW1" do not support a showing of scienter.[31]

## IV.   Plaintiffs Fail to Establish that Any of the Funds' Public Filings Contained Actionable Misrepresentations or Omissions.

Plaintiffs' 1933 and 1934 Act claims likewise fail as a matter of law due to Plaintiffs'

---

[31]     Also telling is the fact that Plaintiffs claim to have interviewed "numerous former employees of Defendants herein," yet offer vague assertions attributable only to *one* "confidential witness."  (CAC ¶ 2.)

failure to allege the existence of material misstatements or omissions attributable to each specific Defendant.[32]   It is simply insufficient for Plaintiffs to allege the existence of misstatements and/or omissions, when, as set forth below, the actual public filings at issue directly contradict Plaintiffs' allegations.   Where a plaintiff fails to plead actual material misstatements or omissions, claims under the 1933 and 1934 Act must be dismissed.  *See, e.g.*, *La Pietra*, 738 F. Supp. 2d at 442-443 (dismissing fraud claims where "[m]any of the facts that the plaintiffs allege were omitted . . . were disclosed").

Plaintiffs' claims are based on four general categories of alleged misstatements and omissions: (1) the extent to which the Funds concentrated investments in certain types of securities (*i.e.*, ABS and MBS) and the risk associated therewith; (2) mis-valuation of securities held in the Funds' portfolios; (3) the comparison of the Funds' returns against an inappropriate benchmark index; and (4) the failure to disclose mismanagement of the Funds, such as inadequate due diligence.   The allegations in Plaintiffs' Complaint, however, fail to tie any alleged misstatement or omission specifically to Defendants and disregard the actual contents of the filings at issue, which disclosed the information Plaintiffs allege was misstated or omitted.

### A.     Plaintiffs' Claims Fail to Satisfy the Pleading Requirements of Rule 9(b) and the PSLRA.

Rule 9(b) and the PSLRA require that Plaintiffs set forth each alleged misrepresentation or omission and "enlighten each defendant as to his or her particular part in the alleged fraud." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d at 985 (quotation and citation omitted).  Plaintiffs

---

[32]     Section 11 of the 1933 Act provides that a person acquiring a security may sue specified persons if any part of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. . . ."  15 U.S.C. § 77k(a).  Section 12 provides a right of action against those who "sell" securities by means of a prospectus which contains a material misstatement or omission.  15 U.S.C. § 77l(a)(2).  Unlike claims under § 10(b), Plaintiffs need not prove that misrepresentation or omission was fraudulent in order to prevail on claims under §§ 11 and 12(a)(2).  To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury."  *P.R. Diamonds,* 364 F.3d at 681 (quotation and citation omitted).

rely predominantly on block quotations of the alleged portions of the Funds' annual, semi-annual, and quarterly reports that they claim to be misleading.  Plaintiffs otherwise address the RHY Fund's Offering Documents only cursorily, failing to identify the alleged misstatements and omissions allegedly contained therein.  (*See* CAC ¶¶ 251-256.)  This is insufficient.[33]

Moreover, Plaintiffs fail to adequately plead facts tying each Defendant to the alleged fraud.  Rather, Plaintiffs make speculative allegations regarding "Defendants'" conduct, based on a hindsight analysis of the Funds' performance.  (*See, e.g.*, CAC ¶ 99 (discussing "Defendants' false classification of the Funds' assets"); ¶ 113 ("Defendants falsely represented that the Funds' portfolios would be professionally managed by 'one of America's leading high-yield fund managers'); ¶ 137 ("Defendants ignored these stated policies and procedures and falsely calculated and reported the values of the Funds' portfolio securities"); ¶ 164 ("Defendants used the Benchmark Index to lure investors . . . .").)  Vague allegations such as these fail to satisfy the requirements of Rule 9(b) and the PSLRA.  *See Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 755-56 (dismissing § 10(b) claim where plaintiffs failed to state with particularity all facts surrounding the alleged misrepresentations or omissions).

Plaintiffs otherwise have copied allegations, nearly verbatim, from filings made by federal and state regulators in other proceedings.  Such allegations are insufficient to plead claims of fraud.  *See Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. at 78-79.  Furthermore, the allegations copied from regulatory proceedings do not pertain specifically to any of the Funds.  Rather, these allegations pertain generally to the "Funds" as a whole (*Compare* CAC Ex. V, ¶¶ 54-76 (specifically discussing the Open-End Funds) with ¶ 77 (only

---

[33]     Throughout the CAC, Plaintiffs' allegations refer to the Funds in general and do not state when their allegations refer specifically to the RHY Fund or alleged misstatements or omissions in the RHY Fund's offering documents.  To the extent Plaintiffs rely on alleged misstatements or omissions outside the offering documents of the RHY Fund, the Court should ignore such allegations when analyzing Plaintiffs' 1933 Securities Act claims.  *See* 15 U.S.C. §§ 77k, 77l; *Gustafson v. Alloyd Co.*, 513 U.S. 561, 584 (1995) (same).

generally discussing the four Closed-End Funds.  As such, these allegations are not sufficiently particularized to support Plaintiffs' fraud claims under the 1933 and 1934 Acts.  *See Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 756 (similar allegations failed to meet even Rule 8(a)'s "more forgiving standard requiring plausibility").

> **B.**     **The Funds' Offering Documents Disclosed the Risk Associated with an Investment in the Funds.**

The Funds' risk disclosures were clear and unequivocal, stating in bold type on the cover page of each Fund's prospectus, that "**[t]he Fund[s'] strategy of investing the majority of its total assets in below investment grade debt securities and its expected use of leverage involve a high degree of risk.  *Stockholders can lose some or all of their investment.*** " Curley Decl. Ex. E (RMA Prosp. Cover Page); *see also id.* Exs. A, C, G, (RMH, RSF, & RHY Prosp. Cover Pages) (same).   The Funds disclosed their investment strategy of investing in "speculative," "below investment-grade" debt securities, or "junk bonds" and made clear that the Funds were not intended to be safe investments that guaranteed preservation of principal.  *See* Curley Decl. Ex. G (RHY Prosp. Cover Page); *see also id.* Ex. V (Appx. of Disclosures).[34]

Except to briefly mention the RHY Fund, Plaintiffs entirely avoid any discussion of the Funds' Offering Documents.[35]   The Funds' Offering Documents, however, are part of the total

---

[34]     For the convenience of the Court, Defendants have attached an Appendix of Disclosures, which groups the Funds' disclosures (verbatim with respect to the RHY Fund and with citation to the substantially the same language concerning the other Funds) by category.

[35]     Plaintiffs' discussion of the RHY Fund is cursory at best.  Of their 367-paragraph CAC, Plaintiffs devote only six paragraphs to alleged deficiencies in the RHY Fund's Offering Documents.  Plaintiffs allege that the RHY Fund should have disclosed that the Funds intended to engage in the misconduct alleged elsewhere in the CAC.  (CAC ¶¶ 251-256.)  They also claim that the RHY Offering Documents failed to disclose that the RHY Fund "would be concentrated in the lowest priority, highly leveraged tranches of ABS backed by subprime assets with significant credit risk, and that, as a result, investors would be exposed to extraordinary credit risk."  (CAC ¶ 254; *see also id.* ¶ 256 (alleging that the RHY Offering Materials only described "very generally the risks of investing in ABS").).  The disclosures contained in all four Funds' Offering Documents, however, address the very same risks Plaintiffs claim were omitted.

mix of information available to investors, and therefore, must be considered when evaluating
Plaintiffs' claims that any material information was misrepresented to or withheld from them.
*See La Pietra*, 738 F. Supp. 2d at 441.  Plaintiffs' absolute failure to address these detailed risk
disclosures contained therein speaks volumes.

