IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE & ERISA LITIGATION<br><br>This Document Relates to:<br><br>*In re Regions Morgan Keegan Closed-End Fund Litigation,*<br><br>No. 07-cv-02830-SHM-dkv | No. 09-md-02009-SHM |

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Joel H. Bernstein
Louis Gottlieb
David J. Goldsmith
Stefanie J. Sundel
LABATON SUCHAROW LLP
140 Broadway
New York, New York  10005
(212) 907-0700

J. Gerard Stranch, IV (BPR # 023045)
BRANSTETTER, STRANCH
  & JENNINGS, PLLC
227 Second Avenue North
Nashville, Tennessee  37201
(615) 254-8801

*Counsel for Lead Plaintiffs
Lion Fund, L.P., Dr. J. Samir
Sulieman and Larry Lattimore*

[Additional counsel listed below]

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities ...................................................................................................... v

Preliminary Statement ................................................................................................. 1

ARGUMENT ............................................................................................................... 6

I.    THE COMPLAINT SUFFICIENTLY PLEADS
MATERIAL MISREPRESENTATIONS AND OMISSIONS ........................ 6

    A.    Pleading Standards in Dispute .............................................................. 6

        1.    Exchange Act Claims.................................................................. 6

        2.    Securities Act Claims................................................................. 8

    B.    The Complaint Sufficiently Alleges
Material Misrepresentations and Omissions...................................... 10

        1.    Misstatements Regarding Valuation
Procedures, Valuations of the Funds'
Assets, and NAV Manipulation ............................................... 11

        2.    Misstatements Regarding Diversification
and Overconcentration of Portfolio Assets.............................. 15

            a.    The Funds' Portfolios Were Not
Broadly Diversified Among a
"Wide Variety of Asset Types" .................................... 15

            b.    The Funds Misrepresented
Adherence to Their "Same
Industry" Investment Restriction ................................ 16

            c.    The Funds Did Not Sufficiently
Disclose Their Violations of the
25% Investment Restriction......................................... 18

        3.    Statements Comparing the Funds to the
Lehman High-Yield Index Misled Investors ............................ 21

    C.    The Funds' Conditional, Boilerplate Risk
Disclosures Did Not Adequately Disclose
the Risks to Which Investors Were Exposed ...................................... 24

1.      Disclosures Concerning Junk
        Bonds, Leverage, MBS, ABS
        and Subordinated Securities..................................................... 24

2.      Disclosures Concerning Management Risk ............................. 27

3.      Disclosures Concerning Illiquid Securities.............................. 27

II.     THE COMPLAINT ALLEGES FACTS RAISING
        A STRONG INFERENCE OF SCIENTER AS TO
        THE OFFICER DEFENDANTS AND THE FUNDS ................................... 28

        A.      Standards for Pleading Scienter Under
                Section 10(b) of the Exchange Act .............................. 28

        B.      The Officer Defendants and the Funds Knew or
                Recklessly Disregarded Facts Contradicting Their
                Public Statements About the Funds' Level of
                Investment Risk, Portfolio Holdings and NAVs.................... 30

                1.      Defendants Manipulated the Fair
                        Value of the Funds' Portfolio Holdings
                        in Order to Report Falsely Inflated NAVs.................. 30

                2.      Defendants Intentionally or Recklessly
                        Misclassified a Material Portion of
                        the Funds' ABS and MBS Holdings as
                        Corporate Bonds and Preferred Stock...................... 40

                3.      Defendants Intentionally or Recklessly
                        Overconcentrated the Funds' Holdings
                        in the Riskiest ABS Assets in Violation
                        of the Funds' Investment Guidelines
                        and at Heightened Risk to Investors ..................... 42

                4.      Defendants Intentionally or Recklessly
                        Failed to Exercise Due Diligence in
                        Acquiring Assets for the Funds' Portfolios ............. 43

                5.      Defendants Intentionally or Recklessly
                        Misled Investors By Using a Benchmark
                        Index That Had a Built-In Asset Mismatch ............... 45

        C.      Even if it Were Equally Plausible to Infer That
                Defendants Innocently Failed to Anticipate the Global
                Credit Crisis Rather Than Acted Intentionally
                or Recklessly—and Such an Inference Is Not
                Plausible—the Complaint Sufficiently Pleads Scienter........... 49

III.   PLAINTIFFS ALLEGE VIOLATIONS
       OF THE FEDERAL SECURITIES LAWS,
       NOT CORPORATE MISMANAGEMENT ................................................................. 51

       A.   The Complaint Is Not Predicated
            on Corporate Mismanagement, and Related
            Derivative Litigation Is Pending in This Court .................................... 51

       B.   This Court Should Not Follow the
            Alabama Supreme Court's Opinion in
            *Rice*, Which Was Based on Maryland Law .......................................... 55

IV.    PLAINTIFFS' EXCHANGE ACT CLAIMS
       SUFFICIENTLY PLEAD LOSS CAUSATION .................................................... 57

       A.   Standards for Pleading Loss Causation ................................................ 57

       B.   The Complaint Alleges Corrective Disclosures
            Resulting in Declines in the Funds' Share Prices ................................ 58

            1.   Correction of the Fund's NAVs ................................................ 58

            2.   Other Corrective Disclosures ................................................... 60

       C.   The Complaint Also Alleges That
            Plaintiffs' Losses Were the Result of
            the Materialization of Concealed Risks ............................................... 66

V.     PLAINTIFFS NEED NOT PLEAD LOSS CAUSATION
       WITH RESPECT TO THEIR SECURITIES ACT CLAIMS ......................................... 69

VI.    PLAINTIFFS' CLAIMS UNDER THE SECURITIES
       EXCHANGE ACT OF 1934 ARE TIMELY ASSERTED ............................................ 70

       A.   Plaintiffs' Exchange Act Claims Are Timely With
            Respect to Purchasers of RMH, RSF, and RMA ................................ 70

            1.   *American Pipe* Tolling Applies to
                 Subsequently Filed Class Actions ............................................ 72

            2.   *American Pipe* Tolls the Statute of
                 Limitations During the Pendency of
                 a Voluntarily Dismissed Complaint ........................................ 74

            3.   There Is an Identity of Claims and Parties
                 Between the Claims Asserted in *DeJoseph*
                 and the Consolidated Amended Complaint ............................ 77

B.      Plaintiffs' Exchange Act Claims Are Timely With
        Respect to RHY Purchasers in the TAL Subclass ................................................. 77

VII.    PLAINTIFFS' CLAIMS UNDER THE SECURITIES
        ACT OF 1933 ARE TIMELY ASSERTED ..................................................... 80

        A.      The Statute of Repose Is
                Subject to *American Pipe* Tolling ........................................................ 80

        B.      The *Willis* Action Timely
                Asserted Securities Act Claims ........................................................... 82

VIII.   THE CHALLENGES TO PLAINTIFFS'
        CLAIMS UNDER SECTION 12(a)(2) OF
        THE SECURITIES ACT LACK MERIT ..................................................... 84

        A.      Whether Morgan Keegan Is a "Seller"
                Is a Question of Fact, and Any Perceived
                Pleading Deficiency Is Readily Cured ................................................ 84

        B.      The Section 12(a)(2) Claim Is Properly
                Asserted Against RMK Multi-Sector ................................................... 86

IX.     THE COMPLAINT STATES CLAIMS
        FOR CONTROLLING PERSON LIABILITY ............................................... 87

X.      THE McABEE FOUNDATION TRUST, BY AND
        THROUGH C. FRED DANIELS AS TRUSTEE
        *AD LITEM*, HAS STANDING TO REPRESENT
        THE CLASS OF RHY PURCHASERS ........................................................ 94

Conclusion ................................................................................................................. 98

## TABLE OF AUTHORITIES

### Cases

*In re 2007 Novastar Finance, Inc.,*
No. 07-0139, 2008 WL 235467
(W.D. Mo. June 4, 2008).................................................................64

*Abrams v. Van Kampen Funds, Inc.,*
No. 01 C 7538, 2002 WL 1160171
(N.D. Ill. May 30, 2002) .................................................12, 39, 53, 79

*Adams v. Kinder-Morgan, Inc.,*
340 F.3d 1083 (10th Cir. 2003)........................................................37

*In re Adams Golf, Inc. Securities Litigation,*
381 F.3d 267 (3d Cir. 2004).............................................................69

*In re AEP ERISA Litigation,*
No. 03-cv-067, 2009 WL 614951
(S.D. Ohio Mar. 6, 2009) ...........................................................72, 75

*Akerman v. Arotech Corp.,*
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ..............................................49

*Alaska Electrical Pension Fund v. Flowserve Corp.,*
572 F.3d 221 (5th Cir. 2009)......................................................61, 70

*In re Ambac Financial Group, Inc.*
*Securities Litigation,*
693 F. Supp. 2d 241 (S.D.N.Y. 2010)...............................................23

*In re America Service Group, Inc.*
*Securities Litigation,*
No. 06-0323, 2009 WL 1348163
(M.D. Tenn. Mar. 31, 2009)..................................................... *passim*

*American Pipe & Construction Co. v. Utah,*
414 U.S. 538 (1974) .............................................................. *passim*

*Anderson v. Aon Corp.,*
614 F.3d 361 (7th Cir. 2010)............................................................57

*Anderson v. Aon Corp.,*
No. 06 C 6241, 2008 WL 5388321
(N.D. Ill. Dec. 22, 2008), *rev'd,*
614 F.3d 361 (7th Cir. 2010)............................................................57

*Andrews v. Orr*,
   851 F.2d 146 (6th Cir. 1988).......................................................................72

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007) ........................................................55

*In re Apple Computer Securities Litigation*,
   886 F.2d 1109 (9th Cir. 1989)..............................................................19,83

*Archdiocese of Milwaukee Supporting Fund, Inc.*
   *v. Halliburton Co.*, 597 F.3d 330 (5th Cir. 2010),
   *rev'd on other grounds sub nom. Erica P. John Fund, Inc.*
   *v. Halliburton Co.*, 79 U.S.L.W. 4416 (June 6, 2011) ............................61

*Argiropoulos v. Kopp*,
   No. CCB-06-0769, 2007 WL 954747
   (D. Md. Mar. 26, 2007) ..............................................................................54

*Arivella v. Lucent Technologies, Inc.*,
   623 F. Supp. 2d 164 (D. Mass. 2009) ......................................................81

*Asher v. Baxter International Inc.*,
   377 F.3d 727 (7th Cir. 2004)......................................................................19

*In re Atlas Air Worldwide Holdings, Inc.*
   *Securities Litigation*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)..................................................47, 54

*Azzolini v. CorTS Trust II for Provident Finance Trust I*,
   No. 03-CV-1003, 2005 WL 2253971
   (E.D. Tenn. Sept. 16, 2005) .......................................................................91

*Ballard v. Tyco International, Ltd.*,
   No. 04-CV-1336-PB, 2005 WL 1683598
   (D.N.H. July 11, 2005)................................................................................81

*Bass v. Ameriquest Mortgage Co.*,
   No. 09-00476 JMS/BMK, 2010 WL 3025167
   (D. Haw. Aug. 3, 2010)...............................................................................18

*In re Bear Stearns Cos. Securities*
   *Derivative & ERISA Litigation*,
   No. 08 MDL 1963, 2011 WL 223540
   (S.D.N.Y. Jan. 19, 2011) .............................................................12, 65, 70

*Betz v. Trainer Wortham & Co.*,
   519 F.3d 863 (9th Cir. 2008)......................................................................83

*Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*,
  735 F. Supp. 587 (S.D.N.Y. 1990) ........................................................91

*In re Bradley Pharmaceuticals, Inc.*
  *Securities Litigation*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ......................................................61

*Brown v. Earthboard Sports USA, Inc.*,
  481 F.3d 901 (6th Cir. 2007) ..........................................................58, 66

*Camofi Master LDC v. Riptide Worldwide, Inc.*,
  No. 10 Civ. 4020 (CM), 2011 WL 1197659
  (S.D.N.Y. Mar. 25, 2011) ..................................................................48

*In re Cardinal Health, Inc. Securities Litigation*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) ...............................................50

*Carpenter v. Harris, Upham & Co.*,
  594 F.2d 388 (4th Cir. 1979) ..............................................................88

*Catholic Social Services, Inc. v. INS*,
  232 F.3d 1139 (9th Cir. 2000) .......................................................73, 74

*Central Bank of Denver, N.A. v.*
  *First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ..........................................................................89

*In re Charles Schwab Corp. Securities Litigation*,
  No. C 08-01510 WHA, 2009 WL 1371409
  (N.D. Cal. May 15, 2009) ..................................................................54

*In re Charles Schwab Corp. Securities Litigation*,
  257 F.R.D. 534 (N.D. Cal. 2009) ................................................ *passim*

*In re CMS Energy Securities Litigation*,
  No. 02-cv-72004, 2005 U.S. Dist. LEXIS 439
  (E.D. Mich. Jan. 7, 2005) .............................................................93, 94

*In re Citigroup Inc. Bond Litigation*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010) .................................................53

*Citiline v. Istar Finance Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010) .................................................21

*City of Monroe Employees' Retirement System v.*
  *Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ...................................................... *passim*

*In re Comverse Technology, Inc.*
  *Securities Litigation,*
  543 F. Supp. 2d 134 (E.D.N.Y. 2008) ......................................................20

*In re Connetics Corp. Securities Litigation,*
  542 F. Supp. 2d 996 (N.D. Cal. 2008) .......................................................8

*In re Countrywide Financial Corp.*
  *Derivative Litigation,*
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ....................................................64

*In re Countrywide Financial Corp.*
  *Securities Litigation,*
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .............................................15, 20, 41, 64

*In re Crazy Eddie Securities Litigation,*
  802 F. Supp. 804 (E.D.N.Y. 1992) ..........................................................74

*Crown, Cork & Seal Co., Inc. v. Parker,*
  462 U.S. 345 (1983) ......................................................................71

*Cullen v. Margiotta,*
  811 F.2d 698 (2d Cir. 1987)...............................................................73

*D. E. & J. Limited Partnership v. Conaway,*
  133 F. App'x 994 (6th Cir. 2005) .........................................................90

*Daniels v. Morgan Keegan & Co.,*
  No. 08-cv-2456, 2009 WL 2749963
  (W.D. Tenn. Aug. 26, 2009) ..............................................................77

*In re Daou Systems, Inc. Securities Litigation,*
  411 F.3d 1006 (9th Cir. 2005)........................................................61, 62, 64

*In re Daou Systems, Inc. Securities Litigation,*
  397 F.3d 704 (9th Cir. 2005)..............................................................88

*de la Fuente v. DCI Telecommunications, Inc.,*
  259 F. Supp. 2d 250 (S.D.N.Y. 2003) .......................................................7

*DeMarco v. Robertson Stephens Inc.,*
  318 F. Supp. 2d 110 (S.D.N.Y. 2004) ......................................................64

*In re Digi International Inc. Securities Litigation,*
  6 F. Supp. 2d 1089 (D. Minn. 1998) .......................................................11

*In re Direct General Corp. Securities Litigation,*
  398 F. Supp. 2d 888 (M.D. Tenn. 2005) ..................................................88, 93

*Disabled in Action of Pennsylvania v. Southeastern*
  *Pennsylvania Transportation Authority,*
  539 F.3d 199 (3d Cir. 2008) .................................................................................18

*In re Discovery Zone Securities Litigation,*
  181 F.R.D. 582 (N.D. Ill. 1998) ...........................................................................81

*In re Dot Hill System Corp. Securities Litigation,*
  594 F. Supp. 2d 1150 (S.D. Cal. 2008) ................................................................44

*Drachman v. Harvey,*
  453 F.2d 722 (2d Cir. 1971).................................................................................51

*In re Dreyfus Aggressive Growth Mutual Fund Litigation,*
  No. 98 Civ. 4318, 2000 WL 10211
  (S.D.N.Y. Jan. 6, 2000) .......................................................................................25

*Dura Pharmaceuticals, Inc. v. Broudo,*
  544 U.S. 336 (2005) ..................................................................................... *passim*

*Employers-Teamsters Local Nos. 175 & 505*
  *Pension Trust Fund v. Anchor Capital Advisors,*
  498 F.3d 920 (9th Cir. 2007)................................................................................75

*Engel v. Sexton,*
  No. 06-10447, 2009 WL 361108
  (E.D. La. Feb. 11, 2009) ......................................................................................50

*In re Evergreen Ultra Short Opportunities*
  *Fund Securities Litigation,*
  705 F. Supp. 2d 86 (D. Mass. 2010) ........................................................22, 53, 68

*Fait v. Regions Financial Corp.,*
  712 F. Supp. 2d 117 (S.D.N.Y. 2010)..................................................................13

*In re FirstEnergy Corp. Securities Litigation,*
  316 F. Supp. 2d 581 (N.D. Ohio 2004).................................................................28

*In re Flag Telecom Holdings, Ltd. Securities Litigation,*
  352 F. Supp. 2d 429 (S.D.N.Y. 2005)..................................................................81

*Footbridge Ltd. Trust v. Countrywide Financial Corp.,*
  No. 10 Civ. 367 (PKC), 2011 WL 907121
  (S.D.N.Y. Mar. 16, 2011) ....................................................................................81

*Frank v. Dana Corp.,*
  No. 09-4233, 2011 WL 2020717
  (6th Cir. May 25, 2011) ................................................................................ *passim*

*Frank v. Dana Corp.*,
    547 F.3d 564 (6th Cir. 2008).................................................................8, 29, 35

*Frank v. Dana Corp.*,
    649 F. Supp. 2d 729 (N.D. Ohio 2009),
    *rev'd*, No. 09-4233, 2011 WL 2020717
    (6th Cir. May 25, 2011) ...........................................................................93

*Fraternity Fund, Ltd. v. Beacon Hill
    Asset Management, LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007)......................................................13

*Freeland v. Iridium World Communications, Ltd.*,
    233 F.R.D. 40 (D.D.C. 2006)....................................................................61

*Freidus v. ING Groep, N.V.*,
    736 F. Supp. 2d 816 (S.D.N.Y. 2010)…………………………………………...83

*Freudenberg v. E*Trade Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).........................................51, 53, 57

*In re Friedman's, Inc. Securities Litigation*,
    385 F. Supp. 2d 1345 (N.D. Ga. 2005) ...................................................84

*In re Giant Interactive Group, Inc. Securities Litigation*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009)......................................................69

*In re Goldman Sachs Mutual Funds Fee Litigation*,
    No. 04 Civ. 2567 WHA, 2009 WL 1371409
    (N.D. Cal. May 15, 2009) ........................................................................55

*Gomez v. St. Vincent Health, Inc.*,
    622 F. Supp. 2d 710 (S.D. Ind. 2008) .....................................................74

*Gosselin v. First Trust Advisors L.P.*,
    No. 08 C 5213, 2009 WL 5064295
    (N.D. Ill. Dec. 17, 2009) ................................................................ *passim*

*Great Plains Trust Co. v. Union Pacific Railroad Co.*,
    492 F.3d 986 (8th Cir. 2007).....................................................................75

*Hawaii Ironworkers Annuity Trust Fund v. Cole*,
    No. 10 CV 371, 2011 WL 1257756
    (N.D. Ohio Mar. 31, 2011)................................................................6, 7, 78

*Helwig v. Vencor*,
    251 F.3d 540 (6th Cir. 2001).............................................................36, 39

x

*Herman & McLean v. Huddleston*,
    459 U.S. 375 (1983) .......................................................................86

*In re HiEnergy Technologies, Inc. Securities Litigation*,
    No. CV 04-1226 DOC (JTLx), 2005 WL 3071250
    (C.D. Cal. Oct. 25, 2005) .............................................................63

*Hollinger v. Titan Capital Corp.*,
    914 F.2d 1564 (9th Cir. 1990) .....................................................93

*Howard v. Everex Systems, Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ..............................................19, 47

*Howard v. Haddad*,
    916 F.2d 167 (4th Cir. 1990) .......................................................54

*In re Huffy Corp. Securities Litigation*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008) ...................................44, 47

*Hunt v. Alliance North American*
    *Government Income Trust*,
    159 F.3d 723 (2d Cir. 1998) .........................................................22

*In re ICG Communications, Inc. Securities Litigation*,
    No. 00 CV 01864, 2006 WL 416622
    (D. Colo. Feb. 7, 2006) ................................................................61

*In re Immucor Inc. Securities Litigation*,
    No. 05-2276, 2006 WL 3000133
    (N.D. Ga. Oct. 4, 2006) ...............................................................27

*In re Immune Response Securities Litigation*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ..........................................26

*In re Independent Energy Holdings PLC Securities Litigation*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001) .....................................26, 91

*Indiana State District Council of Laborers & Hod*
    *Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
    583 F.3d 935 (6th Cir. 2009) .......................................................69

*In re IndyMac Mortgage-Backed Securities Litigation*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010) ..........................................76

*Institutional Investments Group v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ........................................................29

*In re Issuer Plaintiff Initial Public*
   *Offering Antitrust Litigation*,
   No. 00-7804, 2002 WL 31132906
   (S.D.N.Y. Sept. 25, 2002) ..................................................................................74

*J & R Marketing, SEP v. General Motors Corp.*,
   549 F.3d 384 (6th Cir. 2008) .............................................................................87

*Janus Capital Group, Inc. v. First Derivative Traders*,
   564 U.S. ___, 2011 WL 2297762
   (U.S. June 13, 2011) .............................................................................18, 89, 90, 92

*Joffee v. Lehman Brothers, Inc.*,
   410 F. Supp. 2d 187 (S.D.N.Y. 2006) ................................................................11

*Joseph v. Wiles*,
   223 F.3d 1155 (10th Cir. 2000) .........................................................................81

*Kalin v. Xanboo, Inc.*,
   526 F. Supp. 2d 392 (S.D.N.Y. 2007) ............................................................91, 92

*Kandel v. Brother International Corp.*,
   No. 08-1040, 2009 U.S. Dist. LEXIS 105242
   (C.D. Cal. May 12, 2009) ..................................................................................74

*Karpov v. Insight Enterprises., Inc.*,
   No. CV 09-856-PHX-SRB, 2010 WL 2105448
   (D. Ariz. Apr. 30, 2010) ...................................................................................44

*Katyle v. Penn National Gaming Inc.*,
   637 F.3d 462 (4th Cir. 2011) .............................................................................61

*Konkol v. Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009) .............................................................................44

*Korwek v. Hunt*,
   827 F.2d 874 (2d Cir. 1987) ..............................................................................72

*LC Capital Partners, LP v. Frontier Insurance Group, Inc.*,
   318 F.3d 148 (2d Cir. 2003) ..............................................................................83

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ..............................................................................78

*Ley v. Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) .............................................................................19

*Lipsky v. Commonwealth United Corp.*,
 551 F.2d 887 (2d Cir. 1976) ...................................................................8

*Litwin v. Blackstone Group, L.P.*,
 634 F.3d 706 (2d Cir. 2011) .................................................................87

*Local 703, International Brotherhood of Teamsters Grocery
 & Food Employees Welfare Fund v. Regions Financial Corp.*,
 No. CV 10-2847-IPJ, 2011 U.S. Dist. LEXIS 60761
 (N.D. Ala. June 7, 2011) .........................................................13, 50, 62

*Lone Star Ladies Investment Club, Inc. v. Schlotzsky's, Inc.*,
 238 F.3d 363 (5th Cir. 2001) ...................................................................9

*In re Lord Abbett Mutual Funds Fee Litigation*,
 407 F. Supp. 2d 616 (D.N.J. 2005) .......................................................51

*Lubin v. Skow*,
 382 F. App'x 866 (11th Cir. 2010) ........................................................57

*Maine State Retirement System v.
 Countrywide Financial Corp.*,
 722 F. Supp. 2d 1157 (C.D. Cal. 2010) ................................................81

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
 513 F.3d 702 (7th Cir. 2008) .................................................................37

*Matrixx Initiatives, Inc. v. Siracusano*,
 131 S. Ct. 1309 (2011) ................................................................. *passim*

*In re McKesson HBOC, Inc. Securities Litigation*,
 126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................8

*Merck & Co. v. Reynolds*,
 130 S. Ct. 1784 (2010) ..................................................... 70, 78, 83-84

*In re Merrill Lynch & Co. Research Reports
 Securities Litigation*,
 218 F.R.D. 76 (S.D.N.Y. 2003) ..............................................................8

*In re Merrill Lynch & Co. Research Reports
 Securities Litigation*,
 272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...................................................87

*In re Metropolitan Securities Litigation*,
 532 F. Supp. 2d 1260 (E.D. Wash. 2007) ............................................78

*In re MoneyGram International, Inc.*
  *Securities Litigation*,
  626 F. Supp. 2d 947 (D. Minn. 2009) ...................................................12

*Moskowitz v. Mitcham Industries*,
  No. H-98-1244, 2000 WL 33993307
  (S.D. Tex. Oct. 2, 2000) ............................................................... 84-85

*In re MRU Holdings Securities Litigation*,
  No. 09 Civ. 3807 (RMB), 2011 WL 650792
  (S.D.N.Y. Feb. 17, 2011) ................................................................50

*In re Mutual Funds Investment Litigation*,
  566 F.3d 111 (4th Cir. 2009), *rev'd on other
  grounds sub nom. Janus Capital Group, Inc. v.
  First Derivative Traders*, 564 U.S. ___, No. 09-525,
  2011 WL 2297762 (U.S. June 13, 2011). ..............................57, 63, 91

*In re National Australia Bank Securities Litigation*,
  No. 03-6537, 2006 WL 3844463
  (S.D.N.Y. Nov. 8, 2006) .................................................................74

*In re National Century Financial Enterprises, Inc.
  Investment Litigation*,
  No. 03-md-1656, 2006 WL 469468
  (S.D. Ohio Feb. 27, 2006)..........................................................93, 94

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..........................................................6, 33

*In re NVIDIA Corp. Securities Litigation*,
  No. 08-CV-04260-RS, 2010 WL 4117561
  (N.D. Cal. Oct. 19, 2010) ...............................................................62

*Official Committee of Asbestos Claimants
  of G-I Holding, Inc. v. Heyman*,
  277 B.R. 20 (S.D.N.Y. 2002).........................................................81

*In re Orion Securities Litigation*,
  No. 08 Civ. 1328 (RJS), 2009 WL 2601952
  (S.D.N.Y. Aug. 20, 2009) ..............................................................85

*In re Oxford Health Plans, Inc. Securities Litigation*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................11

*Panter v. Marshall Field & Co.*,
  646 F.2d 271 (7th Cir. 1981)..........................................................54

*In re Pharmaceutical Industrial Average*
  *Wholesale Price Litigation*,
  582 F.3d 156 (1st Cir. 2009) ...................................................18

*Phillips v. Kidder Peabody & Co.*,
  782 F. Supp. 854 (S.D.N.Y. 1991) ...........................................83

*Piper Capital Management, Inc.*,
  S.E.C. Release No. 175, 2000 WL 1759455
  (ALJ Nov. 30, 2000) (initial decision) ............................ *passim*

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ..................................... *passim*

*In re Premiere Technologies Inc. Securities Litigation*,
  No. 98-CV-1804-JOF, 2000 WL 33231639
  (N.D. Ga. Dec. 8, 2000) .........................................................15

*In re Prison Realty Securities Litigation*,
  117 F. Supp. 2d 681 (M.D. Tenn. 2000) ....................................9

*In re Prudential Securities Ltd. Partnerships Litigation*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ............................................26

*Public Employees' Retirement System of*
  *Mississippi v. Merrill Lynch & Co.*,
  714 F. Supp. 2d 475 (S.D.N.Y. 2010) ......................................83

*Rafton v. Rydex Series Funds*,
  No. 10-CV-01171-LHK, 2011 WL 31114
  (N.D. Cal. Jan. 5, 2011) .................................................23, 68

*In re RAIT Finance Trust Securities Litigation*,
  No. 07-CV-03148 LDD, 2008 WL 5378164
  (E.D. Pa. Dec. 22, 2008) ........................................................27

*Rauch v. Day & Night Manufacturing Corp.*,
  576 F.2d 697 (6th Cir. 1978)...................................................69

*Recupito v. Prudential Securities, Inc.*,
  112 F. Supp. 2d 449 (D. Md. 2000) ........................................25

*Ex parte Regions Financial Corp.*,
  No. 1090425, 2010 WL 3835727
  (Ala. Sept. 30, 2010) ("*Rice*") ......................................5, 55-57

*In re Regions Morgan Keegan Open-End*
*Mutual Fund Litigation*,
743 F. Supp. 2d 744 (W.D. Tenn. 2010),
*reconsideration denied*, Nos. 07-2784, MDL 2009,
2010 WL 5464792 (W.D. Tenn. Dec. 30, 2010) ............................................................ *passim*

*Reid ex rel. First Horizon National Corp. v. Baker*,
No. 10-2413-STA, 2011 WL 976547
(W.D. Tenn. Mar. 16, 2011) ...........................................................................................78

*In re Rhythms Securities Litigation*,
300 F. Supp. 2d 1081 (D. Colo. 2004) ...........................................................................65

*Robbin v. Fluor Corp.*,
835 F.2d 213 (9th Cir. 1987)...........................................................................................72

*Rodney v. KPMG Peat Marwick*,
143 F.3d 1140 (8th Cir. 1998)..........................................................................................17

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003)...........................................................................................87

*In re Royal Ahold N.V. Securities & ERISA Litigation*,
351 F. Supp. 2d 334 (D. Md. 2004) ......................................................................... 85-86

*Sacred Heart Health System, Inc. v. Humana*
*Military Healthcare Services, Inc.*,
No. 07cv62/MCR, 2008 WL 2385506
(N.D. Fla. June 9, 2008)..................................................................................................75

*Saddle Rock Partners, Ltd. v. Hiatt*,
No. 95-2326 GA, 1996 WL 859986
(W.D. Tenn. Mar. 26, 1996) ...........................................................................................19

*Salazar-Calderon v. Presidio Valley*
*Farmers Association*,
765 F.2d 1334 (9th Cir. 1987)........................................................................................72

*Salkind v. Wang*,
No. 93-10912-WGY, 1995 WL 170122
(D. Mass. Mar. 30, 1995) ...............................................................................................81

*In re Salomon Smith Barney Mutual Fund Fees Litigation*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006).............................................................................69

*San Diego County Employees' Retirement*
   *Association v. Maounis,*
   No. 07 Civ. 2618 (DAB), 2010 WL 1010012
   (S.D.N.Y. Mar. 15, 2010) ......................................................................54

*Sanders Confectionery Products, Inc.*
   *v. Heller Financial, Inc.,*
   973 F.2d 474 (6th Cir. 1992)............................................................88, 90

*Santa Fe Industries, Inc. v. Green,*
   430 U.S. 462 (1977) ........................................................................51

*Sawyer v. Atlas Heating & Sheet Metal Works, Inc.,*
   731 F. Supp. 2d 850 (E.D. Wis. 2010).............................................71, 75

*Schur v. Friedman & Shaftan, P.C.,*
   123 F.R.D. 611 (N.D. Cal. 1988) ......................................................74

*In re Scottish Re Group Securities Litigation,*
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...............................................84

*Searcy v. eFunds Corp.,*
   No. 08 C 985, 2010 WL 1337684
   (N.D. Ill. Mar. 31, 2010) .............................................................73, 75

*SEC v. Coffey,*
   493 F.2d 1304 (6th Cir. 1974)..........................................................88

*SEC v. Haligiannis,*
   470 F. Supp. 2d 373 (S.D.N.Y. 2007) ...............................................37