The Funds' Offering Documents also discussed the risks with respect to the assets in
which the Funds invested.  These disclosures appeared multiple times in the Funds' Offering
Documents.  In the RHY Fund's Offering Documents, a summary of relevant risks appears at the
outset of the Prospectus, *see* Curley Dec. Ex. G (RHY Prosp. at 5-13), and a more detailed
discussion of these risks later in that document, *see id.* (RHY Prosp. at 26-33).  Finally, the RHY
Fund's SAI, which is part of the Fund's Offering Documents, contains **over thirty (30) pages**
discussing the various types of securities in which the Funds could invest and the risks associated
with an investment in such securities.  *See* Curley Dec. Ex. H (RHY SAI at 3-37); *see also*
Curley Dec. Exs. B (RMH SAI at 2-26); D (RSF SAI at 2-27); F (RMA SAI at 3-28).

By way of example, the Funds' Offering Documents discuss five categories of risks
associated with securities in which the Funds invested:

- **Below Investment Grade Securities**:  "Below investment grade debt securities
  are commonly referred to as 'junk bonds.'  Below investment grade quality
  securities are considered speculative with respect to an issuer's capacity to pay
  interest and repay principal and are susceptible to default or decline in market
  value due to adverse economic and business developments.  These securities are
  less liquid than investment grade securities."  Curley Dec. Exs. G (RHY Prosp. at
  8, 28-29);  A (RMH Prosp. at 7, 25); E (RMA Prosp. at 7-8, 26-27); C (RSF
  Prosp. at 8, 26-27).

- **Leverage Risk**:  "Leverage creates an opportunity for an increased return to
  common stockholders, but it is a speculative technique because it increases the

---

The Funds had no duty to disclose any additional information proposed by Plaintiffs.  SEC Form
N-2, which governs what information is required to be included in a registration statement, only requires
that a fund "[c]oncisely describe the risks associated with an investment in the [fund], including . . . the
principal risk factors associated with investment" in the fund.  Curley Decl. Ex. T (SEC Form N-2, Item
8(3)).  It is sufficient that the prospectus disclose the nature of the risk; it is not necessary for such risks to
be characterized in a pejorative manner.  *See Recupito v. Prudential Sec.*, 112 F. Supp. 2d 449, 457 (D.
Md. 2000).

Fund's exposure to capital risk. . . .  There is no assurance that the use of leverage
will be successful during any period in which it is used."  Curley Dec. Exs. G
(RHY Prosp. at 7, 27-28); A (RMH Prosp. at 6, 24); E (RMA Prosp. at 6, 25); C
(RSF Prosp. at 7, 25).

- **Management Risk**:  "The Fund is subject to management risk because it has an
actively managed investment portfolio.   The Adviser will apply investment
techniques and risk analyses in making investment decisions for the Fund, but
there can be no guarantee that these will produce desired results."  Curley Dec.
Exs. G (RHY Prosp. at 6-7, 27); A (RMH Prosp. at 6, 23); E (RMA Prosp. at 6,
25); C (RSF Prosp. at 6, 25).

- **Mortgage-Backed Securities Risk**:   "The value of mortgage-backed securities
may . . . change due to shifts in the market's perception of issuers . . . .  In
addition, mortgage-backed securities are subject to the credit risk associated with
the performance of the underlying mortgage properties."  Curley Dec. Exs. G
(RHY Prosp. at 9, 29-30); A (RMH Prosp. at 7, 26); E (RMA Prosp. at 8, 27); C
(RSF Prosp. at 8, 27).

- **Asset-Backed Securities Risk**:  "Payment of interest and repayment of principal
on asset-backed securities may be largely dependent upon the cash flows
generated by the assets backing the securities . . . .  Asset-backed security values
may also be affected by the creditworthiness of the servicing agent for the pool. . .
."  Curley Dec. Exs. G (RHY Prosp. at 9, 30); A (RMH Prosp. at 8, 26); E (RMA
Prosp. at 8, 27-28); C (RSF Prosp. at 8, 27).

- **Illiquid and Restricted Securities Risk**:  "Illiquid securities may be difficult to
dispose of at a fair price at the times when the Fund believes it is desirable to do
so.  The market price of illiquid securities generally is more volatile than that of
more liquid securities . . . .  Illiquid securities are also more difficult to value and
the Adviser's judgment may play a greater role in the valuation process. . . .  The
risks associated with illiquid securities may be particularly acute in situations in
which the Fund's operations require cash and could result in the Fund borrowing
to meet its short-term needs or incurring losses on the sale of illiquid securities."
Curley Dec. Exs. G (RHY Prosp. at 12, 31-32); A (RMH Prosp. at 10, 28); E
(RMA Prosp. at 11, 30); C (RSF Prosp. at 11, 29-30).

The Funds' SAIs included extensive *additional* discussion of risks inherent in
investments in "Subordinated Securities," or the low-priority tranches of MBS and ABS that
Plaintiffs accuse the Funds of concealing:

The Fund may invest in subordinated classes of senior-subordinated securities
("Subordinated Securities").  Subordinated securities have no governmental guarantee,
and are subordinated in some way as to the payment of principal and/or interests to the
holders of more senior mortgage- or asset-backed securities arising out of the same pool
of assets . . . .  Subordinated securities typically subject the holder to greater risk than

39

senior securities and tend to be rated in a lower rating category (frequently a substantially lower rating category) . . . .  [T]he market for such securities may be less liquid than is the case for traditional fixed-income securities and senior mortgage- or asset-backed securities."

*See* Curley Dec. Exs. H (RHY SAI at 11); B (RMH SAI at 9-10); F (RMA SAI at 11); D (RSF SAI at 10).  With regard to Collateralized Bond Obligations ("CBO"), a structured security, the Funds disclosed that "[l]ower CBO tranches represent lower degrees of credit quality and pay higher interest rates that are intended to compensate for the attendant risks."  Curley Dec. Exs. H (RHY SAI at 13); B (RMH SAI at 11); D (RSF SAI at 11); F (RMA SAI at 12).

No investor who actually read the Funds' Offering Documents could possibly believe that an investment in the Funds was a "safe" or "guaranteed" investment.  The Funds' disclosures characterized the securities in the Funds' portfolios as "junk bonds" and "speculative," and clearly stated that the performance of the Funds' investments depended on the "issuer's capacity to pay," the "credit risk associated with performance of the underlying mortgage properties," and "cash flows generated by the assets backing the securities."  A reasonable investor certainly should have recognized the significant "credit risk," that the issuers of, or assets and loans underlying, below investment-grade, "junk bonds" might fail to perform, especially in an unprecedented economic downturn.

### C.    The Funds Disclosed Their Respective Investments in ABS and MBS.

The Funds' Offering Documents and other filings periodically identified the types of assets in which the Funds could invest and the risks of such investments.  Within the parameters established by the Funds' Offering Documents, the Funds were free to pursue the investment in such assets in furtherance of the Funds' primary investment objective:  "to seek a high level of current income."  Curley Dec. Ex. A (RMH Prosp. Cover Page).