*SEC v. Lee,*
   720 F. Supp. 2d 305 (S.D.N.Y. 2010).................................................7

*SEC v. Smith,*
   No. C2-cv-04-739, 2005 WL 2373849
   (S.D. Ohio Sept. 27, 2005)..............................................................94

*SEC v. Young,*
   No. 09-1634, 2011 WL 1376045
   (E.D. Pa. Apr. 12, 2011) .................................................................37

*In re Security Capital Assurance, Ltd.*
   *Securities Litigation,*
   729 F. Supp. 2d 569 (S.D.N.Y. 2010)................................................57

*In re SeeBeyond Technologies Corp.*
  *Securities Litigation,*
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................44

*Semerenko v. Cendant Corp.,*
  223 F.3d 165 (3d Cir. 2000)...............................................................64

*Simons v. Dynacq Healthcare, Inc.,*
  No. 03-05825, 2006 WL 1897270
  (S.D. Tex. July 10, 2006) ..................................................................14

*In re Sirrom Capital Corp. Securities Litigation,*
  84 F. Supp. 2d 933 (M.D. Tenn. 1999) ................................................9

*In re Smith Barney Transfer Agent Litigation.,*
  No. 05 Civ. 7583 (WHP), 2011 WL 350289
  (S.D.N.Y. Jan. 25, 2011) ........................................................ *passim*

*In re Société Générale Securities Litigation,*
  No. 08 Civ. 2495 (RMB), 2010 WL 3910286
  (S.D.N.Y. Sept. 29, 2010) .................................................................50

*South Ferry LP, #2 v. Killinger,*
  542 F.3d 776 (9th Cir. 2008)..............................................................48

*Stephenson v. Citco Group Ltd.,*
  700 F. Supp. 2d 599 (S.D.N.Y. 2010)..................................................54

*In re StockerYale Securities Litigation,*
  453 F. Supp. 2d 345 (D.N.H. 2006).....................................................64

*Stone Container Corp. v. United States,*
  223 F.3d 1345 (Fed. Cir. 2000)...........................................................81

*Stumpf v. Garvey,*
  No. 03-CV-1352 PB, 2005 WL 2127674
  (D.N.H. Sept. 2, 2005) ................................................................. 64-65

*Suez Equity Investments, L.P.*
  *v. Toronto-Dominion Bank,*
  250 F.3d 87 (2d Cir. 2001)..................................................................38

*SunTrust Bank v. Stoner,*
  No. 07-cv-397, 2008 WL 4443281
  (E.D. Tenn. Sept. 26, 2008) ...............................................................78

*In re Suprema Specialties, Inc.*
   *Securities Litigation*,
   438 F.3d 256 (3d Cir. 2006) ............................................................90

*In re Surebeam Corp. Securities Litigation*,
   No. 03 CV 1721 JM (POR), 2004 WL 5036360
   (S.D. Cal. June 3, 2005) ...........................................................54, 56

*In re Syncor International Corp. Securities Litigation*,
   327 F. Supp. 2d 1149 (C.D. Cal. 2004),
   *aff'd in part, rev'd in part on other grounds*,
   239 F. App'x 318 (9th Cir. 2007) ...................................................44

*Taylor v. United Parcel Service, Inc.*,
   554 F.3d 510 (5th Cir. 2008) ..........................................................75

*In re TCW/DW North American Government*
   *Income Trust Securities Litigation*,
   941 F. Supp. 326 (S.D.N.Y. 1996) ................................................25

*Teamsters Local 445 Freight Division*
   *Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2008) ..................................................................37, 42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..............................................................*passim*

*In re Telxon Corp. Securities Litigation*,
   133 F. Supp. 2d 1010 (N.D. Ohio 2000) .....................................40, 43

*Thompson v. RelationServe Media, Inc.*,
   610 F.3d 628 (11th Cir. 2010) ........................................................37

*In re Vertrue Marketing & Sales Practices Litigation*,
   712 F. Supp. 2d 703 (N.D. Ohio 2010) ......................................72-73

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ...............................................................11, 21

*In re Wachovia Equity Securities Litigation*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...........................................83

*In re Washington Mutual, Inc. Securities,*
   *Derivative & ERISA Litigation*,
   259 F.R.D. 490 (W.D. Wash. 2009) ...............................................13

*White v. Heartland High-Yield Municipal Bond Fund*,
   237 F. Supp. 2d 982 (E.D. Wis. 2002) ...........................................17

*Wilkof v. Caraco Pharmaceutical Laboratories, Ltd.*,
No. 09-12830, 2010 WL 4184465
(E.D. Mich. Oct. 21, 2010) ....................................................................19, 93

*In re Winstar Communications*,
No. 01 Civ. 3014, 2006 WL 473885
(S.D.N.Y. Feb. 27, 2006) ......................................................................61, 64

*Woodward v. Raymond James Financial, Inc.*,
732 F. Supp. 2d 425 (S.D.N.Y. 2010) ........................................................50

*In re World Access, Inc. Securities Litigation*,
119 F. Supp. 2d 1348 (N.D. Ga. 2000) ................................................. 14-15

*In re WorldCom, Inc. Securities Litigation*,
294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................... 87-88

*Yang v. Odom*,
392 F.3d 97 (3d Cir. 2004) ..........................................................................73

*Yu v. State Street Corp.*,
No. 08 Civ. 8235 (RJH), 2010 WL 2816259
(S.D.N.Y. July 14, 2010) ......................................................................17, 20

## <u>Statutes & Rules</u>

15 U.S.C. § 77k ...............................................................................................1

15 U.S.C. § 77k(e) .........................................................................................69

15 U.S.C. § 77*l*(a)(2) ......................................................................................1

15 U.S.C. § 77*l*(b) .........................................................................................69

15 U.S.C. § 77m .............................................................................................80

15 U.S.C. § 77*o* ...............................................................................1, 88, 90

15 U.S.C. § 78j(b) ...........................................................................................1

15 U.S.C. § 78t(a) .................................................................................2, 88, 90

15 U.S.C. § 78u-4(b) ......................................................................................28

17 C.F.R. § 240.10b-5 .........................................................................1, 18, 92

Fed. R. Civ. P. 8(a) ..................................................................................57, 85

Fed. R. Civ. P. 8(e)(2) ...................................................................................94

Fed. R. Civ. P. 9(b) .................................................................................................8, 9

Fed. R. Civ. P. 12(b)(6)...............................................................................65, 69, 85

Fed. R. Civ. P. 12(f) ....................................................................................................8

Fed. R. Civ. P. 15(a) ............................................................................................85, 98

## **Preliminary Statement**

Lead Plaintiffs Lion Fund, L.P., Dr. J. Samir Sulieman and Larry Lattimore, and C. Fred Daniels, as court-appointed Trustee *ad Litem* ("TAL") for the Leroy McAbee, Sr. Family Foundation Trust (the "McAbee Foundation Trust"), the Harold G. McAbee Family Trust, the KPS Group, Inc. Profit Sharing Retirement Plan, the Boyd F. Horn IRA Rollover Trust, the Alice C. Cade for the benefit of Carroll Corbin Bays Trust, and the Patricia Penzone Irrevocable Trust for the benefit of Charles A. Penzone, on behalf of the Class and TAL Subclass (collectively, "Plaintiffs"), respectfully submit this omnibus memorandum of law in opposition to Defendants' motions to dismiss the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint").[1]

Plaintiffs have filed a detailed Complaint alleging that senior executives of the four Regions Morgan Keegan Closed-End Funds, led by James C. Kelsoe, Jr. ("Kelsoe"), the Funds' Senior Portfolio Manager, engaged in a fraud upon investors and other wrongdoing.[2]  Within the

---

[1]  Five motions to dismiss the Complaint were filed by (1) Defendants Morgan Asset Management, Inc. ("MAM"), Morgan Keegan & Company, Inc. ("Morgan Keegan"), and MK Holding, Inc. ("MK Holding") (collectively, the "Morgan Keegan Defendants"), cited herein as "MK Mem."; (2) Defendants Allen B. Morgan, Jr., J. Kenneth Alderman, Brian B. Sullivan, Joseph T. Weller, and James C. Kelsoe, Jr., cited herein as "Ind. Defs. Mem."; (3) Defendants RMK Advantage Income Fund, Inc. ("RMA"), now Helios Advantage Income Fund, Inc.; RMK High Income Fund, Inc. ("RMH"), now Helios High Income Fund, Inc.; RMK Strategic Income Fund, Inc. ("RSF"), now Helios Strategic Income Fund, Inc.; and RMK Multi-Sector High Income Fund, Inc. ("RHY" or "RMK Multi-Sector"), now Helios Multi-Sector High Income Fund, Inc. (collectively, the "Funds"), cited herein as "Funds Mem."; (4) Defendant Regions Financial Corporation ("RFC"), cited herein as "RFC Mem."; and (5) Defendant Carter E. Anthony, cited herein as "Anthony Mem."  Defendants Kelsoe, Weller, Sullivan, and Anthony are referred to collectively in the Complaint and herein as the "Officer Defendants."  ¶¶ 56-60.  Defendants Morgan and Alderman are referred to together in the Complaint and herein as the "Director Defendants."  ¶¶ 61-63. Citations to "¶ __" herein refer to paragraphs of the Complaint.

[2]  The Complaint asserts five claims for relief.  Count I asserts claims under Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, against Defendants RMK Multi-Sector, Morgan Keegan, and the Director Defendants in connection with materially false and misleading statements in the Registration Statement for the public offering of RMK Multi-Sector shares.  ¶¶ 317-331.  Count II asserts claims under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), against RMK Multi-Sector and Morgan Keegan in connection with materially false and misleading statements in the Prospectus for the RMK Multi-Sector offering.  ¶¶ 332-342.  Count III asserts claims under Section 15 of the Securities Act, 15 U.S.C. § 77*o*, against the Director Defendants as controlling persons of RMK Multi-Sector.  ¶¶ 343-352.  Count IV asserts claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against the Officer Defendants and the Funds for material misstatements of fact in various

last decade, investment banks have developed increasingly complex, illiquid "structured finance" securities that were backed not by ongoing businesses but rather by pools of various underlying assets or, indeed, other securities.  Structured finance instruments include asset-backed securities ("ABS"), collateralized by the cash flows from a specified pool of underlying assets, and mortgaged-backed securities ("MBS") backed by payments on a given pool of mortgage loans, often subprime loans made to borrowers with weak credit.  ABS also include various "collateralized obligations" like "CDOs," which essentially are securitizations of other structured finance securities or below investment-grade corporate bonds.  Such complex, opaque "securities" give investment managers, including mutual fund portfolio managers, opportunities to take on significant undisclosed risks.

Kelsoe wholeheartedly embraced that opportunity, and went too far.  Although the Funds were marketed as high-yield bond funds that invested most of their assets in corporate bonds, Kelsoe, unbeknownst to investors, glutted the Funds' overlapping portfolios with huge amounts of low-priority tranches of ABS and subprime MBS without performing reasonable due diligence.  As of March 2007, the Funds' portfolios were ***65%-70%*** invested in ABS and ***27%-32%*** invested in subprime MBS.  This put the Funds firmly in violation of their own restriction against having more than 25% of their assets invested in securities in the "same industry," and rendered misleading the Funds' repeated assurances of having broadly diversified portfolios in a wide variety of asset types.

Worse, in a cynical effort to forestall declines in the Funds' reported net asset values ("NAVs"), Kelsoe artificially propped up NAV by deliberately overvaluing the prices of the Funds' ABS and MBS holdings, assigning—through 262 distinct "price adjustments"—

---

reports of the Funds filed publicly with the SEC.  ¶¶ 353-359.  Count V asserts claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Officer Defendants, the Director Defendants, the Morgan Keegan Defendants, and RFC as controlling persons of the Funds.  ¶¶ 360-367.

arbitrarily high values that deviated materially from third-party quotes and did not reflect fair value as required by SEC regulations and the Funds' internal valuation procedures.  Defendant Joseph T. Weller ("Weller"), who, as head of the Fund Accounting Department, was responsible for pricing portfolio securities and calculating the Funds' NAVs, repeatedly turned a blind eye to Kelsoe's bogus valuations and enabled the fraud to persist.

The Funds, with Kelsoe pulling the strings, also knowingly (or severely recklessly) misclassified more than $200 million-worth of ABS and MBS in the portfolios, falsely reporting them to investors as "corporate bonds" or "preferred stocks" to make the portfolios appear more diversified than they actually were.  Moreover, despite the overconcentration of ABS and MBS in their portfolios, the Funds consistently used a Lehman Brothers high-yield bond index composed solely of corporate bonds and preferred stock to benchmark their performance.  Because of the striking mismatch between the Benchmark Index and the Funds' portfolios, the comparison misled investors as to the enhanced risks associated with Fund shares.

Given their overconcentration in ABS and MBS, the Funds initially outperformed most of their high-yield bond "peer" funds and Kelsoe developed a reputation as a hot-shot fund manager.  The Funds' overheated performance in 2003-2006, however, masked an extraordinary amount of undisclosed risk in the portfolios.  As late as the summer of 2007, when investors were fleeing the structured finance markets, Kelsoe stuck to his clandestine strategy and, as later described in the *Memphis Flyer*, continued to "juice investment returns to Barry-Bonds-like proportions" before the Funds "crashed and burned," resulting in $1 billion of losses to investors in 2007 alone.

Defendants collectively take a "kitchen sink" approach in their motions to dismiss, but their array of challenges to Plaintiffs' allegations and claims ultimately fail.  Broadly,

Defendants contend that the Funds always disclosed their risks, strategies and portfolio holdings, and that the sole cause of the Funds' collapse was the global financial crisis that crippled the market for structured finance securities. The Funds' bland, generic risk disclosures did not remotely inform investors about the extraordinary levels of risk brewing in the portfolios, however, or the potential consequences of Kelsoe's fraudulent "price adjustments." Moreover, the Funds were not victims of the economy. The Funds collapsed beginning in mid-2007—far sooner and more severely than 35 non-RMK closed-end high-yield bond funds—primarily as a consequence of their concentrated holdings of low-priority ABS backed by risky assets and Kelsoe's purposeful asset value and NAV manipulations. *See* Parts I, IV and V below.

While Defendants quibble about the meaning of "same industry"—claiming essentially that they had their own view as to its meaning that differed from the SEC's guidance—they do not dispute that the Funds were more than 25% invested in low-priority ABS and MBS (including CDOs) backed by subprime loans and other risky assets. Nor do Defendants dispute that the Funds falsely classified more than $200 million of these structured finance deals as "corporate bonds" and "preferred stocks," and ultimately reclassified them after calling in an "independent valuation consultant." Nor do they seriously dispute that the securities tracked by the Benchmark Index were entirely different than the bulk of the Funds' portfolio holdings. *See* Part I below.

With respect to scienter, Defendants do not meaningfully dispute Plaintiffs' detailed allegations of Kelsoe's intentional price and NAV manipulations, and instead proffer untenable competing inferences—suggesting, for example, that Kelsoe simply "had input" into a complex valuation process, that the professionals of a major mutual fund company confused ABS with corporate bonds and preferred stock innocently, and again blaming the economy, an implausible

argument courts routinely reject on a motion to dismiss.  Ultimately, Plaintiffs' detailed allegations supporting scienter—which the Supreme Court has held must be accepted as true and analyzed holistically and with a view to applying common sense inferences—amply raise the requisite "strong" inference of knowing or reckless behavior on the part of the Officer Defendants and the Funds.  *See* Part II below.

Defendants offer a welter of additional arguments contending that the Complaint alleges nothing more than mismanagement and that the Alabama Supreme Court's *Rice* decision dictates the Court's ruling here; that all of the claims are time-barred notwithstanding the *American Pipe* tolling doctrine; that RMK Multi-Sector and Morgan Keegan were not "sellers" for purposes of Section 12(a)(2) of the Securities Act; that the Funds (which filed the allegedly false and misleading SEC reports) were "victims" of Kelsoe's misconduct, did not issue the RHY shares, and are not properly named as defendants; that none of the Defendants charged with secondary liability were controlling persons of the Funds; and that the Trustee *ad Litem*, notwithstanding the breadth of the governing Appointment Order, lacks standing to sue on Plaintiffs' behalf.  *See* Parts III and VI-X below.  Consistent with this Court's recent decisions at the pleading stage in *In re Regions Morgan Keegan Open-End Mutual Fund Litigation*, No. 07-cv-02784 (the "Open-End Funds action"), most of these assertions raise fact-intensive issues that cannot be resolved now, and the other arguments are readily disposed of.  For these reasons and others, as more fully discussed below, Defendants' motions to dismiss should be denied in their entirety.[3]

---

[3]  The essential facts in this case are familiar to the Court as a result of the proceedings in the Open-End Funds action, *In re Helios Closed-End Funds Derivative Litigation*, No. 10-cv-02188, and other related litigation pending in this Court.  For this reason, and because Plaintiffs' allegations are discussed in detail in the argument, Plaintiffs will not burden the Court with a statement of facts that inevitably would repeat much of what is set forth below.

<u>**ARGUMENT**</u>

I.    **THE COMPLAINT SUFFICIENTLY PLEADS
      MATERIAL MISREPRESENTATIONS AND OMISSIONS**

      A.    **Pleading Standards in Dispute**

            1.    **Exchange Act Claims**

To state a securities fraud claim under Section 10(b) of the Exchange Act, Plaintiffs must allege, among other things, "a material misrepresentation or omission by the defendant." *E.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011). The materiality requirement "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* at 1318 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Materiality poses a minimal burden at the pleading stage; "[a] complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *City of Monroe Employees' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 681 (6th Cir. 2005) (quoting *Helwig v. Vencor*, 251 F.3d 540, 563 (6th Cir. 2001)).

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") requires that the Complaint provide, among other things, "documentary evidence and/or a sufficient general description of the personal sources of plaintiffs' beliefs." *Hawaii Ironworkers Annuity Trust Fund v. Cole*, No. 10 CV 371, 2011 WL 1257756, at *11 (N.D. Ohio Mar. 31, 2011) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). Plaintiffs' investigation included review and analysis of three regulatory actions concerning the Closed-End Funds and other named Defendants: (1) the SEC Order Instituting Administrative and Cease-And-Desist Proceedings

filed against Morgan Keegan, MAM, Kelsoe and Weller (the "SEC Action"); (2) the Joint Administrative Proceeding launched by Alabama, Kentucky, Mississippi and South Carolina against Morgan Keegan, MAM, Kelsoe and Sullivan (the "Task Force Proceeding"); and (3) the complaint of the Financial Industry Regulatory Authority recommending disciplinary action against Morgan Keegan for violations of NASD rules.  The Task Force Proceeding has made public a wealth of internal Morgan Keegan e-mails and other documents which Lead Plaintiffs analyzed in investigating their claims here.  *See* ¶¶ 2, 174-179; Compl. Exs. A, C, J-U.[4]

"[T]here is nothing improper about utilizing information contained in an SEC complaint as evidence to support private claims under the PSLRA."  *Hawaii Ironworkers*, 2011 WL 1257756, at *11 (citing *SEC v. Lee*, 720 F. Supp. 2d 305, 341 (S.D.N.Y. 2010)).  Indeed, Plaintiffs' reliance upon allegations of the SEC and other regulators "does not demonstrate that [the Complaint] lacks evidentiary support, but rather provides it with the necessary evidentiary support."  *Id.*  As one court aptly stated, "[t]he PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of an SEC investigation has far more 'evidentiary support' than one based on rumor and innuendo."  *de la Fuente v. DCI Telecommc'ns, Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003).

Moreover, the Complaint does not rely entirely on the regulators' allegations as the sole bases for Plaintiffs' claims, *see SEC v. Lee*, 720 F. Supp. 2d 305, 340-41 (S.D.N.Y. 2010), and in fact annexes substantial "documentary evidence" supporting the claims.  *Hawaii Ironworkers*,

---

[4] Defendants' assertion that these "regulatory proceedings do not pertain specifically to any of the Funds" but "pertain generally to the 'Funds' as a whole" (MK Mem. at 36-37) is sophistry.  The proceedings explicitly implicate RMH, RSF, RMA, and RHY.  *See* SEC Action ¶¶ 6-9 (Compl. Ex. D); Task Force Proceeding ¶ 16 (Compl. Ex. V); ¶ 33.  Where they refer to the Open-End Funds, which were also managed by Kelsoe and which had holdings comparable to the Closed-End Funds, Plaintiffs draw appropriate comparisons based upon the overlap in their respective portfolios.  *See* ¶¶ 166 & n.26, 261.  The allegations in the SEC Action led Pricewaterhouse Coopers LLP ("PwC"), the Funds' independent auditor, to promptly disclaim its audit reports on the Funds' fiscal year 2005, 2006 and 2007 financial statements.  ¶¶ 35, 180.  Similarly, the matters raised in the Task Force Proceeding led RFC to acknowledge that a loss was "probable" and led Morgan Keegan to record a $200 million charge against future liabilities.  ¶ 34.

2011 WL 1257756, at *11; *cf. In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (refusing to discount allegations drawn from media reports and newspaper articles). Nor is this scenario akin to *Ryan v. Morgan Asset Management, Inc.*, No. 08-2162 (W.D. Tenn. Dec. 15, 2009) (Dkt. No. 58), where Ryan sought leave to file a sur-reply brief incorporating by reference an entire Amended Complaint in a separate litigation. Here, unlike in *Ryan*, Plaintiffs do not simply incorporate by reference or seek to have the Court examine materials outside the record.[5] The Complaint and its exhibits stands on its own.

### 2.     Securities Act Claims

Defendants overreach when they argue that Plaintiffs' Securities Act claims, alleging material misstatements in the RHY Offering Materials, are subject to both the heightened pleading requirements of the PSLRA and Rule 9(b) because they are "premised" on and incorporate allegations of fraud. MK Mem. at 9 n.9; Ind. Defs. Mem. at 3 n.3. This Court has stated that "[t]he heightened pleading standards of the PSLRA do not apply to claims under the [Securities] Act; however, where the claims sound in fraud, the standards of Rule 9(b) do apply. Thus, 'at a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied.'" *In re Regions Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d 744, 759-60 (W.D. Tenn. 2010) (internal citations omitted, and quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)), *reconsideration denied*, Nos. 07-2784, MDL 2009, 2010 WL 5464792 (W.D. Tenn. Dec. 30, 2010) (Mays, J.) (hereinafter

---

[5] Defendants' cited authority is distinguishable. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 89 (2d Cir. 1976), a pre-PSLRA case, carefully limited its holding to its facts, and struck references to a consent judgment under Rule 12(f) on grounds of inadmissibility, which is not a basis under that Rule. *See* Fed. R. Civ. P. 12(f) (authorizing court to strike "redundant, immaterial, impertinent, or scandalous matter"). The complaint in *In re Connetics Corp. Securities Litigation*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008), unlike the Complaint here, relied "entirely" on the SEC complaint as the "sole" basis for the allegations. Finally, the result in *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003), was driven by the court's finding that the complaint was "so steeped with impertinent and verbose material," including references and exhibits concerning more than 300 entirely unrelated litigations, "that the Court [was] compelled to reinforce Rule 8 with Rule 12(f)." *See* MK Mem. at 10 & n.11; Ind. Defs. Mem. at 4.

"*Open-End Funds*"); *see also Lone Star Ladies Inv. Club, Inc. v. Schlotzsky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001) ("Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment does not mean that no claim has been stated.  The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard.").

Where, as here, Securities Act claims do not mention fraud "except to expressly exclude any allegations which might sound in fraud," the claims need not meet the particularity requirement of Rule 9(b).  ¶¶ 317, 332, 343; *see In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 688-89 (M.D. Tenn. 2000) ("Since fraud is not a necessary element of a § 11 or § 12 claim, and the Court cannot read it into the statute, it need not be pled pursuant to Rule 9(b) in Plaintiffs' § 11 or § 12 claims."); *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938-39 (M.D. Tenn. 1999) (Securities Act claims which "expressly exclude any allegations which might sound in fraud" not subject to Rule 9(b) pleading standard).  Moreover, Director Defendants Morgan and Alderman, the sole Individual Defendants named in the Securities Act Counts, are not charged with fraud in the Complaint.[6]

---

[6]  In any event, the Securities Act claims sufficiently allege the "time, place, and contents" of the misstatements in the RHY Offering Materials and accordingly satisfy Rule 9(b).  *Open-End Funds*, 743 F. Supp. 2d at 749.  The Complaint describes the ways in which the RHY Prospectus, despite its "26 categories of risk descriptions," does "not at all mention the highly concentrated credit risk RHY was taking on through its purchase of low-priority tranches in ABS."  ¶ 254.  The Complaint further alleges that the RHY Statement of Additional Information ("SAI") failed to adequately inform investors that RHY "would be concentrated in the lowest priority, highly leveraged tranches of ABS backed by subprime assets with significant credit risk, and that, as a result, investors would be exposed to extraordinary credit risk."  ¶ 254.  The Complaint further describes the extent to which RHY was concentrated in ABS and MBS and not sufficiently diversified, in violation of the fundamental investment restrictions stated in the Offering Materials.  *See* ¶¶ 251-256.  Defendants' argument that the Complaint's allegations as to RHY are "cursory" and insufficiently short (MK Mem. at 36, 37 n.35) should be rejected for the same reason.  *See Gosselin v. First Trust Advisors L.P.*, No. 08 C 5213, 2009 WL 5064295, at *5 (N.D. Ill. Dec. 17, 2009) ("Defendants contend that Plaintiffs have failed to specifically highlight the exact representations that were misleading or identify what risks were omitted from statements.  However, Plaintiffs have provided sufficient facts concerning the alleged misrepresentations and omissions, and have pointed to portions of the consolidated complaint that provide examples of details concerning such matters.  Thus, Plaintiffs have shown as this juncture that the allegations concerning the disclosures related to the Funds' investment strategies and risks may be actionable.").

### B.    The Complaint Sufficiently Alleges Material Misrepresentations and Omissions

Plaintiffs allege the following categories of material misstatements:

- Statements concerning the Funds' valuation procedures, valuation of the Funds' portfolio assets, and net asset value ("NAV") (¶¶ 202-204, 219-220, 229-230, 246);

- Statements assuring investors that the Funds would remain broadly diversified across a wide range of asset types and would not "purchase the securities of any issuer . . . if, as a result, 25% or more of the Fund[s'] total assets would be invested in the securities of companies the principal business activities of which are in the same industry" (¶¶ 186-189, 191-193, 207-208, 210-211, 213-215, 224-225, 252, 253, 256);

- Statements falsely classifying certain ABS and MBS as "corporate bonds" or "preferred stock," making the portfolios appear more diversified than they actually were (¶¶ 195-196, 205-206, 217-218, 227-228, 234-235, 236-250);

- Statements comparing the Funds' performance to the Lehman Brothers Ba U.S. High Yield Index ("Benchmark Index" or "Index") (¶¶ 188, 190, 194, 200-201, 209, 212, 213, 216, 224, 226, 252-253, 256); and

- Related to all of these, statements generally touting the Funds' professional portfolio management and discipline (¶¶ 197-198, 221-222, 252).

These misrepresentations portrayed the Funds as having broadly diversified, corporate debt portfolios operated in compliance with governing regulations and their own stated investment guidelines.  In reality, however, the Funds' NAVs were materially overstated as a result of intentional manipulation, and their portfolio holdings were wholly inconsistent with those of "true" high-yield bond funds (*e.g.*, ¶¶ 26-28, 161-169); heavily concentrated between 65%-70% in low-priority ABS and 27%-32% in subprime MBS, in violation of their 25% "same industry" investment limitation (*e.g.*, ¶¶ 15-16, 26, 87-88); and far riskier in profile than the Benchmark Index (*e.g.*, ¶¶ 161-168).

10

### 1. Misstatements Regarding Valuation Procedures, Valuations of the Funds' Assets, and NAV Manipulation

Defendants argue that misstatements about the Funds' valuation procedures and valuation of the Funds' assets are inactionable because they "essentially were expressions of judgment" involving "subjectivity and uncertainty."  MK Mem. at 44.  But "[p]rovable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements."  *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991).  Thus, "[o]pinions may be deemed false or misleading under the securities laws if proof of their falsity can be established 'through the orthodox evidentiary process.'"  *Bridgestone*, 399 F.3d at 670 (quoting *Virginia Bankshares*, 501 U.S. at 1090).[7]

Plaintiffs' allegations—which must be accepted as true on these motions, *see Matrixx*, 131 S. Ct. at 1323—detail the ways that statements about the Funds' valuation processes, asset valuations, and NAV calculations were objectively false.  ¶¶ 203-204, 219-220, 229-230, 246. Defendants were obligated to determine the Funds' NAVs consistent with Accounting Series Release No. 118 ("ASR 118") and the Funds' valuation procedures, such that asset values would be based on market quotations where "readily available" and "fair value" otherwise.  ¶¶ 127-135.  Internal procedures required that prices be validated through dealer quotes, which could be overridden only where there was "a reasonable basis to believe" prices "did not accurately reflect

---

[7]  *See also Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 193 (S.D.N.Y. 2006) ("[S]tatements of opinion are actionable . . . to the extent that they are not honestly held"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (statements based upon "beliefs" actionable because of "evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs"); *In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1098 (D. Minn. 1998) (rejecting argument on motion to dismiss that "accounting principles are complex and subject to differing interpretations"; "[t]he evidence, in the form of expert testimony or otherwise, ultimately may prove defendants to be correct, but the Court cannot resolve this issue on a motion to dismiss").

fair value," and only where the basis for overriding was "documented and provided to the Valuation Committee" for review.  ¶ 133.

The Funds ignored their own procedures as well as ASR 118 in valuing their portfolio assets.  ¶ 137.  Kelsoe, the Funds' Senior Portfolio Manager, actively manipulated broker-dealer quotes and "adjusted" the prices of portfolio securities upward without any documented basis. ¶ 138.  In particular, between January and July 2007, he sent 262 phony "price adjustments" to Fund Accounting, which rubber-stamped and used those inflated values to compute the Funds' NAVs.  ¶ 139.  Kelsoe frequently pressured a broker-dealer (the "Submitting Dealer") to provide "interim quotes" that were lower than the prices at which the Funds were valuing securities, but higher than the quotes the Submitting Dealer originally intended to provide.  In some instances, even after causing the Submitting Dealer to increase quotes, Kelsoe sent price adjustments to Fund Accounting that pushed quotes even higher.  ¶ 141.  Kelsoe did not believe, and had no reasonable basis to believe, that the "adjusted" valuations he assigned reflected fair value. ¶¶ 139, 141.  Where, as here, asset values and NAVs were intentionally manipulated, statements about the Funds' valuation procedures, asset valuations and NAVs are actionable.  *See*, *e.g.*, *In re Bear Stearns Cos. Sec., Deriv. & ERISA Litig.*, No. 08 MDL 1963, 2011 WL 223540, at *50 (S.D.N.Y. Jan. 19, 2011) ("Defendants allegedly knew or should have known that their VaR [a model that measured risk] was inaccurate and outdated and inflated their asset values . . . .  Such misstatements are properly alleged to be significant to the reasonable investor making an investment decision."); *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp. 2d 947, 974 (D. Minn. 2009) (misstatements pleaded where company allegedly overstated fair value of certain portfolio securities and understated number of securities, and lacked adequate internal controls); *Abrams v. Van Kampen Funds, Inc.*, No. 01 C 7538, 2002 WL 1160171, at *10 (N.D. Ill. May

12

30, 2002) ("[T]he Fund did not use market pricing for all loans for which market pricing was readily available.  Therefore, it was an inaccurate representation that market pricing was being used as it developed to a reliable degree.").[8]

Defendants' reference to "risk disclosures" concerning the potential differences in amount and certainty between closing market prices and fair value where market prices are not available, MK Mem. at 45, misses the point.  The intentional manipulation of fair value removes issues of reasonable judgment from the equation entirely.  *See Piper Capital Mgmt., Inc.*, S.E.C. Release No. 175, 2000 WL 1759455, at *54 (ALJ Nov. 30, 2000) (initial decision) ("Any intentional or reckless deviation from the use of current market values for all portfolio securities to determine the Fund NAV constitutes NAV manipulation and therefore violates [the Exchange Act].").  If anything, such disclosures were themselves misleading because they conveyed an impression that fair value and NAV would be determined in good faith.