The Funds' 2005 Annual Report expressly states that "[o]ur high income strategy emphasizes very broad diversification *utilizing asset categories beyond the well recognized*

40

*below investment grade corporate and convertible bonds.*  This diversification allows us to find better risk/reward opportunities than would be possible if we were restricted to a single asset sector."  Curley Dec. Ex. I (2005 Consol. Ann. Rpt. at 2, 16, 32.); *see also id.* Exs. J (2006 Consol. Ann. Rpt. at 3, 19, 37, 51 ("The Fund[s] invest[] in a wide range of below investment grade debt securities, including corporate bonds, mortgage- and asset-backed securities"); L (2007 Consol. Ann. Rpt. at 2, 20, 38, 56 (same)); *id.* Ex. V (Appx. of Disclosures).

Nonetheless, Plaintiffs claim that the Funds' statement that they were "diversified" was misleading.  (*See, e.g.,* CAC ¶¶ 186-187, 192, 207-214, 224, 256.)  Plaintiffs reach this conclusion, however, by considering "ABS" as a single industry, and by ignoring the fact that the Funds, as stated, actually were diverse among different types of debt securities—including different types of ABS—that were tied to a diverse group of industries by virtue of their creation from pools of assets including "motor vehicle retail installment sales contracts, installment loan contracts, leases of various types of real and personal property, and receivables from revolving consumer credit (credit cards) agreements, or a combination of the foregoing."  Curley Dec. Exs. H (RHY SAI at 5); B (RMH SAI at 3); D (RSF SAI at 4); F (RMA SAI at 4).[36]

Finally, Plaintiffs assert that "Defendants also falsely characterized the Funds' portfolios during the Class Period as consisting of and performing in the same manner as corporate bonds and preferred stocks."  (CAC ¶ 26.)  This assertion is demonstrably false.  Plaintiffs do not point to a single statement by Defendants which "liken[ed] the Funds' assets to corporate bonds and preferred stocks."  (CAC ¶ 28.)

---

[36]     General statements describing the Funds' "diversification" in the abstract are not actionable misstatements.  Regardless, the Funds categorized and disclosed their investments at all times.  Accordingly, investors were aware of the Funds diversification at all times, and what the Funds considered to be a diverse group of investments.  Moreover, the Funds' Prospectuses warned Plaintiffs that "[t]he Fund[s] should not constitute a complete investment program for any investor."  Curley Dec. Exs. G (RHY Prosp. at 6); C (RSF Prosp. at 5-6); E (RMA Prosp. at 5); A (RMH Prosp. at 5).

41

### 1.      Plaintiffs Misconstrue the Funds' Investment Restrictions.

Plaintiffs allege that the Funds misrepresented their compliance with an investment restriction providing that the Funds may not "purchase the securities of any issuer (other than securities issued or guaranteed by the U.S. Government or any of its agencies or instrumentalities) if, as a result, 25% or more of the Fund's total assets would be invested in the *securities of companies the principal business activities of which are in the same industry*." (CAC ¶¶ 87.)   Plaintiffs claim the Funds violated this restriction because "Asset-Backed Securities" and "Mortgage Lenders and Loan Correspondents" constitute "industries," as defined by the SEC's Standard Industrial Classification List, and the Funds invested 25% or more of their assets in ABS and MBS.  (*Id.* ¶¶ 84-85, 88-89.)

Plaintiffs misconstrue the meaning of this investment restriction.  The Funds disclosed that the Funds viewed ABS and MBS as *types of securities*.  The investment restriction at issue does not restrict the types of securities in which the Funds could invest.  Rather, it limits investments "in the securities of companies *the principal business activities of which are in the same industry*."[37]  Plaintiffs have not pleaded a violation of the actual investment restriction because they failed to plead a single fact regarding the issuing companies and the industry in which those companies principally operated.

Even if the Court were to assume that the Funds were in violation of their investment restrictions, Plaintiffs have failed to state a claim.   Breaching an investment restriction constitutes mismanagement, not fraud.  At most, Plaintiffs' allegations that the Funds violated

---

[37]      This Court previously held that whether or not the Funds "stated they would not invest more . . . than 25% of the Funds' assets in securities related to the same industry" is "a question of fact not justiciable on a motion to dismiss."   *Regions Morgan Keegan Open-End Fund Litig.*, 743 F. Supp. 2d at 760.   Respectfully, it is only possible to arrive at this conclusion by accepting Plaintiffs' mischaracterization of the Funds' actual concentration restriction.  The language used in the Funds' disclosures clearly focuses on the company issuing the security, not the type of security issued.  Plaintiffs have pleaded no facts concerning the actual subject matter of the restriction, so their claim the restriction was violated fails as a matter of law.

investment restrictions and/or guidelines pertain to § 13 of the Investment Company Act of 1940, 15 U.S.C. § 80a-13, for which there is no private right of action. *See Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d at 761-62 (finding no private right of action under § 13 and dismissing this claim).

### 2. The Funds Disclosed Their Asset Concentration Quarterly Throughout the Class Period.

Even assuming for the sake of argument that Plaintiffs are correct, and that the Funds were in violation of the 25% industry concentration restriction during the class period, such a violation cannot serve as the basis of a fraud claim.   At all times, the extent of the Funds' investment in any category of security was disclosed.  If the Funds *were* over-concentrated in ABS and/or MBS, such over-concentration was disclosed on a quarterly basis at all times.  In the Funds' annual and semi-annual reports, the Funds included an asset-allocation pie chart that set forth the types of securities as a percentage of the Fund's investments.   These charts clearly indicated that well over 25% of the Funds' assets were invested in different types of ABS tied to a diverse array of industries.  *See* Curley Dec. Exs. I (2005 Consol. Ann. Rpt. at 4, 18, 34); V (Appx. of Disclosures).

Similarly, each Fund's disclosures also included a portfolio schedule that listed each security held by name and listed each category of securities as a percentage of the Fund's Net Assets.  *See* Curley Dec. Ex. I (2005 Consol. Ann. Rep. at 6 (listing "Asset-Backed Securities—Investment Grade" as 15.6% of RMA Fund Net Assets, and "Asset-Backed Securities—Below Investment Grade" as 55.2% of RMA Fund Net Assets).[38]  Overconcentration—or a violation of

---

[38]      *See also* Curley Dec. Ex. I (2005 Consol. Ann. Rpt. at 20-21 (27.5% and 62.8% of the RMH Fund's Net Assets in Investment Grade and Non-Investment Grade ABS, respectively), at 36-37 (26.2% and 61.1% of RSF Fund Net Assets in Investment Grade and Non-Investment Grade ABS, respectively)); Ex. J (2006 Consol. Ann. Rpt. at 6, 9, 22, 25, 40, 43, 54, 57-58); Ex. L (2007 Consol. Ann. Rpt. at 5, 8-9, 23, 26-27, 41, 44-45, 59, 62-63).   The Funds' Semi-Annual and Quarterly reports contained asset schedules revealing similar concentrations.  *See, e.g.*, Curley Dec. Exs. K, M-R.

any investment restriction, for that matter—is not fraud, especially where it is openly disclosed.

It may constitute mismanagement, but as discussed *infra*, mismanagement is not fraud.[39]

> ### D.   The Funds Disclosed the Uncertainty Inherent in the Valuation of Certain Portfolio Securities.

Plaintiffs claim that Defendants deliberately overvalued certain securities in the Funds'

portfolio and "failed to disclose the extent to which [the Funds] intended to use fraudulent fair

value accounting to price portfolios securities" in the RHY Fund's Offering Documents.  (CAC

¶ 256.)  Plaintiffs fail to plead facts to support this claim.  First, the Funds' filings revealed the

uncertainty inherent in the valuation of particular securities.  Second, Plaintiffs' plead no facts

demonstrating that Defendants deliberately misstated the value of any security held by the Funds,

or that any alleged misstatement materially affected the Funds' NAVs and or share prices.