Defendants argue that the Complaint does not sufficiently allege how Kelsoe's 262 "price adjustments" impacted the Funds' NAVs or "whether the adjustments even pertained to the Funds at issue in this litigation."  They also assert that Plaintiffs do not sufficiently quantify the amount of overstatements in NAV.  MK Mem. at 46.  These arguments must fail.

---

[8]  The Complaint here, unlike that in *Fait v. Regions Financial Corp.*, 712 F. Supp. 2d 117 (S.D.N.Y. 2010) (cited in MK Mem. at 44), alleges objective facts showing not only a faulty valuation "methodology," but also Kelsoe's intentional manipulation of price quotations to inflate asset valuations and NAVs.  *See also Local 703, I. B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, No. 10-2847-IPJ, 2011 U.S. Dist. LEXIS 60761, at *19 (N.D. Ala. June 7, 2011) (finding that similar allegations of misstated goodwill and loan loss reserves concerning same corporate acquisition in *Fait* were not inactionable matters of opinion where RFC had information that did not support such opinions, and distinguishing *Fait* on this basis); *In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 507 (W.D. Wash. 2009) ("Although Allowance provisioning requires some exercise of judgment, allegations of misstatements regarding loan loss reserves are actionable" where objectively false) (citing *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993)).  The court in *Fraternity Fund, Ltd. v. Beacon Hill Asset Management, LLC*, 479 F. Supp. 2d 349, 362-63 (S.D.N.Y. 2007), also cited by Defendants, made clear that "context is important" and that one may not make such a "statement of opinion" if it is knowingly false and susceptible to an "objectively determinable answer."

13

The Complaint alleges that the Funds' daily NAVs were artificially propped up because of Kelsoe's 262 unsupported price adjustments.  ¶¶ 138-153, 204, 229-230.  In particular, Plaintiffs allege in great detail Kelsoe's manipulation of the values of the Long Beach CDO, the Knollwood CDO, and the Terwin ABS, all of which Plaintiffs allege were purchased and held by the Funds during the Class Period (*see* ¶¶ 144, 146, 151), and all of which contributed to the material overstatement of NAVs in 2007.  ¶¶ 144-153.  The Funds had to hire an "independent valuation consultant" in August 2007 to do Kelsoe's (and management's) job and determine the "real" fair value of certain portfolio securities.  ¶ 266.  The Funds lost $1 billion in 2007 alone, and the SEC ultimately brought an enforcement action concerning both the Closed-End and Open-End Funds.  ¶¶ 29-30, 292 & Compl. Ex. D.  PwC has advised the Funds that its audit reports for the Funds' fiscal year 2005, 2006 and 2007 financial statements cannot be relied upon.  ¶¶ 35, 180-183.  Given Kelsoe's *262* phony price "adjustments" and these other facts, Plaintiffs are entitled to the reasonable inference that Kelsoe's manipulations of fair value extended to a material portion of the portfolio securities.  Additional quantification is not required at this stage.  *See Piper Capital*, 2000 WL 1759455, at *47 ("Lest we lose the forest for the trees, what is at issue here is whether Manipulation Respondents, or any of them, purposefully attempted to manipulate the Fund NAV. . . .  If intentional or reckless security price/NAV manipulation took place, it matters only incidentally what specific securities were involved, on what day(s) they actually were mispriced, or even whether/to what degree the mispricing impacted [the Fund's] reported NAV.").[9]

---

[9]  *See also Simons v. Dynacq Healthcare, Inc.*, No. 03-05825, 2006 WL 1897270, at *5 (S.D. Tex. July 10, 2006) ("Defendants additionally argue that Plaintiffs have failed to plead that the alleged internal control deficiencies had any impact on Dynacq's fiscal year 2003 financial statements.  These contentions do not, however, require dismissal of Plaintiffs' internal control allegations as to Defendants . . . [and] does not mean that Plaintiffs failed to plead cognizable misstatements."); *In re World Access, Inc. Sec. Litig.*, 119 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000) ("It is not fatal to the complaint that it does not describe in detail each single specific transaction in which

### 2. Misstatements Regarding Diversification and Overconcentration of Portfolio Assets

#### a. The Funds' Portfolios Were Not Broadly Diversified Among a "Wide Variety of Asset Types"

Defendants argue that the Funds' disclosed their investments in ABS and MBS such that their stated strategy "emphasize[d] very broad diversification utilizing asset categories beyond the well recognized below investment grade corporate and convertible bonds."  MK Mem. at 40-41.  Here, the words "broad diversification" were misleading because the Funds also represented that such diversification would be accomplished in part by having no more than 25% of their assets invested in the "same industry," which, as discussed below, included ABS generally and subprime MBS specifically.  Indeed, the Funds' portfolios were *deeply* concentrated in ABS (65%-70%) and subprime MBS (27%-32%) as of March 31, 2007.  ¶¶ 6, 15-16, 87-88.[10] Compounding this undisclosed risk, the Funds' ABS holdings were heavily weighted toward the most illiquid and riskiest tiers of the security's structure.[11]  This means that the Funds invested in

---

Defendant transgressed, by customer, amount, and precise method."); *In re Premiere Techs. Inc. Sec. Litig.*, No. 98-CV-1804-JOF, 2000 WL 33231639, at *17 (N.D. Ga. Dec. 8, 2000) (complaint "need not specify the exact dollar amount of each accounting error").

[10]  The risks of preferred stock and corporate bonds (even high-yield corporate bonds, sometimes known as "junk bonds") are tied to the fundamental profitability and underlying creditworthiness of the corporations that issue them.  ¶¶ 28, 103.  The risks of MBS, on the other hand, are tied to the creditworthiness of the individual borrowers for each individual loan comprising an MBS securitization, as well as the value, if any, of the underlying collateral for each of the underlying loans.  *Id.*  When the individual loans comprising an MBS are subprime, as here, that risk is magnified significantly.  ¶¶ 12 & n.6, 103-104.  Prospectuses for MBS frequently contain disclosures of data concerning underlying mortgage loans including cumulative data concerning borrowers, collateral and whether the loans are prime or subprime.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1160 (C.D. Cal. 2008).  With such disclosures, MBS investors may be able to judge the level of risk associated with those securities.  Here, however, the Funds disclosed no such data concerning the MBS's subprime loans or other underlying assets.

[11]  For example, all four Funds invested in an ABS called the Webster CDO, "a hybrid cash/synthetic arbitrage CDO" that was backed by subprime MBS that in turn consisted of loans with very low credit scores.  The Funds purchased $9.5 million of the Webster CDO's "preference shares," which (despite their name) were the lowest priority of the 15 tiers of the structure.  "Preference shares" were ineligible to receive interest payment in the event of default in the underlying subprime assets, and were eligible to receive principal payments only upon final maturity.  The value of the Funds' combined holdings in the Webster CDO, as reported by the Funds themselves, crashed from $9.5 million as of December 31, 2006 to *$95.00* as of March 31, 2008.  ¶¶ 101-102, 104 & Tbls. 12-13.  All four Funds also invested in an ABS called the Preferred Term Securities XXIII, Ltd. ("PTS23"), the 23rd in a related series of cash flow trust preferred CDOs.  The Funds held $10 million face value in PTS23 as of September 30, 2006, and reported the value of these holdings as only $5.8 million as of March 31, 2008.  ¶¶ 105-106 & Tbls.

highly correlated assets where the underlying collateral all faced similar risks.  The similarity of these risks and the low subordinated position of the Funds' investments meant that losses would be duplicated, not offset, by losses in other assets.  And when losses ultimately came to bear, the Funds' portfolios had to be drastically "reposition[ed]."  ¶ 280; *see In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 543 (N.D. Cal. 2009) (representation that bond fund was similar to money market fund was false where "fund concentrated an increasing portion of its assets— eventually more than 45 percent—in risky mortgage-backed and asset-backed securities").

The Funds also misclassified more than $200 million of ABS and MBS—up to 18% of the Funds' initial market capitalization—as corporate bonds and preferred stocks in their SEC filings as of March 31 and June 30, 2007.  *See* ¶¶ 17, 90-112 & Tbls. 4-11.[12]  These classifications, the falsity of which Defendants do not challenge, further misled investors about the extent to which the Funds' portfolios were diversified.  *See Charles Schwab*, 257 F.R.D. at 543 (fund improperly categorized as "ultrashort bond fund" where fund "obscured the true nature of the securities in the fund's portfolio by using inconsistent asset descriptions").  Accordingly, the Funds' representations that their portfolios reflected, for example, "broad diversification" among a "wide variety of asset types," *see, e.g.*, ¶¶ 191-192, were materially misleading.

> **b.    The Funds Misrepresented Adherence to Their "Same Industry" Investment Restriction**

Conceding that the Funds were invested more than 25% in ABS and MBS, Defendants argue that Plaintiffs misconstrue the meaning of "same industry" as the Funds' offering documents used that term.  *See* MK Mem. at 42, 44 n.39.  More specifically, Defendants contend

---

14-15.  All four Funds also invested in an ABS called the Eirles Two Ltd. 263 (the "Eirles CDO"), a synthetic CDO, which means that its value was derived from events related to a defined set of referenced securities that may or may not have been owned by the parties involved.  The Funds and one of the Open-End Funds purchased the entire $17.5 million "B" tranche of the Eirles CDO.  The Funds held $12.8 million as of September 30, 2006, and reported the value of this holding as only $7.2 million as of March 31, 2008.  ¶¶ 109-110 & Tbls. 16-17.

[12]  The Complaint alleges in detail how the Funds falsely classified the Webster CDO as preferred stock, PTS23 as a corporate bond, and the Eirles CDO as a corporate bond.  ¶¶ 101, 104-105, 107-111.

that the term "industry" as used by the Funds "focuse[d] on the company issuing the security, not the type of security issued" and, solely on that basis, they urge the Court to once again reconsider its decision in the Open-End Funds action upholding the sufficiency of such allegations. *See Open-End Funds*, 743 F. Supp. 2d at 760.

Plaintiffs' allegations rely on the definitions of industries provided in the SEC's Standard Industrial Classification List (the "SIC List"). ¶¶ 83-85. The SIC List defines "Asset-Backed Securities"—not Asset-Backed Securities that are linked to pools of assets of companies with the same business—as a single industry, No. 6189. ¶ 84. The SIC List similarly defines "Mortgage Lenders and Loan Correspondents"—which clearly includes MBS—as a single industry, No. 6162. ¶ 85; *see also* ¶ 86 (PwC publicly referred to "structured finance" as an "industry").[13] Accordingly, the Funds violated their 25% "same industry" investment restriction when their portfolios were 65%-70% concentrated in ABS and 27%-32% concentrated in subprime MBS. *See Rodney v. KPMG Peat Marwick*, 143 F.3d 1140, 1145 (8th Cir. 1998) ("Reasonable investors reading the Fund's prospectuses . . . would conclude that, whatever risks they were accepting . . . , they were not encountering the enhanced risks created by violations of the Fund's own basic investment policies."); *Yu v. State Street Corp.*, No. 08 Civ. 8235 (RJH), 2010 WL 2816259, at *3-4 (S.D.N.Y. July 14, 2010) (upholding claims based on fund's overexposure to MBS); *White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 984-86 (E.D. Wis. 2002) (upholding claims for fund's exceeding restrictions on investment in illiquid securities) (all *cited in Open-End Funds*, 743 F. Supp. 2d at 760).

---

[13] The SIC List is a reliable and accepted source of industry classifications for this purpose. In the Open-End Funds action, the Morgan Keegan Defendants challenged the sufficiency of virtually identical allegations on the ground that the plaintiffs did ***not*** cite the SIC List to define the relevant industry. *See* Morgan Keegan Mot. to Dismiss, Dkt. No. 222 in No. 07-cv-02784, at 40 & n.35 (Feb. 11, 2010) ("For all filings with the SEC, corporations also are instructed to classify their businesses by using the [SIC] List.").

The Funds' acknowledged deviations from governing SEC guidance by "focus[ing] on the company issuing the security," MK Mem. at 42 n.37, was not disclosed and simply confirms the misleading nature of the Funds' "same industry" representations.  Market participants reasonably relied on the governing definitions of "industry" set by the SEC for reporting purposes, not the Funds' self-serving interpretation.  *See Piper Capital*, 2000 WL 1759455, at *24 (rejecting defendants' technical definition of "diversified" where language in fund's registration statements "impl[ied] diversification in the familiar sense").[14]  At a minimum, whether such misrepresentations and omissions misled investors is a question of fact.

### c.     The Funds Did Not Sufficiently Disclose Their Violations of the 25% Investment Restriction

Defendants contend that even if the Funds were in violation of the 25% "same industry" investment restriction, they "openly disclosed" that fact in asset-allocation pie charts and schedules of portfolio holdings set out in their annual and semiannual reports.  MK Mem. at 43-44; RFC Mem. at 8-9.  Because the Funds also represented in such reports that they were "broad[ly] diversifi[ed]" in "a wide variety of asset types," *e.g.*, ¶¶ 191-192, 207, and the Funds disclosed the 25% investment restriction separately in prospectuses, and not in their annual or semiannual reports, *e.g.*, ¶¶ 15 n.10, 69, Defendants are effectively making a "truth-on-the-market" argument.[15]

---

[14]  *See also In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 170 n.9 (1st Cir. 2009) (rejecting technical definition of "average wholesale pricing"); *Disabled in Action of Pa. v. Southeastern Pa. Transp. Auth.*, 539 F.3d 199, 205 n.8 (3d Cir. 2008) (rejecting "hyper-technical definition of 'exit'"); *Bass v. Ameriquest Mortg. Co.*, No. 09-00476 JMS/BMK, 2010 WL 3025167, at *9 (D. Haw. Aug. 3, 2010) (rejecting technical definition of "churning").

[15]  The Morgan Keegan Defendants argue that the Complaint fails to plead facts "tying" each Defendant to the alleged fraud, and the Funds appear to argue that they are not subject to liability for the alleged misstatements in Fund offering documents and periodic reports.  *See* MK Mem. at 36; Funds Mem. at 7.  The Supreme Court's decision this week in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. ___, No. 09-525, 2011 WL 2297762 (U.S. June 13, 2011), confirms, consistent with the Complaint, that the misstatements in Fund prospectuses and reports filed with the SEC were "made" by the Funds, and not by MAM (the investment adviser) or any other RMK entity.  *Id.* at *7 (holding that mutual fund's investment adviser cannot be held liable under Rule 10b-5 for

18

A misrepresentation or omission will be rendered immaterial by material information already known to the market only where such information was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations."  *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989).  Accordingly, this defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint for failure to plead materiality." *Wilkof v. Caraco Pharm. Labs., Ltd.*, No. 09-12830, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 167 (2d Cir. 2000)); *see Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326 GA, 1996 WL 859986, at *16 (W.D. Tenn. Mar. 26, 1996) ("[W]hether defendants have presented sufficient evidence to establish a truth on the market defense—namely, that the market had full knowledge of the omissions and misrepresentations by defendants—is an issue for the factfinder."); *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) ("A 'truth-on-the-market' defense is available in principle . . . but not at the pleading stage."); *cf. Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008) (reserving decision on whether truth-on-the-market defense may be applied at the motion to dismiss stage).

Neither the pie charts nor the portfolio schedules "intensely" or "credibly" disclosed that the Funds were in violation of the 25% investment restriction.  The pie charts were kaleidoscopic.  They did not enumerate any single asset allocation above 25%, and in fact downplayed the allocation of ABS and MBS.  The pie chart showing RMA's asset allocation as of March 31, 2005, for example, showed "Corporate Bonds" as 23.5% of the portfolio, "Home

---

misstatements in fund prospectuses where, among other things, fund is the "filer" with the SEC).  Further, each Individual Defendant is subject to primary liability for misstatements in the Fund documents he signed.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (person who signs SEC filings "makes" the statements therein); ¶¶ 56-59, 61-62, 300-303.

Equity Loans" as 16.9%, and "Mortgage-Backed Securities" as only 1.8%. *See* Curley (Defs.) Decl. Ex. I, at 4.

The asset allocation percentage tables used later in the Class Period were equally opaque. For example, the RMA percentage table as of March 31, 2007 listed "Corporate Bonds" as 29.5% of the portfolio, and "Collateralized Debt Obligations" as 24.8%. *See* Curley (Defs.) Decl. Ex. L, at 5. No reasonable investor would have known from these summaries that the Funds' portfolios were overconcentrated in violation of their investment restrictions, particularly where he or she was assured in the same or similar reports that the portfolios were properly diversified and was ***not*** told of the 25% threshold. *See* Curley (Defs.) Decl. Ex. I, at 2, 16, 32; Ex. L, at 2, 20, 38, 56. Moreover, a substantial portion of these purported "Corporate Bonds" were actually highly risky ABS. *See* ¶ 26 & Tbl. 10 ($306 million in ABS held by RMA as of March 31, 2007, constituting 73% of total holdings, corrected to $366 million, or 88% of total holdings); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1160 n.32 (C.D. Cal. 2008) ("Even then . . . the data Countrywide used to generate those tables was faultier than a market participant would realize."); *see also In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 151 (E.D.N.Y. 2008) ("[I]n order to 'counter-balance effectively' its prior misleading statements, a factfinder would likely find that Comverse should also have fully and fairly disclosed the nature of the misconduct that had been uncovered, for it is plainly material to investors that executives of a company are acting fraudulently."). And the Funds bear the burden to make reasonable disclosure; investors are not expected to look behind the numbers to try to suss out the true picture. *See Yu*, 2010 WL 2816259, at *3 (defendants' contention that "plaintiff could ascertain the exact composition of the Fund's holdings" regardless of inaccuracies in summary percentage table was "better made at the summary judgment stage. The standing for

20

pleading materiality is low."); *Citiline Holdings, Inc. v. Istar Fin. Inc.*, 701 F. Supp. 2d 506, 514-15 (S.D.N.Y. 2010) ("isolated data points" and "scattered disclosures" insufficient to establish truth-on-the-market defense) (citing cases).

The portfolio schedules similarly did not alert investors that the 25% concentration restriction was exceeded, or render immaterial the Funds' misrepresentations of having broadly diversified portfolios in a wide range of asset types. The schedules, found at the back of annual and semiannual reports, listed of thousands of securities with no reference to "industry" or the 25% restriction. No reasonable investor would have gleaned the "truth" from these lists.[16] Even so, the Supreme Court has made clear that "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." *Virginia Bankshares*, 501 U.S. at 1097.

### 3. Statements Comparing the Funds to the Lehman High-Yield Index Misled Investors

A benchmark index gives an investor a point of reference when evaluating a mutual fund's performance. When investment managers choose a benchmark index, they are telling their investors that the securities chosen for the Fund are similar in nature to those in the index. *See* ¶¶ 161-162. The Funds' comparisons of their performance to that of the Benchmark Index were materially misleading because of the built-in mismatch in both assets and risk profile.

---

[16] Defendants argue that the misclassifications of $240 million of ABS as corporate bonds or preferred stock are immaterial because more than 25% of the Funds' assets were invested in ABS and MBS "with or without" the misclassified securities. MK Mem. at 44 n.39. Given that investors were unaware that the Funds had exceeded the 25% threshold, these misrepresentations only compounded the misleading nature of the Funds' disclosures and made the Funds appear more diversified than they actually were. Every bit of diversification counted when it came to the Funds, because the consequences of insufficient diversification were exceptionally harmful to high-risk investment pools like those held by the Funds. ¶ 18; *see Charles Schwab*, 257 F.R.D. at 543 (upholding separate allegations that fund concentrated up to 45% of assets in MBS and also "obscured true nature" of specific portfolio securities); *see also Matrixx*, 131 S. Ct. at 1313 (concluding that materiality generally "cannot be reduced to a bright-line rule"); *Bridgestone*, 399 F.3d at 681 (materiality generally an issue of fact).

Although the Index was composed of corporate bonds and preferred stock only (and no ABS or MBS), the Funds' portfolios were 65%-70% concentrated in ABS, including 27%-32% in low-priority subprime MBS during the first quarter of 2007.  ¶¶ 16, 26, 162-163.  The Funds could have chosen one of a number of indices that did track subprime MBS (such as ABX) or CDOs (such as TABX) and thus was a more appropriate comparator, but elected not to do so.  ¶¶ 171-173.  A May 2007 internal e-mail raised serious concerns in comparing the performance of one of the Open-End Funds with its benchmark Lehman Brothers index:

> What worries me about this bond fund is the tracking error and the potential risks associated with all that asset-backed exposure.  Mr & Mrs Jones don't expect that kind of risk from their bond funds. The bond exposure is not supposed to be where you take risks.  I'd bet that most of the people who hold that fund have no idea what's it's actually invested in *[sic]*.

¶ 165 & Compl. Ex. C.[17]

Citing *Hunt v. Alliance North American Government Income Trust*, 159 F.3d 723 (2d Cir. 1998), Defendants argue that comparing the Funds' risk profile to the Benchmark Index was not misleading because it was not intended to provide an "exhaustive description" of the Funds' risks.  MK Mem. at 47.  In *Hunt*, the court found that a comparative chart alone was not misleading because nothing in it "purported to contain information regarding the fund's risks." 159 F.3d at 730.  Here, Defendants affirmatively used the Benchmark Index comparison to tout "the stability of the Fund's net asset value offered by a very diverse portfolio."[18]  ¶ 213; *see also* ¶ 191 (Fund's "strong performance was primarily due to [RMH's] . . . relative net asset value stability produced by [RMH's] allocation to a wide variety of asset types"); *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 93 (D. Mass. 2010) (comparison

---

[17]  The portfolios of the Funds and the Open-End Fund specifically discussed in the e-mail overlapped by more than 46% during fiscal year 2007.  ¶ 166 n.26.

[18]  In this respect, if not others, Defendants indeed "[l]ikene[d] the Funds' assets to corporate bonds and preferred stocks."  ¶ 28; *see* MK Mem. at 41.

of fund heavily weighted in MBS to certain Lehman Brothers indices was misleading where it assisted investors in assessing risk, and distinguishing *Hunt* on this basis).

Courts have also upheld similar comparisons as materially misleading regardless of the distinction noted in *Evergreen*.  *See Charles Schwab*, 257 F.R.D. at 543 (comparison of fund to Lehman Brothers index was misleading "when in fact the fund's profile was not comparable to that index"); *Piper Capital*, 2000 WL 1759455, at *22 (statements "expressly comparing Fund performance to the Merrill Lynch 3-5 Year Treasury Bond Index" was important to the reasonable investor and thus material); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010) (finding that "statements that Ambac's CDO portfolio was currently outperforming the market and relevant indices" to "convey something concrete and measurable about Ambac's financial situation, and a reasonable investor could certainly find them important to the 'total mix'").

The Funds' disclosure that their portfolios potentially could deviate from the Benchmark Index because they had "latitude to look at sectors that are not in the index," MK Mem. at 47, was too ambiguous and conditional to render the comparisons inactionable.  *See Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, at *7 (N.D. Cal. Jan. 5, 2011) (conditional language that "tracking error" between fund and benchmark index was "possible" or "may occur" was insufficient).  Indeed, owing to the inherent asset mismatch, deviation from the Benchmark Index here was not merely possible, but inevitable owing to known and then-existing facts.  *Id.* at *8 (fund failed to disclose risk investors faced relative to index); *see also* ¶ 165 (internal e-mail likening Kelsoe's perceived skills to "thinking your small cap manager is a hero because he beat the S&P for the last 5 years. . . .  If people are using RMK as their core, or only bond fund, I think it's only a matter of time before we have some very unhappy investors.").

23

C.   The Funds' Conditional, Boilerplate Risk Disclosures Did Not
Adequately Disclose the Risks to Which Investors Were Exposed

Finally, Defendants argue that the Complaint fails to allege any material misstatements because the Funds fully disclosed all investment risks.  MK Mem. at 37-40; RFC Mem. at 8-9. Defendants make much of the Funds' claim of "investing the majority of its total assets in below-investment grade securities," and suggest the use of the term "junk bonds" and stock phrases "high degree of risk" and "[s]tockholders can lose some or all of their investment" forecloses Plaintiffs' claims in their entirety.  MK Mem. at 38.  Generic disclosures of potential future risks—*e.g.*, that "issuers of, or assets and loans underlying, below investment-grade, 'junk bonds' might fail to perform" (MK Mem. at 40)—failed to reveal the full extent of risk associated with the Funds' undiversified, highly leveraged, ABS-weighted portfolios.  In fact, such disclosures effectively furthered the fraud because they continued the deception of calling assets "bonds," which is an entirely different asset type with different risk characteristics than ABS or MBS.  And no risk disclosure informed investors that asset prices and NAVs were or would be intentionally manipulated, that most ABS holdings were or would be concentrated in the lowest-priority tranches of the structure, that risky assets were or would be misclassified as safer assets, that fundamental investment restrictions were or would be violated, or that neither the Funds' assets nor their risk profiles resembled those of the Index.

1.   Disclosures Concerning Junk Bonds,
Leverage, MBS, ABS and Subordinated Securities

Defendants point to a series of risk disclosures concerning below-investment grade securities, leverage risk, MBS and ABS, and subordinated securities.  MK Mem. at 38-39.  None of these bland disclosures—including that "[t]he Fund may invest in subordinated classes of senior-subordinated securities"—warned investors of the highly concentrated credit risk taken on through purchases of low-priority tranches in ABS.  Indeed, "tranching" is mentioned in just one

24

paragraph of the Funds' SAIs.  The reference to tranching did not adequately inform investors that the Funds would be heavily concentrated in the lowest-priority, highly leveraged tranches of ABS backed by subprime assets with significant credit risk, and that, as a result, investors would be exposed to extraordinary credit risk.  ¶ 254; *see Charles Schwab*, 257 F.R.D. at 544-46 (rejecting risk disclosure sufficiency and sustaining allegations that fund took on greater risk than was represented by extending its average portfolio duration beyond two years, and concentrating significant portion of portfolio in risky MBS); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2000 WL 10211, at *1-5 (S.D.N.Y. Jan. 6, 2000) (rejecting risk disclosures as insufficient where excessive concentration in micro-cap stocks, extreme volatility, and highly illiquid nature of portfolios was not fully or adequately disclosed); *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F. Supp. 326, 330-31 (S.D.N.Y. 1996) (denying motion to dismiss because defendants accurately depicted the type, but not the extent, of risk borne by fund investors).[19]

Notably, while Defendants submit a lengthy Appendix of purported "Relevant Disclosures" (*see* Curley (Defs.) Ex. V), their briefs do not address the material change in the Funds' risk disclosures on December 5, 2007.  ¶ 223.  In the Funds' 2008 Semi-Annual Report, Defendants changed the description of "Investment Risks."  *Id.*  Previous semi-annual reports had stated that "[b]ond funds tend to experience smaller fluctuations in value than stock funds." ¶ 223.  This statement—which is generally an investment truism with respect to bond funds that actually are invested in bonds—was deleted from the Funds' 2008 Semi-Annual Report and, instead, the following was added for the first time:

---

[19]  In *Recupito v. Prudential Securities, Inc.*, 112 F. Supp. 2d 449, 457 (D. Md. 2000), cited in MK Mem. at 37-38 n.35, investors were specifically warned that changes in interest rates would affect the value of the subordinated MBS and the ability to purchase additional MBS, "the very risks Plaintiff claims were not disclosed."  Here, in contrast, the Funds never disclosed that the likelihood of the Funds' collapsing or some other adverse event had increased due to unlawful practices that concealed heightened risks.

> The Fund's investments in [MBS and ABS] that are "subordinated" to other interests in the same pool may increase credit risk to the extent that the Fund as a holder of those securities may only receive payments after the pool's obligations to other investors have been satisfied. Below investment grade bonds are also subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher-rated debt securities.

¶ 223. This partially curative language, however, did not fully disclose the extent of the risks borne by Fund investors. ¶¶ 224-230. It continued to describe only very generally the risks of investing in ABS and MBS, as if investors were exposed to the average interest rate risk, prepayment risk, and credit risk of the underlying assets. Many of the investments selected by the Funds exposed investors to the credit risk equivalent to an investment in the underlying portfolio of assets leveraged ten to one, and while offering materials generically discussed "Leverage Risk" (*see* MK Mem. at 38-39), that disclosure (together with other related disclosures) reflect a limit of 1.33-to-1 on portfolio leverage. ¶ 255. Plaintiffs allege, however, that the Funds' use of low-priority tranches in ABS exposed them to dramatically greater leverage risk than was permitted and represented. ¶ 255.

To be "meaningful," risk disclosures "must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (citation omitted). True cautionary language "warns investors of **exactly** the risk that plaintiffs claim was not disclosed." *In re Independent Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 755 (S.D.N.Y. 2001) (emphasis in original) (citation omitted); *see also In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("Cautionary language . . . must precisely address the substance of the specific statement or omission that is challenged. . . . The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a

26

ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."). The Fund's risk disclosures concerning leverage, ABS, MBS and subordinated securities do not remotely meet this standard.

### 2.   Disclosures Concerning Management Risk

Defendants point to the following "Management Risk" disclosure:

> The Fund is subject to management risk because it has an actively managed investment portfolio.  The Adviser will apply investment techniques and risk analyses in making investment decisions for the Fund, but there can be no guarantee that these will produce desired results.

MK Mem. at 39.  This boilerplate disclosure conveys essentially nothing.  Investors rightfully expected that Defendants' "investment techniques and risk analyses" would not include, for example, the active manipulation of asset valuations and NAV in derogation of the Funds' valuation procedures, the blind purchase of low-priority ABS, and the misclassification of ABS as stocks and bonds.  *See In re RAIT Fin. Trust Sec. Litig.*, No. 07-CV-03148 LDD, 2008 WL 5378164, at *6 (E.D. Pa. Dec. 22, 2008) ("[D]isclosure of the fact that RAIT's investments inherently carry risks does not mean that a reasonable investor would find unimportant the fact that RAIT's credit underwriting and monitoring practices are incapable of detecting risk.  It is one thing to say that a company is unavoidably exposed to credit risk . . . while it is another thing to say that a company lacks the ability to detect the presence and extent of that risk."); *In re Immucor Inc. Sec. Litig.*, No. 05-2276, 2006 WL 3000133, at *12 (N.D. Ga. Oct. 4, 2006) ("A reasonable investor would have been swayed had Immucor identified to the public (as it admits that it identified internally) weaknesses in its internal controls.").

### 3.   Disclosures Concerning Illiquid Securities

Defendants highlight the Funds' disclosures that illiquid securities are "more difficult to value and the Adviser's judgment may play a greater role in the valuation process."  MK Mem.

27

at 39.  These and related risk disclosures did not inform investors, however, that Kelsoe (aided

by Weller) could discard independent price quotations and assign inflated asset prices, or that

they could ignore deteriorating values of subprime MBS and ABS when valuing the Funds'

portfolio securities.  *See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 596 (N.D.