> #### 1.   The Valuations at Issue Are Subjective and Amount to Expressions of Judgment.

Plaintiffs quote selectively from the Funds' disclosures regarding valuation.  As set forth

below, these disclosures, taken as a whole, reveal the subjectivity and uncertainty inherent in

certain aspects of the Funds' valuation process and establish that valuations of the Funds' assets

essentially were expressions of judgment with respect to certain securities and do not support

Plaintiffs' claims.  *See Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 122 (S.D.N.Y. 2010)

(where certain assets "were not traded on the [NYSE] or some other efficient market," then "the

value of such assets is a matter of judgment and opinion"); *Fraternity Fund, Ltd. v. Beacon Hill*

---

[39]    Plaintiffs also allege that Defendants misclassified Fund assets as "corporate bonds" and "preferred stock" to "deliberately obscure" concentration in ABS and MBS.  (CAC ¶ 17; *see also id.* ¶¶ 90-112.)  Plaintiffs plead no facts showing that any misclassification was intentional.  Moreover, they plead no facts alleging which Defendants were responsible for any alleged misclassifications.  Finally, regardless of whether the misclassification of these securities was as clear-cut as plaintiffs allege, they are immaterial.  As discussed *supra*, the Funds' annual, semi-annual, and quarterly reports all include published asset schedules disclosing that with or without this alleged "misclassification" alleged by Plaintiffs, more than 25% of the Funds' assets were invested in ABSs and/or MBSs.  (*Id.*  ¶¶ 93-97.)

*Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 361-63 (S.D.N.Y. 2007) (value of CMOs is

"considerably more a statement of opinion than a report of an objectively determinable fact").

To plead a claim under the 1933 or 1934 Acts, Plaintiffs must have pleaded that the

valuations were "false" *when made*, i.e., that Defendants did not subjectively believe that the

valuations were accurate when they were published.  *See In re Barclays*, 2011 WL 31548, at *8;

*Fait*, 712 F. Supp. 2d at 121.  From each Fund's inception, however, the Funds disclosed in their

Offering Documents that:

> When closing market prices or market quotations are not available or are
> considered by the Adviser to be unreliable, the Fund[s] may use a security's fair
> value.  Fair value is the valuation of a security determined on the basis of factors
> other than market value in accordance with procedures approved by the Fund's
> board.  The use of fair value pricing by the Fund[s] *may cause the net asset value
> of its shares to differ from the net asset value that would be calculated using
> closing market prices.*

Curley Dec. Exs. G (RHY Prosp. at 40); A (RMH Prosp. at 35); E (RMA Prosp. at 37); C (RSF

Prosp. at 36-37) (emphasis supplied); V (Appx. of Disclosures).

The Funds also disclosed that if certain of the Funds' securities were or became illiquid,

as happened during the financial crisis, "[i]lliquid securities are also more difficult to value and

thus the Adviser's judgment plays a greater role in the valuation process."  Curley Dec. Ex. H

(RHY SAI at 18); Ex. F (RMA SAI at 16); Ex. D (RSF SAI at 16); Ex. B (RMH SAI at 15).

The Funds' Annual Reports also highlighted the subjectivity inherent in asset valuation:

> When a Fund believes that a market quote does not reflect a security's true value,
> the Fund may substitute for the market value a fair value *estimate* made according
> to methods approved by the Board of Directors.  The values assigned to fair value
> investments are based on available information and do not necessarily represent
> amounts that might ultimately be realized, since such amounts depend on future
> developments inherent in long-term investments.  Further, *because of the inherent
> uncertainty of valuation*, such *estimated values* may differ significantly from the
> values that would have been used had a ready market for the investments existed,
> and the differences could be material.

Curley Dec. Exs. I (2005 Consol. Ann. Rep. at 54); J (2006 Consol. Ann. Rep. at 79); K (2007

Consol. Ann. Rep. at 83) (emphasis supplied).

These disclosures apprised investors that the Funds' valuation of certain securities involved "estimated values" and "inherent uncertainty."  These disclosures certainly put any reasonable investor on notice that the Funds' valuation processes may involve the exercise of discretion and judgment.  It is not enough simply to allege that, with the benefit of hindsight, the Funds made errors in pricing certain securities amid the market turmoil of mid-2007.  Plaintiffs must establish that the Funds' valuations were subjectively false, which they have failed to do.

### 2.     Plaintiffs Fail to Demonstrate that the Funds Issued Materially Incorrect Valuations.

Plaintiffs have failed to plead particularized facts demonstrating that any of the Defendants "ignored [the Funds'] stated policies and procedures" and published any valuation that was knowingly false. (CAC ¶ 137.)  And, Plaintiffs have failed to allege facts that would show that any such misstatements materially inflated the Funds' NAVs or share prices.

Although Plaintiffs allege that Kelsoe submitted 262 unsupported price adjustments to Fund Accounting between January and July 2007, they include no factual allegations regarding the effect of these adjustments on the Funds' net asset value or whether the adjustments even pertained to the Funds at issue in this litigation.  Similarly, Plaintiffs fail to plead facts supporting any conclusion that Mr. Kelsoe's alleged "manipulation" or "screening" of dealer quotes materially effected the Funds at issue.  (*See* CAC ¶¶ 137-160.)  In fact, Plaintiffs' own allegations affirmatively call into question the materiality of any alleged mis-valuations.  While they assert that the Funds' NAVs were "inflated" and "not timely written down," they fail to quantify these assertions in any way and rely entirely on conclusory statements.  (*See, e.g.,* CAC ¶¶ 220, 230-231, 236-239, 246.)[40]

---

[40]     Plaintiffs further assert that "because the Funds had little or no knowledge of the characteristics of at least certain of their portfolio investments until long after those investments were made, it was impossible for them to comply with their representations of valuation procedures."  (CAC ¶137.)  There is no allegation as to how large a percentage of the Funds' overall assets were subject to poor due diligence.  Plaintiffs concede that their assumption is limited to "at least certain" of the Funds' investments.  It does

**E.     Plaintiffs Fail to Allege Facts that Would Establish that the Funds' Choice of a Benchmark Index Supported a Claim under the Federal Securities Laws.**

Plaintiffs allege that "[t]he [Lehman] High Yield Index was an inappropriate peer or benchmark for comparison with the Funds because the holdings comprising the Lehman High Yield Index were not comparable to the Funds' holdings. . . .   The Funds' portfolios were inherently riskier than, and deviated greatly from, the portfolios within the High Yield Index." (CAC ¶ 163.)[41]   The Funds, however, were not "index funds" that were designed to track the performance of a specified index by investing in the same kinds of securities.   Courts faced with similar allegations have rejected the inference Plaintiffs seek to make here.   For example in *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, the Court concluded that "[t]he chart purported only to compare the Fund's *returns* to those of the Lehman Brothers indexes.   No reasonable investor could have viewed this chart as an exhaustive description of the Fund's *risks*."   159 F.3d 723, 730 (2d Cir. 1998) (dismissing claim that the use of a benchmark index was misleading).

The Funds also affirmatively disclosed that their portfolio composition could (and did) deviate from the chosen bond fund benchmark.   For example, with respect to each Fund, the Annual Reports noted that the "prospectus gives the management team latitude to look at sectors that are not in the index."   Curley Dec. Exs. J (2006 Consol. Ann. Rpt. at 4); V (Appx. of Disclosures).