Ohio 2004) ("Defendants' cautionary language is general and fails to disclose the 'actual risks'

known by the Company.").  In short, these and other like disclosures were woefully inadequate

to warn of the pervasive misconduct and resultant false statements alleged in the Complaint.

Plaintiffs have sufficiently pleaded actionable misrepresentations and omissions.

II.   **THE COMPLAINT ALLEGES FACTS RAISING A STRONG INFERENCE OF SCIENTER AS TO THE OFFICER DEFENDANTS AND THE FUNDS**

    A.   **Standards for Pleading Scienter Under Section 10(b) of the Exchange Act**

Scienter is sufficiently pleaded when the plaintiff alleges particularized facts raising a

"strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-

4(b)(2).  The "required state of mind" to defraud embraces recklessness as well as knowing or

deliberate intent to manipulate, deceive or defraud.  *See Frank v. Dana*, No. 09-4233, 2011 WL

2020717, at *3 (6th Cir. May 25, 2011) (citing *Konkol v. Diebold, Inc.*, 590 F.3d 390, 396 (6th

Cir. 2009)).  Recklessness is defined in this Circuit as "highly unreasonable conduct which is an

extreme departure from the standards of ordinary care.  While the danger need not be known, it

must at least be so obvious that any reasonable man would have known of it."  *Id.* (quoting *PR

Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)).

An inference of scienter is "strong" if it is "cogent and compelling" and "at least as likely

as any plausible opposing inference."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

324, 328 (2007); *see also Matrixx*, 131 S. Ct. at 1324.  The inference of scienter need not be

*more* likely than a plausible opposing inference; the "tie" goes to the plaintiff in that instance. *See Tellabs*, 551 U.S. at 328; *Frank v. Dana*, 547 F.3d 564, 571 (6th Cir. 2008) ("[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward.").  The Supreme Court further cautioned that "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324 (citation omitted); *see also Bridgestone*, 399 F.3d at 683 (inference of scienter "need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder") (quoting *Helwig v. Vencor*, 251 F.3d 540, 553 (6th Cir. 2001)).  The Court also emphasized that "a plaintiff is not forced to plead more than she would be required to prove at trial."  *Tellabs*, 551 U.S. at 328.

Moreover, on a motion to dismiss, the court must consider "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 323; *see also id.* at 326 (scienter must be assessed "holistically").  In *Frank*, 2011 WL 2020717, the Sixth Circuit recently reconsidered the proper approach to reviewing scienter pleadings under *Tellabs*, and held that "[o]ur former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees.  Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency.  Consequently, we will address the Plaintiffs' claims holistically."  *Id.* at *5; *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 280 (3d Cir. 2009) ("As we have taken up each [scienter] allegation in turn, we have added it to the picture painted by the previously considered allegations and asked: How does this addition affect the relative strengths of the culpable and non-culpable inferences?").  As

29

discussed below, Plaintiffs' allegations of scienter, evaluated collectively, raise a strong

inference of scienter as to the Officer Defendants and the Funds.

**B.      The Officer Defendants and the Funds Knew or Recklessly
         Disregarded Facts Contradicting Their Public Statements About
         the Funds' Level of Investment Risk, Portfolio Holdings and NAVs**

**1.      Defendants Manipulated the Fair
         Value of the Funds' Portfolio Holdings
         in Order to Report Falsely Inflated NAVs**

Defendant Kelsoe, the Funds' Senior Portfolio Manager, was responsible for selecting

and purchasing the Funds' portfolio securities and for managing the Funds' day-to-day

operations.  ¶¶ 56, 294.  Morgan Keegan's Fund Accounting Department, which was headed by

Defendant Weller as Controller, was responsible for pricing the Funds' portfolio securities and

calculating the Funds' NAVs.  At the same time, Weller was a member of MAM's Valuation

Committee, which was responsible for overseeing Fund Accounting's processes.  ¶¶ 20, 59, 74,

133, 298.  The Funds' valuation procedures required that prices assigned to portfolio securities

be validated periodically using quotes from third-party broker-dealers.  The valuation procedures

specified that prices obtained from a broker-dealer could be overridden only if there was "a

reasonable basis to believe that the price provided [did] not accurately reflect the fair value of the

portfolio security."  And if a price was overridden, the valuation procedures mandated that the

basis for overriding the price be "documented and provided to the Valuation Committee for its

review."  ¶ 133.  As part of these procedures, Fund Accounting sometimes requested such third-

party broker-dealer quotes as a means to validate the prices assigned to particular portfolio

securities.  PwC, the Funds' auditor, used similar requests for broker-dealer quotes as part of its

year-end audits of the Funds.  ¶ 135.

Plaintiffs allege in detail how Kelsoe, in an effort to forestall declines in the Funds'

reported NAVs, "adjusted" the prices of portfolio securities upward by actively screening and

manipulating the dealer quotes that Fund Accounting or PwC obtained, and by failing to advise Fund Accounting or the Funds' Boards when he received third-party information indicating that the valuations for certain portfolio securities should be reduced.  ¶ 138.  Specifically, Plaintiffs allege that Kelsoe, between January and July 2007, sent 40 e-mails containing 262 phony "price adjustments" to a staff accountant in Fund Accounting who was charged with calculating the Funds NAVs.  Notwithstanding the Funds' valuation procedures, Fund Accounting did not request, and Kelsoe did not supply, any supporting documentation for these "price adjustments," and instead the adjustments were entered without question into a spreadsheet used to calculate NAVs.  Kelsoe knew that his prices were being used to compute the Funds' NAVs because he received biweekly reports on the Funds' portfolio holdings and their prices which, by comparison with previous reports, showed that his price adjustments were being used and were directly affecting the Funds' NAVs.  ¶ 139.

As Plaintiffs further allege, Kelsoe's "price adjustments" did not reflect the fair value of the portfolio securities as required by the valuation procedures.  When Fund Accounting or PwC requested dealer quotes from the Submitting Dealer, Kelsoe would intervene and contact him by e-mail or phone with the aim of having the quotes artificially increased.  Kelsoe engaged in this misconduct concerning at least the month-end quotes for December 31, 2006; February 28, 2007; and March 31, 2007.  ¶ 140.  In some instances, even after causing the Submitting Dealer to increase quotes, Kelsoe sent price adjustments to Fund Accounting that pushed-up those quotes even higher.  Kelsoe also frequently pressured the Submitting Dealer to provide "interim quotes" that were lower than the prices at which the Funds were valuing certain securities, but higher than the initial quotes that the Submitting Dealer had originally intended to provide.  Kelsoe did this to enable the Funds to avoid marking down portfolio securities to their true fair value in one

adjustment.  These adjustments violated the Funds' valuation procedures and were used to falsely report inflated securities values and NAVs to the public.  ¶ 141.

The Complaint provides a specific example of this: on April 25, 2007, Kelsoe called his contact at the Submitting Dealer and discussed quotes that the Submitting Dealer would be providing in connection with PwC's March 31, 2007 audit.  When Kelsoe's contact told him that the Submitting Dealer's trading desk had lowered the price of many of the Funds' portfolio securities, Kelsoe asked him to refrain from providing quotes that reflected actual bid prices.  As a result, on April 30, 2007, the Submitting Dealer provided quotes to PwC that reflected interim prices for certain securities that were lower than the Funds' then-current values, but still higher than the correct quotes the Submitting Dealer originally intended to provide.  ¶ 142.

The Complaint goes on to allege, in detail, Kelsoe's manipulations of the valuations of three specific portfolio securities: the Long Beach CDO, the Knollwood CDO and the Terwin ABS.  In all three instances, Kelsoe caused the Funds to price the securities at levels significantly greater than their true values, with the intent and effect of materially inflating the Funds' NAVs and, accordingly, the Funds' share prices.[20]  ¶¶ 143-153.  Ultimately, PwC advised the Funds that its audit reports on the Funds' fiscal year 2005, 2006 and 2007 financial statements could no longer be relied upon.  ¶¶ 35, 180-183.

These particularized allegations of Kelsoe's deliberate misconduct, and what he was intending to and did accomplish, all in derogation of the Funds' valuation procedures, raise a

---

[20]  Kelsoe manipulated the pricing of the Terwin ABS by failing to timely inform Fund Accounting when he learned on March 15, 2007 that the Submitting Dealer would be lowering its quotes on this security substantially.  ¶¶ 151-153.  Defendants challenge these allegations with a "no harm, no foul" argument, observing that Fund Accounting requested quotes as of March 31, 2007 and Kelsoe ultimately conveyed when he learned from the Submitting Dealer to Fund Accounting on March 30.  MK Mem. at 29 n.27; Ind. Defs. Mem. at 14.  Defendants fail to acknowledge, however, that Kelsoe hid this material information from Fund Accounting for the critical two weeks leading to the end of that quarter.  Kelsoe's first communication with Fund Accounting after his March 15 conversation with the Submitting Dealer was a phony "price adjustment" e-mailed on March 29.  Thus, the Terwin ABS was materially overvalued by the Funds during at least the last two weeks of March.  ¶ 153.

cogent and compelling inference of scienter at least as to Kelsoe and, as discussed below, Weller and the Funds.  *See Piper Capital*, 2000 WL 1759455, at *54 ("Any intentional or reckless deviation from the use of current market values for all portfolio securities to determine the Fund NAV constitutes NAV manipulation and therefore violates [the Exchange Act]."); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scheme of refusing to mark-down value of inventory known to be worthless or obsolete, and in derogation of company's internal policies, reflected intentional misconduct that clearly raised strong inference of scienter); *In re America Serv. Grp., Inc. Sec. Litig.*, No. 06-0323, 2009 WL 1348163, at *50 (M.D. Tenn. Mar. 31, 2009) (scienter strongly inferred from allegations that employees deliberately inputted higher prices into internal accounting system just before customer invoices were sent, and delayed input of falling prices until after invoices with outdated higher prices were generated); *Gosselin v. First Trust Advisors L.P.*, No. 08 C 5213, 2009 WL 5064295, at *6 (N.D. Ill. Dec. 17, 2009) (scienter pleaded against defendants who offered and managed closed-end mutual funds where plaintiffs alleged that they "had access to information contrary to the information contained in the financial statements they distributed" and "violated GAAP by ignoring market data and incorrectly valuing the Funds' NAV").[21]

Kelsoe's scienter is confirmed by his deliberate avoidance of an in-person Due Diligence Review in 2007.  ¶¶ 23, 154-160.  In July 2006, Morgan Keegan implemented an internal Due Diligence Policy for the Funds that involved nine or more annual "touches" by Morgan Keegan's WMS (Wealth Management Services) group, including an annual on-site visit to the Funds'

---

[21]  Allegations of mispricing of individual portfolio securities generally suffice to establish manipulation of the NAV.  *See Piper Capital*, 2000 WL 1759455, at *55 ("It is virtually impossible to determine with certainty whether many of the securities at issue actually were mispriced and, if so, specifically when the mispricing occurred.  Neither is it necessary to do so: the issue is whether [Defendants], or any of them, purposefully attempted to manipulate the Fund NAV.  If intentional or reckless security price/NAV manipulation took place, it matters only incidentally what specific securities were involved, on what day(s) they actually were mispriced or whether/to what degree the mispricing impacted [the Fund's] reported NAV.").

portfolio manager.  ¶ 154.  In 2007, Kim Escue ("Escue"), a Morgan Keegan Vice President and WMS fixed income analyst, was responsible for the annual on-site due diligence visit with the Funds.  Under the Due Diligence Policy, Escue had to observe Kelsoe in person and while the market was open.  ¶ 155.

Escue initially scheduled a meeting with Kelsoe for June 6, 2007.  However, when she explained to Kelsoe on June 4 that she wanted to meet in person (to "sit with [Kelsoe] while he worked to get a better idea of what he was doing"), Kelsoe immediately canceled, and went on to give her the run-around and rebuff her repeated attempts to meet in person.  ¶ 156.  It was only after Escue threatened to blow the whistle on Kelsoe that he agreed to meet with her on July 3, 2007, but only after the bond markets closed early (for the July 4 holiday) so she would be unable to observe his normal routine.  ¶ 157.  After this meeting, Kelsoe simply ignored Escue's written requests for information.  Escue ultimately determined that it was in Morgan Keegan's best interest to "drop coverage" of the Funds because they could not "do [their] regular due diligence."[22]  ¶ 158.  Escue's July 23 and 31, 2007 internal e-mails, Exhibits T and U to the Complaint, vividly describe her repeated, frustrated attempts to conduct due diligence of Kelsoe and issue a report, such that she was "stalled and put off since the get go."  Compl. Exs. T-U; ¶¶ 156-158.  All of this occurred during or shortly after the January-July 2007 period when Kelsoe directed the 262 phony "price adjustments" on securities held by the Funds and manipulated the prices of the Long Beach CDO, Knollwood CDO and Terwin ABS.  ¶¶ 139, 143-153.  These allegations raise a cogent and compelling inference that Kelsoe deliberately

---

[22]  Defendants quibble with this allegation, contending that Morgan Keegan dropped analyst coverage of all of its proprietary investment products, not just the Funds.  MK Mem. at 30 n.28; Ind. Defs. Mem. at 15 n.9.  A fair reading of Escue's July 31, 2007 e-mail suggests, however, that Morgan Keegan did so at least in part because Kelsoe was "in no way going to continue providing us with information or allow us to do our due diligence."  Compl. Ex. U.  And even assuming *arguendo* that Morgan Keegan did not drop analyst coverage of the Funds and other proprietary products solely because Kelsoe stonewalled Escue, Kelsoe stonewalled her just the same in an effort to conceal his fraudulent conduct.  ¶¶ 159-160.

rebuffed Escue to conceal his manipulations of portfolio security prices and the Funds' NAVs.[23]
¶ 160.

Defendants proffer two competing nonfraudulent inferences.  Neither is plausible, let alone *more* compelling than Plaintiffs' allegations of intentional and reckless misconduct.  *See Tellabs*, 551 U.S. at 328; *Frank*, 547 F.3d at 571.  First, Defendants contend that Kelsoe was simply "providing his input into the valuation process" and was not responsible for the final valuation of the Funds' assets.  MK Mem. at 28; Ind. Defs. Mem. at 13.  Kelsoe's "input" into the valuation process, however, was to purposefully manipulate that process such that the Funds' assets, in violation of the valuation procedures, were artificially priced higher than fair value.  ¶¶ 139-153.  Moreover, as Plaintiffs allege, Kelsoe's "price adjustments" sent to Fund Accounting were simply accepted and entered without question into a spreadsheet used to calculate the Funds' NAVs, and Kelsoe knew this because of the biweekly reports he received setting forth the Funds' portfolio securities and their prices and which, by comparison with previous reports, indicated that his price adjustments were being used and were directly affecting the Funds' NAVs.[24]  ¶ 139; *see In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583 (WHP), 2011 WL 350289, at *8 (S.D.N.Y. Jan. 25, 2011) (scienter pleaded against mutual fund executive who directed fraud and signed numerous prospectuses that failed to disclose scheme,

---

[23] Defendants argue nonetheless that such an inference "is unsupported by *any* factual allegations."  MK Mem. at 29-30; Ind. Defs. Mem. at 14.  Defendants fail to proffer any plausible competing inference, however, and argue only that Plaintiffs do not specifically allege that Escue's due diligence efforts were related to the Closed-End Funds as opposed to the Open-End Funds.  Nothing in Escue's July 23 e-mail or the body of her July 31 e-mail is limited to the Open-End Funds; indeed, Escue's statement that Kelsoe told her that "the Intermediate fund had experienced no defaults and that High Yield product had experienced no more defaults than what would be expected" is reasonably read as an effort to mollify Escue's concerns and divert her attention from even worse performance by the Closed-End Funds.  *See* Compl. Exs. T-U; ¶ 166 (Select Intermediate Bond Fund less risky than Funds).  The most reasonable inference is that an annual, in-person due diligence meeting with Kelsoe would be intended to cover all of the Funds he managed.  *See also* Compl. Ex. V at ¶¶ 16(b), 131-134 (according to Task Force Proceeding, Escue's efforts to conduct due diligence of Kelsoe concerned the four Closed-End Funds).

[24] As such, and contrary to Defendants' assertion, Plaintiffs indeed allege that Kelsoe sent price adjustments that he knew did not reflect fair value while also knowing that Fund Accounting was failing to verify their accuracy.  *See* MK Mem. at 29; Ind. Defs. Mem. at 14.

and thus "knew facts or had access to information suggesting that [his] public statements were not accurate"); *Piper Capital*, 2000 WL 1759455, at *54 (intentional or reckless deviation from use of current market values for all portfolio securities to determine NAV constitutes NAV manipulation). Rather than simply "provide his input" into the valuation process, Kelsoe took control of and abused the valuation process.

Second, Defendants point to the provision of the Funds' valuation policies, noted above, that allowed Kelsoe to override a broker-dealer quote if (and only if) he had a reasonable basis to believe the quote did not accurately reflect fair value, and contend that the more compelling inference from this allegation is that broker-dealer quotes submitted to the Funds for use in verifying the price of securities were not determinative of the values assigned to those securities. MK Mem. at 28-29; Ind. Defs. Mem. at 13-14; *see* ¶ 133. Similarly, Defendants contend that Kelsoe's "pressuring" of broker-dealers to increase quotes alleges nothing more than his belief that quotes were incorrect or inadequate. MK Mem. at 29 n.26; Ind. Defs. Mem. at 14 n.8; *see* ¶¶ 143-153. As Plaintiffs allege in detail, however, Kelsoe's 262 "price adjustments" were knowingly phony, did not reflect fair value, and consistently were used to report artificially inflated securities values to the public.[25] ¶ 141; *see* ¶¶ 138-153; *Helwig v. Vencor, Inc.*, 251

---

[25] Kelsoe's manipulation of the price of the Long Beach CDO, which was held by each of the Funds, illustrates this well. On April 25, 2007, Kelsoe spoke by telephone with his contact at the Submitting Dealer about dealer quotes that would be submitted in connection with PwC's audit for March 31, 2007. Kelsoe's contact told him that his trading desk had priced down many of the bonds held by the Funds. Kelsoe asked his contact to refrain from providing low dealer quotes that reflected actual bid prices. The contact had initially determined to provide PwC with information supporting a mark down of the Long Beach CDO from $81.00 to $50.00 but, on April 30, 2007, as a result of his April 25 conversation with Kelsoe, he provided PwC with information supporting a mark down from $81.00 to only $65.00 as an "interim" step. Meanwhile, on April 26, Kelsoe sent a price adjustment to Fund Accounting marking down the price of the Long Beach CDO from $78.00 (the price at which the Funds were valuing the security at the time) to $72.00. Fund Accounting promptly used the $72.00 price (rather than $50.00 or even $65.00) to calculate the Funds' NAVs without verifying the accuracy of that price pursuant to the Funds' valuation policies and procedures. ¶¶ 142, 144-145. These facts and others alleged in the Complaint do not allow a fair inference that broker-dealer quotes, as opposed to Kelsoe's artificial "price adjustments," did not reflect fair value. *See also* ¶¶ 146-153.

F.3d 540, 552 (6th Cir. 2001) ("divergence between internal reports and external statements on the same subject" is a key indicator of scienter).

Defendants argue that Plaintiffs' allegations concerning valuation are addressed solely to Kelsoe and do not support an inference of scienter against the Funds or the other Officer Defendants.[26]  Despite the Funds' incongruous argument that Plaintiffs do not "explain the motive or required state of mind of any of the Fund[s]," Funds Mem. at 6, "[c]orporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010).[27]  As the Funds' Senior Portfolio Manager and the person responsible for selecting and purchasing the Funds' portfolio assets and managing their day-to-day operations (¶¶ 56, 294), Kelsoe's scienter is imputed to the Funds.  *See SEC v. Young*, Civ. No. 09-1634, 2011 WL 1376045, at *1, 6 (E.D. Pa. Apr. 12, 2011) (individual's scienter imputed to hedge fund for which he was investment advisor and related entity where "he had control over those entities and used them to commit his fraud"); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381-82 (S.D.N.Y. 2007) (individual's scienter imputed to hedge fund where he had effective control over fund's management and operations).

Morgan Keegan's fact-laden protestations to the contrary (MK Mem. at 25 n.24), and the Funds' repeated assertion that they "'were issued, underwritten, sold, and managed by two wholly owned and controlled subsidiaries of' a co-defendant," Funds Mem. at 7 (quoting ¶ 4), do not undermine Kelsoe's ongoing, day-to-day control of the Funds' operations and his use of

---

[26]  MK Mem. at 30; Ind. Defs. Mem. at 15; *see also* Funds Mem. at 5-7; Anthony Mem. at 3; RFC Mem. at 11.

[27]  *See also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.  In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) ("A corporation is liable for statements by employees who have apparent authority to make them."); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.").

them as a vehicle of fraud.  Moreover, as discussed in Part I.B above, the Complaint sufficiently

alleges that the Funds made materially false and misleading statements in various publicly filed

reports to shareholders, many of which Kelsoe also signed in his official capacity.  *See* ¶ 300.

Any issue regarding the precise scope of Kelsoe's agency relationship with the Funds or

authority to speak for them raises questions of fact that cannot be resolved now.  *See Suez Equity*

*Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001) (reversing dismissal of

complaint for insufficient allegations of scienter as to certain entity defendants because, *inter*

*alia*, "defendants' arguments with respect to the scope of [individual defendant's] agency are

best left to a later stage in the litigation").[28]

Weller argues that Plaintiffs' allegations of scienter are limited to his membership on the

Valuation Committee and Fund Accounting's failure to follow stated policies and procedures.

Ind. Defs. Mem. at 15.  As alleged in the Complaint and discussed above, however, Weller had

responsibility as ***head*** of Fund Accounting for pricing the Funds' portfolio securities and

calculating NAV.  His simultaneous membership on the Valuation Committee gave him

responsibility for overseeing Fund Accounting's processes as well as knowledge of the Fund's

valuation procedures.  ¶¶ 59, 74, 133, 298.  The valuation procedures specified that dealer quotes

could be overridden only if there was a reasonable basis to believe the quote did not reflect fair

value, and that if a price was overridden, the basis for that had to be "documented and provided

to the Valuation Committee for its review."  ¶ 133.  Weller ignored the valuation procedures,

however, repeatedly turning a blind eye to Kelsoe's 262 bogus "price adjustments" while at the

---

[28]  In any event, as discussed in Part II.B.5 below, the Complaint sufficiently pleads scienter against Defendants Sullivan and Anthony, who served in succession as President and Principal Executive Officer of the Funds during the Class Period.  *See* ¶¶ 57-58, 295-297.  Sullivan's and Anthony's scienter is clearly imputed to the Funds.  *See Frank*, 2011 WL 2020171, at *7.

same time signing the Funds' materially misleading public reports.[29]  ¶¶ 137, 139, 145, 150, 299,

303; *see Helwig*, 251 F.3d at 552 ("disregard of the most current factual information before

making statements" is a key indicator of scienter).

Defendants contend that Fund Accounting's slavish acceptance of Kelsoe's price

adjustments constitutes mere "mismanagement" of the Funds.  MK Mem. at 29.  The facts show

fraud, however.  With regard to the Knollwood CDO, for example, when the Submitting Dealer

finally provided a list of quotes to Fund Accounting, it left a ***blank space*** for the Knollwood

CDO quote but the Funds, in derogation of their valuation procedures, continued to price that

security at Kelsoe's unverified and artificially high price.  ¶ 150; *see also* ¶ 139 (Fund

Accounting entered Kelsoe's price adjustments "without question" into spreadsheet used to

calculate NAVs); ¶ 145 (Fund Accounting used Kelsoe-adjusted price to value Long Beach CDO

and calculate NAV without verifying accuracy of that figure).  All the while, the Funds were

issuing materially false and misleading public reports, signed by Kelsoe, Weller and others.

¶¶ 300, 303.  This conduct goes well beyond mere "mismanagement" or negligence.  Instead,

these are textbook examples of "highly unreasonable conduct which is an extreme departure

from the standards of ordinary care."  *Frank*, 2011 WL 2020717, at *3; *see Piper Capital*, 2000

WL 1759455, at *57 ("finessing the NAV in any way necessarily presented a danger of

misleading Fund buyers and sellers" because, among other things, "[t]he NAV is the most

prominent piece of information available to the investing public").[30]  In sum, Plaintiffs'

---

[29]  Moreover, as Weller knew, the only pricing test regularly applied by the Valuation Committee was a meaningless "look back" test that compared the sales price of a security from the portfolio to the valuation of that security used in the NAV calculation for the five business days preceding the sale.  Because the test only covered securities after they were sold, the Valuation Committee never knew at any given time how many securities prices it could ultimately validate.  ¶ 176.

[30]  *See also Gosselin*, 2009 WL 5064295, at *2 (shareholders of closed-end mutual funds pleaded fraud, not inactionable corporate mismanagement, where defendants allegedly "engaged in deception through material misrepresentations and omissions to conceal the ramifications of Defendants' alleged misconduct"); *Van Kampen*,

allegations concerning the overvaluation of portfolio securities raise the requisite inference of scienter at least as to Kelsoe, Weller and the Funds.

> 2.   **Defendants Intentionally or Recklessly Misclassified a Material Portion of the Funds' ABS and MBS Holdings as Corporate Bonds and Preferred Stock**

As of the first six months of 2007, as discussed in Part I.B.2.a above, Defendants misrepresented hundreds of millions of dollars' worth of risky ABS and MBS, comprising material percentages of the Funds' portfolios, as corporate bonds or preferred stock to conceal the Funds' dangerous lack of diversification and convey the false impression that the Funds were traditional high-yield bond funds.  *See* ¶¶ 17-18, 90-112 & Tbls. 4-11.

Although Defendants argue that these misstatements resulted from negligent rather than intentional or reckless misconduct (MK Mem. at 31-32; Ind. Defs. Mem. at 15-16), a strong inference of scienter is straightforward: ABS and MBS are entirely different securities than corporate bonds or preferred stock.  As investment professionals charged with fully understanding the Funds' portfolio holdings and the importance of proper diversification, the Officer Defendants either knowingly misrepresented ABS as corporate bonds or preferred stock, or they closed their eyes to the nature of Funds' ABS assets before reporting them publicly as corporate bonds or preferred stock.  ¶¶ 17, 98-99, 103, 107, 111; *see In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1031 (N.D. Ohio 2000) (inference of scienter strongly supported where "[t]hese accounting decisions are not of the type that are generally within any range of 'reasonable treatments'; they are, instead, the kind of accounting entries which, at least on their face, would seem to put reasonable men, particularly those with the training, background and access to information available to [the individual defendants], on notice that they were improper

---

2002 WL 1160171, at *11 (mispricing of assets of closed-end mutual fund was not mismanagement where Fund was not adhering to disclosed valuation policies).

and would lead to a serious misstatement of revenue."); *Countrywide*, 588 F. Supp. 2d at 1196

(inference of scienter against CFO in part because he "was directly responsible for

Countrywide's financials . . . [which] depended on Countrywide's operations").

Further, these misclassifications could not have been innocent or even negligent errors

because (a) they impacted nearly one-fifth of the value of the Funds' portfolios; (b) they all went

in the same risky-to-less risky direction (*i.e.,* ABS/MBS were misclassified as bonds or stock and

not the other way around); and (c) they cannot be explained away as innocent confusion over

complex nomenclature because all of the "Preferred Term Securities," for example, were

misrepresented to be corporate bonds rather than preferred stocks.  ¶¶ 17, 90-92 & Tbls. 4-7;

¶ 107; *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 685 (6th Cir. 2004) ("Common

sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the

more likely it is that such a restatement or violation was made consciously or recklessly.")

(citation omitted); *id.* at 686 (accounting violations will support inference of scienter if, "by

virtue of their type and size," they "should have been obvious" to defendants).

Defendants do not challenge these facts or Plaintiffs' assertions that ABS are entirely

different than corporate bonds and preferred stock and that the Officer Defendants were

responsible for knowing what kinds of securities the Funds owned.  *Cf. Piper Capital*, 2000 WL

1759455, at *28 (defendant's position as fund's "co-manager," subordinate to senior portfolio

manager, "in itself imposed on her a general duty to ensure that material Fund

disclosures/representations were accurate and complete insofar as it was within her authority and

expertise to do so").  Instead, Defendants argue that if ABS cannot reasonably be confused with

corporate bonds or preferred stock, then "it would have been obvious to all . . . that such

securities had been misclassified."  MK Mem. at 31; Ind. Defs. Mem. at 16.  This argument

improperly seeks to shift responsibility for Defendants' undisputedly false statements to the Class and others outside Morgan Keegan. A reasonable investor could not be expected to know that the "Lincoln Park Referenced Link Notes 2001-1 8.780% 7/30/31," for example, was actually an ABS rather than a corporate bond (Compl. Tbl. 4), but the Officer Defendants knew or should have known this based on their experience and positions within Morgan Keegan. *See* ¶ 98 (alleging that proper securities classifications "were (or should have been) well-within the portfolio managers' knowledge and expertise").[31] And Defendants do not point to any securities analyst or other investment professional, let alone any Class member, who was aware of the misclassifications before Defendants were forced to correct them. Accordingly, Defendants' misclassifications of the Funds' ABS and MBS assets support a strong inference of scienter.

### 3. Defendants Intentionally or Recklessly Overconcentrated the Funds' Holdings in the Riskiest ABS Assets in Violation of the Funds' Investment Guidelines and at Heightened Risk to Investors

Despite Defendants' public assurances that the Funds' portfolios were properly diversified consistent with their investment policies and objectives, the Funds invested 65%-70% of their portfolio assets in ABS (and 27%-32% in subprime MBS) in violation of their "fundamental investment limitation" of having more than 25% of portfolio assets in the "same

---

[31] Pointing to Defendants' alleged lack of pre-purchase due diligence as reflected in the e-mails of Al Landers, Morgan Keegan contends that the asset misclassifications are more likely the result of innocent reliance on erroneous or incomplete information than fraud. MK Mem. at 32 n.29; *see* ¶¶ 116-124 & Compl. Exs. J-R. In April 2007, however, Landers asked Michael Hubbe in an e-mail whether the Centurion VII security was a "CLO" or something else, "to make sure I'm classifying it properly." ¶ 119 & Compl. Ex. M. Hubbe's response, that Centurion VII was a "hybrid CLO/CLO" with "mostly US credits," suggested to Landers that the security was backed mostly with ***"corp credits."*** *Id.* Even assuming *arguendo* that one could negligently confuse "corp credits" with "corporate bond," the Funds nonetheless classified Centurion VII as ***preferred stock*** in their June and August 2007 public reports. Compl. Tbls. 4-7. Landers' other e-mails also support a strong inference of scienter because the ABS securities referenced in those e-mails were not misclassified; the Funds were thus able to, and did, choose which ABS they would and would not classify correctly for reporting purposes. *Compare* ¶¶ 116-118, 120-124 *with* Compl. Tbls. 4-7. Morgan Keegan's citation to *Dynex Capital*, 531 F.3d at 197, does not support its position. Plaintiffs in *Dynex Capital* failed to allege any motive to mislead investors concerning the securities, leaving the court to acknowledge a number of competing nonculpable inferences. *Id.* Here, Defendants misclassified the ABS to conceal the Funds' overconcentration in ABS and lack of diversification. ¶¶ 17-18, 99.

industry."  Defendants failed to disclose this overconcentration and the enhanced risks it posed to investors.  ¶¶ 14-16; 83-89.