Finally, Plaintiffs seek to infer fraud from the fact that the Funds ultimately underperformed their benchmark and "peer funds."   (CAC ¶¶ 169 ("the Funds collapsed in late 2007 while the value of the 35 non-RMK closed-end funds held up through the summer of

---

not follow that "Defendants knew when they made those representations that they had insufficient information to follow those procedures" with respect to *all* securities held by the Funds.   (*Id.* ¶137.)

[41]     By alleging that the Funds' choice of index was "inappropriate," Plaintiffs concede that choice of an index involves an exercise of discretion.   Plaintiffs have pleaded no facts demonstrating that the Funds' selection of an allegedly "inappropriate" index was intentional or deliberate.   By proposing alternative indices based on a hindsight analysis of which indices performed similarly to the Funds during the credit crisis, Plaintiffs merely propose to substitute their own hindsight judgment for that of the Funds.   (CAC ¶¶ 161-63.)

2008"), 170-173).  Such a theory is classic fraud by hindsight, and fails as a matter of law.  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996) ("To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted."); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 958-960 (S.D. Ohio 2009) (rejecting allegations of fraud by hindsight).

## V.  Plaintiffs Allege Non-Actionable Corporate Mismanagement.

Plaintiffs have failed to plead that Defendants misstated or omitted any material facts regarding the Funds' investment strategy and performance.  At most, they allege that Defendants mismanaged the Funds by investing in securities that became illiquid and difficult to value at the onset of the financial crisis.  But second-guessing management decisions does not state a claim under the federal securities laws.  "[I]f a shareholder's investment is frittered away by corporate mismanagement, only the corporation can recover" in a derivative action.  *Regions Morgan Keegan Open-End Fund Litig.*, 2010 WL 5464792, at *5 (quotations and citation omitted); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474-80 (1977); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007).

### A.  Failure to Disclose Corporate Mismanagement is Not Actionable Under the Federal Securities Laws.

Plaintiffs' allegations that Defendants mismanaged the Funds amount to a derivative claim, which belongs solely to the Funds.  Shareholders do not have standing to assert such claims directly on their own behalf.  *See Argiropoulos v. Kopp*, 2007 U.S. Dist. LEXIS 22351, at *18 (D. Md. March 26, 2007) (allegations of mismanagement are derivative "notwithstanding allegations of fraudulent representations.");[42] *Stephenson v. Citco Group Ltd.*, 2010 U.S. Dist. LEXIS 32321, at *28 (S.D.N.Y. March 31, 2010) ("A claim for deficient management or

---

[42]     Whether a claim is derivative is a question of state law and governed by the law of the investment company's state of incorporation, here Maryland.  *See In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 625 (D.N.J. 2005).  Under Maryland law, a shareholder may only pursue a direct claim where the alleged injury is distinct from that suffered by the corporation.  *Id.* at 626.

administration of a fund is 'a paradigmatic derivative claim." (citation omitted)); *San Diego County Employees Ret. Ass'n v. Maounis*, 2010 U.S. Dist. LEXIS 25501, at *55-61 (S.D.N.Y. Mar. 15, 2010).

At their core, Plaintiffs' claims are premised on the theory that "representations that the Funds were professionally managed and investments were professionally selected were simply untrue" (CAC ¶126), despite the fact that "[t]he Funds emphasized money management by 'one of America's leading high-yield Fund managers' and 'sophisticated' wealth management services offered by Morgan Keegan as AAS provide and effective co-manager." (CAC ¶¶ 24-25.) Specifically, Plaintiffs complain that MAM failed to perform adequate due diligence, (CAC ¶¶ 115-126), overconcentrated the Funds' investments in ABS and MBS (*id.* ¶¶ 15-18, 83-112), and misvalued the securities in the Funds' portfolios (*id.* ¶¶ 127-160.) Finally, Plaintiffs seek to infer fraud from the fact that the Funds' ultimately failed to outperform their benchmark index and "peer funds." (*Id.* ¶¶ 26-28, 161-173.) The law is clear. Plaintiffs cannot turn a claim for mismanagement into a claim for fraud simply by alleging that the mismanagement in question was intentional or concealed. *See Argiropoulos*, 2007 U.S. Dist. LEXIS 22351, at *18.

### B.    The Court Should Follow the Decision of the Alabama Supreme Court in *Rice v. Regions Fin. Corp.*

In *Ex parte Regions Fin. Corp.*, 2010 Ala. LEXIS 183 (Ala. Sept. 30, 2010) ("*Rice*"), the Alabama Supreme Court granted the mandamus petition of Regions, MAM and Mr. Kelsoe and ordered the trial court to grant their motion to dismiss on the grounds that plaintiffs' claims of securities fraud concerning Morgan Keegan-related funds were claims for mismanagement that were derivative in nature and could not be asserted directly by the funds' shareholders. *See Rice*, 2010 Ala. LEXIS 183, at *28-29; Curley Dec. Ex. U (*Rice* Sec. Am. Compl.).[43]

---

[43]    In its Order Denying Motions for Reconsideration in the Open-End Funds action, the Court stated that it could not consider the allegations in *Rice* because the full allegations made in that action were not discussed in sufficient detail in the *Rice* opinion, and the *Rice* Complaint was not before the Court.

The relevant allegations asserted in *Rice* are virtually identical to those asserted in this action.  There plaintiffs alleged that MAM and Mr. Kelsoe caused the Funds to use a misleading benchmark index (*Rice* Sec. Am. Compl. ¶ 23); failed to disclose the credit risk to which the Funds' shareholders were exposed (*id.* ¶ 25); failed to disclose that the Funds violated the applicable concentration limitation by investing more than 25% of the Funds' total assets in "mortgages" (*id.* ¶ 33); and failed to disclose that the Funds mis-valued the securities held in the Funds' portfolios (*id.* ¶ 35).

Upon review of these allegations, the Court concluded that the loss alleged by shareholders (i.e., the decline in the Funds' share price) resulted from an alleged injury to the Funds themselves: "[W]e conclude that the actions of MAM and Kelsoe first injured the RMK funds and only secondarily injured the shareholders; accordingly, in the absence of any distinct injury to the shareholders, the claims they now assert must be considered derivative claims belonging to the RMK funds, not direct claims."  *Rice*, 2010 Ala. LEXIS 183, at *25; *see also id.* at *24 ("[T]he shareholders are essentially seeking damages for fraud based on the defendants' misrepresentations covering up their alleged mismanagement of the RMK Funds.  Courts have generally rejected attempts by plaintiffs to convert traditionally derivative claims into direct claims based on the failure of the alleged guilty parties to disclose their bad acts.") (citations omitted); *accord San Diego County Emp. Ret. Ass'n*, 2010 U.S. Dist. LEXIS 25501, at *55-61.

*Rice* recognizes that allegations of mismanagement cannot form the basis of a direct claim for fraud by a shareholder.  Other courts have reached similar conclusions, particularly since the onset of the global credit crisis in mid-2007.  *See, e.g.*, *Anderson v. Aon Corp.*,  614 F.3d 361, 367 (7th Cir. 2010) (shareholders asserting claims under § 10(b) not entitled to recover on account of mismanagement as such claims require a shareholders' derivative suit); *Lubin v.*

---

*Regions Morgan Keegan Open-End Mut. Fund Litig.*, 2010 WL 5464792, at *5.  Defendants, however, had filed the *Rice* Complaint with the Court as an exhibit to a declaration in support of Defendants' Motion for Reconsideration (Docket No. 277-4).