In challenging scienter, Defendants argue solely that there was no concealment of overconcentration or failure to disclose violations of the investment limitation because the Funds disclosed that they were more than 25% invested in ABS.  MK Mem. at 31; Ind. Defs. Mem. at 15-16.  As discussed in Part I.B.2.c above, however, no reasonable investor could discern from the Funds' kaleidoscopic asset allocation charts or asset schedules that the Funds were violating their investment restrictions.  Indeed, Defendants' suggestion that this overconcentration was disclosed, when combined with the Officer Defendants' expertise and knowledge of the Funds' internal policies and their responsibilities for properly managing the Funds (¶¶ 56-59, 294-299, 304), only confirms that Defendants' violation of the Funds' own investment policies was reckless if not intentional.  It could not plausibly have happened by accident, or without Defendants turning a blind eye to the Funds' own fundamental investment limitation.  *See PR Diamonds*, 364 F.3d at 686 (magnitude and obvious nature of errors tend to support inference of scienter); *Telxon*, 133 F. Supp. 2d at 1031 (defendants' training and information available to them relevant to inference of scienter).  Defendants offer no competing nonculpable inference.

### 4.   Defendants Intentionally or Recklessly Failed to Exercise Due Diligence in Acquiring Assets for the Funds' Portfolios

Defendants misrepresented the Funds as professionally managed with a proven and disciplined investment approach, and particularly touted Kelsoe as "one of America's leading high-yield fund managers."  ¶¶ 24-25, 126, 198, 222.  A series of e-mails from Al Landers, a MAM Portfolio Analyst, to various broker-dealers show, however, that Defendants acquired highly complex ABS securities for the Funds' portfolios without conducting adequate due diligence into their structure, the nature of their underlying assets, or their inherent investment

risks.  ¶¶ 113, 116-125.  According to Confidential Witness 1 ("CW1"), Landers was within Kelsoe's inner circle and was considered to be his right-hand man, and Kelsoe was too busy to do research on securities purchased for the Funds' portfolios and did not have time to conduct pre-purchase diligence.  ¶¶ 114-115.[32]

Defendants argue in challenging scienter that (a) inadequate due diligence is negligence or mismanagement, not intentional or reckless conduct; (b) the Funds and Officer Defendants did not make knowing or reckless false statements concerning the extent of MAM's due diligence; and (c) these Defendants did not know that Landers was not conducting adequate due diligence. MK Mem. at 33; Ind. Defs. Mem. at 17.  Plaintiffs do not merely allege that due diligence was inadequate.  Rather, Plaintiffs allege that Defendants made affirmative misrepresentations that due diligence and portfolio management would be conducted by experts in a professional manner.  ¶¶ 197, 221, 252.  Further, Defendants do not and cannot reasonably dispute that the Officer Defendants had an obligation to conduct sufficient pre-purchase due diligence to know what they were buying for the Funds' portfolios, that the basic information Landers was seeking

---

[32]  Defendants challenge the reliability of CW1's factual averments.  MK Mem. at 33-34; Ind. Defs. Mem. at 17.  CW1's averments at ¶¶ 114-115 are consistent with allegations of the Task Force Proceeding.  *See* Compl. Ex. V, at ¶ 125 (alleging that "[p]rior to purchasing holdings for the Funds, MAM and Kelsoe did not properly investigate and evaluate the holdings" and describing Landers as a "portfolio analyst to Kelsoe regarding Fund management"); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008) (corroboration of confidential witness's statements supports reliability).  It is unlikely that both the Task Force and CW1 simply have it wrong.

Moreover, the Complaint's description of CW1's position and period of employment at Morgan Keegan is sufficient.  *See id.* at 993 n.26 (rejecting rule, proposed by Defendants here, that complaint "set forth the job title, specific dates of employment, responsibilities and basis of personal knowledge for each anonymous witness").  *Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009), cited by Defendants, is not to the contrary because the complaint there did "not provide *any* details about most of the Confidential Witnesses."  *Id.* at 399 (emphasis added).  Plaintiffs' effort to protect CW1 by not pleading additional identifying information (¶ 114 n.23) is an appropriate means to guard against pressure or retaliation from Defendants.  *See In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1158 (C.D. Cal. 2004) ("[P]laintiffs are not required to plead details to the extent that they jeopardize the confidentiality of the source."), *aff'd in part, rev'd in part on other grounds*, 239 F. App'x 318 (9th Cir. 2007); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1159 (C.D. Cal. 2003) ("[A]dditional information, such as the exact dates of employment, would significantly erode the confidentiality of these sources.").  In any event, as Defendants' cited authority makes clear, any such pleading deficiency is properly cured in a further amended complaint.  *See Karpov v. Insight Enters., Inc.*, No. CV 09-856-PHX-SRB, 2010 WL 2105448, at *8 (D. Ariz. Apr. 30, 2010); *In re Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1164 (S.D. Cal. 2008) (both *cited in* MK Mem. at 34).

in his e-mails is fundamental to proper management of the portfolios, and that Defendants' utter failure to possess such information would contradict their public representations of professional fund management and disciplined investing of the Funds' assets.  Landers' e-mails raise a strong inference that no one at Morgan Keegan or MAM, including Kelsoe and the other Officer Defendants (and therefore the Funds), possessed the basic data that Landers had to attempt to obtain from third-parties long after the fact.  ¶ 126.

Defendants' argument that the Officer Defendants were unaware "of the supposed inadequacy of the due diligence at issue" (Ind. Defs. Mem. at 17) or that "Landers was not performing adequate due diligence" (MK Mem. at 33) is a red herring.  It was Kelsoe's and the other Officer Defendants' responsibility to ensure that adequate due diligence was performed, and it was Kelsoe and the other Officer Defendants (and the Funds) that falsely assured investors that MAM, as the Investment Adviser, was doing its job.  ¶¶ 197-198, 221-222.  Accordingly, the Complaint raises a strong inference that these misrepresentations were made knowingly or highly recklessly.

> ### 5.  Defendants Intentionally or Recklessly Misled Investors By Using a Benchmark Index That Had a Built-In Asset Mismatch

Defendants' reliance in the Funds' public reports on a Benchmark Index that contained a built-in asset mismatch misled investors as to the basic nature of the Funds and the high degree of risk inherent in the Funds' portfolios.  There were no ABS or MBS in the Benchmark Index, which tracked only corporate bonds and preferred stock.  Yet, 65%-70% of the Funds' portfolios were comprised of ABS.  ¶¶ 163; 26-28; *see also* Part II.B.2 above.  A May 2007 internal e-mail from Gary Stringer, a Senior Vice President at Morgan Keegan, raises a strong inference that Defendants were aware of a serious "tracking error" and high "asset-based exposure" showing a sharp divergence between the holdings and investment risk of a comparable Kelsoe-managed

RMK fund and what investors were led to believe.[33]  ¶ 165 ("Mr & Mrs Jones don't expect that

kind of risk from their bond funds.  The bond exposure is not supposed to be where you take

risks.  I'd bet that most of the people who hold that fund have no idea what's it's actually

invested in. . . .  If people are using RMK as their core, or only bond fund, I think it is only a

matter of time before we have some very unhappy investors.") & Compl. Ex. C; *see also* ¶¶ 166-

167.  Moreover, CW1 specifically avers that Defendants used the Index to lure investors who

understood what corporate bonds and preferred stock were, but not the intricacies of structured

finance products.  ¶ 164.

Defendants argue that the Funds had discretion in selecting a benchmark index, and the

Complaint does not allege that Defendants intentionally or recklessly chose the Benchmark

Index as a means to misrepresent the Funds' portfolio assets.  MK Mem. at 32-33; Ind. Defs.

Mem. at 17.  CW1 avers, however, that the index was chosen in order to induce investors to

purchase Fund shares.  ¶ 164.  Moreover, having chosen the Benchmark Index and held it out to

investors as a reasonable proxy for the assets held by the Funds, Defendants—who were and

affirmatively represented themselves to be investment professionals—knew or should have

known that the contents of the Index was dramatically different than the securities held by the

Funds.  ¶ 165; *see also* ¶ 170 (chart depicting disastrous performance of Funds as compared with

35 non-RMK closed-end high yield bond funds).  At the same time, the Officer Defendants were

---

[33] Defendants contend that the Stringer e-mail exchange does not support scienter because Stringer is not a named Defendant and the e-mails do not mention the Benchmark Index or the Closed-End Funds.  MK Mem. at 33 n.30.  As Plaintiffs allege, however, the portfolio of the Open-End Fund discussed in the e-mails, the RMK Select Intermediate Bond Fund, overlapped substantially with and indeed was considerably less risky than the portfolios of the Funds.  ¶ 166 & n.26.  A fair inference can be drawn, therefore, that the tracking error between the Funds and the Benchmark Index was at least as serious as that with respect to the Select Intermediate Bond Fund.  And regardless of whether Stringer himself is a named Defendant here, and his e-mails reveal contradictions between what was known at a high level within RMK (*see* ¶ 64) and what investors were being told.  *See also* Compl. Ex. C, at 3 (Stringer e-mail to William Deupree III, member of the Funds' Advisory Council: "The RMK fund has a huge underweight in Govt bonds, *a large overweight in asset-backed securities* and an overweight in Corp bonds.  Again, these differences result in lower correlation, higher tracking error, *and most important, far different risks* than the broad market and *than what most investors would expect from their fixed income portfolio."*) (emphases added).

signing public reports that led investors to believe that the Benchmark Index was an appropriate comparator. Thus, Plaintiffs raise a strong inference Defendants knew or were highly reckless in not knowing that the Benchmark Index misled investors as to the riskiness of the Funds' portfolio securities.[34]

Defendants Sullivan and Anthony argue that Plaintiffs' allegations of scienter with respect to them are limited to their positions as President of the Funds and President and Chief Investment Officer of MAM.[35] Sullivan and Anthony read the Complaint too narrowly. These Defendants were high-level corporate officers of the Funds and MAM, the Funds' investment adviser, and signed SEC filings containing allegedly false and misleading statements. "As signatories to the SEC filings . . . each individual defendant who served as a high-level officer had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations. The individual defendants were not entitled to make statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false and misleading." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000)); *see also In re Huffy Corp.*

---

[34] Defendants' challenges to Plaintiffs' allegations of motive and opportunity (MK Mem. at 26-28; Ind. Defs. Mem. at 11-12), fail to address Kelsoe's alleged motive in connection with his 262 bogus "price adjustments"—that is, to artificially support the Funds' NAVs in a deteriorating market environment. ¶ 138; *see also* ¶¶ 13, 263, 285 (Kelsoe became dangerously "intoxicated" with high-risk ABS; glutted the portfolios with huge amount of low-priority ABS tied to subprime mortgages; and "juic[ed] investment returns to Barry-Bonds-like proportions" before the Funds "crashed and burned"). This particularized motive to mislead investors strengthens the cogent inference of scienter raised by the facts identified herein. In any event, "[t]here is no need to establish what motivated any NAV manipulation in order to establish a . . . violation. The issue is the fraudulent conduct itself, not its motivation. Any reasonable investor would consider an artificially inflated NAV important in the investment decision calculus and would view such an NAV as a significant alteration of the total mix of available information." *Piper Capital*, 2000 WL 1759455, at *54. Further, Morgan Keegan's observation that the Officer Defendants did not engage in insider selling (MK Mem. at 26 n.26) has limited application in a mutual fund case such as this. The Complaint alleges that the Officer Defendants were compensated in cash, not in shares of the Funds (*see* ¶¶ 21, 71), and Defendants do not contend otherwise. And the Supreme Court has made clear that "[t]he absence of a motive allegation, though relevant, is not dispositive." *Matrixx*, 131 S. Ct. at 1324 (citing *Tellabs*, 551 U.S. at 325).

[35] *See* MK Mem. at 26-27; Ind. Defs. Mem. at 11-12; Anthony Mem. at 3; *see also* ¶¶ 57-58, 295-297.

*Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008) ("Courts have held that the more central

a fact is to a company's core operations the more likely its executive acted with scienter.").

Management of the Funds' portfolios was at the heart of Morgan Keegan's core operations.  *See*

¶ 24; Compl. Ex. A; *see also* ¶¶ 299-304.  Having this duty, and as experienced professionals in

the industry, a strong inference is raised that Sullivan and Anthony knew or were reckless in not

knowing, for example, that portfolio securities reported in SEC filings as corporate bonds or

preferred stock were actually ABS or MBS, that the portfolios were not as diversified as

represented, and that the Benchmark Index misled investors as to the Funds' risk profile.  *See*

*Camofi Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020 (CM), 2011 WL 1197659, at

*9 (S.D.N.Y. Mar. 25, 2011) ("It is plausible to infer that based on their positions within the

company, [the individual defendants] were familiar with Riptide Worldwide's day-to-day

financial outlook, and, as such, should have known that the company was misrepresenting its

ability to repay the loan in the . . . SEC filings.  Any other inference, frankly, would mean that

[the individual defendants] were derelict in their duties."); *see also South Ferry LP, #2 v.*

*Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("In assessing the allegations holistically as required

by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are

probative of scienter viewed with a practical and common-sense perspective.").  Because scienter

is sufficiently pleaded as to Sullivan and Anthony, it is sufficiently pleaded as to the Funds as

well.  *See Frank*, 2011 WL 2020717, at *7 ("Because Plaintiffs have adequately pleaded scienter

as to . . . Dana's chief executive officer and chief financial officer . . . they have also pleaded

scienter as to Dana.").

48

**C.    Even if it Were Equally Plausible to Infer That Defendants Innocently Failed to Anticipate the Global Credit Crisis Rather Than Acted Intentionally or Recklessly—and Such an Inference Is Not Plausible—the Complaint Sufficiently Pleads Scienter**

Finally, Defendants argue that the Complaint raises "a much more plausible inference" that the alleged misstatements were a consequence, and that the collapse of the Funds were a result, of the "global credit crisis" rather than intentional or reckless misconduct.  MK Mem. at 23-24; Ind. Defs. Mem. at 6-8.  In support, Defendants contend that (1) the Funds disclosed the risks associated with investing in the Funds, and particularly that the values of the Funds' portfolio securities generally were volatile and unpredictable; and (2) the Funds' share prices declined sharply "in the wake of" the global credit crisis that severely impacted the ABS and MBS markets.  *Id.*

This argument conflates loss causation with scienter.  The question of whether investor losses were caused by false statements is different than the question of whether statements were intentionally or recklessly false when made.[36]  Nonetheless, the Complaint illustrates that the Funds collapsed beginning in the summer of 2007, far sooner and more severely than 35 non-RMK high-yield bond funds.  ¶¶ 169-170 (chart).  This tends to show that the Funds' collapse was not solely or even principally the result of the credit crisis, but such questions of causation

---

[36]  As discussed in Part I.C above, the Funds' boilerplate risk disclosures did not come close to warning investors of the full extent of risk they were exposed to as Kelsoe glutted the portfolios with huge amounts of low-priority ABS tied to subprime mortgages, "juicing investment returns to Barry-Bonds-like proportions" before the Funds "crashed and burned."  ¶¶ 13, 263, 285.  And this "juicing" was materially aided by, among other things, Kelsoe's "adjustments" of the values of portfolio securities and was concealed by, among other things, the Funds' reckless violations of their internal asset allocation policies and misclassification of ABS in the portfolios as preferred stock or corporate bonds.  *See Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 385 (E.D.N.Y. 2009) (notwithstanding defendants' "urg[ing] that the stronger inference here is not fraud but the unimpaired operation of the market in response to corporate disclosures, and the coming to pass of a risk . . . that investors were fully warned of," plaintiffs' "inferences need only be 'at least as strong as,' not stronger than, any competing inferences," and concluding that inference tipped decidedly in plaintiffs' favor where material misstatements were alleged) (citing *Tellabs*, 551 U.S. at 325-26).

and timing ultimately raise complex factual issues that are not susceptible to adjudication now.[37]
*See Gosselin*, 2009 WL 5064295, at *6 (rejecting argument, in closed-end mutual funds case,
that inference of good faith surrounding impact of credit crisis was "significantly more
compelling" because "at the pleading stage, it is Plaintiffs, the non-movants, that are entitled to
have facts construed in their favor"); *Engel v. Sexton*, No. 06-10447, 2009 WL 361108, at *13
(E.D. La. Feb. 11, 2009) ("In evaluating competing non-culpable inferences from the facts
alleged, *Tellabs* does not require the Court to dismiss the complaint merely because there is a
cogent inference pointing to an innocent explanation.").[38]

     In any event, the onset of the global credit crisis did not excuse Defendants' obligation to
disclose material adverse facts concerning (among other things) the level of credit risk brewing
in the Funds' portfolios, and Plaintiffs sufficiently allege that Defendants failed to do so
throughout the Class Period.  *See* Part I.B above; *see also Local 703, I. B. of T. Grocery & Food
Emps. Welfare Fund v. Regions Fin. Corp.*, No. 10-2847-IPJ, 2011 U.S. Dist. LEXIS 60761, at
*25 (N.D. Ala. June 7, 2011) (finding inference that defendants knowingly or recklessly ignored

---

[37] Defendants submit a December 2007 *Wall Street Journal* article by Alan Greenspan in support of their
contentions regarding the sudden collapse of the credit markets.  Curley (Defs.) Decl. Ex. S.  Because the article is
not referenced in or annexed to the Complaint, and is not integral to Plaintiffs' claims, and concerns disputed facts,
the Court should not consider it here.  *See*, *e.g.*, *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 714
(S.D. Ohio 2006) ("In the context of a motion to dismiss, a court may not accept an otherwise reliable public
document to decide facts that are in dispute.") (striking news article).  In any event, Mr. Greenspan states in the first
sentence of the article that financial markets began to seize up on August 9, 2007.  The Funds' collapse in
comparison to actual high-yield bond funds began before August, highlighting the fact-specific nature of
Defendants' effort to lay blame on macroeconomic factors.  *See* ¶¶ 169-170 (chart).

[38] Defendants' cited authority is distinguishable.  The court in *Woodward v. Raymond James Financial, Inc.*,
732 F. Supp. 2d 425 (S.D.N.Y. 2010), inferred a nonculpable inference from an isolated allegation of the existence
of an economic report that forecasted a continued decline in home prices.  This forecast was well-known to "market
observers in all sectors," however, and accordingly the report "appear[ed] only to be a general statement of the
economic situation at the time."  *Id.* at 436.  Unlike Plaintiffs' allegations, there were no allegations of intentional
misconduct or knowledge of undisclosed adverse facts.  Similarly, plaintiffs in *In re Société Générale Securities
Litigation*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010), had alleged nothing more than
"knowledge of a general economic (subprime) trend."  *Id.* at *8.  The court in *In re MRU Holdings Securities
Litigation*, No. 09 Civ. 3807 (RMB), 2011 WL 650792 (S.D.N.Y. Feb. 17, 2011) (which also decided *Société
Générale*), appeared most persuaded by the individual defendants' contention, not made here, that they purchased
and retained significant amount of shares of the defendant company during the class period.  *Id.* at *13.

falsity of external statements "at least as plausible" as inference that global financial crisis caused the losses).  For the same reason, Defendants' argument that the Complaint pleads nothing more than mismanagement by their failure to anticipate market developments (MK Mem. at 24) is easily rejected.  Because Defendants' proffered nonculpable inference is not more compelling than an inference of fraud, Plaintiffs sufficiently plead scienter and the Complaint states a claim under the Exchange Act.

## III.   PLAINTIFFS ALLEGE VIOLATIONS OF THE FEDERAL SECURITIES LAWS, NOT CORPORATE MISMANAGEMENT

### A.   The Complaint Is Not Predicated on Corporate Mismanagement, and Related Derivative Litigation Is Pending in this Court

Defendants argue that Plaintiffs allege nothing more than bad business decisions and internal mismanagement.  *See* MK Mem. at 48-49; Ind. Defs. Mem. at 2, 8; Funds Mem. at 1-4.  The Supreme Court made clear in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977), however, that even where the alleged misconduct involves fraud or deception related to corporate mismanagement, and not mismanagement alone, the claims remain actionable under the federal securities laws.  Indeed, "the mere fact that the conduct . . . arguably constitutes mismanagement will not preclude a claim [under the federal securities laws] if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement."  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (citation omitted).[39]

---

[39]  Contrary to Defendants' argument (MK Mem. at 48 n.42), most if not all courts look to federal rather than state law in determining whether a party has standing to assert a Section 10(b) claim.  *See Drachman v. Harvey*, 453 F.2d 722, 727-30 (2d Cir. 1971) ("Federal law must be consulted to decide whether there is standing to sue under the Exchange Act."); *Smith Barney*, 2011 WL 350289, at *4 (citing *Drachman* and other cases, and noting that defendants failed to identify authority applying state law to the issue of standing under section 10(b)).  The court in *In re Lord Abbett Mutual Funds Fee Litigation*, 407 F. Supp. 2d 616 (D.N.J. 2005), which Defendants cite, did not address this issue because the parties there agreed that state law governed, and plaintiffs' claims asserted violations

Plaintiffs do not allege that Defendants made bad decisions or mismanaged the Funds, although it would appear that they did both.  Rather, the Complaint alleges that Defendants affirmatively misled the investing public by, among other things, intentionally manipulating the value of portfolio securities in order to artificially support and hold off foreseeable declines in the Funds' NAVs reported to the public (*see* ¶¶ 137-153); by misrepresenting to the public the degree of proper diversification and asset allocation in the Funds' portfolios (*see* ¶¶ 15-16, 87-88); by telling the public that large swaths of securities in the portfolios were corporate bonds or preferred stock when they actually were complex ABS and MBS (*see* ¶¶ 90-112 & Tbls. 4-7); and by misleadingly portraying the Funds to the public as true high-yield bond funds when their portfolios were overconcentrated cesspools of holdings in low-priority tranches of ABS and MBS (*see* ¶¶ 100-112 & Tbls. 12-17).  All of this in combination, and notwithstanding the Funds' boilerplate and sanitized "risk disclosures," served to severely downplay and misrepresent the extraordinary degree of credit risk to which the Funds' shareholders were exposed.  *See* ¶¶ 254-255.

These allegations, describing material contradictions between Defendants' disclosures to the public and the facts then-known or recklessly disregarded within the Complex, plainly are actionable under the federal securities laws.  *See*, *e.g.*, *Open-End Funds*, 2010 WL 5464792, at *5 ("Material misrepresentations in a registration statement of the risk posed by the Funds' holdings are actionable under the '33 Act.  An allegation that a statement was false when made is actionable under the federal securities laws and does not state an invalid mismanagement or fraud-by-hindsight claim.") (citations omitted).

---

of the Investment Company Act of 1940 and state law.  *Id.* at 622-23, 625; *see also Smith Barney*, 2011 WL 350289, at *9 n.4 (distinguishing decisions relying on state law to resolve shareholder standing under 1940 Act).

Other courts, including those assessing claims in the mutual fund context, are in accord. Most notably, in *Smith Barney*, 2011 WL 350289, the court authoritatively examined whether a Section 10(b) claim must be pleaded directly against or derivatively in the right of a group of mutual funds, and concluded:

> Plaintiffs claim that they were fraudulently induced to purchase shares in the Smith Barney Funds based on material misrepresentations regarding the transfer agent fees in the prospectuses. If those misrepresentations induced Plaintiffs' investment, they can be said to have suffered a direct injury. . . . Indeed, a determination that Plaintiffs' § 10(b) claims are derivative claims—i.e., that the Smith Barney Funds were the primary victim of the Defendants' alleged fraud—overlooks the fact that Defendants' misrepresentations were directly primarily at investors in the Smith Barney Funds.

*Id.* at *5 (internal citations omitted). The court reached this result notwithstanding the fact that the fraud was premised on Smith Barney's allegedly causing the funds to be charged excessive fees for transfer agent services. *See id.* at *1-2. This is a far easier case in which to conclude that Plaintiffs' claims are properly asserted directly against the Funds and the other Defendants. *See also Gosselin*, 2009 WL 5064295, at *2 (shareholders of closed-end mutual funds pleaded fraud, not inactionable corporate mismanagement, where defendants allegedly "engaged in deception through material misrepresentations and omissions to conceal the ramifications of Defendants' alleged misconduct"); *Van Kampen*, 2002 WL 1160171, at *11 (mispricing of assets of closed-end mutual fund portfolio was not mismanagement where Fund was not adhering to disclosed valuation policies).[40]

---

[40] *See also In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 592-93 (S.D.N.Y. 2010) ("The [corporate mismanagement] argument is unavailing because the complaint does not allege that defendants should be liable simply for mismanaging their loss reserves but instead for materially misrepresenting the scope of the risk posed by Citigroup's holdings in its registration statements."); *Evergreen*, 705 F. Supp. 2d at 89 (while not addressing direct/derivative issue, ruling that marketing fund "as a safe, liquid and stable investment when, in fact, it was comprised of illiquid, risky and volatile securities" by means of misleading offering materials stated claim under Securities Act); *Freudenberg*, 712 F. Supp. 2d at 193 ("Because Plaintiffs allege that Defendants intentionally misled the public, rather than simply making bad business decisions, Plaintiffs have pled more than mere

The direct nature of Plaintiffs' claims is further supported by the pendency in this Court of *In re Helios Closed-End Funds Derivative Litigation*, No. 10-cv-2188 SHM (W.D. Tenn.), in which shareholders assert breach of fiduciary duty and other state-law claims on behalf of the Funds based on similar alleged misconduct.  Because direct and derivative actions are routinely brought side-by-side, the pendency of the derivative action tends to confirm that the claims here are direct in nature.  *See Smith Barney*, 2011 WL 350289, at *5 ("That Plaintiffs seek losses similar to those recoverable by the Smith Barney Funds in a derivative action does not deprive them of standing—direct and derivative actions based on the same underlying conduct are not mutually exclusive.") (citing cases); *In re Surebeam Corp. Sec. Litig.,* No. 03 CV 1721 JM (POR), 2004 WL 5036360, at *13 (S.D. Cal. June 3, 2005) ("The fact that Lead Plaintiffs' allegations could potentially state claims for corporate mismanagement or a breach of fiduciary duty does not negate the applicability of federal securities laws, if the statements in the Prospectus were materially false or misleading at the time they were made."); *Howard v. Haddad*, 916 F.2d 167, 170 (4th Cir. 1990) ("The mere fact that Howard and the FDIC are pursuing the same source of assets does not transform Howard's action to a derivative one.").[41] Plaintiffs' claims against all Defendants are properly asserted as direct and not derivative claims.

---

mismanagement."); *Atlas Worldwide*, 324 F. Supp. 2d at 494 n.11 ("The fact that plaintiffs have adequately alleged that the individual defendants made false or misleading statements also distinguishes this case from those where the court dismissed the plaintiff's claims because the allegations amounted to nothing more than corporate mismanagement. . . .  [A] plaintiff has alleged more than mere corporate mismanagement when he has adequately alleged that the defendant made false statements concerning historical facts.").

[41] Defendants' cited authority does not support dismissal.  The complaint in *Argiropoulos v. Kopp*, Civ. Action No. CCB-06-0769, 2007 WL 954747, at *4 (D. Md. Mar. 26, 2007), asserted a welter of state-law claims centering on breach of fiduciary duty, corporate waste, and unjust enrichment.  The court nonetheless recognized the difference between the claims that were direct versus derivative in nature, and dismissed only the latter group.  *Id.* at *6.  Plaintiffs in *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599 (S.D.N.Y. 2010), similarly asserted only state-law claims.  Defendants in *San Diego County Employees Retirement Ass'n v. Maounis*, No. 07 Civ. 2618 (DAB), 2010 WL 1010012, at *12-16 (S.D.N.Y. Mar. 15, 2010), did not contend, and the court did not find, that plaintiff's securities fraud claim should have been brought derivatively.  *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289-291 (7th Cir. 1981), concerned a lost tender offer opportunity and thus failed to allege substantial misconduct outside of corporate mismanagement, and the key alleged misrepresentations were immaterial.  The claims found to be derivative in *In re Charles Schwab Corp. Securities Litigation*, No. C 08-01510 WHA, 2009 WL 1371409, at *5-

**B.    This Court Should Not Follow the Alabama Supreme Court's Opinion in *Rice*, Which Was Based on Maryland Law**

Defendants attempt to relitigate this Court's conclusion in the Open-End Funds action that the Supreme Court of Alabama's unpublished decision in *Ex parte Regions Financial Corp.*, No. 1090425, 2010 WL 3835727 (Ala. Sept. 30, 2010) ("*Rice*"), does not support dismissal of Plaintiffs' federal securities claims.  MK Mem. at 49-51; *see Open-End Funds*, 2010 WL 5464792, at *5 (distinguishing *Rice* as, *inter alia*, "a separate suit with a separate complaint" making "only a general allegation of fraud").  Defendants' sole basis for this is their assertion that the Court was wrong to note that it was "impossible to compare [*Rice*'s] allegations to those presently before the Court" (*id.*), because Defendants had in fact submitted the *Rice* complaint to the Court as part of their reconsideration motion.  MK Mem. at 49-50 n.43.

Review of the entire *Rice* complaint confirms this Court's ruling that the Alabama Supreme Court's decision does not apply to actions in this Court, and certainly does not support a finding that the Complaint pleads inactionable mismanagement.  The *Rice* plaintiffs asserted sweeping violations of Tennessee, Alabama, Georgia, Florida and Illinois statutory law and Alabama common law, not the federal securities laws.  *See* Curley (Defs.) Decl. Ex. U (*Rice* Second Am. Compl.), ¶¶ 58-87; *cf. Rice*, 2010 WL 3835727, at *1 (inaccurately and suggestively describing claims as "multiple counts of securities fraud").  Accordingly, the Alabama Supreme Court was bound to apply Maryland law (the state of the Open-End Funds' incorporation) in determining whether the claims were direct or derivative in nature.  *Id.* at *3.  As discussed

---

6 (N.D. Cal. May 15, 2009), and *In re Goldman Sachs Mutual Funds Fee Litigation*, No. 04 Civ. 2567 (NRB), 2006 WL 126772, at *5-6 (S.D.N.Y. Jan. 17, 2006), were breach of fiduciary duty and other state-law claims or claims for violations of the 1940 Act.  Finally, in *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007), unlike here, the misstatements at issue merely alleged a failure to reveal managerial deficiencies. *See* MK Mem. at 48-49; Funds Mem. at 3-4.

above, this Court properly looks to federal precedent, however, in making this determination

with respect to the Complaint.  *See Smith Barney*, 2011 WL 350289, at *4.

Maryland law is strict on this issue:

> [W]hen the shareholders of a corporation suffer an injury that is
> distinct from that of the corporation, the shareholders may bring
> direct suit for redress of that injury; there is shareholder standing.
> When the corporation is injured and the injury to its shareholders
> derives from that injury, however, only the corporation may bring
> suit; there is no shareholder standing.  The shareholder may, ***at
> most***, sue derivatively, seeking in effect to require the corporation
> to pursue a lawsuit to compensate for the injury to the corporation,
> and thereby ultimately redress the injury to the shareholders.