*Skow*, 2010 U.S. App. LEXIS 12140, *8 (11th Cir. June 14, 2010) ("[I]f a shareholder's investment is frittered away by corporate mismanagement, only the corporation can recover."); *In re Sec. Capital Assur., Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. March 31, 2010) (rejecting claims premised on a failure to maintain adequate loss reserves and to monitor collateral underlying CDOs and understated mark-to-market losses as "criticisms of . . . business judgment and management . . . , not fraudulent misrepresentations" ).

## VI.   Plaintiffs' Allegations Fail to Show Loss Causation.

Loss causation requires a direct, causal connection between the alleged misrepresentation and the plaintiffs' loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Loss causation is an affirmative element of a claim under § 10(b) of the 1934 Act or Rule 10b-5. *See* 15 U.S.C. § 78u-4(b)(4). Therefore, Plaintiffs must plead facts sufficient to render their theory of loss causation plausible. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (plaintiff must allege, "in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements and omissions and plaintiff's economic loss"). Where, as here, Plaintiffs fail to plead *any* facts supporting a viable theory of loss causation, and in fact plead facts affirmatively defeating such a theory, 1933 Act claims likewise fail. *See* 15 U.S.C. § 77k(e); § 77l(b); *see also Azzolini v. CorTS Trust II*, 2005 WL 3448053, at *5-6 (E.D. Tenn. Dec. 14, 2005) (noting that dismissal of 1933 Act claims is required "[i]f it is apparent on the face of the complaint the decline in share value is not related to any material misstatement and/or omission.").

### A.   Plaintiffs' 1934 Act Claims Fail Because Plaintiffs Do Not Establish that Defendants' Alleged Fraud Caused Their Losses.

Plaintiffs fail to allege any facts demonstrating that the Funds' stock price declined due to the revelation of fraudulent conduct concerning the Funds. Plaintiffs cite a litany of purported "corrective disclosures," primarily newspaper articles that do not address the Funds in question

in this litigation, much less identify any prior fraudulent statements by Defendants.[44]
Nevertheless, Plaintiffs baldly assert that these "disclosures" of alleged fraud caused the Funds'
share price to decrease.  (*See, e.g.,* CAC ¶¶ 263-64 (discussing losses suffered by the RMK
Select Open-End Funds), 272-73 (same).)  Without exception, these "disclosures" do nothing
more than assert that certain Morgan Keegan mutual funds lost value during the financial crisis.
At most, they reveal poor investment decisions and a failure to anticipate the credit crisis that
caused the sharp decline in the value of the Funds' assets.  No matter how poorly the Funds may
have performed vis-à-vis "peers," the fact that an investment strategy ultimately proves to be
unsuccessful is not a revelation of fraud.  Plaintiffs have not pleaded any "corrective disclosures"
that revealed any alleged misrepresentations or omissions by the Funds or any other Defendant.

The bare assertion that a drop in the price of a security followed a public announcement
of poor financial results is insufficient as a matter of law to establish loss causation under
controlling case-law.  *See Dura Pharm.*, 544 U.S. at 342-43; *D.E. & J. Ltd. P'ship v. Conaway*,
133 F. App'x at 1000-1001.  A plaintiff, therefore, must "prove that its loss resulted directly
*because* of the correction to a prior misleading statement; otherwise there would be no inference
raised that the original, allegedly false statement caused an inflation in the price to begin with."
*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton*, 597 F.3d 330, 336 (5th Cir.
2010).

---

[44]     Plaintiffs quote numerous disclosures that relate to Funds other than those at issue in this
litigation, namely the three RMK Select Open-End Funds.  These are irrelevant to the loss causation
inquiry.  Plaintiffs offer the convoluted argument that mutual fund investors "buy the manager" and not
the Funds, and therefore this Court should consider as "corrective disclosures" any and all newspaper
articles discussing all other Kelsoe-managed funds not at issue here.  (CAC ¶¶ 257-261.)  This argument
is without merit.  Corrective disclosures must reveal to the market the specific prior misrepresentations or
omissions that form the basis for the plaintiff's claims of fraud.  *See In re Oracle Corp. Sec. Litig.*, 627
F.3d 376, 392 (9th Cir. 2010) ("[L]oss causation is not adequately pled unless a plaintiff alleges that the
market learned of and reacted to the practices the plaintiff contends are fraudulent, as opposed to merely
reports of the defendant's poor financial health generally.").  Therefore, any of the alleged "corrective
disclosures" relating to Funds other than those at issue in this case, or not specifically directed to the
Funds at issue in this case, should be disregarded, including CAC ¶¶ 263-265, 271-276, 282-293.

52

Plaintiffs plead no "causal connection . . . between [their] loss and the misrepresentation concerning" the Funds as required under *Dura*.  *See Dura Pharm.*, 544 U.S. at 347.  Their allegations do not "demonstrate the joinder between an earlier false or deceptive statement, for which the defendant was responsible, and a subsequent corrective disclosure that reveals the truth of the matter. . . ."  *Halliburton*, 597 F.3d at 336.

Simply put, Plaintiffs have not established loss causation because "none of the announcements made by Defendants mention any alleged fraudulent practices."  *Nat'l Junior Baseball League v. Pharmanet Devp't Group Inc.*, 720 F. Supp. 2d 517, 561 (D.N.J. 2010).  "The corrective disclosure must reveal the fraud or the falsity of the prior representation . . . . [T]he revelation of confirmatory information, or information already known to the market, cannot constitute a corrective disclosure."  *Magruder v. Halliburton Co.*, 2009 WL 854656, *11 (N.D. Tex. March 31, 2009).

The alleged "disclosures" cited by Plaintiffs are confirmatory in nature, meaning that they address information already disseminated to and known by investors, such as the fact that the Funds' financial performance suffered as the credit markets seized up and asset-backed and mortgage-backed securities became increasingly illiquid.  None of the disclosures is alleged to have preceded loss and none purports to reveal fraud:

- Plaintiffs quote an August 14, 2007 statement from the Funds' Form 8-K reports, disclosing that "[a]n independent valuation consultant has been retained to assist in determining the fair value of certain portfolio securities" due to "[r]ecent instability in the markets for fixed income securities. . . ."  Contrary to Plaintiffs' statement in ¶ 267 of the CAC, nowhere does this disclosure state that "the Funds' internal accounting and valuation processes were inadequate."  (CAC ¶¶ 266-267.)

- Plaintiffs quote an August 16, 2007 *Commercial Appeal* article merely observing the fact that the Funds suffered losses.  (*Id.* ¶¶ 268.)

- Plaintiffs quote an August 17, 2007 letter from an unidentified individual allegedly published by the *Commercial Appeal*, personally attacking Mr. Kelsoe and describing his investment strategy as "short-sighted."  (*Id.* ¶ 270.)

53

- Plaintiffs incorrectly state that the article cited in ¶ 273 refers to the RMH Fund. The article cited therein addresses losses suffered by the RMK Select High Income Fund, which is not at issue in this litigation and therefore irrelevant. (*Id.* ¶ 274.)

- Plaintiffs quote a letter from Mr. Kelsoe to the Funds' shareholders dated November 7, 2007, which discusses the losses the Funds had suffered in recent months. This letter revealed no new information to the market. Mr. Kelsoe states that the Funds' "portfolios have been pressured across the board" due to the "difficult environment," and confirmed that the Funds' "investment objectives are clearly stated in the prospectus of each fund." At set forth *supra*, Plaintiffs' assertion that this letter told investors for the first time what types of securities the Funds invested in is inaccurate and directly contrary to the Funds' public disclosures. (*Id.* ¶ 277-278.)