*Rice*, 2010 WL 3835727, at *5 (quoting *Strougo v. Bassini*, 282 F.3d 162, 169-71 (2d Cir. 2002),

as construing Maryland law) (emphasis added); *see also id.* ("[H]arm to shareholders may flow

from injuries to a corporation's business or property, including those that decrease the value of

firm assets or otherwise impair the corporation's ability to generate profits.  Maryland law

nonetheless provides that in such circumstances, ***despite the harm to shareholders, the***

***corporation alone*** has a cause of action to recover for the injury asserted.") (emphasis added).

Accordingly, Maryland law effectively forecloses direct claims when a derivative claim

could conceivably be brought.  Federal decisions, in contrast, expressly note that "direct and

derivative actions based on the same underlying conduct are not mutually exclusive."  *Smith

Barney*, 2011 WL 350289, at *5.  In distinguishing *Rice*, this Court correctly cited *Surebeam* as

"noting that merely because the same allegations may support a derivative mismanagement claim

and a federal securities law claim does not mean that a plaintiff must bring one claim instead of

the other."  *Open-End Funds*, 2010 WL 5464792, at *5 (citing *Surebeam*, 2004 WL 5036360, at

*13).  Maryland law, however, does require a plaintiff to bring one claim instead of the other,

and that was the basis for the result in *Rice.  See Rice*, 2010 WL 3835727, at *6 ("[A]lthough the

shareholders appear to be therefore to be arguing that their claims must be direct claims because

they are fraud claims, under Maryland law, fraud claims may still be derivative claims if the alleged injury is to the corporation."). This Court was right the first time and should again decline to follow *Rice*.[42]

## IV.   PLAINTIFFS' EXCHANGE ACT CLAIMS SUFFICIENTLY PLEAD LOSS CAUSATION

### A.   Standards for Pleading Loss Causation

The Supreme Court explained in *Dura Pharmaceuticals, Inc. v. Broudo*, 554 U.S. 336 (2005), that the pleading rules for loss causation are "not meant to impose a great burden on a plaintiff," and that the Complaint need only plead "a short and plain statement," pursuant to Rule 8(a), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 346-47. "There is no heightened pleading standard for pleading loss causation." *Freudenberg*, 712 F. Supp. 2d at 202; *accord America Serv.*, 2009 WL 1348163, at *62 (Rule 8(a) standard applies to loss causation).

Loss causation is pleaded where plaintiffs allege facts showing that the misrepresentation or omission was "one substantial cause of the investment's decline in value." *In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 128 (4th Cir. 2009) (citation omitted), *rev'd on other grounds sub nom. Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. ___, No. 09-525, 2011 WL 2297762 (U.S. June 13, 2011). Loss causation may be shown by allegations that the share

---

[42] The cases Defendants cite as reaching similar conclusions as *Rice* (MK Mem. at 50-51) all involve very different circumstances than those here or are otherwise inapplicable. In *Anderson v. Aon Corp.*, 614 F.3d 361 (7th Cir. 2010), the court was addressing "holder" claims, which are inactionable under the federal securities laws, and the plaintiff plainly alleged that mismanagement induced him to hold onto the shares. *Id.* at 363; *see also Anderson v. Aon Corp.*, No. 06 C 6241, 2008 WL 5388321, at *1 (N.D. Ill. Dec. 22, 2008) ("Mr. Anderson did not include claims for securities fraud arising under federal or state securities laws"), *rev'd*, 614 F.3d 361 (7th Cir. 2010). In *Lubin v. Skow*, 382 F. App'x 866, 869 (11th Cir. 2010), a bankruptcy trustee brought an adversary proceeding alleging breach of fiduciary duties and negligence by the debtors' officers. The trustee alleged that mismanagement and risky lending practices materially encumbered the equity interests of the stockholders. *Id.* Last, the court in *In re Security Capital Assurance, Ltd. Securities Litigation*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010), found that certain "fraud by hindsight" allegations and puffery reflected claims of corporate mismanagement rather than actionable misrepresentation. As this Court found on similar allegations in the Open-End Funds action, Plaintiffs' claims here allege actionable misrepresentations based on then-known contrary facts.

price declined when material conditions concealed by the alleged fraud were revealed to the

market, or that defendants' fraud concealed material risks that ultimately manifested, causing a

decline in the share price.  *See America Serv.*, 2009 WL 1348163, at *62 ("The securities

plaintiff must allege that the misrepresentations or concealment 'made its way into the market' or

became 'generally known' to the market and thereby caused a company's stock price to

decline.") (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)); *see also*

*Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 920 (6th Cir. 2007).  As with other

elements of Plaintiffs' claims, the well-pleaded factual allegations supporting loss causation must

be taken as true, together with all reasonable inferences flowing therefrom.  *See Tellabs*, 551

U.S. at 322.

### B.    The Complaint Alleges Corrective Disclosures Resulting in Declines in the Funds' Share Prices

#### 1.    Correction of the Fund's NAVs

Defendants limit their loss causation challenge essentially to arguing about the substance

of some, but not all, of the alleged corrective disclosures, and pointing out the unremarkable fact

that some of the disclosures coincided with the ill-defined "global credit crisis."  *See* MK Mem.

at 51-55; RFC Mem. at 12.  Because Plaintiffs sufficiently allege that "after the Funds made

certain disclosures, the value of the Funds' shares substantially declined," and the Complaint

raises "an inference that the Defendants' partial disclosures were a substantial reason for those

declines," *Gosselin*, 2009 WL 5064295, at *7, Defendants' arguments fail.

The essential allegations of the Complaint are that Defendants' misrepresented the

overall level of risk in the Funds' portfolios and materially misstated the Funds' NAVs.  *E.g.*,

¶¶ 21-22, 137-142, 161-171, 204, 229-230, 254-255.  The Funds, like all mutual funds, published

their NAVs each trading day.  While the prices of the Funds' shares could trade at a premium or

discount to NAV, such trading prices closely correlated with and were causally connected to

NAV throughout the Class Period:



¶¶ 67, 81-82.

Like a company's report of periodic earnings, publication of NAV measures

performance.  Each day's publication of the Fund's NAV was a material representation of that

Fund's value and investment risk.  Additionally, NAV was directly linked to the market value of

the security.  Defendants made multiple representations, among others, that the Funds were

invested in portfolios properly diversified "among many different asset sectors that provide

stability and income beyond the performance of a single sector."  ¶¶ 186, 207, 210.  By reporting

NAVs that were artificially supported, Defendants were able to create a false impression that the

values of the Funds' assets were relatively stable.  As the market began to learn that NAVs had

been overstated,[43] however, the Funds' share prices crashed, and Class members suffered

$1 billion in losses as of the end of 2007 alone.  ¶¶ 29, 81-82, 262.  Each day's setting of a new,

---

[43] *E.g.*, ¶ 266 (August 14, 2007 disclosure that Funds retained an "independent valuation consultant" to correct the fair values of certain portfolio securities).

lower, corrected NAV for each Fund was a corrective disclosure, further informing the market of the prior overstatements of portfolio asset values and misrepresentations of NAV, and leading to further declines in share prices.  ¶¶ 81, 169-170, 262-293.

### 2.    Other Corrective Disclosures

Defendants argue that all of the alleged corrective disclosures are merely "confirmatory" in nature because they provided no new information to the market.  *See* MK Mem. at 53-54.  In support, Defendants cherry-pick a subset of disclosures, most notably the revelation in August 14, 2007 Form 8-K reports that the Funds had hired an "independent valuation consultant" to determine the fair value of certain of the Funds' portfolio securities.  ¶ 266.  Defendants do not dispute that this disclosure was new, however, and instead simply disagree with Plaintiffs' allegation that it effectively revealed that the Funds' internal accounting and valuation processes—the processes that resulted in the daily misrepresentation of NAV—were false and inadequate.  ¶ 267; *see* MK Mem. at 53.

Indeed, logic dictates that the retention of an independent valuation consultant was anything but confirmatory.  Defendants claimed throughout the Class Period that they were experienced and expert at valuing their portfolio holdings.  ¶¶ 202, 219, 221, 252.  If the drop in NAV were simply attributed to a change in the overall economy, Defendants surely had the expertise to re-value NAVs accordingly.  The more plausible inference raised by Defendants' retention of an independent valuation consultant, *i.e.*, an expert, is that the NAV had been previously misstated.  Moreover, Defendants do not dispute that the Funds' shares fell very significantly, in the range of 14% to 17%, on this disclosure.  ¶ 267.

Defendants also suggest that to support loss causation, an alleged corrective disclosure must "reveal fraud" or "mention any alleged fraudulent practices."  MK Mem. at 53; *see also* RFC Mem. at 12.  Courts have repeatedly rejected this "fact-for-fact" pleading requirement for

loss causation, and it is not the law in this Circuit.  *See America Serv.*, 2009 WL 1348163, at *61-62 (rejecting argument that plaintiffs cannot recover losses resulting from stock drops following earnings announcements where "neither of these announcements revealed to the market any of the alleged fraudulent practices"); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (rejecting as incorrect defendant's theory that "a fraud causes a loss only if the loss follows a corrective statement that specifically reveals the fraud").[44]

Defendants also dispute the significance of Kelsoe's partially corrective disclosure, in a November 7, 2007 shareholder letter, that a "large portion" of the Funds' portfolios are invested in structured finance securities, and that "it is a fair assumption to say that the weakness in the portfolios relates to this area of investment."  ¶ 277; *see* MK Mem. at 54.  Defendants claim that the Funds always disclosed their portfolio holdings but, as discussed above, investors were entirely unaware of the true value of those assets, the overconcentration of high-risk assets, or

---

[44] *See also Katyle v. Penn Nat'l Gaming Inc.*, 637 F.3d 462, 472 (4th Cir. 2011) (rejecting "fact-for-fact" theory); *Daou*, 411 F.3d at 1026 (rejecting argument that plaintiffs did "not allege that there were any negative public statements, announcements or disclosures at the time the stock price dropped that Defendants were engaged in improper accounting practices."); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (rejecting "rigid and dogmatic" interpretation: "*Dura* did not address what types of events or disclosures may reveal the truth.  Nor did *Dura* explain how specific such disclosure must be.") (citation omitted); *In re Winstar Commc'ns*, No. 01 Civ. 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) ("*Dura* did not set forth any . . . requirement that the disclosure take a particular form or be of a particular quality."); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("[T]he Supreme Court stopped short of requiring plaintiffs to prove that they sold after a complete, corrective disclosure resulting in a large price decline.  Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures."); *In re ICG Commc'ns, Inc. Sec. Litig.*, No. 00 CV 01864, 2006 WL 416622, at *10 (D. Colo. Feb. 7, 2006) ("The law does not require the plaintiffs to allege that ICG disclosed every fine detail of the alleged manipulation of ICG's revenue to establish that the manipulations caused the plaintiff's losses.").

The "fact-for-fact" theory found support for a short time in the Fifth Circuit, requiring plaintiffs to plead a stock price decline that followed a corrective disclosure that was a "mirror image" of alleged misleading statements.  The Fifth Circuit ultimately retreated from this position, however, recognizing that it gave defendants too much control to avoid liability for securities fraud by simply lying about the reasons for an event that caused a stock drop, then coming clean much later after the share price had already been corrected to reflect the anticipated impact of the event on a company's financial condition.  *See Flowserve*, 572 F.3d at 230; *accord Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 337 & n.26 (5th Cir. 2010) (*cited in* MK Mem. at 52-53), *rev'd on other grounds sub nom. Erica P. John Fund, Inc. v. Halliburton Co.*, 79 U.S.L.W. 4416 (June 6, 2011) (holding that loss causation need not be proven to obtain class certification).

the degree of credit risk to which they were exposed. Further, the Funds' shares suffered

material declines as a result of Kelsoe's disclosure. ¶ 278.

Defendants also contend that the Funds' December 5, 2007 disclosure that "[a]t any

available opportunity, we are attempting to reposition the Fund[s'] portfolio with a preference for

safer, more liquid assets in order to create some stability in the Fund[s'] net asset value," ¶ 280,

merely confirmed the fact that the Fund had suffered losses. MK Mem. at 54. To the contrary,

this disclosure suggested to the market that the Funds' NAVs were not accurate and that they

were overleveraged in risky, illiquid assets, and resulted in material share price declines for at

least three of the Funds. ¶ 281.[45]

And Defendants leave several corrective disclosures unmentioned, including:

- The July 20, 2007 article in *The International Herald Tribune* titled "Loan Defaults Hit Kelsoe Hard," stating that one of the Kelsoe funds "is the worst in its class" and "the one real big exception" in terms of its significant ownership of subprime MBS (¶ 263);

- The August 11, 2007 article in *The Commercial Appeal,* quoting a Morningstar analyst's comment that "Jim Kelsoe runs the fund[s] in a manner that is very, very different than his high-yield bond fund peers" (¶ 265);

- The December 16, 2007 article in the *Boston Herald*, titled "More Who Deserve Lumps of Coal for Blunders This Year," singling out Kelsoe as "The Lump of Coal (Mis)Manager of the Year," and noting that his "funds had an impressive record, which attracted a

---

[45] Defendants argue in conclusory fashion that the share price declines alleged in response to corrective disclosures demonstrate "correlation" rather than causation. MK Mem. at 54. The Complaint alleges, however, that the share price declines occurred "as a result" of the particular corrective disclosure. ¶¶ 264, 267, 274, 276, 278, 281, 284, 288; *see also Regions Fin.*, 2011 U.S. Dist. LEXIS 60761, at *33 (plaintiffs sufficiently alleged causal nexus where the "drop followed closely after the . . . disclosure"). In *In re NVIDIA Corp. Securities Litigation,* No. 08-CV-04260-RS, 2010 WL 4117561 (N.D. Cal. Oct. 19, 2010), cited by Defendants, the court was persuaded (prematurely) that a stock drop following an announcement of disappointing earnings and a large charge to the company's financial statements was more likely caused by the earnings news than the charge. This result, on a motion to dismiss, is directly at odds with *In re Daou Systems, Inc. Securities Litigation*, 411 F.3d 1006 (9th Cir. 2005), in which the Ninth Circuit found that a stock drop following an earnings miss was sufficiently causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned. *Id.* at 1026 (citing *Dura*, 544 U.S. at 347); *cf. America Serv.*, 2009 WL 1348163, at *61 (loss causation sufficiently pleaded for stock drops "following earnings announcements").

lot of investors who didn't find out until this past summer just how
he did it." (¶ 282);

- The April 23, 2008 article in *The Commercial Appeal* quoting a
  Morningstar analyst's comment that "RMK ultimately showed it
  didn't have the risk controls needed to protect investments *[sic]*
  from securities that could hurt them." (¶ 290); and

- RFC's July 15, 2009 Form 8-K disclosing that Morgan Keegan,
  MAM, and three employees received a "Wells" notice indicating
  the SEC's intention to bring enforcement actions for violations of
  the federal securities laws (¶ 292; *see In re HiEnergy Techs., Inc.
  Sec. Litig.*, No. CV 04-1226 DOC (JTLx), 2005 WL 3071250, at
  *4 (C.D. Cal. Oct. 25, 2005) (allegation of stock drop when
  company disclosed SEC's issuance of Wells notice pleaded
  sufficient causal relationship under *Dura*)).[46]

These corrective disclosures and resultant share price declines support a finding that loss
causation is sufficiently pleaded.

Finally, Defendants attempt to use the "global credit crisis" to shield themselves from
liability, contending that every penny of decline in the Funds' shares during the Class Period was
caused by the collapse of the ABS and MBS markets and other unspecified macroeconomic
factors. *See* MK Mem. at 54-55. This argument must fail. Recognizing the "tangle of factors
affecting price," *Dura*, 544 U.S. at 343, and the notice-pleading standard applicable to loss
causation, *see id.* at 346, courts have made clear that "[t]he facts alleged in the complaint . . .
need not conclusively show that the securities' decline in value is attributable solely to the
alleged fraud rather than to other intervening factors." *Mutual Funds*, 566 F.3d at 128; *see also
America Serv.*, 2009 WL 1348163, at *63 ("[T]he Court agrees . . . that 'it is possible for more

---

[46] Defendants argue that corrective disclosures that reference the Open-End Funds managed by Kelsoe cannot
support loss causation here. *See* MK Mem. at 52 n.44. As alleged in the Complaint, however, because the Closed-
End and Open-End Funds had same managers and investment objectives, and there was high correlation among
portfolio securities in which all these funds were invested, public information that ostensibly related to one fund also
affected the share prices of other funds. ¶ 261. Indeed, the (Closed-End) Funds suffered material declines following
a news article that specifically referenced the Open-End Funds only, ¶ 273, and the Open-End and Closed-End
Funds all collapsed essentially in tandem. Moreover, while Defendants criticize Plaintiffs' "buy the manager"
theory that further supports these allegations, they do not dispute that the Funds (including the Open-End Funds)
were marketed in this fashion. ¶¶ 257-260.

than one cause to affect the price of the security and . . . a trier of fact can determine the damages attributable to the fraudulent conduct.'") (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)).[47]

Consistent with these holdings, courts routinely reject Defendants' "blame the economy" argument at the pleading stage.  *See Countrywide*, 588 F. Supp. 2d at 1173-74 ("It is not the Court's role [on a motion to dismiss] to speculate on the causes of the current economic situation . . . .  It will be the fact-finder's job to determine which losses were proximately caused by [the] misrepresentations and which are due to extrinsic or insufficiently linked forces.  The Court will not be distracted by liquidity versus solvency and other macroeconomic arguments."); *In re 2007 Novastar Fin., Inc.*, No. 07-0139, 2008 WL 2354367, at *1 (W.D. Mo. June 4, 2008) ("While the Court can take judicial notice of the fact that the Company's industry suffered reversals, the Court cannot take judicial notice of the impact of those industry-wide reversals on the Company."); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price of StockerYale shares raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal.").[48]

---

[47] *See also Daou*, 411 F.3d at 1025 (plaintiff not required to show "that a misrepresentation was the *sole* reason for the investment's decline in value"; "[a]s long as the misrepresentation is one substantial cause . . . other contributing forces will not bar recovery under the loss causation requirement"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000) ("So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and its subsequent decline in value, other contributing forces will not bar recovery.").

[48] *See also In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1065-66 (C.D. Cal. 2008) ("Independent of any turmoil in the capital markets, the widespread violations of underwriting standards, as alleged, would significantly raise the risk of loan default.  When combined with what Plaintiffs allege are misrepresentations concerning the quality of Countrywide's loans, these underwriting issues would ultimately undermine confidence in the secondary market for Countrywide products."); *Winstar*, 2006 WL 473885, at *16 (argument that "intervening events, including the collapse of the telecommunication sector, broke the chain of causation" could not be resolved on motion to dismiss); *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 115-16, 123 (S.D.N.Y. 2004) (rejecting defendants' argument that "the market's overall disenchantment with telecommunications stock was the intervening cause responsible for plaintiffs' losses" where defendants allegedly "pump[ed] up the very bubble that then predictably collapsed"); *Stumpf v. Garvey*, No. 03-1352, 2005 WL 2127674, at *13 (D.N.H. Sept. 2, 2005) ("Even if, as defendants maintain, there had been an intervening event that interrupted the chain of causation, such a

In addition to the alleged corrective disclosures, the performance of the Funds in comparison to 35 non-RMK closed-end, high-yield bond funds during 2007 and 2008 tends to support causation in any event.  As alleged in the Complaint, comparison of a $100 investment in the Funds versus the 35 non-RMK funds dramatically illustrates how the Funds collapsed and continued to slide beginning in the summer of 2007 while the value of the non-RMK funds generally held up until the fall of 2008, when the credit crisis arguably was at its height:



¶¶ 169-170 & n.27.  Defendants cannot establish that an external market decline caused all of the Funds' staggering losses when other high-yield bond funds did not fall significantly until the Fall of 2008, after the Funds had already lost nearly all their value.  *See also* ¶ 285 (*Memphis Flyer* article noting that Funds "are 'worst in class' at a time when the phrases 'credit crisis' and 'subprime lending' have become household words . . . .  In 2007, the funds lost 50 percent or more of their value, while other funds in their peer group either had positive returns or losses of 8 percent or less"); *Bear Stearns*, 2011 WL 223540, at *68 ("[T]he Securities Complaint has

---

determination is . . . not to be decided here on a Rule 12(b)(6) motion to dismiss."); *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004) ("It is not Plaintiffs' burden to prove loss causation in the pleadings.  The bulk of Defendants' arguments speak to the merits of the case and turn on competing factual assertions not appropriate for weighing at this stage of the proceedings.") (internal citation omitted).

alleged that the banking indices were relatively stable during this period and did not share in the stock price decline seen at Bear Stearns.  Furthermore, at the motion to dismiss stage, the Securities Complaint need not rule out all competing theories for the drop in Bear Stearns' stock price; that is an issue to be determined by the trier of fact on a fully developed record.").[49]

### C.   The Complaint Also Alleges That Plaintiffs' Losses Were the Result of the Materialization of Concealed Risks

Even were the Court to rule that the Complaint insufficiently pleads loss causation on a corrective disclosure and price decline theory, "[l]oss causation . . . is not limited to the common 'corrective disclosure-price drop' scenario."  *Charles Schwab*, 257 F.R.D. at 547 (rejecting argument that misstatements could not cause decline in mutual fund's share price because NAV is determined solely by assets in fund's portfolio); *see Dura*, 544 U.S. at 346 (declining to consider "proximate cause or loss-related questions" other than inflation-disclosure-deflation scenario).  As noted above, a plaintiff may also establish loss causation by alleging "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered; that defendants misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of the security."  *Charles Schwab*, 257 F.R.D. at 547 (quoting *Lentell*, 396 F.3d at 173, 177); *see also Brown*, 481 F.3d at 920 (causation satisfied by allegation that defendant "concealed the circumstances that bear upon the loss such that [plaintiffs] would have been spared all or an ascertainable portion of that loss absent the fraud") (quoting *Lentell*, 396 F.3d at 175); *America Serv.*, 2009 WL 1348163, at *62.

---

[49] Defendants argue that certain corrective disclosures specifically attribute the Funds' losses to the credit crisis.  *See* MK Mem. at 55.  Defendants quote a snippet of an October 17, 2007 *Wall Street Journal* article stating that "Kelsoe, like other investors with subprime holdings, had difficulty figuring out what the investments were worth."  ¶ 275.  The article, however, partially disclosed that Kelsoe's Funds were heavily invested in the lowest-priority tranches of ABS tied to subprime mortgages (noting that "the B-3 tranche was so sensitive to losses, its market price plunged"), indicated that the Funds' holdings were dependent on the credit of subprime borrowers rather than companies, and was followed by material declines in the Funds' share prices.  ¶¶ 275-276.

In other words, loss causation can be established when the loss is caused by the materialization of the concealed risk.

The Complaint alleges that Defendants materially misrepresented the overall level of risk in the Funds' portfolios. *E.g.*, ¶¶ 22-22, 137-142, 161-171, 254-255. Defendants made multiple representations, among others, that the Funds were invested in portfolios broadly diversified "among many different asset sectors that provide stability and income beyond the performance of a single sector," when the portfolios were glutted with huge amounts of low-priority ABS tied to subprime mortgages.[50] These representations of proper diversification, as well as representations misclassifying a material portion of the Funds' ABS assets as corporate bonds or preferred stock hid the substantially greater and different risks inherent in the huge amounts of low-priority ABS, and failed to disclose the high degree of risk to which investors were unwittingly exposed. ¶¶ 195-196, 205-206, 217-218, 227-228, 234-250. In mid-2007, the music stopped and the realization of these risks finally came to fruition.[51] As the market began to learn that the risks associated with the Funds were far greater than Defendants had disclosed, the

---

[50] ¶¶ 186-189, 191-193, 207-208, 210-211, 213-215, 224-225, 252-253, 256.

[51] *See* ¶ 263 (July 20, 2007 article observing that "Kelsoe, a top-ranked junk bond fund manager since 2000, dropped to last place this year because of losses tied to mortgages for people with poor credit," and that an open-end fund he manages with a similar portfolio "ranks last of 93 high-yield rivals and it was the eighth-worst performer this year of more than 550 U.S.-based bond funds," is a "big exception," and "worst in its class"); ¶ 265 (August 11, 2007 article observing that "Kelsoe runs the fund[s] in a matter that is very, very different than his high-yield bond fund peers"); ¶ 266 (August 14, 2007 disclosure that Funds retained an "independent valuation consultant" to correct the fair values of certain portfolio securities); ¶ 268 (August 16, 2007 article observing that shares of the Funds have fallen victim to "the same type of investments that hurt their open-end cousins—subprime mortgages" and noting that the Funds were trading at a premium to NAV before the credit crisis, "a very unusual situation for a closed-end fund"); ¶ 273 (October 15, 2007 article observing that "[t]he High Income Fund, the worst-performing junk bond fund for the one-, three- and five-year performance periods, is down 35% year to date."); ¶ 280 (December 5, 2007 disclosure that Funds "are attempting to reposition the . . . portfolio with a preference for safer, more liquid assets in order to create some stability in the . . . net asset value and to provide as much income as possible"); ¶ 285 (*Memphis Flyer* article noting that Funds "are 'worst in class' at a time when the phrases 'credit crisis' and 'subprime lending' have become household words . . . . In 2007, the funds lost 50 percent or more of their value, while other funds in their peer group either had positive returns or losses of 8 percent or less"); *see also* ¶ 261 (alleging overlap and correlation between Closed-End and Open-End Funds).

Funds' NAVs and share prices crashed, and Class members suffered $1 billion in losses as of the end of 2007 alone.  ¶¶ 29, 81-82, 262.

Courts have accepted this loss causation theory in recent decisions upholding complaints alleging similar misconduct and false statements by mutual fund companies.  The plaintiffs in *Charles Schwab* alleged that a short-term fixed-income mutual fund took on significantly greater and undisclosed risk by concentrating an increasing portion of its portfolio in riskier assets like ABS and MBS, and that the fund mispriced certain of its assets and thus overstated the value of its portfolio holdings.  257 F.R.D. at 542-43.  The court rejected defendants' argument, in challenging Securities Act claims, that plaintiffs could not establish loss causation on the face of the complaint:

> Here, plaintiffs certainly alleged that the ***subject*** of the fraudulent statements caused their losses—that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses.  Similarly, if defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses.

*Id.* at 547; *see also Rafton*, 2011 WL 31114, at *11 ("Plaintiffs have plausibly alleged loss causation inasmuch as Plaintiffs allege that their loss in this case was caused, or exacerbated by, the 'materialization' of the concealed/ undisclosed risk that holding the Fund for longer than one day would inevitably lead to a failure of the Fund to track the inverse performance of the 30-year U.S. Treasury Bond."); *Evergreen*, 705 F. Supp. 2d at 89-90 ("Eventually . . . the true risks presented by the Fund's assets (which were apparently unknown to the investing public during the Class Period), materialized, resulting in the repricing of the Fund's assets . . . and significant losses to the Fund's investors.").  This reasoning is equally applicable to Plaintiffs' Exchange Act claims.

## V.   PLAINTIFFS NEED NOT PLEAD LOSS CAUSATION
##      WITH RESPECT TO THEIR SECURITIES ACT CLAIMS

Contrary to Defendants' assertions, Plaintiffs need not plead loss causation as part of

their *prima facie* case under Sections 11 or 12(a)(2) of the Securities Act.  *See Indiana State*

*Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d

935, 947 (6th Cir. 2009) (reversing dismissal of Section 11 claim where district court

affirmatively found "lack of loss causation").[52]  While Defendants may raise negative causation

as an affirmative defense, courts—including this Court in the Open-End Funds action—generally

will not dismiss Securities Act claims on that ground at the pleading stage.  *See Open-End*

*Funds*, 743 F. Supp. 2d at 760 ("Loss causation is not an element of a § 11 claim; it is an

affirmative defense unsuitable for adjudication in a motion to dismiss.") (citing *Indiana State*

*Dist. Council*, 583 F.3d at 947), *reconsideration denied*, 2010 WL 5464792, at *5 (reiterating

that loss causation on a Section 11 claim "is an affirmative defense that the Defendants must

***prove***.") (emphasis in original).[53]

Defendants argue nonetheless that every penny of decline in the Funds' share prices was

caused solely by the "credit and financial crisis," thus severing any link between Defendants'

alleged misstatements and Plaintiffs' losses.  MK Mem. at 56.  Defendants have a heavy burden

---

[52]  Defendants also assert misleadingly that "[i]n the PSLRA, Congress added an express loss causation provision to the 1933 Act."  MK Mem. at 55 (citing *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 588 (S.D.N.Y. 2006)).  The provision added by the PSLRA to the Securities Act, Section 12(b), places the burden upon the defendant to prove that plaintiff's losses resulted from factors other than the false prospectus or oral communication, and mirrors Section 11(e) in this regard.  *See Salomon Smith Barney*, 441 F. Supp. 2d at 588 n.7 (quoting 15 U.S.C. § 77*l*(b)); 15 U.S.C. § 77k(e).

[53]  *See also In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("While a defendant may be able to prove this 'negative causation' theory, an affirmative defense may not be used to dismiss a plaintiff's complaint."); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Sections 11 and 12, the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion."); *Gosselin*, 2009 WL 5064295, at *7 (where complaint did not "suggest negative causation," defendants "will have to rely on a negative causation argument, if appropriate, at a later stage in the litigation").  *Rauch v. Day & Night Manufacturing Corp.*, 576 F.2d 697, 702 (6th Cir. 1978), cited in MK Mem. at 56 n.45, is not to the contrary.  There, the court ruled that a statute of limitations defense could be raised in a Rule 12(b)(6) motion to dismiss where the complaint plainly was time-barred on its face.  Negative causation requires a more searching inquiry, one ill-suited to a motion to dismiss.

in seeking to establish this now.  *See Flowserve*, 572 F.3d at 234 (on summary judgment motion, defendants bore "heavy" burden "to prove that *no* reasonable juror could believe that *any portion* of [Plaintiffs'] losses was caused by the defendants' alleged misrepresentations . . . . This poses quite a different question than the one posed by the loss-causation issue under the Exchange Act.") (emphases added).

As discussed in Part IV above, Defendants are incorrect when they assert that all of the corrective disclosures link the share price declines and other problems at the Funds strictly to macroeconomic factors, and such share declines were caused at least in substantial part by the materialization of the severe investment risks Defendants concealed.  And, as also discussed above, the performance of the Funds in comparison to 35 non-RMK closed-end, high-yield bond funds during 2007 and 2008 tends affirmatively to show causation.  *See Bear Stearns*, 2011 WL 223540, at *68 (complaint need not rule out competing theories for stock drop, and these theories raise issues of fact).  Finally, Defendants' "blame the credit crisis" argument only raises factual issues that cannot be resolved now.  Because Defendants cannot establish negative causation on the face of the Complaint, Plaintiffs' Securities Act claims should be upheld.

## VI.   PLAINTIFFS' CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934 ARE TIMELY ASSERTED

### A.   Plaintiffs' Exchange Act Claims Are Timely With Respect to Purchasers of RMH, RSF, and RMA

Plaintiffs' Exchange Act claims were timely filed on behalf of all purchasers of RMH, RSF, and RMA within the Class.  Claims under Sections 10(b) and 20(a) are subject to a two-year limitations period.  *See Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798 (2010) ("[T]he [two-year] limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a

reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first.").

The first class action complaint asserting Section 10(b) and 20(a) claims on behalf of RMH, RSF, and RMA investors was *DeJoseph*, No. 08-cv-2212, filed on April 4, 2008. *DeJoseph* remained pending for nearly two years until it was voluntarily dismissed on February 18, 2010. *See* Dkt. No. 83 in No. 08-cv-2212 (entered Feb. 18, 2010). On April 8, 2010, the *Jones* complaint, No. 10-cv-2248, was filed asserting Exchange Act claims on behalf of investors in the same three Funds. *See also* MK Mem. at viii (chart of consolidated actions).