- Plaintiffs quote from the Funds' December 5, 2007 Forms N-CSRS filed with the SEC, in which the Funds reported their semi-annual results. These reports revealed no new information to the market, but rather confirmed the fact that the Funds had suffered losses and were attempting to "reposition" their portfolios by acquiring different assets not affected by the ongoing financial crisis. (*Id.* ¶¶ 279-281.)

The CAC's boilerplate assertions that these "disclosures" caused a decline in the Funds' share price do not establish loss causation. (*See, e.g., id.* ¶ 264.) At most, the facts pleaded by Plaintiffs demonstrate a correlation between these disclosures and a decline in share price over a period of time. Correlation, however, is not causation. *See, e.g., In re NVidia Corp. Sec. Litig.*, 2010 WL 4117561, *12 (N.D. Cal. Oct. 19, 2010).

Significantly, the decline in value of the Funds' shares correlated with market-wide losses associated with the global credit crisis. As other courts have observed in the wake of that crisis, it is far more plausible that Plaintiffs' losses resulted from the "overnight" evaporation of the market for ABS and MBS, than Defendants' fraud. *See, e.g., Waterford Twp. Gen. Emp. Ret. Sys. v. SunTrust Banks, Inc.*, 2010 WL 3368922, at *5 (N.D. Ga. Aug. 19, 2010) (Plaintiffs failed to plead loss causation where "[t]he eleven percent drop occurred during a financial crisis that hit the financial services industry particularly hard."); *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 165 (D. Mass. 2009) ("'[W]hen the plaintiff's loss coincides with a marketwide

54

phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss
was caused by fraud decreases.'") (citation omitted); *Lentell v. Merrill Lynch & Co.*, 396 F.3d
161, 174 (2d Cir. 2005) (holding that "a plaintiff's claim fails when 'it has not adequately ple[]d
facts which, if proven, would show that its loss was caused by the alleged misstatements as
opposed to intervening events'") (citation omitted).

Even the purported "corrective disclosures" cited by Plaintiffs expressly attribute the
Funds' losses not to fraud, but to "a breakdown in the market for hard-to-value debt-backed
securities," and observed that the Funds declined as "financial institutions worldwide faced
credit concerns." (CAC ¶ 269; *see also id.* ¶ 268 (citing article entitled "Funds Reeling from
Subprime Fallout—As Prices Take Hit, Firms Study Value of Mutuals"); ¶ 275 ("*[A]s trading in
subprime-backed securities dried up amid a broader panic, Mr. Kelsoe, like other investors
with subprime holdings, had difficulty figuring out what the investments were worth . . .*")
(emphasis in CAC).) These allegations, and the accompanying disclosures actually made by the
Funds regarding economic conditions, reveal "a pattern of . . . keeping the market abreast of . . .
developments as they occurred and [the Funds'] necessary adjustments," which "undermine[]
any conclusion that the . . . statements corrected prior misrepresentations or that the company
acted with deception." *Halliburton*, 597 F.3d at 341.

The "corrective disclosures" identified by Plaintiffs are insufficient to show loss
causation with respect to Plaintiffs' 1934 Act claims. The failure to plead loss causation requires
dismissal of these claims as a matter of law.

**B.  Plaintiffs' 1933 Act Claims Fail to Plead Loss Causation and Must Be
Dismissed.**

In the PSLRA, Congress added an express loss causation provision to the 1933 Act. *See
In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 588 (S.D.N.Y. 2006).
The fact that the alleged "corrective disclosures" cited by Plaintiffs expressly attribute the

decline in the Funds' share prices—and therefore, Plaintiffs' losses—to the onset of the credit and financial crisis affirmatively defeats Plaintiffs' §§ 11 and 12(a)(2) claims.

Although failure to establish loss causation is an affirmative defense to claims under §§ 11 and 12(a)(2), dismissal is appropriate "[w]here it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).[45] Here, Plaintiffs' own "loss causation" allegations demonstrate that their loss did not causally result from the revelation of allegedly false portions of the prospectus, oral communication, or registration statement, but rather from the intervening event of the credit crisis, which had an industry-wide impact on the value of the asset-backed and mortgage-backed securities in which the Funds invested heavily.

The CAC is facially deficient.  Plaintiffs' attribution of the Funds' losses to a decline in asset value at the onset of the global financial crisis, as opposed to any alleged misrepresentations or omissions contained in the RHY Fund's disclosures, severs any causal link between the alleged misconduct and the economic harm ultimately suffered by the Plaintiffs. Plaintiffs claims' under the 1933 Act must be dismissed as well.

## VII.   Plaintiffs Have Failed to Plead Facts Demonstrating that Either Morgan Keegan, MAM or MK Holding Was a Control Person.

Plaintiffs do not allege that Morgan Keegan, MAM or MK Holding is liable directly under § 10(b) of the 1934 Act.  Rather, Plaintiffs allege that these Defendants are subject to control person liability under § 20(a) of the 1934 Act.

---

[45]    *See also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253-54 (S.D.N.Y. 2003) ("It is an affirmative defense under Sections 11 and 12 that if the amounts recoverable represent other than the depreciation in value of the subject security resulting from such part of the prospectus, oral communication, or registration statement, with respect to which the liability of the defendant is asserted then such amount shall not be recoverable. *See* 15 U.S.C.A. §§ 77k(e), l(b).  Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is proper.") (citations omitted); *Rauch v. Day & Night Mfg. Corp.*,   576 F.2d 697, 702 (6th Cir. 1978) (observing that the "prevailing rule is that a complaint showing on its face that relief is barred by an affirmative defense is properly subject to a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted").

In a related action, this Court held that "[w]hether a party exercised the requisite control involves a factual analysis best saved for later determinations." *Regions Morgan Keegan Open-End Fund Litig.*, 743 F. Supp. 2d at 761. The Court offered that conclusion concerning a claim for control person liability under § 15 of the 1933 Act. Given that the claim for control person liability before the Court involves 1934 Act claims and the requirements of Rule 9(b) and the PSLRA apply, Defendants respectfully submit that it is necessary to scrutinize Plaintiffs' allegations of control person liability at the pleading stage.

To state a claim under § 20(a), Plaintiffs must plead facts showing that Morgan Keegan, MAM and MK Holder were control persons with respect to the alleged primary violators—the Funds and the Officer Defendants. *See Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 485-86 (6th Cir. 1992); *see also P.R. Diamonds*, 364 F.3d at 696-97. Plaintiffs must plead facts showing that each of these Defendants possessed both "power to control the specific transaction or activity upon which the primary violation is predicated" as well as "actual participation (*i.e.*, exercise [of] control) in the operations of the primary violator in general." *Azzolini v. CorTS Trust II*, 2005 U.S. Dist. LEXIS 31853, at *42 (E.D. Tenn. Sept. 16, 2005) (quoting *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000)).[46]

Plaintiffs allege that Morgan Keegan and MK Holding controlled MAM. (*See* CAC ¶ 362.) Such allegations fail as a matter of law to support a claim under § 20(a), as MAM is not alleged to be a primary violator of § 10(b). *See, e.g., D.E. & J. Ltd. P'Ship*, 133 F. App'x at 1001 (dismissing control person claim where allegedly controlled entity was not charged with a primary violation of the securities laws).