Under the doctrine established in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), and *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 351-54 (1983), the filing of *DeJoseph* tolled the two-year limitations period from April 4, 2008 through February 18, 2010. *See*, *e.g.*, *Sawyer v. Atlas Heating & Sheet Metal Works, Inc.*, 731 F. Supp. 2d 850, 852-53 (E.D. Wis. 2010) (tolling limitations period for a subsequent class action during pendency of prior class action that was voluntarily dismissed); *see also* Part VI.A.2 below. Taking into account the seven-week gap between the date *DeJoseph* was voluntarily dismissed and the date *Jones* was filed, the relevant date for accrual of these claims is May 23, 2006, which is two years less seven weeks before *DeJoseph* was filed.

Because, as discussed in Part VI.B below, a reasonably diligent plaintiff would not have discovered the facts constituting the Exchange Act violations before May 23, 2006, the Exchange Act claims asserted in the Complaint were timely filed with respect to all Class members who purchased RMH, RSF, and RMA.

1.    ***American Pipe* Tolling Applies
       to Subsequently Filed Class Actions**

Relying solely on *Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988), Defendants argue that

Plaintiffs' Exchange Act claims are time-barred because the *DeJoseph* complaint would have

tolled the limitations period only for subsequently filed individual actions, not class actions.  MK

Mem. at 12-13.

"*Andrews* cannot be read as broadly as the Defendants urge," however.  *In re Vertrue*

*Mktg. & Sales Practices Litig.*, 712 F. Supp. 2d 703, 712 (N.D. Ohio 2010).  Rejecting the

argument Defendants make here, district courts within this Circuit have read *Andrews* to hold

that a class action complaint can and does toll the statute of limitations for a subsequent class

action where, as here, there has been no determination as to class certification.  *Id.*; *see also In re*

*AEP ERISA Litig.*, No. 03-cv-067, 2009 WL 614951, at *5 (S.D. Ohio Mar. 6, 2009) ("*Andrews*

is not controlling" where there has been no determination as to class certification or otherwise

rendering class action treatment improper).  Indeed, in *Andrews*, the Sixth Circuit relied

principally upon *Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir. 1987), which explained that "the

Supreme Court . . . did not intend to afford plaintiffs the opportunity to argue and reargue the

question of class certification by filing new but repetitive complaints."  In both of the other cases

on which the Sixth Circuit rested its decision, the district court similarly was faced with a

subsequent class action after it previously had denied class certification.  *See Salazar-Calderon*

*v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1350 (5th Cir. 1985), and *Robbin v. Fluor*

*Corp.*, 835 F.2d 213, 214 (9th Cir. 1987).

This limitation of *Andrews* makes eminent sense because "[t]here is a clear distinction

between the subsequent filing of an otherwise stale class action where a prior court has already

ruled that class certification is improper and one where no court has spoken on the class

72

certification issue." *Vertrue*, 712 F. Supp. 2d at 712-13.  That is, the rule prevents a putative

class from getting a second bite at the class certification apple while ensuring at the same time

that the class gets a first bite.

Decisions by other Circuit Courts further demonstrate "a trend towards allowing the use

of the class vehicle, at least in certain circumstances, where a previous court has not made a

'definitive' determination regarding the propriety of class certification."  *Vertrue*, 712 F. Supp.

2d at 712.  The Ninth Circuit has held that when a new class action is not simply an attempt to

re-litigate the correctness of an earlier decision to deny class certification, or an attempt to

correct a procedural deficiency in an earlier would-be class, a new class action may receive

*American Pipe* tolling.  *See Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1147-49 (9th Cir.

2000) (en banc).

The Third Circuit applies *American Pipe* to toll subsequent class actions even where the

subsequent action seeks to cure a procedural deficiency in the earlier class.  In *Yang v. Odom*,

392 F.3d 97 (3d Cir. 2004), the named plaintiff was not an adequate class representative, and a

subsequent class action proffered a different class representative.  The Third Circuit held:

> Drawing the line arbitrarily to allow tolling to apply to individual
> claims but not to class claims would deny many class plaintiffs
> with small, potentially meritorious claims the opportunity for
> redress simply because they were unlucky enough to rely upon an
> inappropriate lead plaintiff.  For many, this would be the end
> result, while others would file duplicative protective actions in
> order to preserve their rights lest the class representative be found
> deficient under Rule 23.  Either of these outcomes would run
> counter to the policy behind Rule 23 and, indeed, to the reasoning
> employed by the Supreme Court in *American Pipe* and *Crown,
> Cork & Seal.*

*Id.* at 111; *see also Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 1337684, at *4 (N.D. Ill.

Mar. 31, 2010) (following *Yang*); *Cullen v. Margiotta*, 811 F.2d 698, 721 (2d Cir. 1987)

(assuming without deciding that *American Pipe* tolling applies to claims asserted in a successor class action).

Because this Court has not issued any ruling respecting class certification in *DeJoseph*, *Jones*, or any of the other consolidated Closed-End Fund cases, Plaintiffs are "in a fundamentally different posture from plaintiffs in cases in which subsequent class actions were not allowed." *Catholic Soc. Servs.*, 232 F.3d at 1149.[54]  Accordingly, the running of the statute of limitations was tolled by the filing of the *DeJoseph* complaint until February 18, 2010, and was again tolled from April 8, 2010, when the *Jones* complaint was filed, through the filing of the Consolidated Amended Complaint.

### 2.   *American Pipe* Tolls the Statute of Limitations During the Pendency of a Voluntarily Dismissed Complaint

Defendants contend that even if *American Pipe* tolling applies to subsequently filed class actions, the Court nonetheless should not apply tolling to the *DeJoseph* complaint because it was voluntarily dismissed.  MK Mem. at 14.  Such a result, however,

> would totally undermine the *American Pipe* doctrine because unnamed class members have no control over whether the named plaintiff decides to abandon the suit.  If [Defendants'] argument were accepted, the unnamed class members would be encouraged

_____

[54]  *See also Kandel v. Brother Int'l Corp.*, No. 08-1040, 2009 U.S. Dist. LEXIS 105242, at *10 (C.D. Cal. May 12, 2009) (applying *American Pipe* tolling to successive class action where no certification decision was made in the first class action; "[s]equential class actions . . . do not raise statute of limitations related concerns."); *Gomez v. St. Vincent Health, Inc.*, 622 F. Supp. 2d 710, 717 (S.D. Ind. 2008) ("Nothing in the Supreme Court's reasoning [in *American Pipe* and *Crown, Cork*] is limited to individual suits as distinct from fresh attempts to certify a class.  The Court's broad language seems to encourage tolling regardless of differences in procedures . . . ."); *In re National Australia Bank Sec. Litig.*, No. 03-6537, 2006 WL 3844463, at *4 (S.D.N.Y. Nov. 8, 2006) ("The Supreme Court's *American Pipe* tolling rule is designed to protect the interests of class members who are not only entitled, but encouraged, to rely on the class representative's claim up until and through class certification."); *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, No. 00-7804, 2002 WL 31132906, at *4 (S.D.N.Y. Sept. 25, 2002) ("Since there was not a 'definitive' determination of class certification in the First Action, the tolling doctrine of *American Pipe* does indeed apply and plaintiffs may proceed with this [class] action."); *In re Crazy Eddie Sec. Litig.*, 802 F. Supp. 804, 813 (E.D.N.Y. 1992) ("[A] second class action would not be an attempt to relitigate the question of class certification by filing repetitive claims"); *Schur v. Friedman & Shaftan, P.C.*, 123 F.R.D. 611, 613 (N.D. Cal. 1988) (finding class members entitled to *American Pipe* tolling where no determination on class certification in the first action and therefore that plaintiff was "not attempting to relitigate an unsuccessful class certification motion").

> to file their own lawsuits to ensure that their claims are not deemed untimely in the event that the named plaintiff elects to voluntarily dismiss the class's claims.  Yet, the whole point of *American Pipe* is to allow unnamed class members to rely on the pending class action in lieu of filing their own protective lawsuits.  Thus, the tolling rule applies even though [Plaintiff] voluntarily dismissed the prior class action.

*Sawyer*, 731 F. Supp. 2d at 853.[55]

Defendants' cited authority on this point (MK Mem. at 14) is unavailing.  In particular, Defendants' quotation from *Great Plains Trust Co. v. Union Pacific Railroad Co.*, 492 F.3d 986, 997 n.3 (8th Cir. 2007), that "a dismissal without prejudice and a voluntary dismissal . . . does not include the typical circumstances that trigger the *American Pipe* rule," omits the critical next sentence in that footnote: "We decline to determine whether this fact is material, however, in light of the application of the Kansas savings statute."  *Id.*  Indeed, the court expressly acknowledged in the same footnote that *American Pipe* will toll the statute of limitations for subsequent class actions where there has been no class certification determination.  *See id.* ("Whether the *American Pipe* rule applies to subsequent class actions, however, depends on the reasons for the denial of certification of the predecessor action.") (citing *Yang*, 392 F.3d at 111, and *Catholic Soc. Servs.*, 232 F.3d at 1149).

Defendants also cite *AEP*, 2009 WL 614951, at *5, in asserting that *American Pipe* tolling is inapplicable "after the dismissal of an earlier action."  MK Mem. at 14.  Like *Great Plains Trust*, *AEP* is inapposite because the court there was confronted with a motion to intervene after class certification had been denied.

---

[55] *See also Employers-Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 925 (9th Cir. 2007) (*American Pipe* tolling applies to subsequent class action where prior class action was voluntarily dismissed); *Searcy*, 2010 WL 1337684, at *4 (same); *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, No. 07cv62/MCR, 2008 WL 2385506, at *3 n.8 (N.D. Fla. June 9, 2008) (rejecting argument that tolling should not be available "because the prior actions at issue were voluntarily dismissed"); *cf. Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 521 (5th Cir. 2008) (reinforcing that "reliance" by putative class members is motivating factor behind tolling).

Last, Defendants cite *In re IndyMac Mortgage-Backed Securities Litigation*, 718 F. Supp. 2d 495, 504 (S.D.N.Y. 2010), in arguing that the "law treats a voluntarily dismissed complaint as if it never had been filed."  *See* MK Mem. at 14.  The court in *IndyMac*, however, was faced with an atypical scenario in which the first class action complaint, which was filed in California state court, was voluntarily dismissed only after a second complaint was filed in federal court asserting the same claims.[56]  There was no consequence to the first class action's claims falling away because those claims were already being asserted in the later-filed class action.  The scenario here is different and far more typical.  *DeJoseph*, which was filed in this Court and not a state court, was voluntarily dismissed prior to any subsequent class action being filed.  Here, unlike in *IndyMac,* denying tolling to a voluntarily dismissed action would harm the entire Class, which, for years, properly relied on the pendency of *DeJoseph*.  In short, the two-year limitations period on Plaintiffs' Exchange Act claims was tolled during the pendency of the *DeJoseph* complaint.[57]

And even assuming *arguendo* that no *American Pipe* tolling results from *DeJoseph*, the TAL Subclass's Exchange Act claims for RMH, RSF and RMA purchasers are timely nonetheless because they were filed on July 11, 2008, less than two years after a reasonably diligent plaintiff could have discovered the violations.

---

[56]  Notably, the court in *IndyMac* observed that the Second Circuit in *Korwek* (upon which the Sixth Circuit relies in *Andrews*) did not reject *American Pipe* tolling for successive class actions where no determination of class certification has been made.  *IndyMac*, 718 F. Supp. 2d at 503-04.

[57]  The Complaint asserts Exchange Act claims on behalf of purchasers of RMH, RSF, and RMA as tolled by *DeJoseph*, which was timely filed, and to which *Jones* and *Palmour* clearly relate back.  Accordingly, Defendants' argument that the Exchange Act claims asserted in *Jones* and *Palmour* are "untimely on their face" as filed for the first time in 2010 is easily rejected.  MK Mem. at 11-12.

3.      **There Is an Identity of Claims and Parties**
**Between the Claims Asserted in *DeJoseph***
**and the Consolidated Amended Complaint**

There is an identity of parties and claims between *DeJoseph* and the present Complaint as they relate to RMH, RSF, and RMA.  *DeJoseph* names RMH, RSF, RMA, RFC, MAM, Morgan Keegan, Kelsoe, Morgan, Alderman, Sullivan, and Weller as Defendants.  So does the present Complaint.  Thus, with the limited exceptions of RHY, MK Holding and Anthony, all of the Defendants named herein are named in *DeJoseph*.  *DeJoseph* alleges claims under Section 10(b) and 20(a) of the Exchange Act.  So does the present Complaint.  Thus, at least with regard to RMH, RSF, and RMA, there is a requisite identity of claims between *DeJoseph* and the Complaint here.

**B.      Plaintiffs' Exchange Act Claims Are Timely With**
**Respect to RHY Purchasers in the TAL Subclass**

The Complaint asserts timely Exchange Act claims on behalf of RHY purchasers who are members of the TAL Subclass.  The first class action complaint asserting Exchange Act claims on behalf of RHY purchasers in the TAL Subclass was timely filed on July 11, 2008: *Daniels v. Morgan Keegan*, No. 08-cv-2456, which has been consolidated with this action on Defendants' motion.  *See Daniels v. Morgan Keegan & Co.*, No. 08-cv-2456, 2009 WL 2749963, at *4 (W.D. Tenn. Aug. 26, 2009) (Mays, J.).

Defendants contend that Plaintiffs' Section 10(b) claims on behalf of RHY purchasers in the TAL Subclass are time-barred because investors were on notice of the misstatements alleged in the Complaint "as of March 2006."  MK Mem. at 16-17.  Nothing in the marketplace as of then, however, put Plaintiffs (or any reasonable plaintiff) on notice of the facts constituting the violations alleged here.

In *Merck*, the Supreme Court rejected the notion that the limitations period begins to run after a potential plaintiff is placed on "inquiry notice"—the point at which a given set of facts would lead a reasonable plaintiff to investigate further.  Instead, the Court adopted an actual notice standard, holding that "a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Merck*, 130 S. Ct. at 1789-90.  Significantly, the Court made clear that scienter is among the "facts constituting the violation," reasoning that "[i]t would . . . frustrate the very purpose of the discovery rule in this provision . . . if the limitations period began to run regardless of whether a plaintiff had discovered any facts suggesting scienter." *Id.* at 1796.  The Court observed that facts tending to show a materially misleading statement are ordinarily insufficient alone to show scienter.  *Id.* at 1797.

When a plaintiff would have discovered the facts constituting the violation is itself a question of fact.  *See*, *e.g.*, *Reid ex rel. First Horizon Nat. Corp. v. Baker*, No. 10-2413-STA, 2011 WL 976547, at *8 (W.D. Tenn. Mar. 16, 2011) ("Generally, the time at which a claim accrues is a question of fact."); *SunTrust Bank v. Stoner*, No. 07-cv-397, 2008 WL 4443281, at *4 (E.D. Tenn. Sept. 26, 2008) ("A determination of inquiry notice is a question of fact.") (quoting *Robert Mickham Trust v. United States*, No. 94-2189, 1996 WL 77450, at *4 (6th Cir. Feb. 20, 1996)); *Hawaii Ironworkers*, 2011 WL 1257756, at *14 ("Generally speaking, the statute of limitations is an affirmative defense on which the defendant bears the burden of proof.") (citations omitted).[58]  A defendant seeking to dismiss a claim on this basis "undertake[s] a heavy burden."  *In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1287 (E.D. Wash. 2007).

---

[58]  *See also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 169 (2d Cir. 2005) (noting "fact-specific nature of the limitations defense, particularly where the claim is foreclosed by inquiry notice," and recognizing that the Second Circuit has been "decidedly reluctant to foreclose such claims as untimely absent a manifest indication that plaintiffs 'could have learned' the facts underpinning their allegations" before the end of the limitations period); *Van*

Defendants contend that RHY's "Offering Documents, annual, semi-annual, and quarterly reports disclosed the risks, investments, and valuation information . . . that Plaintiffs allege was misrepresented or omitted by Defendants."  MK Mem. at 16.  As discussed in Part I.C above, none of the Funds' generic, boilerplate risk disclosures put investors on notice of their Exchange Act claims.  Similarly, a list of assets or an asset allocation chart alone (even if they had disclosed the risks associated with the assets) did not suggest to the TAL Subclass or anyone else that Defendants were engaged in fraud.  Rather, the Complaint alleges that investors first learned of Kelsoe's strategy during the summer of 2007, and pleads a first partial corrective disclosure on July 20, 2007, less than one year before the *Daniels* cases were filed.  ¶¶ 13, 262-263.  And even as of March 2008, Defendants continued to falsely classify assets to hide RHY's (and the other Funds') overconcentration of investments in ABS and MBS.  ¶¶ 104, 108, 111.

Defendants also argue that Plaintiffs were "on notice of the risks associated with . . . price volatility and the difficulty of valuing [illiquid] assets well before March 2006."  MK Mem. at 17.  Investors first learned on August 14, 2007, however, that RHY (and the other Funds) were unable to properly assign values to portfolio securities when the Funds each filed a Form 8-K, disclosing that they needed to retain an independent valuation consultant in order to properly value portfolio securities.  ¶ 266.  When the Funds disclosed this information, their share prices plummeted.  ¶ 267.  Indeed, as the Complaint alleges, "Kelsoe's funds had an impressive record, which attracted a lot of investors who didn't find out until th[e] summer [of 2007] just how he did it. . . ."  ¶¶ 13, 282.  Even if Plaintiffs knew that judgment played a role in the process of valuing illiquid portfolio securities, Plaintiffs did not know that Kelsoe was arbitrarily

---

*Kampen*, 2002 WL 1160171, at *10 ("On defendants' motion to dismiss, plaintiffs' federal claims will not be dismissed based on the statute of limitations.  It cannot be held that the facts properly before the court conclusively contradict plaintiffs' allegation that they could not have reasonably discovered their claims more than a year before the filing of the original complaint.").

"adjusting" the prices of such securities in derogation of the Funds' valuation procedures.
¶¶ 133, 137-153.

Last, Defendants argue that RHY's offering documents sufficiently warned investors by March 2006 of the "limits of comparisons" stemming from the Benchmark Index.  MK Mem. at 17 n.19.  Such disclosures, however, failed to explain that all benchmark "comparisons" were rendered meaningless by the built-in mismatch of assets.  ¶¶ 26, 161-162, 190, 194, 201, 209, 212, 216, 226.  In sum, members of the TAL Subclass could not have discovered the facts constituting their Exchange Act claims as of March 2006.

## VII.  PLAINTIFFS' CLAIMS UNDER THE SECURITIES ACT OF 1933 ARE TIMELY ASSERTED

The Complaint asserts timely Securities Act claims on behalf of purchasers of RHY in both the Class and TAL Subclass.  Claims under the Securities Act have a one-year statute of limitations and a three-year statute of repose.  *See* 15 U.S.C. § 77m.  The first complaint asserting Securities Act claims on behalf of RHY purchasers was the *Willis* complaint, No. 07-cv-2830, which was filed on December 21, 2007 and was in fact the first-filed complaint in this consolidated Closed-End Funds action.  That date was less than one year after a reasonably diligent plaintiff would have discovered the facts underlying the violations.

### A.  The Statute of Repose Is Subject to *American Pipe* Tolling

Defendants contend that even if *Willis* tolls the one-year statute of limitations for the present Complaint, the Securities Act claims are time-barred because *American Pipe* does not toll the three-year statute of repose, such that without tolling, the period of repose expired on January 19, 2009, before the *Jones* complaint was filed.  The vast majority of courts that have addressed this issue have held that *American Pipe* tolling applies to statutes of repose because the *American Pipe* doctrine is a species of legal or statutory tolling derived from a statutory

source (Rule 23) as opposed to a species of equitable tolling, a judicially created doctrine.  *See*, *e.g.*, *Joseph v. Wiles*, 223 F.3d 1155, 1166-68 (10th Cir. 2000) ("[I]n a sense, application of the *American Pipe* tolling doctrine to cases such as this one does not involve 'tolling' at all.  Rather, [the plaintiff] has effectively been a party to an action against these defendants since a class action covering him was requested but never denied. . . .  Consequently, we conclude that *American Pipe* tolling applies to the statute of repose governing [the plaintiff's] action.").[59]  *See* MK Mem. at 18.  Accordingly, because *Willis* was filed less than three years after the RHY offering on January 19, 2006, and the statute of repose was tolled by that complaint, the Class's Securities Act claims are timely asserted.

With respect to the Securities Act claims asserted by the TAL Subclass, even assuming *arguendo* that *Willis* did not toll the statute of repose, such claims are timely asserted nonetheless because the *Daniels* RHY action, No. 08-cv-2456, was filed on July 11, 2008, less than three years after RHY's initial offering.

---

[59]  *See also*, *e.g.*, *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1166 (C.D. Cal. 2010); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 455 n.19 (S.D.N.Y. 2005); *Ballard v. Tyco Int'l, Ltd.*, No. 04-CV-1336-PB, 2005 WL 1683598, at *7 (D.N.H. July 11, 2005); *In re Discovery Zone Sec. Litig.*, 181 F.R.D. 582, 600 n.11 (N.D. Ill. 1998); *Salkind v. Wang*, No. 93-10912-WGY, 1995 WL 170122, at *3 (D. Mass. Mar. 30, 1995) (all applying *American Pipe* doctrine to toll Securities Act's 3-year statute of repose); *Stone Container Corp. v. United States*, 229 F.3d 1345, 1354 (Fed. Cir. 2000); *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 31 (S.D.N.Y. 2002); *Arivella v. Lucent Techs., Inc.*, 623 F. Supp. 2d 164, 176 (D. Mass. 2009) (applying *American Pipe* doctrine to toll other statutes of repose).  Some "Circuit court decisions have referred to *American Pipe* tolling as equitable tolling.  The distinction between legal and equitable tolling, however, is only thrown into relief in limited circumstances, namely, when a court must decide whether to toll a statute of repose.  None of the above cases that classify *American Pipe* tolling as equitable tolling squarely addressed that question, and thus their characterizations of *American Pipe* as an equitable tolling decision are of limited use to the case at bar."  *Arivella*, 623 F. Supp. 2d at 176 n.7.  *Footbridge Ltd. Trust v. Countrywide Financial Corp.*, No. 10 Civ. 367 (PKC), 2011 WL 907121, at *3, 7 (S.D.N.Y. Mar. 16, 2011), Defendants' sole cited authority, is an outlier and ultimately unpersuasive in view of the weight of these contrary decisions.

### B.     The *Willis* Action Timely
### Asserted Securities Act Claims

Defendants contend nonetheless that RHY's public filings made Plaintiffs aware of the

facts underlying their Securities Act claims before December 21, 2006, one year before *Willis*

was filed.  MK Mem. at 19.

As set forth in Part I.C above, although RHY disclosed that its portfolio securities were

permitted to be invested in so-called "junk bonds," RHY's disclosures were insufficient to warn

investors of the risks of investing in that Fund.  The true risks associated with investing in RHY

did not begin to come to light until the summer of 2007 at the earliest.  ¶¶ 262-293.  Indeed,

Defendants' assertion that Plaintiffs were on inquiry notice of their Securities Act claims

concerning RHY before December 21, 2006 by virtue of the risk disclosures contained in RHY's

offering documents, MK Mem. at 19-20, are contrary to the allegations in the Complaint.

¶¶ 251-256.  The Complaint alleges that "even though the [RHY] Prospectus portion of the RHY

Offering Materials contains 26 categories of risk descriptions, it does not at all mention the

highly concentrated credit risk RHY was taking on through its purchase of low-priority tranches

in ABS."  ¶ 255.  The Complaint further alleges that "[a]lthough the RMK Multi-Sector SAI

does explicitly mention tranching in one paragraph—and alludes to it in a second—neither

reference to tranching adequately informs investors that RMK Multi-Sector would be

concentrated in the lowest priority, highly leveraged tranches of ABS backed by subprime assets

with significant credit risk, and that, as a result, investors would be exposed to extraordinary

credit risk."  *Id.*  Further, the Complaint alleges that RHY's Form N-Q dated February 28, 2007

was materially false and misleading because it represented that substantial securities were

corporate bonds when, in fact, they were ABS.  ¶ 247.

Moreover, in June 2007, when other market participants and investment professionals
had recognized that "subprime mortgage pool losses would rise through the BBB MBS tranches
and leap into Mezzanine CDOs," meaning that the "value of these securities was substantially
impaired and even, imminently, worthless" (¶ 172), Kelsoe reassured investors that "[a]lthough
this downward volatility in the mortgage backed arena has had a negative impact on the net asset
value of [RHY], . . . [it] has also provided an opportunity to buy assets at considerably higher
yields than have been available for more than two years . . . .  This is also the best opportunity
we have seen in years to secure better portfolio earnings for quarters to come."  ¶ 199; *see also
Betz v. Trainer Wortham & Co.*, 519 F.3d 863, 878 (9th Cir. 2008) ("[W]e cannot say that, as a
matter of law, a reasonable investor in Betz's position should have discovered the facts giving
rise to her claim before July 11, 2001, especially in light of the express assurances made by
Defendants that they would remedy the problems with the account, which may have lulled a
reasonable investor into inaction.").  Considering that "the investing public justifiably places
heavy reliance on the statements and opinions of corporate insiders," *Apple Computer*, 886 F.2d
at 1116, the factfinder could readily conclude that Kelsoe's assurances had such a lulling effect.
*See LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003)
(investors are not placed on inquiry notice when "the warning signs are accompanied by reliable
words of comfort from management"); *Phillips v. Kidder Peabody & Co.*, 782 F. Supp. 854, 864
(S.D.N.Y. 1991) (articles did not trigger duty of inquiry where Defendants were also
disseminating positive information).  Nor can Defendants show that a reasonable investor should
have known before December 21, 2006 that RHY's reported NAVs were false.[60]

---

[60] Defendants' reliance on *Freidus v. ING Groep, N.V.*, 736 F. Supp. 2d 816 (S.D.N.Y. 2010), is misplaced.
After *Merck*, courts have declined to apply "inquiry notice" in favor of the "discovery rule" to determine whether
Securities Act claims are timely.  *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 371 n.39 (S.D.N.Y.
2011); *Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2010)

Accordingly, with respect to the Securities Act claims asserted on behalf of purchasers of RHY, these claims were first filed less than three years after RHY's shares were *bona fide* offered to the public (January 19, 2006) and within one year of discovery of the facts constituting the claim.  Plaintiffs' Securities Act claims are not time-barred.

## VIII.   THE CHALLENGES TO PLAINTIFFS' CLAIMS UNDER SECTION 12(a)(2) OF THE SECURITIES ACT LACK MERIT

### A.      Whether Morgan Keegan Is a "Seller" Is a Question of Fact, and Any Perceived Pleading Deficiency Is Readily Cured

Count II of the Complaint asserts claims against RMK Multi-Sector and Morgan Keegan under Section 12(a)(2) of the Securities Act in connection with material misstatements in the RHY Offering Materials.  ¶¶ 332-342.

Morgan Keegan argues that "Plaintiffs' allegations regarding Morgan Keegan's role as underwriter, standing alone, are insufficient to show Morgan Keegan as a Seller."  MK Mem. at 58.  Although the Complaint sufficiently alleges Morgan Keegan's role in soliciting purchases of and selling RHY shares to Class members,[61] the Court need not parse these allegations or Defendants' arguments for two reasons.

---

(both applying *Merck* "discovery rule" to Securities Act claims).  Regardless, as discussed above, Plaintiffs were not placed on "inquiry notice" more than one year before *Willis* was filed.

[61]  *See* ¶ 333 (claim asserted against Morgan Keegan as seller of the shares of RMK Multi-Sector in the RMK Multi-Sector IPO); ¶ 334 (Morgan Keegan was the underwriter of the shares issued pursuant to the RMK Multi-Sector IPO); ¶ 335 (claim brought on behalf of "McAbee Foundation Trust and other members of the Class who purchased or otherwise acquired RMK Multi-Sector shares issued pursuant to the RHY Offering Materials from Morgan Keegan); ¶ 340 (McAbee Foundation Trust and other Class members purchased RMK Multi-Sector's shares pursuant to the RHY Offering Materials and were damaged thereby); ¶ 338 (RMK Multi-Sector and Morgan Keegan owed to the McAbee Foundation Trust and the Class the duty to make a reasonable and diligent investigation of the statements contained in the RHY Offering Materials); Compl. Ex. H (McAbee purchased 3,333 shares of RHY at $15 per share offering price, immediately after effective date of RHY prospectus).  These allegations are sufficient.  *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 400-01 (S.D.N.Y. 2007) ("The Complaint adequately alleges that defendants, including the Underwriter Defendants, sold the securities as part of the Offerings, and plaintiffs acquired securities in the Offerings.  A reasonable inference is that plaintiffs acquired their securities from the Underwriter Defendants."); *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1368 (N.D. Ga. 2005) ("[T]he Court finds the allegations that Plaintiffs purchased stock on the date of the offering at the offering price is sufficient at this stage to establish that Plaintiff . . . purchased in the offering and thus has standing to pursue Plaintiffs' Section 12(a)(2) claims."); *cf. Moskowitz v. Mitcham Indus.*, No. H-98-1244, 2000 WL 33993307, at *10

84

First, this Court has held that "whether someone 'solicits' a purchase is a fact-bound inquiry unsuited for a Rule 12(b)(6) motion."  *Open-End Funds*, 743 F. Supp. 2d at 760 (denying Morgan Keegan and other defendants' motions to dismiss Section 12(a)(2) claims) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).  Defendants give this Court no reason to depart from that ruling here, and other courts are in accord.  *See*, *e.g.*, *Charles Schwab*, 257 F.R.D. at 550 ("Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs need only satisfy Rule 8(a)'s lenient pleading standards.").  Indeed, in *Charles Schwab*, defendants "virtually conced[ed]" that the issuer and underwriter of mutual fund shares were properly named parties on plaintiffs' section 12(a)(2) claims; the issue was whether certain individuals and other corporate affiliates were properly alleged to be "sellers."  *Id.* at 548.

Second, even assuming *arguendo* that the Court is inclined to assess the sufficiency of Plaintiffs' allegations **and** finds those allegations to be insufficient, the McAbee Foundation Trust, consistent with its amended certification annexed to the Complaint, did in fact purchase its RHY shares directly from Morgan Keegan.  Although Plaintiffs submit that it is not necessary, Plaintiffs can make this allegation explicit in an amended pleading.  If the Court rules that it is necessary, Plaintiffs respectfully submit leave pursuant to Rule 15(a) to file an amended pleading to add these allegations.  Notably, although Morgan Keegan contends that Count II must be dismissed "as a matter of law," the courts in both cases on which it relies granted plaintiff leave to amend to allege that it purchased directly from the underwriter defendant.  *See In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2009 WL 2601952, at *2-3 (S.D.N.Y. Aug. 20, 2009); *In re*

---

(S.D. Tex. Oct. 2, 2000) ("Plaintiffs only allege that [plaintiffs] purchased Mitcham shares in the Secondary Offering and that the Underwriter Defendants sold Mitcham shares to the public in that offering.  In the context of a class action . . . there would be sufficient numbers of purchasers to ensure that at least some of the plaintiffs purchased from the underwriter defendants, satisfying the privity requirement.").

*Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 406-07 (D. Md. 2004) (both *cited in* MK Mem. at 59).

### B.     The Section 12(a)(2) Claim Is Properly Asserted Against RMK Multi-Sector

RMK Multi-Sector, like Morgan Keegan, argues that Plaintiffs' Section 12(a)(2) claim does not sufficiently allege that RMK Multi-Sector is a "seller" because RHY was "'issued, underwritten, sold, and managed' by outside entities." RMK Multi-Sector suggests further that Plaintiffs must allege something more than its role as issuer of the shares. Funds Mem. at 4-5.