---

[46]     Some district courts in the Sixth Circuit have used an even more exacting standard that requires culpable participation: "To establish liability under § 20(a), plaintiffs must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1032 (N.D. Ohio 2000); *see also In re Century Bus. Servs. Sec. Litig.*, 2002 WL 32254513, at *24-25 (N.D. Ohio June 27, 2002).

With respect to the balance of the allegations against Morgan Keegan and MAM, Plaintiffs fail to state a primary violation, which precludes their control person claim.  *See P.R. Diamonds*, 364 F.3d at 696-97.  Plaintiffs otherwise make only conclusory assertions of control based on those Defendants' contractual relationships with the Funds; namely, that MAM and Morgan Keegan controlled the Funds by virtue of the Advisory and AAS Agreements, and therefore were "alter egos" of each other who "functioned as the officers and directors of the Funds."  (CAC ¶ 365.)  These allegations likewise fail to state a claim under § 20(a).  The contractual roles performed by Morgan Keegan and MAM as investment advisor and provider of administrative services are similar to other third parties—*e.g.,* accountants and attorneys, for which there can be no secondary liability.  *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994).

## VIII.   Plaintiffs Fail to Adequately Plead that Morgan Keegan Is a "Statutory Seller" under Section 12(a)(2) of the 1933 Act.

Plaintiffs have failed to plead facts sufficient to state a claim under § 12(a)(2) against the RHY Fund and Morgan Keegan.  Under § 12(a)(2), a seller that "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading" shall be liable to any "person purchasing such security from him. . . ." 15 U.S.C. § 77l(a)(2).  A "seller" is defined as "the owner who passed title, or other interest in the security, to the buyer for value" and/or (2) "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988); *see also Smith v. Am. Nat'l Bank & Trust Co.*, 982 F.2d 936, 941 (6th Cir. 1992).

Plaintiffs' allegations regarding Morgan Keegan's role as underwriter, standing alone, are insufficient to show Morgan Keegan as a Seller.  (CAC ¶¶ 55, 321, 334.)  Plaintiffs otherwise

fail to specify any actions taken by Morgan Keegan to sell or solicit the purchase of shares to Plaintiffs.   Rather, Plaintiffs only allege that "RMK Multi-Sector solicited the purchase of its shares . . ."  (CAC ¶ 336.)

As discussed above, despite their disclaimers, Plaintiffs have premised their 1933 Act claims on allegations of fraud.  (*See* CAC ¶ 343 (incorporating all allegations by reference).) Plaintiffs, however, have failed to plead facts with the requisite particularity to support their §12(a)(2) claim.  Plaintiffs have not alleged that they either directly purchased the RHY Funds from Morgan Keegan or that Morgan Keegan successfully solicited such sales from Plaintiffs. Without more, such conclusory allegations that Morgan Keegan was a statutory "seller" are insufficient to state a claim.  *See In re Orion Sec. Litig.*, 2009 WL 2601952, *2 (S.D.N.Y. Aug. 20, 2009) (dismissing § 12(a)(2) claims because the "CAC lacks sufficient allegations to satisfy the 'immediate seller' requirement of Plaintiff's section 12(a)(2) claim against the Underwriter Defendants"); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 406 (D. Md. 2004) (holding that "the complaint [in a § 12(a)(2) case] must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser").  Accordingly, Plaintiffs' § 12(a)(2) claim against Morgan Keegan fails as a matter of law.

## IX.   The Trustee *ad Litem* Lacks Standing to Assert Claims on Behalf of Anyone Other than Trusts and Custodial Accounts.

The TAL purports to bring Counts I-III of the CAC (asserting claims concerning the RHY Fund under the 1933 Act) on behalf of not only the TAL Subclass, but also the broader Class of shareholders who purchased shares of the RHY Fund.[47]   The TAL, however, lacks

---

[47]      The TAL purports to bring these claims not only on behalf of the "McAbee Foundation Trust," but also on behalf of "other members of the Class who purchased or otherwise acquired shares of [the RHY Fund] issued pursuant or traceable to the RHY Offering Materials."  (CAC ¶¶ 319, 335, 344.)

standing and/or authority to pursue these claims on behalf of the Class.  The Probate Court's Order, pursuant to which the TAL derives his sole grant of authority to pursue claims concerning the Funds, appointed the TAL to represent only trusts and custodial accounts for which Regions Bank served as trustee and which purchased shares of the Funds.  (*See* CAC Ex. I, at 7-8.) Trustees likewise have limited authority to prosecute and defend actions under Alabama law pursuant to which the TAL was appointed.  *See* Ala. Code. § 19-3B-816(24).

The TAL's assertion of claims on behalf of the broader Class exceeds his authority. Plaintiffs themselves acknowledge these limitations on the TAL's authority.  (*See* CAC ¶ 47 (noting that the TAL was "appoint[ed] . . . for the limited and specific purposes of monitoring, evaluating, and participating in securities litigation, and taking other appropriate litigation actions, in substitution for Regions Trust *on behalf of the trusts and custodial accounts in connection with the Funds*") (emphasis supplied).)  As the TAL has no authority to bring claims on behalf of the Class and Plaintiffs have not identified another representative of the Class that purchased shares of the RHY Fund pursuant to the RHY Fund's Offering Documents, the 1933 Act claim asserted on behalf of the Class must be dismissed.

## CONCLUSION

For the reasons set forth herein, it is respectfully requested that this Court dismiss the CAC and Consolidated Actions with prejudice.

DATED this 13th day of April 2011.

Respectfully submitted,

BASS BERRY & SIMS PLC

/s/ Matthew M. Curley
Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
150 Third Avenue South, Suite 2800
Nashville, TN  37201
(615) 742-6200

Shepherd D. Tate
Michael A. Brady
BASS BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, TN  38103-3672
(901) 543-5900

*Attorneys for Morgan Asset Management, Inc., Morgan Keegan & Company, Inc., and MK Holding, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 13, 2011, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following and/or served the following via U.S. Mail:

**BRANSTETTER STRANCH JENNINGS, PLLC**
J. GERARD STRANCH, IV
227 Second Avenue, North
Nashville, TN 37201

**SUTHERLAND ASBILL & BRENNAN, LLP**
S. LAWRENCE POLK
999 Peachtree Street NE
Atlanta, GA 30309

**LABATON SUCHAROW LLP**
JOEL H. BERNSTEIN
LOUIS GOTTLIEB
DAVID J. GOLDSMITH
STEFANIE J. SUNDEL
MICHAEL WOOLLEY
140 Broadway
New York, NY 10005

**SULLIVAN & CROMWELL LLP**
DAVID B. TULCHIN
DAVID E. SWARTS
125 Broad Street
New York, New York  1004

**PEARSON SIMON WARSHAW & PENNY, LLP**
GEORGE S. TREVOR
44 Montgomery Street, Suite 2450
San Francisco, CA 94104

**MAYNARD COOPER & GALE PC**
PETER S. FRUIN
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203

**CABANISS JOHNSTON GARDNER DUMAS & O'NEAL LLP**
CRAWFORD S. MCGIVAREN
R. CARLTON SMYLY
Suite 700, Park Place Tower
2001 Park Place North
Birmingham, AL 35203

**PURSLEY LOWERY MEEKS LLP**
R. HAL MEEKS
ROBIN A. BESAW
260 Peachtree Street NW
Atlanta, GA 30303

**PAUL HASTINGS JANOFSKY & WALKER LLP**
KEVIN C. LOGUE
75 E. 55th Street
New York, NY  10022

/s/ Matthew M. Curley_____