Plaintiffs specifically allege that RMK Multi-Sector was the issuer of the RHY shares and solicited Plaintiffs' purchases of those shares. *See* ¶ 10 ("RHY conducted an IPO in which it issued 27 million shares at $15.00 per share raising approximately $405 million."), ¶ 251 (RMK Multi-Sector filed the RHY Offering Materials with the SEC); ¶ 319 (shares of RMK Multi-Sector issued pursuant or traceable to the RHY Offering Materials), ¶ 320 ("RMK Multi-Sector was the registrant for the RHY Registration Statement and issued shares pursuant to the RHY Offering Materials."), ¶ 325 ("RMK Multi-Sector, as issuer, is strictly liable for the material misstatements and omissions contained in the RHY Offering Materials"), ¶ 329 (RMK Multi-Sector's shares issued pursuant or traceable to the RHY Offering Materials), ¶ 335 (RMK Multi-Sector shares issued pursuant to the RHY Offering Materials), ¶ 336 ("RMK Multi-Sector solicited the purchase of its shares").[62]

Nothing more is required. As noted above, this Court has held that whether a defendant "solicits" a sale for purposes of Section 12(a)(2) is a question of fact. *Open-End Funds*, 743 F. Supp. 2d at 760. Further, it is well-settled that issuers are subject to liability under Section

---

[62] In view of the same allegations, RMK Multi-Sector's half-hearted argument that it is not a proper defendant on Plaintiffs' Section 11 claim because it was not the issuer of the RHY shares (Funds Mem. at 1-3) is insubstantial and easily rejected. *See also Herman & McLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Liability [under Section 11] against the issuer of a security is virtually absolute, even for innocent misstatements.").

12(a)(2) as well as Section 11. *See J & R Mktg., SEP v. General Motors Corp.*, 549 F.3d 384,

390 (6th Cir. 2008) ("Sections 11 and 12 both impose a duty to disclose additional facts when a

statement of material fact made by the issuer is misleading, and they both impose liability for

failing to fulfill that duty of disclosure as well as for misstating a material fact."); *Litwin v.

Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) ("Section 12(a)(2) imposes liability . . .

on issuers or sellers of securities by means of a prospectus."); *Charles Schwab*, 257 F.R.D. at

548 (issuer and underwriter of shares virtually assumed to be subject to section 12(a)(2) claim).[63]

Accordingly, Plaintiffs' Securities Act claims should be upheld as against RMK Multi-Sector.

## IX.   THE COMPLAINT STATES CLAIMS FOR CONTROLLING PERSON LIABILITY

The Morgan Keegan Defendants, RFC, the Director Defendants and the Officer

Defendants challenge Plaintiffs' claims under Section 20(a) of the Exchange Act, and the

Director Defendants additionally challenge the claims under Section 15 of the Securities Act,

arguing that the Complaint insufficiently pleads that they were controlling persons of the Funds.

*See* MK Mem. at 56-58; RFC Mem. at 6-8; Ind. Defs. Mem. at 18-20; Anthony Mem. at 3.

These arguments fail for several reasons.  Contrary to the Morgan Keegan Defendants'

assertion (MK Mem. at 57), "[a]llegations of control are not averments of fraud and therefore

need not be pleaded with particularity."  *America Serv.*, 2009 WL 1348163, at *59 (upholding

Section 20(a) claim) (quoting *In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*, No. 03-md-1565,

2006 WL 469468, at *23 (S.D. Ohio Feb. 27, 2006)); *see also*, *e.g.*, *In re WorldCom, Inc. Sec.*

---

[63] *Rosenzweig v. Azurix Corp*., 332 F.3d 854 (5th Cir. 2003), and *In re Merrill Lynch & Co. Research Reports Securities Litigation*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003), cited by RMK Multi-Sector, are not to the contrary. *Rosenzweig* concerns an issuer's Section 12(a)(2) liability in a firm commitment underwriting, where all securities are sold by the issuer to the underwriter, which then sells to the public. *Rosenzweig*, 332 F.3d at 871.  Neither RMK Multi-Sector nor Morgan Keegan, the underwriter, contends that the RHY shares were sold in a firm commitment underwriting.  In contrast to *Merrill Lynch*, 272 F. Supp. 2d at 255, Plaintiffs sufficiently allege that they purchased RHY shares from RMK Multi-Sector.  *See* ¶ 340 ("The McAbee Foundation Trust and other members of the Class purchased RMK Multi-Sector's shares pursuant to the RHY Offering Materials and were damaged thereby.").

*Litig.*, 294 F. Supp. 2d 392, 415-16 (S.D.N.Y. 2003) (to plead "control" element of section 20(a) claim, "[a] short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required").

Moreover, it is well-settled, and this Court has held, that the issue whether a defendant is a controlling person is a question of fact.  *See Open-End Funds*, 743 F. Supp. 2d at 761 ("Whether a party exercised the requisite control involves a factual analysis best saved for later determination."); *see also SEC v. Coffey*, 493 F.2d 1304, 1318 (6th Cir. 1974) ("Whether a person 'controls' another under section 20(a) is a complex factual question."); *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 897-98 (M.D. Tenn. 2005) ("Whether a person is a controlling person is normally a question of fact that cannot be determined at the pleading stage.").[64]

Even if the Court is inclined to assess Plaintiffs' control person liability allegations without further factual development, such allegations are sufficient.  *See* ¶¶ 363-367; *see also* ¶ 52 (RFC), ¶ 64 (diagram of Defendants' relationships).  Courts have required plaintiffs to plead that the defendant actually participated generally in the operations of the primary violator, and possessed the power to control the specific transaction or activity upon which the primary violation is predicted.  *See*, *e.g.*, *Direct Gen.*, 398 F. Supp. 2d at 897.

---

[64]  The Morgan Keegan Defendants argue that the Court's determination on this issue in the Open-End Funds action applies only to Section 15 claims because plaintiffs there did not assert Section 20(a) claims.  *See* MK Mem. at 57.  They provide no basis for such a distinction, none exists in the statutory language (*compare* 15 U.S.C. § 77*o with* 15 U.S.C. § 78t(a)), and courts consistently interpret Section 15 and 20(a) claims in the same manner.  *See Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 485-86 (6th Cir. 1992); *In re Daou Sys., Inc. Sec. Litig.*, 397 F.3d 704, 725 (9th Cir. 2005) ("'Controlling person' under both of the above acts is given the same interpretation because 'section 20(a) [of the Exchange Act] is an analogue of section 15 of the Securities Act.'") (quoting *Durham v. Kelly*, 810 F.2d 1500, 1503 (9th Cir. 1987)); *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 393-94 (4th Cir. 1979) (drawing no distinction).

Here, Plaintiffs allege that the Defendants charged with secondary liability under Section 20(a) "had the power to control the general business affairs of the Funds, and the power to directly or indirectly control or influence the specific corporate policy (*e.g.*, the content of the Funds' financial statements and other public statements), which resulted in primary liability." ¶ 364.  Each Defendant had that power "by virtue of its position as the manager of, investment advisor to, the Funds, as the administrator of the Funds, or as the wholly owning parent of a Defendant."  ¶ 363.  Plaintiffs also allege that each Defendant "materially participated in the conduct giving rise to" primary liability (*id.*), and "had knowledge of, and participated in, the Funds' transaction of business."  ¶ 364.[65]

Plaintiffs further allege that Morgan Keegan and MAM effectively were alter egos that "functioned as the officers and directors of the Funds, or occupied a similar status or performed similar functions," and that they "directly or indirectly controlled the Funds through the performance of their obligations under the Advisory Agreements and AAS Agreements."  ¶ 365; *see also* ¶¶ 71-72.  Under those agreements, "all of the business, administrative, managerial, clerical and/or other functions attendant to the operation of the Funds' business was performed by MAM and Morgan Keegan, including providing officers and employees to the Funds."[66] ¶ 365.  Thus, contrary to the Morgan Keegan Defendants' argument (MK Mem. at 58),

---

[65]  With regard to the Section 15 claim, Plaintiffs similarly allege that the Director Defendants "each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of RMK Multi-Sector, including the content of its financial statements and the RHY Offering Materials."  ¶ 348.  The Director Defendants had the power to control and exercised control, directly or indirectly, "because of their senior executive positions with the Funds; their direct involvement in RMK Sector's day-to-day operations; and their signatures and participation in the preparation and dissemination of the RHY Offering Materials."  ¶ 347.

[66]  The Morgan Keegan Defendants cite *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), for the proposition that third parties such as accountants and attorneys that perform contractual roles can never be subject to secondary liability under Section 20(a).  MK Mem. at 58.  *Central Bank* holds, however, that such third parties are not subject to secondary liability for aiding and abetting a violation of Section 10(b) because the text of Section 10(b) does not prohibit aiding and abetting.  *Central Bank*, 511 U.S. at 191.  No violation of section 20(a) was alleged.  In fact, in refusing to read aiding and abetting liability into Section 10(b), the Supreme Court explicitly recognized that "Congress did not overlook secondary liability" when enacting the Exchange Act because Congress included Section 20(a).  *Id.* at 184; *see Janus Capital*, 564 U.S. ___, 2011 WL 2297762, at *5 n.6 (noting that "*Central Bank* involved secondary, not primary liability").

Plaintiffs' allegations of Morgan Keegan, MAM, and MK Holding's control of the Funds are far more than "conclusory assertions."

The Morgan Keegan Defendants also argue that Plaintiffs' allegation that Morgan Keegan and MK Holding controlled MAM is insufficient because MAM is not alleged to be a primary violator. *See* MK Mem. at 57. The Supreme Court reaffirmed this week that "Congress . . . has established liability in §20(a) for '[e]very person who, ***directly or indirectly,*** controls any person liable' for violations of the securities laws," and described controlling person liability as being based on a "relationship of influence." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. ___, No. 09-525, 2011 WL 2297762, at *6 (U.S. June 13, 2011) (quoting 15 U.S.C. § 78t(a)) (emphasis added); *see also PR Diamonds*, 364 F.3d at 696 (section 20(a) requires showing that defendant "directly or indirectly controlled the person liable for the securities law violation").[67] "The term 'control' in this context is defined by the code of federal regulations as 'the possession, ***direct or indirect***, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *Bridgestone*, 399 F.3d at 667 (quoting 17 C.F.R. § 230.405) (emphasis added). By directly controlling MAM, Morgan Keegan and MK Holding indirectly controlled the Funds. ¶¶ 362-363; *see also* ¶ 64 (RMK organizational diagram).[68] For the same reason,

---

[67] Similarly, Section 15 of the Securities Act imposes liability on one who controls a person liable of a primary violation "by or through stock ownership, agency, or otherwise." 15 U.S.C. § 77*o*; *see also Sanders*, 973 F.2d at 485-86. Notably, the Director Defendants, who alone are subject to both Section 15 and 20(a) claims, do not distinguish their arguments challenging these claims. *See* Ind. Defs. Mem. at 19.

[68] *D. E. & J. Limited Partnership v. Conaway*, 133 F. App'x 994, 1001 (6th Cir. 2005), cited in MK Mem. at 57, is distinguishable because KMart, the controlled entity, was not named as a defendant at all. Here, the Funds are the allegedly controlled entities and are named in the Section 10(b), 11, and 12(a)(2) counts as primary violators, and MAM is named as a controlling person in the Section 20(a) count. *Cf. In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006) ("[T]here is no requirement in the language of either [section 15 or 20(a)] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants. A plaintiff need only establish the controlled person's liability.") (citing *In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1022 n.11 (E.D. Mich. 2003) ("[I]f the complaint states

there is no merit to RFC's suggestion that it is not subject to controlling person liability under Section 20(a) because Plaintiffs do not allege that it "directly" controlled the Funds.  RFC Mem. at 6-7; *see also* ¶ 52 (RFC).[69]

Further, Plaintiffs have pleaded more than a "mere allegation of a parent/subsidiary relationship" between RFC and its subsidiaries Morgan Keegan, MAM and MK Holding.  *See* RFC Mem. at 7.  "In cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and common principals."  *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) (finding that plaintiff sufficiently pleaded that one corporate defendant controlled another, related, corporate defendant which was a primary violator).[70]  In addition to the allegations described above, Plaintiffs allege that Morgan Keegan and MK Holding are wholly owned subsidiaries of RFC, and that MAM is a wholly owned subsidiary of MK Holding.  ¶¶ 53-55.  Plaintiffs explain that "RFC owned and controlled MAM and Morgan Keegan, MAM and Morgan Keegan managed and administered the Funds, and RFC had a cross-directorship and overlapping employees with the Funds, MAM, and Morgan Keegan."  ¶ 64.  Plaintiffs identify the directors and officers that

a primary violation by the Company, even if the Company is not named in the complaint as a defendant, then a § 20 claim can stand if the individuals were controlling persons.")).

[69]  The Sixth Circuit's recent decision in *Frank v. Dana*, 2011 WL 2020717, does not undermine the Section 20(a) claims against Morgan Keegan, MK Holding and RFC.  Although the court stated there that "Section 20(a) claims are predicated on at least one underlying violation committed by a controlled party," the issues before the court were limited essentially to whether plaintiffs had alleged an underlying violation of Section 10(b) by the CEO and CFO of the defendant company, and whether plaintiffs should have affirmatively pleaded that the CEO and CFO did not act in good faith.  *Id.* at *6.  The court did not have occasion to consider arguments similar to those made by Morgan Keegan, MK Holding and RFC here.

[70]  *See also Mutual Funds*, 566 F.3d at 130-31 (upholding section 20(a) claim against parent corporation as controlling person of wholly owned subsidiary); *Independent Energy*, 154 F. Supp. 2d at 770 ("Plaintiffs have pled sufficient facts supporting an inference that DLJ Inc. controlled [its subsidiaries] DLJ Securities and DLJ International."); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F. Supp. 587, 591 (S.D.N.Y. 1990) (controlling person liability adequately alleged because as sole shareholder of the subsidiary, the parent corporation "had the power to influence and direct the activities of" its subsidiary).  *Azzolini v. CorTS Trust II for Provident Fin. Trust I*, No. 03-CV-1003, 2005 WL 2253971 (E.D. Tenn. Sept. 16, 2005), on which RFC principally relies, is inapposite.  There, the court dismissed a Section 11 claim asserted against the parent company of the issuer, finding that the parent company was not an enumerated party suable under Section 11.  *See id.* at *12.  This result says nothing about whether a parent company can directly or indirectly control its subsidiary.

RFC shared with Morgan Keegan, MAM, and the Funds. ¶ 64. Plaintiffs also allege that Defendant Morgan, who contemporaneously served as a Director and Vice Chairman of RFC, a Director of MAM, Chairman and Executive Managing Director of Morgan Keegan, and as Chairman of the Funds' Boards, directed Defendant Carter, then President of MAM, to *"leave Kelsoe alone"* and to give him whatever he wanted or needed. ¶ 363; *see also* ¶ 64 (diagram). As such, Plaintiffs' allegations against RFC are plainly sufficient. *See Kalin*, 526 F. Supp. 2d at 406 (denying dismissal of Section 20(a) claim where plaintiff alleged principal had "substantial stock ownership, shared officers and principals, and at least some direct involvement"). Indeed, the Supreme Court's decision in *Janus Capital*, having narrowed the scope of primary liability under Rule 10b-5, suggests that a robust interpretation of controlling person liability, based on an undefined "relationship of influence," is warranted. *See Janus Capital*, 564 U.S. ___, 2011 WL 2297762, at *6; *cf. id.* at *6 n.10 (declining to address whether controlling person liability exists "for entities that act through innocent intermediaries"). This is particularly true in mutual fund cases such as this, which tend to involve a series of interrelated entities with shared personnel, functions and responsibilities. *See* ¶ 64.

The Director and Officer Defendants suggest that Plaintiffs rest their controlling person liability claims solely on positions and job descriptions. Ind. Defs. Mem. at 19. The allegations described above amply describe how each of the Director and Officer Defendants had both the power to control the activity and transactions underlying the alleged primary violations and actually participated in the Funds' general operations. In addition, Plaintiffs identify (1) the roles played by each Director Defendant and Officer Defendant and, (2) the Offering Materials and other alleged false and misleading documents each of them signed. *See, e.g.*, ¶¶ 56-59 (alleging, *inter alia,* that Sullivan and Anthony were each President of the Funds), 61-62, 294-304; *see also*

¶¶ 347-348.  Moreover, *Frank v. Dana Corp.*, 649 F. Supp. 2d 729, 746 (N.D. Ohio 2009), on which these Defendants rely for the proposition that "lack of good faith" must be pleaded, was recently reversed.  It is now established in this Circuit that "[g]ood faith is an affirmative defense in section 20(a) claims and Plaintiffs [are] not required to plead that [controlling person defendants] acted without it."  *Frank v. Dana*, No. 09-4233, 2011 WL 2020717, at *7 (6th Cir. May 25, 2011).[71]

Defendant Anthony, who was President of the Funds and President and Chief Investment Officer of MAM, argues in conclusory fashion that Plaintiffs have pleaded neither a primary violation nor that he exercised the requisite level of control over the Funds.  *See* Anthony Mem. at 2-3.  Plaintiffs have adequately alleged that Anthony, as well as the other Defendants charged with secondary liability, directly or indirectly had the power to control the specific transactions and activities upon which the Funds' primary violations are predicated, and that he actually participated in the Funds' general operations.  *See, e.g.*, ¶¶ 57, 363-367; *see also Direct Gen.*, 398 F. Supp. 2d at 898 (denying dismissal of control person claim where defendants were involved in primary violator's day-to-day management and controlled or had authority to control contents of communications at issue).

Finally, the Director Defendants and Officer Defendants contend incorrectly that Plaintiffs may not seek to hold them liable both as primary violators under Sections 10(b) or 11

---

[71]  Defendants other than RFC note that two district courts within the Sixth Circuit have required that a control person also be a "culpable participant" in the primary violation.  *See* MK Mem. at 57 n.46; Ind. Defs. Mem. at 19 n.11.  More recently, however, a district court expressly rejected the "culpable participation requirement" because the "Sixth Circuit's most recent statement on the elements of a § 20(a) claim makes no mention of such a requirement."  *In re National Century Fin. Enters., Inc., Inv. Litig.*, No. 03-md-1565, 2006 WL 469468, at *24 (S.D. Ohio Feb. 27, 2006) (citing *PR Diamonds*, 364 F.3d at 696; *see also Wilkof*, 2010 WL 4184465, at *10 ("[T]his Circuit does not require that 'culpable participation' be plead in order to set forth a Section 20(a) violation."); *In re CMS Energy Sec. Litig.*, No. 02-cv-72004, 2005 U.S. Dist. LEXIS 439, at *48 (E.D. Mich. Jan. 7, 2005) ("As plaintiffs contend, the *PR Diamonds* case did not hold that 'culpable participation' was an element of a 20(a) claim."); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) ("Today, . . . we hold that a plaintiff is *not* required to show 'culpable participation' to establish that a broker-dealer was a controlling person under § 20(a).  The statute does not place such a burden on the plaintiff.").

and as controlling persons under Sections 20(a) or 15.  *See* Ind. Defs. Mem. at 18.  The court in

*In re National Century Financial Enterprises, Inc. Investment Litigation*, after noting the same

authority these Defendants cite, allowed plaintiffs to pursue their Section 10(b) and Section 20(a)

claims because "plaintiffs may plead alternate legal theories 'regardless of consistency'" under

Rule 8(e)(2).  No. 03-md-1565, 2006 WL 469468, at *24 (S.D. Ohio Feb. 27, 2006) ("A plaintiff

may also plead that a defendant is both a primary violator and a control person without

redundancy.") (citing treatise).  There is nothing unusual or inconsistent about a corporate insider

committing primary violations of the federal securities laws (by, for example, having signed

false SEC reports) and also controlling an entity that itself committed primary violations (by, for

example, filing such reports).  Many courts have rejected Defendants' position.  *See*, *e.g.*, *SEC v.*

*Smith*, No. C2-cv-04-739, 2005 WL 2373849, at *9 n.2 (S.D. Ohio Sept. 27, 2005) (holding that

plaintiff could go forward with section 10(b) and 20(a) claims against the same defendant); *In re*

*CMS Energy Sec. Litig.*, No. 02-cv-72004, 2005 U.S. Dist. LEXIS 439, at *48 (E.D. Mich.

Jan. 7, 2005) (same).  Plaintiffs' Section 15 and Section 20(a) claims should be upheld.

**X.    THE McABEE FOUNDATION TRUST, BY AND THROUGH
C. FRED DANIELS AS TRUSTEE *AD LITEM*, HAS STANDING
TO REPRESENT THE CLASS OF RHY PURCHASERS**

Defendants argue that C. Fred Daniels, as Trustee *ad Litem* (the "TAL") for the Leroy

McAbee, Sr. Family Foundation Trust (the "McAbee Foundation Trust"), has standing as a Fed.

R. Civ. P. 23 representative plaintiff to bring Securities Act claims **only** on behalf of the TAL

Subclass, and not the Complaint's more broadly defined Class of purchasers of RHY shares.  *See*

MK Mem. at 59-60.

This argument cannot withstand analysis.  Defendants do not and cannot argue that the

TAL or McAbee Foundation Trust lacks ***individual*** standing to bring Securities Act claims based

on purchases of RHY shares (*i.e.*, that the McAbee Foundation Trust purchased no RHY Fund shares or suffered no losses).  Nor do (or could) Defendants argue that the TAL or McAbee Foundation Trust lacks standing as a Rule 23 representative plaintiff to bring Securities Act claims on behalf of all TAL Subclass members who purchased RHY shares.  Instead, Defendants contend that the terms of the June 20, 2008 Amended Order Appointing Trustee *Ad Litem* (Compl. Ex. I, the "Appointment Order") prohibit the TAL from serving—deprive him of "standing" to serve—as a Rule 23 representative plaintiff for any class that does not consist *solely* of Trust Accounts and Custodial Accounts as defined in the Appointment Order (collectively, "Trusts").  Nothing in the Appointment Order implies, much less states, any intention by the court to deprive the TAL of "standing" to serve as a Rule 23 class representative.  Some context is in order.  Regions Bank, a non-party corporate affiliate of the Morgan Keegan/MAM Defendants and Defendant Regions Financial Corporation, served as trustee or custodian for Trusts that purchased shares of the Funds (including the RHY Fund).  When the Funds imploded in 2007-2008, and class actions (including some of the actions consolidated herein) asserting federal securities claims were filed against the Morgan Keegan/MAM Defendants and Regions Financial based on the sale and marketing of the Funds' shares, Regions Bank's conflict of interest in fulfilling its fiduciary duty to seek recovery from its corporate affiliates on behalf of the Trusts was obvious.  Accordingly, the Probate Court of Jefferson County, Alabama, where Regions Bank and Regions Financial are headquartered, entered the Appointment Order appointing the TAL to serve in substitution for Regions Bank—to stand in Regions Bank's shoes—in class litigation against Regions Bank's corporate affiliates seeking recovery based on the Trusts' investments in the Funds.

The TAL's authority—standing—to act in class litigation involving the Funds is coextensive with the authority—standing—that Regions Bank itself would have had as trustee for the Trusts were it not for Regions Bank's conflicts of interest.  The Appointment Order explicitly authorizes the TAL to "participate in . . . the Class Actions" and  "pursu[e] . . . the Class Actions" (Appointment Order ¶¶ 3, 12), and further

> **ORDERS** that the Trustee *ad litem* shall have all powers appropriate to achieving the foregoing purposes, including, ***but not limited to***, the powers set forth in ALA. CODE § 19-3B-816 (23), (24), (25) and (28) (2007 Repl.)

Appointment Order ¶ 4 (emphasis added).

Despite this broad grant of authority, Defendants seize disingenuously upon the Appointment Order's necessary use of the phrase "on behalf of the Trust Accounts and the Custodial Accounts" in an effort to manufacture a limitation upon the TAL's "standing."  They argue that the phrase "on behalf of the Trust Accounts and the Custodial Accounts" is an explicit judicial limitation upon the TAL's "standing" to participate in class litigation as a Rule 23 representative plaintiff.  This argument ignores the obvious: the authority and capacity of ***any*** trustee or other similar fiduciary is inherently and inescapably representative—"on behalf of"— in nature.  All trustees necessarily act "on behalf of" the trusts they serve, and all trusts can act only by and through their trustees.  The phrase "on behalf of" is a necessary and natural part of any description of ***any*** actions by ***any*** trustee and cannot be imbued with the unintended meaning now urged by Defendants.

Defendants, intentionally or otherwise, confuse and conflate the inherently representational nature of ***any*** actions by ***any*** trustee "on behalf of" a trust on the one hand, with the entirely separate and distinct representational capacity and role of a Rule 23 class representative on the other.  They then erroneously equate the Appointment Order's necessary

and appropriate use of the phrase "on behalf of the Trust Accounts . . ." with an explicit judicial removal of the "standing" that the TAL, as substitute trustee for Regions Bank, would otherwise have to serve as a Rule 23 representative plaintiff. In doing so, they inject into the Appointment Order a limitation that simply does not exist.

The simple truth is that the Appointment Order's careful delineation of "the limited and specific purposes" for which the TAL was appointed is attributable to Regions Bank's retention of all of Regions Bank's duties and obligations as trustee for the Trusts other than pursuing the Class Actions—as to which Regions Bank has a conflict of interest. *See* Appointment Order ¶ 12. "*Ad litem*" in the TAL's title literally means "for the suit or action," and Regions Bank remains trustee of the Trusts for all other purposes, *e.g.*, investments and disposition of Trust assets. The TAL's appointment and authority is clearly limited in this respect. But within the scope of the TAL's limited purpose of appointment—pursuing the class litigation against Regions Bank's corporate affiliates—the TAL's authority is as broad as Regions Bank's would have been, including: "all powers appropriate to achieve the foregoing purposes." Accordingly, the McAbee Foundation Trust, by and through the TAL, has standing to bring claims as a Rule 23 representative plaintiff on behalf of the full Class of RHY purchasers.

## **Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants'

motions to dismiss in their entirety.  In the event the Court grants any of the motions in whole or

in part, Plaintiffs respectfully request leave to amend pursuant to Rule 15(a) of the Federal Rules

of Civil Procedure.

Dated:  June 17, 2011                                    Respectfully submitted,

                                                        BRANSTETTER, STRANCH
                                                          & JENNINGS, PLLC

                                                        */s/ J. Gerard Stranch, IV*
                                                        J. Gerard Stranch, IV (BPR# 023045)
                                                        227 Second Avenue North
                                                        Nashville, Tennessee  37201
                                                        Telephone:  (615) 254-8801
                                                        Facsimile:  (615) 250-3937

                                                        *Liaison Counsel for Lead Plaintiffs*

                                                        Joel H. Bernstein
                                                        Louis Gottlieb
                                                        David J. Goldsmith
                                                        Stefanie J. Sundel
                                                        LABATON SUCHAROW LLP
                                                        140 Broadway
                                                        New York, New York  10005
                                                        Telephone:  (212) 907-0700
                                                        Facsimile:  (212) 818-0477

                                                        *Lead Counsel for Lead Plaintiffs*
                                                        *Lion Fund, L.P., Dr. J. Samir*
                                                        *Sulieman and Larry Lattimore*

Crawford S. McGivaren
R. Carlton Smyly
CABANISS, JOHNSTON, GARDNER
  DUMAS & O'NEAL LLP
Suite 700, Park Place Tower
2001 Park Place North
Birmingham, Alabama  35203
Telephone:  (205) 716-5237
Facsimile:  (205) 716-5389

*Additional Counsel for the Trustee* ad Litem

George S. Trevor
PEARSON, SIMON, WARSHAW
  & PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, California  94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2011, I electronically filed the foregoing document with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

the following participating CM/ECF participants:

**Adam Julien Gana**
agana@nbrlawfirm.com

**Albert C. Harvey**
harveya@thomasonlaw.com

**Andrew Berke**
andy@berkeattys.com

**Asa R. Danes**
asadanes@paulhastings.com

**B. J. Wade**
bwade@gewwlaw.com

**Beth A. Keller**
bkeller@faruqilaw.com

**Charles H. Jones, Jr.**
fwatson@watsonburns.com

**Christopher Marlborough**
cmarlborough@faruqilaw.com

**D. Andrew Pietro**
pietroda@sullcrom.com

**Dale H. Tuttle**
dtuttle@gewwlaw.com

**David B. Tulchin**
tulchind@sullcrom.com

**Emily C. Komlossy**
ekomlossy@faruqilaw.com

**Emily Nicklin**
enicklin@kirkland.com

**Ernest Koella**
nf@fallsveach.com

**Eugene J. Podesta, Jr.**
gpodesta@bakerdonelson.com

**Frank L. Watson, III**
fwatson@watsonburns.com

**Harold Naill Falls, Jr.**
nf@fallsveach.com

**Ira Horowitz**
fwatson@watsonburns.com

**J. Timothy Francis**
francis@bham.rr.com

**Jeffrey B. Maletta**
jeffrey.maletta@klgates.com

**Jeffrey R. Sonn**
jsonn@sonnerez.com

**Jerome A. Broadhurst**
jbroadhurst@appersoncrump.com

**David E. Swarts**
swartsd@sullcrom.com

**Derek W. Loeser**
dloeser@kellerrohrback.com

**Edge Partners, Ltd.**
fwatson@watsonburns.com

**Ellen M. Doyle**
edoyle@stemberfeinstein.com

**Kevin C. Logue**
kevinlogue@paulhastings.com

**Kristopher S. Ritter**
ritterk@kirkland.com

**Leo Maurice Bearman , Jr**
lbearman@bakerdonelson.com

**Marc Jay Bern**
mjbern@nbrlawfirm.com

**Mark P. Chalos**
mchalos@lchb.com

**Martin W. Zummach**
martin@sparkman-zummach.com

**Matthew M. Curley**
mcurley@bassberry.com

**Michael A. Brady**
mbrady@bassberry.com

**Michael L. Dagley**
mdagley@bassberry.com

**Nicole A. Baker**
nicole.baker@klgates.com

**Peter H. Burke**
pburke@bhflegal.com

**John A. Cremer**
cmb@indylaw.com

**John B. Veach, III**
tv@fallsveach.com

**John J. Carey**
jcarey@careydanis.com

**Kenneth C. Johnston**
kjohnston@krel.com

**Peter S. Fruin**
pfruin@maynardcooper.com

**Randall K. Pulliam**
rpulliam@cauleybowman.com

**Richard A. Lockridge**
ralockridge@locklaw.com

**Scott L. Adkins**
sadkins@sonnerez.com

**Scott T. Beall**
sbeall@bealllaw.com

**Seymour Warren**
fwatson@watsonburns.com

**Shepherd D. Tate**
state@bassberry.com

**Steven Lawrence Polk**
larry.polk@sutherland.com

**Timothy A. Duffy**
tduffy@kirkland.com

**W. Brantley Phillips, Jr.**
bphillips@bassberry.com

Furthermore, I hereby certify that I have mailed the document via the U.S. Postal Service
to the following non-CM/ECF participants:

**Paul J. Dobrowski**
DOBROWSKI LLP
4601 Washington Avenue, #300
Houston, TX 77007-5471

**Richard M. Heimann**
LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
Embarcadero Center West
275 Battery St., 30th Floor
San Francisco, CA 94111-3339

**Robert A. Izard**
**Jeff Nobel**
**Nancy A. Kulesa**
IZARD NOBEL
29 South Main Street, Suite 215
West Hartford, CT 06107

_/s/ J. Gerard Stranch, IV_
J. GERARD STRANCH, IV