IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

|  |  |  |
|---|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE and ERISA LITIGATION | ) ) ) ) | No. 2:09-md-02009-SHM |
| This Document Relates to: | ) ) ) | |
| *In re Regions Morgan Keegan Closed-End Fund Litigation*, | ) ) ) | |
| No. 2:07-cv-02830-SHM-dkv | ) ) ) | |

_____

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF MOTION TO DISMISS FILED BY MORGAN ASSET MANAGEMENT, INC.,
MORGAN KEEGAN & COMPANY, INC., AND MK HOLDING, INC.**

Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
BASS BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN  37201
(615) 742-6200

Shepherd D. Tate
Michael A. Brady
BASS BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, Tennessee  38103-3672
(901) 543-5900

*Attorneys for Morgan Asset Management,
Inc., Morgan Keegan & Company, Inc., and
MK Holding, Inc.*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

I.      Plaintiffs' 1934 Act Claims Are Time-Barred................................................3

      A.      Sixth Circuit Precedent Provides that *American Pipe* Does Not Apply to
              Successive Class Actions.................................................................4

      B.      *American Pipe* Does Not Apply To Voluntarily Dismissed Actions. ....................7

      C.      *American Pipe* Does Not Apply Given the Absence of Identity of Parties.............8

II.     Plaintiffs' 1933 Act Claims Concerning the RHY Fund Are Time-Barred........................8

III.    The TAL Subclass Claims Are Untimely Because *Daniels* Was Untimely. ....................10

IV.     Plaintiffs Have Failed to Adequately Plead Facts Giving Rise to a Strong Inference of
      Scienter. .................................................................................................11

      A.      Plaintiffs Are Required To Plead Specific Facts Giving Rise to a Strong
              Inference of Scienter on the Part of the Funds and Their Officers. ......................11

            1.      Plaintiffs Cannot Use "Group Pleading" to Satisfy Their
                  Obligation to Plead Scienter. .................................................12

            2.      Mr. Kelsoe's Alleged Scienter Cannot Be Imputed to the Funds.............13

      B.      Plaintiffs Fail to Plead Particularized Facts Giving Rise to a Strong
              Inference that Any Alleged Misrepresentations or Omissions Were Made
              with the Requisite Scienter. ...................................................................15

            1.      Plaintiffs' Allegations that the Funds Knowingly Misvalued
                  Portfolio Securities Fail to Give Rise to a Strong Inference of
                  Scienter. .......................................................................15

            2.      Plaintiffs' Allegations that the Funds Mischaracterized or
                    Concealed the Composition of Their Portfolios Fail to Give Rise to
                  a Strong Inference of Scienter.................................................17

             3.      Plaintiffs' Allegations Regarding Due Diligence Fail to Give Rise
                    to a Strong Inference of Scienter. ............................................19

            4.      Plaintiffs' Allegations Regarding the Funds' Choice of a
                    Benchmark Index Fail to Give Rise to a Strong Inference of
                  Scienter. .......................................................................20

C.    The Most Plausible Inference Is that Defendants Failed to Anticipate the Global Credit Crisis ...........................................................................20

D.    Plaintiffs' "Confidential Witness" Allegations Do Not Support a Strong Inference of Scienter. ................................................................23

V.    Plaintiffs Have Failed to Plead that Any of the Funds' Public Filings Contained Actionable Misrepresentations or Omissions. ...................................24

A.    Corporate Mismanagement Is Not Actionable Under the Federal Securities Laws. ......................................................................25

B.    Plaintiffs Have Failed to Plead that the Funds Knowingly Issued False Valuations of Securities. ..........................................................27

C.    The Funds Disclosed the Types of Securities in which the Funds Would Invest and the Risk Associated with these Investments...................28

D.    Plaintiffs' Allegations Are Premised on Their Own Misstatement of the Funds' Industry Concentration Restriction............................29

E.    The Funds Were Not "Index Funds" and the Funds' Benchmark Was Not Offered For Purposes of Risk Analysis. ....................................31

VI.    Plaintiffs Have Failed to Adequately Plead Loss Causation. ...........................33

A.    Plaintiffs Have Failed to Plead Corrective Disclosures that Revealed Previously Misrepresented Facts. ................................................34

B.    Plaintiffs Have Failed to Plausibly Allege that the Revelation of Any Purported Corrective Disclosures Caused Plaintiffs' Losses...............37

C.    Plaintiffs' New "Materialization-of-Risk" Theory Does Not Satisfy Plaintiffs' Obligation to Plead Loss Causation. .........................39

VII.    Plaintiffs Have Failed to Allege that MAM, Morgan Keegan and MK Holding Were "Control Persons" Under § 20(a) of the 1934 Act. .....................41

VIII.    The TAL Lacks Authority to Bring Class Action Litigation. ..............................44

IX.    Plaintiffs' "Notice of Filing Supplemental Authority" Must Be Disregarded.................45

CONCLUSION..........................................................................................46

ii

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Abner v. County of Saginaw,*
  496 F. Supp. 2d 810 (E.D. Mich. 2007) .................................................................................. 6

*American Pipe & Construction Co. v. Utah,*
  414 U.S. 538 (1974) ................................................................................... *passim*

*Andrews v. Orr,*
  851 F.2d 146 (6th Cir. 1988) ..................................................................... *passim*

*Anixter v. Home-Stake Prod. Co.,*
  939 F.2d 1420 (10th Cir. 1991), *vacated on other grounds sub. nom.*
  *Dennler v. Trippet,* 503 U.S. 978 (1992) ................................................................ 9

*Archdiocese of Milwaukee Supporting Fund v. Halliburton,*
  597 F.3d 330 (5th Cir. 2010), *rev'd on other grounds,* 131 S. Ct. 2179 (2011) .............................. 34

*Ashland, Inc. v. Oppenheimer & Co., Inc.,*
  2011 WL 3181277 (6th Cir. 2011) ............................................................. *passim*

*Azzolini v. CorTS Trust II for Provident Fin. Trust I,*
  2005 U.S. Dist. LEXIS 31853 (E.D. Tenn. Sept. 16, 2005) .................................................. 43

*Basch v. Ground Round, Inc.,*
  139 F.3d 6 (1st Cir. 1998) ........................................................................ 4

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................. 44

*Bishop v. Lucent Techs., Inc.,*
  520 F.3d 516 (6th Cir. 2008) ..................................................................... 39

*Brecher v. Citigroup Inc.,*
  2011 WL 2209145 (S.D.N.Y. June 7, 2011) ..................................................... 10, 16

*Brown v. Earthboard Sports USA, Inc.,*
  481 F.3d 901 (6th Cir. 2007) ..................................................................... 39

*Carpenters Health & Welfare Fund v. Coca-Cola Co.,*
  2008 U.S. Dist. LEXIS 112503 (N.D. Ga. 23, 2008) ........................................................ 45

*Collmer v. U.S. Liquids, Inc.,*
  268 F. Supp. 2d 718 (S.D. Tex. 2003) .............................................................. 20

*Crown, Cork & Seal Co. v. Parker,*
    462 U.S. 345 (1983)....................................................................................6, 8

*DE & J Ltd. P'ship v. Conaway,*
    284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd* 133 F. App'x 994 (6th Cir. 2005).......35, 41, 42

*Ex Parte Regions Fin. Corp. ("Rice"),*
    2010 WL 3835727 (Ala. Sept. 30, 2010)..............................................................26

*Footbridge Ltd. Trust v. Countrywide Fin. Corp.,*
    770 F. Supp. 2d 618 (S.D.N.Y. 2011).................................................................9

*Frank v. Dana Corp.,*
    2011 WL 2020717 (6th Cir. May 25, 2011) ..........................................................22

*Ganousis v. E.I. du Pont de Nemours & Co.,*
    803 F. Supp. 149 (N.D. Ill. 1992) .....................................................................7

*Graham v. Barriger,*
    699 F. Supp. 2d 612 (S.D.N.Y. 2009)................................................................44

*Hayes v. Gen. Motors Corp.,*
    94 F.3d 644 (6th Cir. 1996) ...........................................................................9

*Hubbard v. BankAtlantic Bancorp, Inc.,*
    625 F. Supp. 2d 1267 (S.D. Fla. 2008) ..............................................................23

*In the Matter of Piper Capital Mgmt, Inc.,*
    2000 WL 1759455 (Nov. 30, 2000).....................................................................32

*In re AEP ERISA Litig.,*
    2009 WL 614951 (S.D. Ohio Mar. 6, 2009)..........................................................5, 6

*In re Ambac Fin. Group Sec. Litig.,*
    693 F. Supp. 2d 241 (S.D.N.Y. 2010).................................................................32

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. 534 (N.D. Cal. 2009)......................................................................32

*In re Citigroup, Inc. Securities Litig.,*
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)................................................................26

*In re Daou Sys., Inc. Sec. Litig.,*
    411 F.3d 1006 (9th Cir. 2005) ........................................................................38

*In re Digital Island Sec. Litig.,*
    223 F. Supp. 2d 546 (D. Del. 2002)..................................................................43

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
  705 F. Supp. 2d 86 (D. Mass. 2010) ................................................................31

*In re Huffy Corp. Securities Litig.*,
  577 F. Supp. 2d 968 (S.D. Ohio 2008) ........................................................14, 23

*In re IndyMac Mortgage-Backed Sec. Litig.*,
  2011 WL 2462999 (S.D.N.Y. June 21, 2011) ....................................................10

*In re IndyMac Mortgage-Backed Securities Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y 2010)...................................................................7

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 298 (S.D.N.Y. 2005)................................................................40

*In re Lehman Bros. Sec. & ERISA Litig.*,
  2011 WL 1453790 (S.D.N.Y. Apr. 13, 2011)..................................................9, 10

*In re Manulife Fin. Corp. Sec. Litig.*,
  2011 WL 1990883 (S.D.N.Y. May 23, 2011) ...............................................35, 36

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 429 (S.D.N.Y. 2003)................................................................40

*In re Merrill Lynch & Co, Inc. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) .........................................................................46

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
  2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006).....................................................45

*In re N.Y. Community Bancorp. Sec. Litig.*,
  448 F. Supp. 2d 466 (E.D.N.Y. Sept. 18, 2006) ................................................28

*In re Nvidia Corp. Sec. Litig.*,
  2010 WL 4117561 (N.D. Cal. Oct. 19, 2010).....................................................39

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ............................................................................33

*In re RAC Mortg. Inv. Corp. Sec. Litig.*,
  765 F. Supp. 860 (D. Md. 1991) .......................................................................28

*In re Regions Morgan Keegan Open-End Fund Litig.*,
  743 F. Supp. 2d 744 (W.D. Tenn. 2010), *recons. denied*
  2010 WL 5464792 (W.D. Tenn. Dec. 30, 2010) ...........................................25, 43

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996) ................................................................................8

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)..................................................................33

*In re Tyson Foods, Inc.*,
  155 Fed. Appx. 53 (3d Cir. 2005)......................................................................14

*Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v.
  Omnicare, Inc.*,
  583 F.3d 935 (6th Cir. 2009) ....................................................................... *passim*

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*,
  32 F.3d 697 (2d Cir. 1994)....................................................................................9

*Janus Capital Group, Inc. v. First Derivative Traders*,
  131 S. Ct. 2296 (2011)................................................................................. *passim*

*Johnson v. Metro. Gov't of Nashville & Davidson County*,
  2008 WL 3163531 (M.D. Tenn. Aug. 4, 2008) ...................................................45

*Kadel v. Flood*,
  2011 WL 2015379 (11th Cir. May 24, 2011) ......................................................21

*Kalin v. Xanboo, Inc.*,
  526 F. Supp. 2d 392 (S.D.N.Y. 2007).................................................................42

*Krinsk v. Fund Asset Mgmt., Inc.*,
  1986 WL 205 (S.D.N.Y. May 9, 1986) ................................................................6

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991)..............................................................................................9

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005).................................................................................40

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976).................................................................................46

*Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v.
  Fifth Third Bancorp.*,
  731 F. Supp. 2d 689 (S.D. Ohio 2010) ...................................................13, 18, 23

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*,
  2011 U.S. Dist. LEXIS 60761 (N.D. Ala. June 7, 2011)................................22, 37

*Lormand v. U.S. Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009)...............................................................................37

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
  652 F. Supp. 2d 576 (E.D. Pa. 2009) ....................................................38

*Madu, Edozie & Madu P.C. v. Socketworks Ltd. Nigeria*,
  265 F.R.D. 106 (S.D.N.Y. 2010) .........................................................45

*Magruder v. Halliburton Co.*,
  2009 WL 854656 (N.D. Tex. March 31, 2009) .....................................35

*Nat'l Junior Baseball League v. Pharmanet Dev. Group, Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) .....................................................35

*PR Diamonds v. Chandler*,
  91 F. App'x 418 (6th Cir. 2004) ..........................................................37

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ....................................................... *passim*

*R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*,
  584 F.3d 1 (1st Cir. 2009).....................................................................38

*Rafton v. Rydex Series Funds*,
  2011 WL 31114 (N.D. Cal. Jan. 5, 2011) ............................................32

*Rodrigo, L.L.C. v. Twp. of Richmond*,
  641 F.3d 673 (6th Cir. 2011) ...............................................................39

*S. Cherry St., LLC v. Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009).................................................................19

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*,
  765 F.2d 1334 (5th Cir. 1985) ...............................................................4

*Santa Fe Indus. v. Green*,
  430 U.S. 462 (1977)..........................................................................26

*SEC v. Haligiannis*,
  470 F. Supp. 2d 373 (S.D.N.Y. 2007)..................................................14

*SEC. v. Young*,
  2011 WL 1376045 (E.D. Pa. Apr. 12, 2011) .......................................14

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000)................................................................39

*Sherer v. Construcciones Aeronauticas, S.A.*,
  987 F.2d 1246 (6th Cir. 1993) ...............................................................7

vii

*Short v. Belleville Shoe Mfg. Co.*,
  908 F.2d 1385 (7th Cir. 1990) ...................................................................................9

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)....................................................................................21

*Teamsters Local 445 v. Bombardier, Inc.*,
  2005 WL 2148929 (S.D.N.Y. Sept. 6, 2005).........................................................35

*Tellabs v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................................11

*Thompson v. Relationserve Media, Inc.*,
  610 F.3d 628 (11th Cir. 2010) ................................................................................12

*Zelman v. J.D.S. Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) ...................................................................14

## STATUTES

15 U.S.C. 77m.............................................................................................................9

15 U.S.C. §§ 77k(a), 77l(a)(2) ...................................................................................24

## OTHER AUTHORITIES

Fed. R. Civ. P. 8 ...................................................................................................37, 43

Fed. R. Civ. P. 9(b) ..............................................................................................32, 43

Fed. R. Civ. P. 12(f) ...................................................................................................46

| | *In re Regions Morgan Keegan Closed-End Fund Litigation*,, 2:08-cv-02830-SHM-dkv <br> **Pending Actions** | | | | |
|---|---|---|---|---|---|
| **Action** | **Date Filed** | **Closed-End Funds** | **Claims** | **Status** | **Class Period** |
| *Willis v. Morgan Keegan*, No. 07-cv-02830 | Dec. 21, 2007 | RHY | §§ 11, 12(a)(2), 15 | Pending | Unstated |
| *Hartman v. Morgan Keegan*, No. 08-cv-02071 | Feb. 4, 2008 | RHY | §§ 11, 12(a)(2), 15 | Pending | Dec. 6, 2004 Nov. 7, 2007 |
| *Gregory v. Morgan Keegan*, No. 08-cv--2078 | Feb. 6, 2008 | RSF RMH RMA | § 11, 12(a)(2), 15 | *Voluntarily Dismissed* Dec. 3, 2008 | Dec. 6, 2004 Feb. 6, 2008 |
| *Massey v. Morgan Keegan*, No. 08-cv-02127 | Feb. 26, 2008 | RSF RMH RMA | § 11, 12(a)(2), 15 | *Voluntarily Dismissed* May 9, 2008 | Dec. 6, 2004 Feb. 6, 2008 |
| *DeJoseph v. Morgan Keegan*, No. 08-cv-2212 | Apr. 4, 2008 | RSF RMH RMA | §§10(b), 20(a) | *Voluntarily Dismissed* Feb. 18, 2010 | Dec. 8, 2006 Dec. 5, 2007 |
| *Daniels v. Morgan Keegan*, No. 08-cv-02452 (*"Daniels RMH"*) | July 11, 2008 | RMH | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Daniels v. Morgan Keegan*, No. 08-cv-2453 (*"Daniels RMA"*) | July 11, 2008 | RMA | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Daniels v. Morgan Keegan*, No. 08-cv-2455 (*"Daniels RSF"*) | July 11, 2008 | RSF | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Daniels v. Morgan Keegan*, No. 08-cv-2456 (*"Daniels RHY"*) | July 11, 2008 | RHY | §§ 11, 12(a)(2) §§ 10(b), 20(a) § 34(b) of the ICA | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Jones v. Morgan Keegan*, No. 10-cv-02248 | Apr. 8, 2010 | RSF RMH RMA RHY | **All Funds:** §§ 10(b), 20(a) **RHY:** §§ 11, 12(a)(2), 15 | Pending | Dec. 6, 2004 Feb. 6, 2008 |
| *Palmour v. Morgan Keegan*, No. 10-cv-02380 | May 19, 2010 | RSF RMH RMA RHY | **All Funds:** §§ 10(b), 20(a) | Pending | June 6, 2005 July 14, 2009 |
| *Consolidated Class Action Compl.* | Feb. 22, 2010 | RSF RMH RMA RHY | **All Funds:** §§ 10(b), 20(a) **RHY:** §§ 11, 12(a)(2), 15 | Pending | Various Periods |

Morgan Keegan & Company, Inc. ("Morgan Keegan"), Morgan Asset Management, Inc. ("MAM"), and MK Holding, Inc. ("MK Holding," and collectively with the foregoing, "Defendants"), respectfully submit this reply memorandum in further support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("CAC").[1]

## PRELIMINARY STATEMENT

Plaintiffs' CAC fails to state claims under the Securities Act of 1933 (the "1933 Act") and the Securities Exchange Act of 1934 (the "1934 Act") against Morgan Keegan, MAM and MK Holding for a number of separate and independent bases.  As an initial matter, Plaintiffs' §§ 11 and 12(a)(2) claims under the 1933 Act asserted against Morgan Keegan and Plaintiffs' control person claims asserted against Morgan Keegan, MAM and MK Holding under § 20(a) of the 1934 Act are time-barred.  While Plaintiffs hope to rely on previously filed class actions to toll the limitations and repose periods with respect to claims asserted in this action, such tolling is not permitted under either Sixth Circuit precedent or other well-grounded limitations on the principles flowing from the Supreme Court's opinion in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).

Plaintiffs' Opposition otherwise cannot overcome the substantive pleading deficiencies with respect to Plaintiffs' 1933 Act and 1934 Act claims.  With respect to the issue of scienter, Plaintiffs' CAC contains no particularized allegations that the Funds or their officers or employees acted with the requisite intent in connection with any of the allegedly fraudulent conduct at issue in this action.  Similarly, as to loss causation, Plaintiffs' Opposition fails to identify a corrective disclosure that revealed to the market a non-confirmatory material fact that an alleged primary violator, such as the Funds, previously misrepresented or that the revelation

---

[1]     Except as otherwise indicated, the capitalized and defined terms set forth herein are the same as in the initial memorandum submitted by Morgan Keegan, MAM and MK Holding in support of their Motion to Dismiss ("MK/MAM Mem.").

of any such previously undisclosed fact actually caused Plaintiffs' alleged losses.  Rather, the "disclosures" upon which Plaintiffs rely simply confirmed information already in the possession of investors and cannot be said to have caused Plaintiffs' losses.  Because Plaintiffs' CAC affirmatively establishes that Plaintiffs cannot plead loss causation with respect to their 1933 Act claims, those claims likewise must be dismissed.

Plaintiffs also have failed to plead material misrepresentations and/or omissions attributable to any primary violator, such as the Funds or the "Officer Defendants," necessary to state a claim under either the 1933 Act or the 1934 Act.  While Plaintiffs allege that the Funds misvalued certain assets and violated certain investment restrictions, such allegations would at most show corporate mismanagement, not a violation of the federal securities laws.  The balance of Plaintiffs' allegations focus on Plaintiffs' criticisms of the Funds' risk disclosures.  There can be no dispute, however, that the Funds' public filings fully disclosed to investors the nature of the assets in which the Funds could and did invest and the significant risk associated with an investment in the Funds.

Plaintiffs' control person claims under § 20(a) of the 1934 Act against Morgan Keegan, MAM and MK Holding fail as a result of Plaintiffs' failure to plead an underlying primary violation of § 10(b).  These claims are also legally insufficient as a result of the nature of the "control" allegedly exercised by these Defendants.  Morgan Keegan and MK Holding are alleged to have controlled MAM, which is not alleged to be a primary violator.  With respect to MAM, Plaintiffs have failed to plead facts sufficient to show that MAM allegedly controlled any primary violator.  Accordingly, Plaintiffs' claims must be dismissed.

## **ARGUMENT**

### I.     **Plaintiffs' 1934 Act Claims Are Time-Barred.**

Plaintiffs acknowledge that the timeliness of their 1934 Act claims concerning the RMA, RSF and RMH Funds[2] turns on whether the previously filed and voluntarily dismissed *DeJoseph*[3] action – which asserts 1934 Act claims concerning the RMA, RSF and RMH Funds – tolls these claims.   In other words, Plaintiffs' 1934 Act claims concerning these Funds are time-barred unless Plaintiffs can avail themselves of the tolling principles set forth in *American Pipe* with respect to *DeJoseph*.   As a matter of law, the application of *American Pipe* with respect to Plaintiffs' 1934 Act claims rises and ultimately falls on three related questions: (1) whether *American Pipe* applies to subsequently filed class actions; (2) whether *American Pipe* applies to voluntarily dismissed actions; and (3) whether *American Pipe* applies absent an identity of claims and parties.[4]   Each of these questions provides separate grounds for dismissal of Plaintiffs' 1934 Act claims.

---

[2]     As no prior class action asserted claims on behalf of members of the putative Class concerning the RHY Fund, Plaintiffs impliedly concede that the claims asserted on behalf of the Class under the 1934 Act concerning the RHY Fund are untimely.  (*See* Pls.' Opp. at 70 (stating that "Plaintiffs' Exchange Act claims were timely filed on behalf of all purchasers of RMH, RSF, and RMA within the Class."); *id.* at 77 ("[A]t least with regard to RMH, RSF, and RMA, there is a requisite identity of claims between *DeJoseph* and the Complaint here.").)

[3]     For the Court's convenience, Defendants attach a chart containing relevant information regarding the related pending actions, including case name and number and the Funds at issue.  *See supra* p. ix.

[4]     Plaintiffs also concede that they are relying solely on the filing of *DeJoseph* to toll the 1934 Act claims asserted on behalf of the Class concerning RMA, RSF and RMH Funds.  Plaintiffs impliedly concede that *Willis*, *Hartman*, *Massey*, *Gregory* and *Daniels* do not toll the 1934 Act claims asserted on behalf of the Class defined in the CAC due to the absence of an identity of parties and claims.  (*See* Pls.' Opp. at 77.)

### A.   Sixth Circuit Precedent Provides that *American Pipe* Does Not Apply to Successive Class Actions.

Long-standing Sixth Circuit precedent holds that *American Pipe* does not permit a previously filed class action to toll the statute of limitations with respect to claims asserted in a subsequently filed class action. *See Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988). Notwithstanding the Sixth Circuit's opinion in *Andrews*, Plaintiffs assert that the previously filed and voluntarily dismissed *DeJoseph* action tolls the statute of limitations on their otherwise time-barred 1934 Act claims.

*American Pipe* creates a narrow exception that permits tolling based on a previously filed class action only for individual claims and not subsequently filed claims asserted on behalf of a putative class. In considering this question, the Sixth Circuit's opinion in *Andrews* provides that, under *American Pipe*, a previously filed class action cannot be used to toll the statute of limitations with respect to a successive class action: "[T]he pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class." *Andrews*, 851 F.2d at 149.

Plaintiffs invite this Court to ignore the plain language of *Andrews* and considerably limit its holding in a manner inconsistent with *American Pipe*. (*See* Pls.' Opp. at 72-74.) As other courts have explained, the tolling rule set forth in *American Pipe* is not "meant to permit the stacking of class actions." *Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998). And, as the Fifth Circuit recognized in *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985), "Plaintiffs have cited no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely, nor have we found any." *Id.* at 1351.

4

Plaintiffs misleadingly cite to *In re AEP ERISA Litig.*, 2009 WL 614951, *5 (S.D. Ohio Mar. 6, 2009), in support of their position.   *AEP*, however, illustrates that Plaintiffs' hoped-for limitation of *Andrews* is unwarranted.   While Plaintiffs cite *AEP* for the proposition that "'*Andrews* is not controlling' where there has been no determination as to class certification or otherwise rendering class action treatment improper" (Pls.' Opp. at 72), this is an incorrect reading of the district court's holding in *AEP*.

In *AEP*, a putative class member sought to intervene after the district court denied class certification due to the inadequacy of the class representative.   2009 WL 614951, at *1. Defendants asserted that the intervenor's claims were untimely and not tolled by *American Pipe*. *Id.* at *2.   The district court characterized the plaintiff's argument in that action as follows: "[Intervenor] argues that *Andrews is not controlling* because it applied to successive class actions, which is not the case here, where class certification was denied simply because the class representative was inadequate.   [Intervenor's] argument is persuasive."   *Id.* at *5 (emphasis supplied).[5]

*AEP* does not stand for the proposition that *American Pipe* tolls a subsequently filed class action so long as no determination has been made with respect to class certification.   To the contrary, *AEP* specifically recognized that the line of cases concluding that tolling under *American Pipe* was not applicable involved two distinct circumstances: (1) "an attempt to file an entirely separate class action" *or* (2) "an attempt to bring a later class action after the court had determined that proceeding as a class was an inappropriate method of resolving the lawsuit."   *Id.* at *5 (citing *Andrews*; *Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987)).

---

[5]     The phrase quoted by Plaintiffs – "*Andrews* is not controlling" – does not otherwise appear in the district court's opinion in *AEP*.

In identifying circumstances in which *American Pipe* did not toll the statute of limitations, the district court in *AEP* identified the exact scenario that exists before this Court – an attempt to file an entirely separate class action.  Under such circumstances, the district court in *AEP* recognized that *Andrews* does not permit a plaintiff in "successive class actions" to avail themselves of tolling under *American Pipe*.  *Id.* at *5; *see also Abner v. County of Saginaw*, 496 F. Supp. 2d 810, 822 (E.D. Mich. 2007) ("The Sixth Circuit has rejected the view that serial class actions can perpetuate themselves under the *American Pipe* rule. '[T]he pendency of a previously filed class action does not toll the limitations period for additional class actions by putative members of the original asserted class.'" (quoting *Andrews*, 851 F.2d at 149)).

In *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), Justice Powell forewarned, and the Sixth Circuit has since reminded, that "[t]he tolling rule of *American Pipe* is a generous one, inviting abuse."  *Id.* at 354 (Powell, J., concurring), *quoted approvingly in Andrews*, 851 F.2d at 149; *see also Krinsk v. Fund Asset Mgmt., Inc.*, 1986 WL 205, at *3 (S.D.N.Y. May 9, 1986) ("[T]he broad reading of *American Pipe* sought by the plaintiffs would logically lead to an endless succession of representative actions not contemplated by the Supreme Court in holding that the *individual* claims in *American Pipe* were not time barred.").  The stacking of putative class actions to extend the statute of limitations for putative class claims, as Plaintiffs urge, would amount to just the sort of abuse that the Sixth Circuit sought to prevent in *Andrews*. Indeed, the entire purpose of *American Pipe* is to allow for the tolling of individual claims – not class claims – during the pendency of a putative class action and not to allow the serial filing of putative class actions and indefinitely extend the statute of limitations for such class claims.

It is certainly true, as demonstrated by the cases upon which Plaintiffs rely, that some courts have stretched the principles of *American Pipe* beyond recognition.  The Sixth Circuit,

however, rightly recognized the limited nature of the tolling afforded by *American Pipe*.  Until

such time, if ever, that the Sixth Circuit revisits (and substantially narrows) its holding in

*Andrews*, "the pendency of a previously filed class action does not toll the limitations period for

additional class actions by putative members of the original asserted class."  *Andrews*, 851 F.2d

at 149.

   B.   ***American Pipe* Does Not Apply To Voluntarily Dismissed Actions.**

   Under *American Pipe*, a "voluntarily dismissed complaint does not toll the statute of

limitations."  *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 504 (S.D.N.Y

2010). This is because the "law treats a voluntarily dismissed complaint as if it never had been

filed."  *Id.*; *see also Sherer v. Construcciones Aeronauticas, S.A.*, 987 F.2d 1246, 1247 (6th Cir.

1993) ("[A] voluntary dismissal without prejudice leaves the situation as if the action had never

been filed.").[6]

   Under Plaintiffs' theory, the successive filing and voluntary dismissal of putative class

actions could toll the statute of limitations for each subsequent class action indefinitely, so long

as the issue of class certification had not been taken up by the Court.  Such a result could allow

for the very real likelihood of forum shopping, judge shopping and the endless delay of

proceedings, among other tactics.  This certainly was not what the Supreme Court intended in its

holding in *American Pipe.*

---

[6]    The refusal to extend *American Pipe* tolling to voluntarily dismissed actions is consistent with the
narrow view afforded such tolling by the Sixth Circuit in *Andrews*.  Plaintiffs, however, complain that
such a rule would be unfair because the putative class relied on the pendency of *DeJoseph* to preserve
their rights, either by intervening in *DeJoseph* or otherwise pursuing their individual claims.  If that truly
were the case, then members of the putative class would have realized that the plaintiff in *DeJoseph* took
absolutely no action in advancing claims on behalf of the putative class between the filing of *DeJoseph* on
April 4, 2008, and its dismissal on February 24, 2010.  In light of this realization, putative class members
presumably would have taken action in furtherance of their own claims.  Moreover, as courts have
recognized, *American Pipe* is founded on a "fiction upon a fiction" that absent class members know of a
pending class action and, solely because the class action is pending, do not assert individual claims.  *See
Ganousis v. E.I. du Pont de Nemours & Co.*, 803 F. Supp. 149, 155 (N.D. Ill. 1992).

As the Sixth Circuit reiterated in *Andrews*, "[t]he tolling rule of *American Pipe* [] is a generous one, inviting abuse."  *Andrews*, 851 F.2d at 149 (citation omitted).  For this reason, even if the Sixth Circuit's directive in *Andrews* regarding the inapplicability of *American Pipe* tolling for successive class actions were to be disregarded, the Court should not permit Plaintiffs to stack the instant claims on the voluntarily dismissed *DeJoseph* action.

>    **C.**     ***American Pipe* Does Not Apply Given the Absence of Identity of Parties.**

Plaintiffs entirely gloss over the requirement that there be an identity of parties in order for *American Pipe* to apply.  Here, Plaintiffs are seeking to use *American Pipe* to accomplish an extraordinary expansion of the putative class.  While *DeJoseph* pleaded a putative class period of December 8, 2006, through December 5, 2007, Plaintiffs seek to expand the class period for their 1934 Act claims to include all shareholders who purchased or acquired Fund securities from June 24, 2003, to as late as July 14, 2009.  *American Pipe*, however, only applies where an earlier action was brought on behalf of "all members of the putative class."  *Crown, Cork & Seal*, 462 U.S. at 354.  The expansion of the putative class precludes application of *American Pipe*.  *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 936 (9th Cir. 1996) ("The equitable tolling doctrine only tolls the statute of limitations for asserted class members.").  The attempted expansion of the putative class further demonstrates the abuses that Plaintiffs' position would invite.  *See American Pipe*, 414 U.S. at 561 (Blackmun, J., concurring) ("Our decision . . . must not be regarded as encouragement to lawyers . . . to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights.").

**II.**     **Plaintiffs' 1933 Act Claims Concerning the RHY Fund Are Time-Barred.**

Plaintiffs' 1933 Act claims, which relate only to the RHY Fund, are likewise time-barred.  Plaintiffs maintain that the filing of *Willis* tolled the 1933 Act's one-year statute of limitations and the three-year statute of repose.  Plaintiffs' reliance on *Willis* to toll the statutes of limitations

and repose, however, is misplaced.   As explained above, *American Pipe* applies only to successive individual actions, not to successive class actions.  *See Andrews*, 851 F.2d at 149.

Even if *American Pipe* were to toll the statute of limitations, it would not toll the 1933 Act's statute of repose, which expired on January 19, 2009.  The repose period under the 1933 Act is absolute and not subject to tolling:  "*In no event* shall any such action be brought to enforce a liability created under [section 11 or section 12(a)(1)] of this title more than three years after the security was bona fide offered to the public, or under [section 12(a)(2)] of this title more than three years after the sale."  15 U.S.C. § 77m (emphasis supplied).

The plain language of 1933 Act's statute of repose creates "an absolute limitation." *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir. 1994).  As the Seventh Circuit has explained, "[u]nless the 'in no event more than three' language cuts off claims of tolling and estoppel at three years . . ., it serves no purpose at all . . . ."  *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1391 (7th Cir. 1990); *see also In re Lehman Bros. Sec. & ERISA Litig.*, 2011 WL 1453790, *3 (S.D.N.Y. Apr. 13, 2011) ("Section 13 of that act states quite clearly that '[i]n no event' shall such claims be asserted 'more than three years after' the pertinent offerings.  That language is absolute. . . . In the absence of further legislation, this Court must apply the statute as written.").

Based on the foregoing, the 1933 Act's statute of repose is not subject to tolling under *American Pipe.  See Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 623 (S.D.N.Y. 2011).[7]  Plaintiffs hope to paint *Footbridge* as an outlier.  (*See* Pls.' Opp. at 81 n.59.)

---

[7]     As the district court in *Footbridge* explained, unlike statutes of limitation, statutes of repose are not subject to equitable tolling.  *See Footbridge*, 770 F. Supp. 2d at 624 ("It is settled that a federal statute of repose is not subject to equitable tolling.").  The Supreme Court also has held, "a period of repose [is] inconsistent with tolling," and the purpose of a repose period "is clearly to serve as a cutoff."  *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991); *see also Hayes v. Gen. Motors Corp.*, 94 F.3d 644, at *4 (6th Cir. 1996) (table); *Anixter v. Home-Stake Prod. Co.*, 939 F.2d

9

To the contrary, in the few months since the district court issued its opinion in *Footbridge*, at least two other district courts have explicitly approved of its reasoning and adopted its conclusions on this issue.  *See In re Lehman Bros. Sec. & ERISA Litig.*, 2011 WL 1453790, at *2 (S.D.N.Y. Apr. 13, 2011) ("Judge Castel, in a particularly persuasive decision, recently adopted this view [that *American Pipe* does not toll Section 13's statute of repose].  For the reasons discussed below, this Court agrees." (footnote omitted)); *In re IndyMac Mortgage-Backed Sec. Litig.*, 2011 WL 2462999, *2 (S.D.N.Y. June 21, 2011) ("Although some cases have reached a different result, this Court is persuaded by Judge Castel's recent ruling that neither *American Pipe* nor any other form of tolling may be invoked to avoid the three year statute of repose set forth in Section 13 of the Securities Act of 1933.").  The district court's well-reasoned opinion in *Footbridge* applies with equal force here.

## III.    The TAL Subclass Claims Are Untimely Because *Daniels* Was Untimely.

Plaintiffs acknowledge that the 1933 Act and 1934 Act claims asserted on behalf of the TAL Subclass were not asserted until the filing of *Daniels*, on July 11, 2008.  (*See* Pls.' Opp. at 76, 77.)  As discussed, however, as of March 2006, the Funds' offering documents and other public filings set forth a significant portion of the information upon which TAL Subclass now base their claims.  Given the allegations at issue in this action, the Funds' offering documents and public filings certainly provided a reasonably diligent plaintiff with the information upon which Plaintiffs have ultimately based their 1933 Act and 1934 Act claims as of March 2006. (*See* MK/MAM Mem. at 15-17.)  For this reason, the claims asserted on behalf of the TAL Subclass are time-barred.  *See Brecher v. Citigroup Inc.*, 2011 WL 2209145, at *9 (S.D.N.Y. June 7, 2011) (dismissing the plaintiffs' 1933 Act claims as untimely because the defendants'

---

1420, 1435 (10th Cir. 1991), *vacated on other grounds sub. nom. Dennler v. Trippet*, 503 U.S. 978 (1992) (holding that "no concept of equitable tolling can have validity beyond the three-year period of repose because Congress did not allow for breaching the Chinese Wall it intentionally created.").

"disclosures announced the *very information* the Complaint alleges had been misrepresented or withheld . . . concerning Citigroup's subprime exposures").

## IV.   Plaintiffs Have Failed to Adequately Plead Facts Giving Rise to a Strong Inference of Scienter.

In addition to being time-barred, Plaintiffs' claims under § 10(b) of the 1934 Act and Rule 10b-5 against the Funds and the "Officer Defendants"[8] fail as a matter of law because Plaintiffs have failed to plead any specific, particularized facts giving rise to a strong inference of scienter.  The PSLRA requires Plaintiffs to plead such facts "with particularity," and a "strong" inference of scienter drawn from such facts must be cogent and at least as compelling as any inference of nonfraudulent intent.  *See, e.g.*, *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); *see also Ashland, Inc. v. Oppenheimer & Co.*, 2011 WL 3181277, *4 (6th Cir. 2011).

Plaintiffs have not met this exacting standard.  Plaintiffs allege: (1) that securities in the Funds' portfolios were misvalued; (2) that the Funds' portfolios were overconcentrated in certain types of securities; (3) that the Funds' investment advisor failed to perform adequate due diligence; and (4) that the Funds' performance was compared to an incorrect benchmark index. They fail to plead, however, a single particularized fact alleging that the Funds or any of the Officer Defendants engaged in any knowing or reckless misconduct as required to show scienter. As such, Plaintiffs' § 10(b) claims fail as a matter of law.

### A.   Plaintiffs Are Required To Plead Specific Facts Giving Rise to a Strong Inference of Scienter on the Part of the Funds and Their Officers.

Because the Funds are each separate corporations, Plaintiffs must plead facts demonstrating that the employees of each of the Funds acted with the requisite scienter, which

---

[8]   Plaintiffs define "Officer Defendants" to include Individual Defendants Weller, Sullivan, Anthony, and Kelsoe.  (CAC ¶ 60.)

11

could then be imputed to the Funds themselves.  *See Thompson v. Relationserve Media, Inc.*, 610 F.3d 628, 635 (11th Cir. 2010).  Here, the CAC contains no particularized allegations that *any* of the Funds' employees acted with the requisite scienter, nor do Plaintiffs plausibly allege that any of the Funds' employees had a motive to commit fraud.  (*See* MK/MAM Mem. at 26-28.)  Faced with such deficient allegations, courts routinely conclude that the requirement of pleading scienter has not been satisfied.  *See, e.g.*, *Thompson*, 610 F.3d at 635 (holding that "[c]orporations have no state of mind of their own," and affirming dismissal where the complaint "fails to sufficiently plead scienter as to any of the individuals who serve as corporate directors or officers" of the company).

### 1.     Plaintiffs Cannot Use "Group Pleading" to Satisfy Their Obligation to Plead Scienter.

Plaintiffs rely almost exclusively on conclusory assertions that the Funds' officers, by virtue of their positions alone, "knew or should have known about the failure to conduct due diligence, the inappropriate and inaccurate NAV calculations, the deficiencies in risk management, and the failure to follow pricing and risk assessment policies during the Class Period."  (CAC ¶ 304; *see also id.* ¶¶ 294-99, 357 (alleging in conclusory fashion that "Defendants" acted "knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud")).  Such nonspecific "group pleading" is insufficient to plead scienter with respect to the Funds or the Officer Defendants.  (*See* MK/MAM Mem. at 24-26.) The PSLRA requires Plaintiffs to "allege specific facts and circumstances suggestive of [each Defendant's] knowledge," *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004), and the bare allegation that the Funds' officers knew, or should have known, of alleged fraud simply by virtue of their positions "is tantamount to an allegation of fraud by hindsight and thus

insufficient to establish scienter." *Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 726 (S.D. Ohio 2010).

Plaintiffs urge the Court to overlook their failure to plead particularized allegations supporting a strong inference of scienter with respect to the Funds, and to evaluate Plaintiffs' allegations "collectively" and by "'address[ing] the Plaintiffs' claims holistically.'" (Pls.' Opp. at 28-29 (quoting *Frank v. Dana Corp.*, 2011 WL 2020717 (6th Cir. May 25, 2011).) As the Sixth Circuit recently explained, however, taking a "collective" or "holistic" view of Plaintiffs' allegations of scienter merely means that district courts are not required to engage in an "itemized claim analysis," or to use a "checklist" of factors in evaluating allegations of scienter. *Ashland, Inc.*, 2011 WL 3181277 at *5. The "holistic approach" does not spare Plaintiffs the "[e]xacting pleading requirements for pleading scienter." *Id.* at *4-5 (quoting *Frank*, 547 F.3d at 570, and affirming dismissal of § 10(b) claim where "apart from conclusory allegations, [plaintiff] fails to provide *any* facts" in support of a strong inference of scienter).

## 2. Mr. Kelsoe's Alleged Scienter Cannot Be Imputed to the Funds.

The allegations relating to scienter that Plaintiffs do plead exclusively concern Mr. Kelsoe, an employee not of the Funds, but of MAM – the Funds' investment adviser. Even assuming that Plaintiffs pleaded facts that give rise to a strong inference of scienter on the part of Mr. Kelsoe (which they have not done), Mr. Kelsoe's state of mind cannot be imputed to the Funds because he was not a Fund employee. (*See* MK/MAM Mem. at 25 n.24.)

Allegations of scienter cannot be viewed in the abstract. The allegations of scienter must be viewed in connection with the alleged misstatements and omissions at issue. In this instance, virtually all of the alleged fraudulent misstatements or omissions in question were contained in the Funds' public filings, such as registration statements and annual, semi-annual, and quarterly reports. (*See* CAC ¶¶ 185-256.) These are statements of the Funds, however, and not of any of

13

the other Defendants.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011).

Because only the investment company can "make" an alleged misstatement in its public filings, *id.*, it follows that the Fund, and not its adviser or other individuals, must possess the fraudulent intent required to make that statement actionable under § 10(b).  Because Mr. Kelsoe is not the maker of the statements in question, or even an employee of the "maker" of the statement, Mr. Kelsoe's intent – irrespective of whatever it might have been – cannot be imputed to the Funds under § 10(b).  *See In re Tyson Foods, Inc.*, 155 F. App'x 53, 56 (3d Cir. 2005) ("[T]he question is . . . who made the statements and whether the maker of the statements acted with the requisite scienter."); *Zelman v. J.D.S. Uniphase Corp.*, 376 F. Supp. 2d 956, 971 (N.D. Cal. 2005) ("Showing scienter is a matter of showing facts known to or knowable by the *makers* of alleged misstatements at the time the statements were made.") (emphasis supplied); *cf. In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 998-99 (S.D. Ohio 2008) ("Simply stated, one can not make a statement with scienter or fraudulent intent, if he does not make a statement.").  (*See also* Ind. Defs.' Reply at 2-5.)[9]

---

[9]       The cases cited by Plaintiffs in support of their argument that the court may impute Mr. Kelsoe's scienter to the Funds are unavailing, and ultimately support dismissal of Plaintiffs' claims under § 10(b). In *SEC. v. Young*, an individual's scienter could be imputed to partnership entities because the individual was the managing member of one partnership entity, which in turn was the general partner of another entity.  *Young*, 2011 WL 1376045, at *1, 6 (E.D. Pa. Apr. 12, 2011).  Similarly, in *SEC v. Haligiannis*, an individual was the President and CEO of two entities to which his scienter was imputed, and the court found that he "had exclusive control over the management and operation of" an affiliated hedge fund. *Haligiannis*, 470 F. Supp. 2d 373, 378, 381-82 (S.D.N.Y. 2007).  Here, there is no allegation that the Funds were an instrumentality or alter ego of Mr. Kelsoe or MAM, and to the extent either of these cases is inconsistent with the principles set forth in *Janus*, they do not control.

**B.    Plaintiffs Fail to Plead Particularized Facts Giving Rise to a Strong Inference that Any Alleged Misrepresentations or Omissions Were Made with the Requisite Scienter.**

    **1.    Plaintiffs' Allegations that the Funds Knowingly Misvalued Portfolio Securities Fail to Give Rise to a Strong Inference of Scienter.**

Plaintiffs allege that the Funds and their officers "manipulated" the valuations of securities in the Funds' portfolios in order to falsely inflate the Funds' NAVs.  (*See* Pls.' Opp. at 30-40.)  At most, Plaintiffs allege that the Funds and their officers mismanaged the Funds by failing to adhere to proper valuation procedures and/or relying on erroneous data from Mr. Kelsoe.  Plaintiffs devote the bulk of their argument concerning valuation to a discussion of Mr. Kelsoe's scienter, which cannot be imputed to the Funds.  *See supra* Part IV(A)(2).  Even these allegations, however, are insufficient to give rise to a strong inference of scienter.

Plaintiffs' plead no facts supporting their assertions that Mr. Kelsoe proposed price adjustments that were "knowingly phony, did not reflect fair value, and consistently were used to report artificially inflated securities values to the public."  (Pls.' Opp. at 36.)  Plaintiffs ask the Court to infer scienter simply from the fact that that Mr. Kelsoe proposed these adjustments, and overrode price quotations provided to him by broker-dealers and other market participants with whom he disagreed.  (*Id.* at 30.)  But, as Plaintiffs must concede, Mr. Kelsoe was authorized to provide his views regarding such price quotations if he felt they were unreasonable.  (*Id.*)  Disagreement with Mr. Kelsoe's judgment that price adjustments were reasonable, and labeling the adjustments as "phony" without specific factual support regarding Mr. Kelsoe's actual state of mind, does not adequately plead scienter.

Further, Plaintiffs plead no facts to support their allegation that Mr. Kelsoe "stonewalled" Morgan Keegan's internal due diligence in order "to conceal his fraudulent conduct."  (*Id.* at 34, n. 22.)  This proposed inference of scienter is based on speculation, not facts.  For example,

Plaintiffs concede that the e-mails cited in support of their arguments do not address the Closed-End Funds at issue in this action, and specifically reference entirely separate mutual funds.  (*Id.* at 35 n.23.)  Nonetheless, Plaintiffs contend that "[n]othing in [the e-mails] is limited to the Open-End Funds," and that Mr. Kelsoe's discussion of affiliated Open-End Funds "is reasonably read as an effort to mollify Escue's concerns and divert her attention from even worse performance by the Closed-End Funds."  (*Id.*)  Nothing in the CAC or the referenced e-mails supports such an inference, and such speculation does not amount to a showing of scienter.

Finally, Plaintiffs fail to plead any facts supporting an inference that any of the Funds' officers knew, or recklessly disregarded, that securities had been misvalued.  (*Id.* at 38-40.)  Plaintiffs' allegations concerning Mr. Weller are premised entirely on his position and his presumed access to information regarding the alleged fraud.  Plaintiffs allege that, as head of Fund Accounting, Mr. Weller had a "responsibility" to request "supporting documentation" from Mr. Kelsoe regarding the price adjustments in question.  (*Id.*; CAC ¶ 139.)  Plaintiffs then speculate that had Mr. Weller requested this "documentation," Mr. Kelsoe would have been unable to provide it, and therefore, the "fraud" would have been revealed.

Such allegations are insufficient to plead scienter.  "[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004).  Moreover, Plaintiffs do not identify what sort of "documentation" Fund Accounting should have requested from Mr. Kelsoe, nor do they explain why Mr. Kelsoe's opinion, as a previously successful trader and market participant, would have been inadequate "documentation" for overriding another market participant's opinion regarding the value of a security.  These pleading failures demonstrate the inadequacy of Plaintiffs' scienter allegations as a matter of law.  *See Brecher*,

2011 WL 2209145, *13 (holding that plaintiffs failed to plead facts giving rise to an inference of scienter where they "have alleged no facts establishing the existence of this supposed duty nor have they specifically identified any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements" (quotations omitted)).

Plaintiffs otherwise plead no facts in support of their conclusory assertion that Mr. Weller "repeatedly turn[ed] a blind eye to [Mr.] Kelsoe's 262 bogus 'price adjustments.'" (Pls.' Opp. at 38.)   And, Plaintiffs make no real effort to defend their allegations of scienter on the part of Messrs. Sullivan or Anthony, other than a conclusory statement of liability offered in a footnote. (*Id.* at 38 n.28.)

> **2.    Plaintiffs' Allegations that the Funds Mischaracterized or Concealed the Composition of Their Portfolios Fail to Give Rise to a Strong Inference of Scienter.**

Plaintiffs contend that the Funds misrepresented their compliance with a self-imposed investment restriction that supposedly prohibited the Funds from investing more than 25% of the Funds' assets in ABS and MBS, and then sought to conceal the Funds' concentration in such investments by misclassifying certain ABS as corporate bonds and preferred stock.  Plaintiffs' CAC, however, is devoid of any particularized facts alleging that the Funds overconcentrated the portfolios with the intent to defraud investors.  (*See* Pls.' Opp. at 42-43; CAC ¶¶ 83-89.)  Instead, Plaintiffs assert that scienter based on these purported "misrepresentations and omissions" should be self-evident.   (*See* Pls.' Opp. at 40-41 ("[A] strong inference of scienter is straightforward: ABS and MBS are entirely different securities than corporate bonds or preferred stock."); 42-43 (arguing that exceeding the investment limitation "could not plausibly have happened by accident, or without Defendants turning a blind eye . . . .").)

17

Scienter cannot be presumed from the bare allegations that the Funds violated an investment restriction and misclassified securities.  Scienter is a distinct element of a claim under § 10(b), which bears its own heightened pleading requirement.  *See Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009), *cert. dismissed*, 178 L. Ed. 2d 411 (U.S. Nov. 5, 2010) (listing the required elements of a § 10(b) claim); *see also Ashland*, 2011 WL 3181277, at *4 (reiterating the exacting pleading requirements for pleading scienter).  Plaintiffs have failed to meet the exacting burden of pleading scienter with respect to the Funds' alleged violation of their concentration restriction.

Further, Plaintiffs' proposed inference of scienter is implausible given the fact that the Funds disclosed each and every asset contained in their portfolios on a quarterly basis to both investors and the SEC in public filings.  *See* Curley Dec. Exs. O-R (Quarterly Schedules of Assets) (Doc. No. 199).  The assets held in the Funds' respective portfolios were organized and listed by category, with each category of securities being stated as a percentage of net assets.  For example, the Quarterly Schedule of Assets for RMH, filed with the SEC on March 1, 2005, explicitly states "Asset Backed Securities – Non-Investment Grade – 67.3% of Net Assets." Curley Dec. Ex. O.  The Funds also included pie charts breaking down their investments.  The very act of this disclosure militates strongly against a conclusion that Plaintiffs have adequately pleaded scienter.  *See Fifth-Third Bancorp*, 731 F. Supp. 2d at 727 ("[C]utting strongly against a finding of scienter is the fact that much of the information that Plaintiffs claim was concealed was actually reported" in the defendants' SEC filings.).

Plaintiffs do not dispute the existence of these disclosures.  Rather, Plaintiffs claim that the manner in which the disclosures were presented to investors was confusing.  For example, Plaintiffs argue that even though the Funds disclosed the concentration of assets in its portfolios,

18

"no reasonable investor" could sufficiently interpret the allocation charts and asset schedules that disclosed the Funds' asset concentration. (*See* Pls.' Opp. at 43.)  Plaintiffs' conclusory assertion is contradicted by the Funds' disclosures, which indicated that well over 25% of the Funds' assets were invested in different types of ABS.  *See* Curley Dec. Exs. I (2005 Consol. Ann. Rpt. at 6, 20-21, 36-37); V (Appx. of Disclosures).

The allegation that the Funds misclassified securities with the intent of deceiving investors about the fact that they were concentrated in ABS – a fact that was repeatedly disclosed to investors – is implausible.  (*See* MK/MAM Mem. at 31.)  Similarly, if any of the Funds' chosen classifications were "obviously" incorrect, then it also would make no sense for the Funds to list the "misclassified" assets by name and classification in filings that were subject to scrutiny by regulators, analysts and investors.  Plaintiffs' allegations with respect to this issue are entirely inconsistent with an inference of scienter.

### 3.    Plaintiffs' Allegations Regarding Due Diligence Fail to Give Rise to a Strong Inference of Scienter.

Plaintiffs argue that the Funds acted with the requisite scienter because they failed to ensure that MAM performed adequate due diligence prior to purchasing securities for the Funds. (*See* CAC ¶¶ 24-25; ¶¶ 113-114.)   Plaintiffs' argument is based entirely on allegations of substandard due diligence by Al Landers, an employee of MAM.  (*Id.* ¶¶ 115-126.)  Of course, Mr. Landers's scienter cannot be imputed to the Funds, and Plaintiffs do not allege that the Funds knew that MAM's due diligence was inadequate.  Further, Plaintiffs fail to cite a single case or provide any legal authority to support their argument that an alleged failure to perform due diligence supports an inference of scienter, as opposed to negligence or mismanagement.  To the contrary, courts have found such allegations to be wholly insufficient to plead scienter.  *See S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 103, 111-113 (2d Cir. 2009)

19

(allegations that the defendant "represented that it had performed due diligence when in fact it had not done so . . . do not give rise to a strong inference that the alleged failure to conduct due diligence was indicative of an intent to defraud."); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 753 (S.D. Tex. 2003) (allegations of failure to perform due diligence, even when considered with additional allegations, deemed "insufficient to raise a strong inference of scienter").

###### 4. Plaintiffs' Allegations Regarding the Funds' Choice of a Benchmark Index Fail to Give Rise to a Strong Inference of Scienter.

Plaintiffs plead no facts supporting an inference that the Funds acted with the requisite scienter in connection with the Funds' choice of a benchmark index. Plaintiffs rely on an e-mail written by Gary Stringer, a non-defendant and Morgan Keegan employee who was not employed by the Funds, discussing how Morgan Keegan internally marketed certain mutual funds not at issue in this action. (*See* Pls.' Opp. at 45-46.) This e-mail generally refers to potential "tracking error," and does not address the issue of whether the Funds knowingly selected and used an improper benchmark index for the purpose of deceiving investors. Even accepting the statements of "Confidential Witness Number 1" ("CW1") (which, as described below, must be rejected), Plaintiffs offer only speculative and conclusory allegations, not specific facts giving rise to a strong inference of scienter. (*See* MK/MAM Mem. at 32.)

##### C. The Most Plausible Inference Is that Defendants Failed to Anticipate the Global Credit Crisis

Citing recent Sixth Circuit authority, Plaintiffs encourage the Court to overlook glaring deficiencies in their allegations of scienter and to "address the Plaintiffs' claims holistically." (Pls.' Opp. at 29 (quoting *Frank*, 2011 WL 2020717, at *5).) But, in the absence of *any* specific allegations that the Funds or its officers acted with the requisite scienter, the *only* plausible inference that can be drawn from Plaintiffs' allegations is a nonculpable one – that the Funds and their officers failed to anticipate the extent to which risks inherent in securities held by the Funds

20

would materialize at the onset of a global financial crisis.  *See Ashland, Inc.*, 2011 WL 3181277 at *6 ("While the inference of scienter is *possible* in this case, the more compelling explanation is that the near-spontaneous collapse of the . . . [Auction Rate Securities] market caught [defendant] and its employees off guard."); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 197 (2d Cir. 2008) ("[Plaintiffs] would have us infer that *someone* whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements.  We cannot say . . . that this inference is 'at least as compelling' as the competing inference. . . ." (citation omitted)).

There is no dispute that the global credit crisis, which began in mid-2007, was unprecedented both in its suddenness and its impact on the market for debt securities – particularly the market for ABS and MBS.  (*See* MK/MAM Mem. at 5, 23-24.)  Plaintiffs argue, however, that competing inferences drawn from their allegations, and which flow directly from the global credit crisis, are implausible.  (*See* Pls.' Opp. at 49-51.)  Courts considering fraud claims in the wake of the crisis, however, have reached an opposite conclusion.  (*See* MK/MAM Mem. at 24.)  *See also Kadel v. Flood*, 2011 WL 2015379, *3 (11th Cir. May 24, 2011) ("[T]he stronger inference is that [the defendants] simply failed to predict the eventual collapse of the housing and subprime mortgage market, and, as a result, were ill-prepared to respond when those markets crashed."); *Ashland, Inc.*, 2011 WL 3181277, at *6 (holding that although defendant "may have engaged in bad (in hindsight) business judgments . . . or may have been negligent in not detecting and disclosing the imminent market collapse, such actions fall short of scienter in the context of securities fraud" (quotations and citations omitted)).  And, in the one case on which Plaintiffs rely for the proposition that failure to anticipate the global financial crisis was

not more plausible than an inference of adequately pleaded scienter, the district court explicitly found such a non-culpable inference *to be plausible*. *See Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, No. 10-2847-IPJ, 2011 U.S. Dist. LEXIS 60761, at *25 (N.D. Ala. June 7, 2011) ("Defendants contend that the global financial crisis is the cause here, and the court finds that inference plausible.").

Plaintiffs also argue that Defendants' proposed non-culpable inference "conflates loss causation with scienter." (Pls.' Opp. at 49-50.) Plaintiffs miscast Defendants' argument to avoid addressing it. The overarching theory of the CAC is that Defendants intentionally over-concentrated the Funds' portfolios in exceedingly risky securities, and subsequently engaged in a fraudulent scheme to conceal the extent of the risks inherent in the Funds from investors. (*See* CAC ¶¶ 14 ("To conceal the significant risks . . . Kelsoe and the other Officer Defendants named herein operated the [Funds] with two faces:  a public face . . . and a private face . . . ."); ¶¶ 355-56 (alleging that the Funds and its Officers engaged in a fraudulent "plan, scheme, and course of conduct").) The most plausible inference drawn from the actual facts pleaded is not one of fraud, but at most a simple failure to appreciate the magnitude of the risks that materialized during the onset of an unforeseen global credit crisis. (*See* MK/MAM Mem. at 24.)

Whether Plaintiffs have adequately pleaded scienter cannot be divorced from the fact that the global credit crisis played a significant role in causing the decline of the Funds' share price. This is particularly true where Plaintiffs premise their claims on the allegation that Defendants failed to disclose known, foreseeable risks. Under such circumstances, the context in which Plaintiffs suffered their losses is directly relevant to the question of scienter. Plaintiffs' argument that an unprecedented global credit crisis cannot be considered as part of the scienter inquiry runs contrary to the Sixth Circuit's "holistic approach." *See Frank,* 2011 WL 2020717, at *5.

Based on a holistic view of Plaintiffs' allegations, the non-culpable inference regarding the Funds' and the Officer Defendants' conduct is much stronger than that of intent to defraud or deliberate recklessness.

> ### D.      Plaintiffs' "Confidential Witness" Allegations Do Not Support a Strong Inference of Scienter.

Plaintiffs' allegations of scienter rely heavily upon the allegations of a confidential witness, yet the CAC contains no facts suggesting that the statements of CW1 are reliable. Nothing in Plaintiffs' lengthy footnote devoted to this issue contradicts or rebuts Defendants' arguments with respect to this issue.  (*See* Pls.' Opp. at 44 n.32.)  In fact, the case on which Plaintiffs rely most heavily describes the need for details noticeably absent from the CAC:

> [T]o determine whether the Plaintiffs have complied with the pleading requirements contained in the PSLRA, this Court will examine the descriptions of each of [the confidential witnesses'] jobs to ascertain whether any would have been in a position to have gained first hand knowledge of the facts attributed to him or her, and the detail of the information each is reported to have provided.  In addition, the Court will consider whether the statements attributed to confidential witnesses have been corroborated.

*In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d at 993.

Other courts have similarly held that a complaint must contain basic factual information sufficient to show that the witness was in a position to gain the knowledge in question.  *See Omnicare*, 583 F.3d at 946 ("[A]ny inferences drawn from [a confidential witness'] accusations must be steeply discounted" where "no information is given regarding [the witness] except the title of his position"); *Fifth Third Bancorp.*, 731 F. Supp. 2d at 721 ("[T]he confidential witnesses must provide enough information to establish their basis of knowledge of the alleged misconduct ('what, when, where, and how')"); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1284-85 (S.D. Fla. 2008).  (*See also* MK/MAM Mem. at 33-34.)

The CAC contains no factual information about CW1 other than to state that he or she supposedly "worked at Morgan Keegan as a broker during the Class Period."  (CAC ¶¶ 114-115, 164.)  Although Plaintiffs attempt to corroborate some of CW1's allegations with allegations from the Task Force Proceeding, they make no such effort to corroborate CW1's allegation relating to the Funds' use of the benchmark index "to deceive investors."  (*See* Pls.' Opp. at 44 n.32; CAC ¶¶ 114-115, 164.)   These allegations concerning CW1 are insufficient to show scienter on the part of the Funds or the Officer Defendants.

## V.   Plaintiffs Have Failed to Plead that Any of the Funds' Public Filings Contained Actionable Misrepresentations or Omissions.

Plaintiffs must identify material misstatements and/or omissions made by the Defendants alleged to be primarily liable under the federal securities laws.  With respect to Plaintiffs' 1933 Act claims concerning the RHY Fund, Plaintiffs must identify material misstatements or omissions in the Fund's offering documents.  *See* 15 U.S.C. §§ 77k(a), 77l(a)(2).  With respect to Plaintiffs' 1934 Act claims, Plaintiffs must identify a material omission or misstatement made by a specific Defendant.  For purposes of Rule 10b-5, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."   *Janus*, 131 S. Ct. at 2302.   Relevant to the inquiry before this Court, statements in a mutual fund's prospectus or other public filings are "made" by the fund and not by others who may prepare or publish the filings on behalf of the fund.  *See id.* at 2301-02.

The allegedly false and misleading statements at issue in this action pertain almost exclusively to the Funds' public filings and focus primarily on the Funds' risk disclosures, asset allocation and valuation of the Funds' portfolio securities.  (*See* CAC ¶¶ 185-256.)  Plaintiffs' allegations of misstatements and omissions, however, are undercut significantly by the actual content of the Funds' public filings.  The Funds continuously disclosed the securities in which

the Funds invested and made extensive disclosures regarding the "high degree of risk" associated with an investment in the Funds, including disclosures in bold type on the front page of each Fund's prospectus.  *See* Curley Dec. Exs. A, C, E, G (RMH, RMA, RSF, & RHY Prosp. Cover Pages).  At bottom, Plaintiffs' allegations amount to hindsight questioning of valuations, the Funds' choice of benchmark index, quibbling with the word choice used in connection with the Funds' risk disclosures, and allegations that amount to nothing more than corporate mismanagement.  Such allegations are insufficient to state a claim against the RHY Fund, Morgan Keegan and the Director Defendants under the 1933 Act or the Funds and the Officer Defendants under the 1934 Act.  *See, e.g.*, *Ashland*, 2011 WL 3181277, at *4.

### A. Corporate Mismanagement Is Not Actionable Under the Federal Securities Laws.

Plaintiffs' allegations amount to little more than corporate mismanagement, which does not state a claim under the federal securities laws.  While Plaintiffs now claim that they "do not allege that Defendants made bad decisions or mismanaged the Funds," (*see* Pls.' Opp. at 52), this assertion is contradicted directly by the allegations in the CAC (*see, e.g.,* CAC ¶ 126 (alleging that "representations that the Funds were professionally managed and investments were professionally selected were simply untrue")).  Similarly, claims based on Plaintiffs' allegations that the Funds incorrectly valued the Funds' portfolio securities, failed to disclose the proper diversification and asset allocation in the portfolios, failed to conduct adequate due diligence, and misclassified securities in the portfolios are claims of mismanagement that must be brought derivatively.  (*See* MK/MAM Mem. at 49.)

This Court has recognized that Plaintiffs may not premise a claim under the federal securities laws by casting allegations of mismanagement as "fraud."  *See In re Regions Morgan Keegan Open-End Mutual Fund Litig.*, 2010 WL 5464792, at *10 (W.D. Tenn. Dec. 30, 2010)

("[I]f a shareholder's investment is frittered away by corporate mismanagement, only the corporation can recover" derivatively).  Under either Maryland law or federal law, a plaintiff cannot convert a derivative claim for corporate mismanagement into a claim for securities fraud through artful pleading.  *See, e.g., Ex Parte Regions Fin. Corp. ("Rice")*, 2010 WL 3835727, *8 (Ala. Sept. 30, 2010) ("Courts have generally rejected attempts by plaintiffs to convert traditionally derivative claims into direct claims based on the failure of the alleged guilty parties to disclose their bad acts.") (citing *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986)).

Plaintiffs attempt to distinguish *Rice* on the grounds that the Alabama Supreme Court looked to Maryland law in determining that plaintiffs' allegations of corporate mismanagement could only be pursued derivatively.  Plaintiffs argue that the Alabama Supreme Court's reliance on Maryland law renders *Rice* inapposite because Maryland law never permits a plaintiff to assert a direct claim "when a derivative claim could conceivably be brought," whereas under federal law plaintiffs may assert both direct and derivative claims as long as the claims are labeled as such.  (Pls.' Opp. at 56-57.)  No authority exists for this purported distinction.  An attempt to label an inherently derivative claim as "direct" is equally improper under federal law, as the *Rice* court observed.  *See Rice*, 2010 WL 3835727, at *8 (citing federal law as well as Maryland law).

The Court must look to the nature of Plaintiffs' allegations, not the labels they chose to affix to their allegations.  For this reason, claims sounding in mismanagement are not actionable under § 10(b) or any other provision of the 1934 Act or the 1933 Act.  *See, e.g., Santa Fe Indus. v. Green*, 430 U.S. 462, 476-77 (1977); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) (holding that "even where a plaintiff claims that it would not have invested in

26

an entity had it known of [those] management issues," those allegations "amount[] to nothing more than a charge that [the defendant's] business was mismanaged" and "are insufficient to support a securities fraud claim under section 10(b)").  Because Plaintiffs' claims are based squarely on allegations of corporate mismanagement, such allegations may not form the basis of their claims under the securities laws and must be pursued derivatively, if at all.

### B.   Plaintiffs Have Failed to Plead that the Funds Knowingly Issued False Valuations of Securities.

As Plaintiffs concede, the valuation of securities is a matter of judgment and opinion and the Funds disclosed the uncertainty inherent in the valuation process.  (*See* Pls.' Opp. At 11.) Therefore, any statements by the Funds or any other Defendants regarding valuation can only be considered "fraudulent" if they were made with knowledge of their falsity.

Plaintiffs proceed on the theory that the valuations of securities in the Funds' portfolios, and therefore, the Funds' published NAVs, were both objectively and subjectively false.  (*Id.*) Because the Funds are the "makers" of the statements in question, *see Janus*, 131 S. Ct. at 2302, Plaintiffs must allege that the *Funds* made these statements knowing they were false.[10]  Because Plaintiffs have failed to plead any facts alleging that the Funds or any of their employees knowingly misvalued securities, or knowingly made false statements relating to the valuation process, they have failed to plead actionable misrepresentations or omissions relating to valuation of securities held by the Funds.

---

[10]     Plaintiffs' allegations regarding the allegedly misvalued securities do not relate to the Funds. Rather, these allegations relate to Mr. Kelsoe.  (*See* Pls.' Opp. at 11-14 (alleging, among other things, that Kelsoe "actively manipulated" price quotations, and "did not believe, and had no reasonable basis to believe" his valuations were accurate).)

**C.**     **The Funds Disclosed the Types of Securities in which the Funds Would Invest and the Risk Associated with these Investments.**

Plaintiffs criticize the Funds' disclosures as conditional, boilerplate disclosures that failed to adequately disclose the risks associated with an investment in the Funds.  (*See* Pls.' Opp. at 24-25.)  The Funds' registration statements and other public filings, however, contained detailed risk disclosures that discuss the very risks Plaintiffs now claim were omitted.  (*See* MK/MAM Mem. at 37-40.)  Plaintiffs do not deny the existence of these disclosures, which speak for themselves.  Instead, they label them as "bland," and argue that the disclosures were not accompanied by the correct modifying adjectives.  To this end, Plaintiffs challenge the Funds' disclosures as failing to "adequately inform investors that the Funds would be *heavily* concentrated in the *lowest-priority, highly leveraged* tranches of ABS backed by subprime assets with *significant* credit risk, and that, as a result, investors would be exposed to *extraordinary* credit risk."  (Pls.' Opp. at 25 (emphasis supplied).)

This argument is without merit.  "Whether or not a company used the adjective plaintiff chooses should not be the focus of the Court's inquiry."  *In re RAC Mortg. Inv. Corp. Sec. Litig.*, 765 F. Supp. 860, 864 (D. Md. 1991) (internal quotations omitted).  The Funds were under no obligation to describe their portfolio holdings in a pejorative manner.  *Id.* (holding that defendants were under no obligation to use pejorative language to describe risk factors, such as "extreme sensitivity," "potentially devastating," "especially vulnerable," and "dramatic"); *see also Ashland*, 2011 WL 3181277, at *4 (alleged misrepresentations and/or omissions are not actionable under the federal securities laws if the defendant had no duty to disclose them); *In re N.Y. Community Bancorp. Sec. Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. Sept. 18, 2006).  The

question before the Court is whether the Funds actually disclosed all material risks, not described them in the manner preferred by Plaintiffs.[11]

Plaintiffs then argue that the Funds' "disclosures effectively furthered the fraud because they continued the deception of calling assets 'bonds,' which is an entirely different asset type with different risk characteristics than ABS or MBS." (Pls.' Opp. at 24.) This statement is demonstrably incorrect. First, the SEC recognizes that ABS and MBS are types of bonds. *See* Supplemental Declaration of Matthew M. Curley Ex. A (SEC, "Bonds" Defined ("There are many different kinds of bonds, including: U.S. Government securities, municipal bonds, corporate bonds, mortgage and asset-backed securities, federal agency securities, and foreign government bonds.")); *see also id.* Ex. B (SIFMA, "Bond Markets Defined" (discussing the "Mortgage Securities Market" and "Asset Backed Securities" market)). Second, the Funds clearly disclosed that they would and did invest in ABS and MBS. Plaintiffs' allegation that the Funds represented that they would invest in "broadly diversified, corporate debt portfolios" (Pls. Opp. at 10), simply fails when viewed in light of the Funds' actual disclosures.

### D.     Plaintiffs' Allegations Are Premised on Their Own Misstatement of the Funds' Industry Concentration Restriction.

Plaintiffs' premise their claims on the Funds' alleged violation of a concentration restriction with respect to assets held by the Funds. Such allegations, however, are undermined by Plaintiffs' disregard of the express language of what they describe as the Funds' "Same Industry Investment Restriction." (Pls.' Opp. at 16-18.) The Funds' concentration restriction prohibits the Funds from "purchas[ing] the securities of any issuer . . . if, as a result, 25% or more of the Fund[s'] total assets would be invested in the *securities of companies the principal*

---

[11]     The fact that the Funds changed a description of the relevant risks inherent in an investment in the Funds in December, 2007 is not surprising. (*See* Pls.' Opp. at 25.) By then, the global financial crisis was well underway and the risks that had emerged were given greater emphasis.

*business activities of which are in the same industry.*" (CAC ¶ 87 (emphasis supplied).)  In their

CAC, however, Plaintiffs do not address the alleged industries of the issuers of securities held by

the Funds.  Rather, they make the conclusory assertion that the Funds invested more than 25% of

their assets in ABS and "subprime mortgage-related securities."  (CAC ¶¶ 88-89; MK/MAM

Mem. at 42.)

       In hopes of avoiding the plain language of the Funds' concentration restriction, Plaintiffs

state that the Funds' focus on the "company issuing the security" constitutes a "deviation[] from

governing SEC guidance."  (*See* Pls.' Opp. at 18.)  No authority exists for this proposition and

none is cited by Plaintiffs.  And, it is self-evident that whether an investment company violates

its disclosed investment restriction turns on the actual language of the restriction; not Plaintiffs'

self-serving interpretation of that restriction.[12]

       Plaintiffs' allegation that the Funds fraudulently concealed a violation of the

concentration restriction is rendered even more implausible by the fact that the Funds disclosed

the concentration of their portfolio securities at all times.  (*See* MK/MAM Mem. at 43-44.)

Plaintiffs' assertions that Defendants did not "intensely" or "credibly" disclose the Funds' asset

concentration, "did not enumerate any single asset allocation above 25%," and disclosed

"kaleidoscopic" pie charts is directly contrary to the disclosures contained in the Funds' annual,

semi-annual, and quarterly reports.  (*See* Pls.' Opp. at 18-21.)  The pie charts and the Funds'

portfolio schedules clearly disclosed investments of well over 25% of the Funds' net assets in

---

[12]     Plaintiffs avoid addressing their own pleading deficiencies.  Rather, Plaintiffs point to arguments allegedly made in other actions pending before this Court.  (*See* Pls.' Opp. at 17 n.13.)  Defendants' arguments are entirely consistent with arguments asserted in other actions.  In *In re Regions Morgan Keegan Open-End Mutual Fund Litigation*, the plaintiffs alleged that the mutual funds at issue violated their applicable investment restrictions "by investing more than 25% of [the] total assets in securities issued by companies engaged in the mortgage loan industry . . . ."  (*Open-End* CAC ¶ 276 (Docket Entry No. 218.)  In response to this allegation, Defendants responded that Plaintiffs in the *Open-End* action did not adequately identify a relevant industry.  (*See Open-End* MK/MAM Mem. at 40 n.35 (Docket No. 222).)

ABS.  (*See* MK/MAM Mem. at 43-44 n.38.)   Even if Plaintiffs were stating the Funds'
concentration restriction accurately, the Funds' portfolio concentrations, under Plaintiffs'
standard, would have been obvious to any investor who read the Funds' public filings at all
relevant times.

> **E.     The Funds Were Not "Index Funds" and the Funds' Benchmark Was Not
> Offered For Purposes of Risk Analysis.**

Plaintiffs allege that the Funds' selection of a benchmark index constituted a
misrepresentation.  Plaintiffs correctly observe that "[a] benchmark index gives an investor a
point of reference when evaluating a mutual fund's performance."  (Pls.' Opp. at 21.)  When a
fund chooses an index, however, the fund is not "telling their investors that the securities chosen
for the Fund are similar in nature to those in the index."  (*Id.*)  While that may be true for specific
types of funds, namely "index funds" designed to track the performance of a specified
benchmark index, the Funds at issue in this action are not index funds and made no
representations that their composition was identical to or patterned after the Lehman BA Index.
Such a comparison would be unwarranted given the nature of the Funds' disclosures.  The Funds
were not attempting to replicate the performance of the Lehman Index; if anything, they were
attempting to outperform it.   In any event, the Funds expressly disclosed that MAM had
authority to "deviate" from the index.  (*See* MK/MAM Mem. at 47-48.)  Moreover, contrary to
Plaintiffs' representations, the Funds certainly never stated that investors should use a
benchmark index to assess the Funds' risks.

As Plaintiffs acknowledge, the cases upon which they rely are distinguishable on these
grounds.  (*See* Pls.' Opp. at 23.)  *See, e.g., In re Evergreen Ultra Short Opportunities Fund Sec.
Litig.*, 705 F. Supp. 2d 86, 93 (D. Mass. 2010) (holding that comparison of a fund to an index
was misleading where the fund expressly stated that the benchmark was "intended to provide

[investors] with some indication of the risks of investing in the Fund"); *In the Matter of Piper Capital Mgmt, Inc.*, 2000 WL 1759455, *22-23 (Nov. 30, 2000) (citing no authority for SEC's determination that a fund's chosen benchmark was inappropriate, but implying that index was offered as a "risk/performance benchmark").

Other cases cited by Plaintiffs do not address a fund's choice of benchmark index, but rather dealt with misrepresentations about a company's or fund's performance vis-à-vis a certain index. *See In re Ambac Fin. Group Sec. Litig.*, 693 F. Supp. 2d 241, 271-72 (S.D.N.Y. 2010) (addressing alleged misstatements regarding the performance of a company's MBS portfolio vis-à-vis a market index, namely that the portfolio outperformed the index when in fact it performed in accordance with the index); *Rafton v. Rydex Series Funds*, 2011 WL 31114, *1, 7 (N.D. Cal. Jan. 5, 2011) (addressing situation where a fund was "designed to track a particular benchmark," and failed to disclose to investors that certain factors rendered it a near certainty that the Fund would deviate from its benchmark).[13]

Finally, Plaintiffs argue that "[t]he Funds could have chosen one of a number of indices that did track subprime MBS (such as ABX) or CDOs (such as TABX) and thus was a more appropriate comparator, but elected not to do so." (Pls.' Opp. at 22.) This argument is without merit. Neither the ABX nor the TABX existed until January 2006 and January 2007, respectively. *See* Supp. Curley Dec. Ex. C (Markit Press Rel. dated January 17, 2006); Ex. D (Markit Press Rel. dated February 14, 2007). Moreover the ABX and TABX are tradable indices that, according to their creator, were never intended to be used as a valuation tool for securities or as a portfolio benchmark. *See* Supp. Curley Dec. Ex. E (Reuters, Oct. 25, 2007 ("[T]he ABX

---

[13]      Plaintiffs' citation to *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 543 (N.D. Cal. 2009), is not a citation to the court's holding. Rather, it is a citation to the plaintiffs' allegations in that action. The Court did not address the specifics of these allegations, and denied Defendants' motion on the grounds that Rule 9(b)'s heightened pleading requirements did not apply. *Id.* at 546.

was not intended to be used as a broad-tracking index for the market. . . . 'It's not intended to be a portfolio benchmark for people.'" (quoting representative of Markit, creator of the index))); Ex. F (Reuters, Dec. 13, 2007 (same)); Ex. G (Risk.net, May 1, 2008, "The ABX index:  A pricing conundrum") ("The ABX may be a standardised and liquid tradable index but it was not designed to be uncritically extrapolated to the broader ABS market, and it was certainly not designed as a valuation tool for individual securities.")).  In light of the foregoing, Plaintiffs' criticism of the Funds' choice of a benchmark index does not amount to an affirmative misrepresentation by the Funds or any other Defendant.

## VI.    Plaintiffs Have Failed to Adequately Plead Loss Causation.

To plead loss causation, Plaintiffs: (1) must identify a corrective disclosure that revealed to the market a non-confirmatory material fact that Defendants previously misrepresented; and (2) must plausibly allege that the revelation of this previously undisclosed fact caused Plaintiffs' losses.  *See Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010).   "Loss causation may not be predicated merely upon averments that the defendant's misrepresentations inflated the purchase price of the underlying securities."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282 (S.D.N.Y. 2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 554 U.S. 336 (2005)).  Rather, loss causation must "connect the diminution in stock prices to a particular corrective disclosure, 'which revealed an alleged misstatement's falsity or disclosed that the allegedly material information had been omitted.'"  *Id.* (quoting *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007)).

The purported corrective disclosures upon which Plaintiffs rely to show loss causation revealed no new information to the market, much less fraud by the Funds or any of the Individual Defendants.  The disclosed information merely described losses already sustained by the Funds

or informed the market of changed circumstances unconnected to any past misrepresentations. (*See* MK/MAM Mem. at 53-54.)  As a result, these disclosures could not have caused whatever price drops may have followed.  Plaintiffs' allegations rest on the implausible inference that the value of the Funds plummeted because investors' discovered the Funds' purported "fraud," not because the Funds were heavily invested in securities whose values declined sharply in the wake of the global credit crisis.

### A. Plaintiffs Have Failed to Plead Corrective Disclosures that Revealed Previously Misrepresented Facts.

Plaintiffs allege that Defendants misrepresented both the composition of the Funds' respective portfolios and the true value of the assets in the Funds' portfolios.  (*See* Pls.' Opp. at 58.)  Plaintiffs further maintain that these misrepresentations were revealed in a series of corrective disclosures, including the daily publication of the Funds' Net Asset Value ("NAV"), newspaper articles, SEC filings and letters to investors.  The content of these alleged corrective disclosures, however, fails to show the revelation of any alleged misrepresentations as required to plead loss causation.[14]

Plaintiffs rely on the novel argument that each Fund's daily publication of its NAV constituted both a new misrepresentation and a corrective disclosure of the previous day's "fraudulent" NAV.  (*See* Pls.' Opp. at 59-60 ("Each day's publication of the Fund's NAV was a material representation of that Fund's value and investment risk. . . . Each day's setting of a new, lower, corrected NAV for each Fund was a corrective disclosure. . . .").)  The very notion that,

---

[14]      Contrary to Plaintiffs' suggestion, Defendants do not ask the Court to apply a fact-for-fact theory of loss causation.  At a minimum, however, the purported corrective disclosures must "reveal *something* about the deceptive nature of the original false statement."  *Archdiocese of Milwaukee Supporting Fund v. Halliburton*, 597 F.3d 330, 337 (5th Cir. 2010) (emphasis supplied), *rev'd on other grounds*, 131 S. Ct. 2179 (2011).  *See also Omnicare*, 583 F.3d at 944-45 (finding loss causation "thoroughly lacking" where plaintiffs fail to "explain how the [allegedly fraudulent] statements were revealed to be false and thereby caused a drop in the stock price").

on a daily basis, the Funds would commit fraud while simultaneously disclosing that they had committed fraud the previous day is entirely implausible.  Moreover, Plaintiffs cite no authority for the proposition that each "Fund's NAV was a material representation of that Fund's value and investment risk," (*id.* at 59), and that when a given NAV declined from the previous day's value, it amounted to a corrective disclosure by the Funds.  Such a theory is inconsistent with the requirements of loss causation.  *See In re Manulife Fin. Corp. Sec. Litig.*, 2011 WL 1990883, *16-18 (S.D.N.Y. May 23, 2011).  And, as the Sixth Circuit has made clear, "the observation that a stock price dropped on a particular day . . . is not the same as an allegation that a defendant's fraud caused the loss."  *D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994, 1000-1001 (6th Cir. 2005); *cf. Teamsters Local 445 v. Bombardier, Inc.*, 2005 WL 2148919, *9 (S.D.N.Y. Sept. 6, 2005) ("[P]oor performance alone is not an indication of securities fraud.").

The other alleged statements upon which Plaintiffs rely likewise do not constitute corrective disclosures. Statements that discuss the diversification of the Funds' portfolio composition certainly do not reveal anything previously unknown about the Funds' composition, or the Funds' risks or investment strategies.  The newspaper articles cited by Plaintiffs describing the decline in the Funds' NAV and share price merely confirmed information already in investors' possession concerning the Funds' portfolio composition as set forth in the Funds' public filings.  (*See* Pls.' Opp. at 62-63.)  The disclosure of confirmatory information will not support a showing of loss causation.  *See Nat'l Junior Baseball League v. Pharmanet Dev. Group, Inc.*, 720 F. Supp. 2d 517, 561 n.34 (D.N.J. 2010) (citing *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 705 (D. Minn. 2009)); *see also Magruder v. Halliburton Co.*, 2009 WL 854656, *11 (N.D. Tex. March 31, 2009) ("[T]he revelation of confirmatory information, or information already known to the market, cannot constitute a corrective disclosure.").

Similarly, Mr. Kelsoe's November 7, 2007, letter to investors is not a corrective disclosure. (Pls.' Opp. at 61.) The letter reads, in relevant part, as follows: "Our investment objectives are clearly stated in the prospectus of each fund, but in general, we have always invested a large portion of our portfolios in 'structured finance' fixed income securities. Without going into great detail explaining structured finance, it is a fair assumption to say the weakness in the portfolios relates to this area of investment." (CAC ¶ 277.) Again, this allegedly corrective disclosure merely reiterates information already in investors' possession by virtue of the Funds' public filings. Indeed, as set forth in the detailed quarterly asset schedules published by the Funds, there was never any doubt that "a large portion" of the Funds' portfolios were invested in structured financial products, as reiterated in Mr. Kelsoe's letter. (*See* MK/MAM Mem. at 43-44.)

Plaintiffs also place great weight on the Funds' decision to hire an "independent valuation consultant," which was announced in a Form 8-K filed with the SEC by the Funds on August 14, 2007. Plaintiffs allege that this disclosure revealed the falsity of the supposed representation that the Funds and their advisers "were experienced and expert at valuing their portfolio holdings." (Pls.' Opp. at 60 (citing Compl. ¶¶ 202, 219, 221, 252).) The Funds' announcement that they had decided to hire an independent valuation consultant in response to dramatic changes in the structured finance market, however, in no way spoke to any prior misrepresentation about Defendants' overall experience or skill in valuing securities. This announcement is not a "corrective disclosure" sufficient to show loss causation. *See Manulife Fin. Corp.*, 2011 WL 1990883, at *18 ("[I]n order to qualify as a 'corrective disclosure' for loss causation purposes, an alleged disclosure must 'reveal the falsity of an alleged misstatement.'" (quoting *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008)). If

anything, the Funds' disclosure of the hiring of a consultant runs counter to any inference that the Funds or other Defendants concealed some sort of misconduct.  *Cf. PR Diamonds v. Chandler*, 91 F. App'x 418, 436 (6th Cir. 2004).

Finally, the July 15, 2009, announcement that certain of the Defendants received Wells Notices cannot serve as a corrective disclosure in this action because it postdates the filing of class action lawsuits making identical allegations regarding the Funds by over one year.  (*See* Pls.' Opp. at 63.)  Plaintiffs were aware of these lawsuits, and, in fact, have cited them in arguing that their own claims are timely.  (*See id.* at 70-80.)  For this reason, the announcement of the receipt of the Wells Notices does not amount to a corrective disclosure.

**B.  Plaintiffs Have Failed to Plausibly Allege that the Revelation of Any Purported Corrective Disclosures Caused Plaintiffs' Losses.**

"Loss causation requires the Plaintiff to allege that the security's share price fell significantly after the truth became known."  *Local 703, I.B. of T. Grocery & Food Emp. Welfare Fund*, 2011 U.S. Dist. LEXIS 60761, at *31 (quotation omitted).   Plaintiffs, however, fail to meet this standard.  Plaintiffs have failed to plead plausible allegations that would show that any of the so-called corrective disclosures actually *caused* Plaintiffs' losses.  Plaintiffs' failure to do so renders their claims insufficient as a matter of law.  *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) ("Rule 8(a)(2) requires the plaintiff to allege . . . a facially 'plausible' relationship between the fraudulent statements or omissions and plaintiff's economic loss . . . .").

As set forth in the Funds' public filings, the Funds were heavily invested in structured financial instruments, such as ABS and MBS.  The market for these types of securities evaporated when two related events occurred.  First, subprime borrowers began defaulting on their mortgages and other loans at rates that greatly exceeded historical norms.  Second, banks

began to realize that the financial models on which their valuations depended were flawed, because they had wrongly assumed that default rates would follow historical norms and housing prices would not decline.  The confluence of these events caused investors in ABS and MBS, such as the Funds, to suffer huge losses, generally beginning with those who owned the lowest-priority tranches, then spreading to those owning higher-priority tranches.

The foregoing is a matter of well-established historical fact, of which courts can freely take judicial notice.  *See, e.g., Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578 (E.D. Pa. 2009) ("There can be no serious dispute that after Plaintiffs purchased the mortgage-backed securities at issue, the mortgage industry and mortgage-backed securities have faced historically unprecedented declines with widespread consequences."); *R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 5 (1st Cir. 2009) (describing the case as "ris[ing] from the ashes of the once vibrant market in mortgage-backed securities").[15] This is not, as Plaintiffs assert, a case in which Defendants merely "refer[] to a wide range of economic and other factors that may have caused or contributed to the decline in price of [the company's] shares."  (Pls.' Opp. at 64 (quoting *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006)).)  Rather, it is a case in which there can be no dispute that the Funds invested in ABS and MBS, that the market for these securities evaporated, and that the Funds' NAVs and market prices plummeted as a result.

Plaintiffs are required to allege facts supporting the inference that the misrepresentations were a "*substantial cause*" of the losses, not just a fractional or incidental one.  *See In re Daou*

---

[15]  In fact, Plaintiffs rely on documents that describe these historical events, and which further demonstrate that these events were in fact the cause of the Funds' losses.  For example, the Complaint quotes a *Wall Street Journal* article that explains (1) that Mr. Kelsoe bet heavily on mortgage-backed securities, (2) that these securities "depended heavily on the good fortune of borrowers", (3) that borrowers became unable to pay their mortgages, and (4) that "[b]ecause Mr. Kelsoe's investment in the B-3 tranche was so sensitive to losses, its market price plunged."  (CAC ¶ 275 (emphasis omitted).)

*Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000).   In this action, the competing inference of causation that Plaintiffs now proffer – that the Funds' prices plunged because investors were told that the firm had hired an independent valuation consultant, or because investors read articles describing the Funds' recent performance – is implausible and falls well short of showing that any alleged corrective disclosures were a substantial cause of Plaintiffs' losses.[16]   Because Plaintiffs have "fail[ed] to address the 'far more plausible reason for the resulting drop'" in the Funds' prices – i.e., the indisputable and unprecedented decline in the market for ABS and MBS – their "allegations do not adequately plead loss causation."   *See In re Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *12 (N.D. Cal. Oct. 19, 2010) (quoting *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008)).

### C.   Plaintiffs' New "Materialization-of-Risk" Theory Does Not Satisfy Plaintiffs' Obligation to Plead Loss Causation.

Perhaps as a tacit acknowledgement of the implausibility of their theory of loss causation as alleged in the CAC, Plaintiffs now proffer an entirely new theory of loss causation – that loss causation is satisfied because undisclosed risks supposedly materialized.   As an initial matter, the Sixth Circuit has never adopted the materialization-of-risk theory of loss causation.[17] Regardless, the Funds disclosed the very risks that Plaintiffs allege ultimately materialized – that

---

[16]       *See, e.g.*, *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) ("The '[f]actual allegations must be enough to raise a right to relief above the speculative level'; they must 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007))); *Rodrigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) ("The complaint must state a claim that is plausible on its face, i.e., the court must be able to draw a '*reasonable* inference that the defendant is liable for the misconduct alleged.'" (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)) (emphasis added)).

[17]       The Sixth Circuit's opinion in *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901 (6th Cir. 2007), cited by Plaintiffs, is not to the contrary.   In *Brown*, it was "the revelation of the truth about the purported . . . merger [that] proximately caused [the plaintiff's] economic loss."   *Id.* at 920.   In other words, *Brown* involved a straightforward case of misrepresentation, corrective disclosure, and loss.

the Funds were invested in securities that involved a high degree of risk and further disclosed the specific risks inherent in the various categories of securities in which the Funds invested.  (*See* MK/MAM Mem. at 37-40.)

"[W]here (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud – rather than other salient factors – that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment."  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005); *see also In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005) (noting that "*Lentell* imposes a heavy burden" in cases like this one).  As discussed above, Plaintiffs have failed to plead facts supporting an inference that it was Defendants' alleged fraud, rather than the crash of the market for ABS or MBS, that caused Plaintiffs' loss.  Plaintiffs make no effort to allege facts sufficient to quantify and apportion the losses attributable to Defendants' alleged "fraud" and the overall market crash.

In the absence of such allegations, Plaintiffs' 1934 Act claims must be dismissed.  And, while the failure to establish loss causation is an affirmative defense to Plaintiffs' 1933 Act claims, "[w]here it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses," dismissal is appropriate.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).  Plaintiffs' failure to plead loss causation requires dismissal of their 1933 and 1934 Act claims.

40

**VII.    Plaintiffs Have Failed to Allege that MAM, Morgan Keegan and MK Holding Were "Control Persons" Under § 20(a) of the 1934 Act.**

Plaintiffs have failed to plead sufficient facts that either MAM, Morgan Keegan or MK Holding was a "control person" within the meaning of § 20(a) of the 1934 Act.  As an initial matter and as discussed above, Plaintiffs' failure to plead a primary violation of the securities laws renders their control person claims inadequate as a matter of law.  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir. 2004).

Even if Plaintiffs were to have pleaded primary violations, Plaintiffs' circular allegations surrounding the relationships among Defendants otherwise fail to state a claim for control person liability under § 20(a).  Plaintiffs allege that: (1) Regions, as parent, controlled MAM, Morgan Keegan and MK Holding; (2) MK Holding, as the wholly owned parent of MAM, in turn, controlled MAM; (3) Morgan Keegan also allegedly controlled MAM; (4) MAM and Morgan Keegan, by virtue of its control of MAM, allegedly controlled the Funds together; and (5) Regions, MAM, Morgan Keegan, MK Holding and the Funds allegedly had overlapping employees.  (Pls.' Opp. at 89-92; CAC ¶¶ 52-55, 64, 362-366.)

In other words, Morgan Keegan and MK Holding are alleged to have controlled MAM.  MAM, as investment advisor to the Funds, however, is not alleged to be primarily liable under the 1934 Act; nor could MAM be liable under *Janus*.  This renders the control person claims against Morgan Keegan, MK Holding and MAM deficient as a matter of law.  *See PR Diamonds*, 364 F.3d at 696-98 (the "'controlled person' must have committed an underlying violation of the securities laws"); *DE & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 750 (E.D. Mich. 2003), *aff'd* 133 F. App'x 994 (6th Cir. 2005) (holding that "a complaint must allege facts establishing

that the defendant 'controlled' another person who committed an underlying violation of the Act, and that the defendant 'culpably participated' in that underlying violation").[18]

Moreover, Plaintiffs' conclusory assertions regarding MAM as a control person of the Funds likewise fail to state a claim under § 20(a). Plaintiffs rely on the parent-subsidiary relationships among Regions, Morgan Keegan, MK Holding and MAM, to argue that these Defendants were control persons of the Funds. (*See* Pls.' Opp. at 91; CAC ¶¶ 363-366.) Such parent-subsidiary arguments, however, do not support control person liability here.

Plaintiffs' reliance on *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392 (S.D.N.Y. 2007), is misplaced, as *Kalin* merely repeats the principle that a control person allegation "requires control of the primary violator by the defendant" such as a parent "of the primary violator corporation." *Id.* at 404; *see also PR Diamonds*, 364 F.3d at 696-98. Plaintiffs simply have not alleged that either Morgan Keegan, or MK Holding or MAM was a parent of the Funds, the alleged primary violator of the securities laws. (CAC ¶¶ 48-51, 354, 366.) Plaintiffs also have failed to allege that any of these alleged subsidiaries were primary violators. (*Id.*)

Plaintiffs also rely on Defendants' contractual relationships with the Funds; namely, that MAM and Morgan Keegan controlled the Funds by virtue of the Advisory and AAS Agreements, and therefore were "alter egos" of each other who "functioned as the officers and directors of the Funds." (Pls.' Opp. at 89; CAC ¶ 365.) Plaintiffs also include vague, nonspecific assertions that Mr. Morgan, who served as the director of MAM, Morgan Keegan

---

[18]        Contrary to Plaintiffs' assertions, the Sixth Circuit's holding in *D.E. & J. Limited Partnership* merely reconfirmed its previous holdings that "a plaintiff may hold a defendant liable under [control person liability] only if the defendant controlled an entity that violated the Securities Act." 133 Fed. Appx. at 1001 (citing *PR Diamonds*, 364 F.3d at 696-98; *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 554 n. 11 (6th Cir. 1999); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)). Whether the plaintiffs actually named the controlled entity as a defendant in that case does not change the fact that Plaintiffs here have not named MAM, the alleged controlled entity, as a primary violator of the 1934 Act. (CAC ¶ 354.)

and the Funds, told Carter Anthony, the president of MAM, to "'leave Kelsoe alone' and to give him whatever he wanted or needed."  (*Id.* at 92; CAC ¶ 363.)  Such conclusory allegations do not suffice to establish "day-to-day involvement" by Morgan Keegan or MAM in the Funds' operations, much less the control of purportedly fraudulent conduct alleged in the CAC.

At most, the foregoing allegations speak to "'power to control the specific transaction or activity upon which the primary violation is predicated.'"  *Azzolini v. CorTS Trust II for Provident Fin. Trust I*, 2005 WL 2253971, at *13 (E.D. Tenn. Sept. 16, 2005) (quoting *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000)).  But Plaintiffs' obligation does not end there. They must also plead facts demonstrating "actual participation (i.e., exercise [of] control) in the operations of the primary violator in general," *id.*, and several courts in the Sixth Circuit have required that Plaintiffs plead "culpable participation" in the primary violation in question.[19]  This they have failed to do.  (*See* MK/MAM Mem. at 57 n.46; Ind. Defs.' Reply at 8-9.)

Finally, Plaintiffs' assertion that Rule 8, not Rule 9(b), controls the pleading standard for their control person allegations does not overcome the pleading deficiencies at issue.  (*See* Pls.' Opp. at 87-88.)  Courts consistently hold that control person liability is not something that can be inferred from conclusory assertions of control or the mere fact of corporate affiliation.  (MK/MAM Mem. at 57-58.)[20]  While this Court has held that "[w]hether a party exercised the requisite control involves a factual analysis best saved for later determination," *In re Regions*

---

[19]    Without addressing the element of "culpable participation" on its merits, Plaintiffs assert that there is no "culpable participation" test in the Sixth Circuit. (Pls.' Opp'n at 93 n.71.)  While it is true that the Sixth Circuit has yet to address this issue, numerous district courts within the Sixth Circuit have applied this test. (*See* MK/MAM Mem. at 57 n.46.)

[20]    *See also In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002) (holding that the "heightened standard of the PSLRA requires that a claim under Section 20(a) state with particularity the circumstances of both the defendants' control of the primary violator, as well as of the defendants' culpability as controlling persons").

*Morgan Keegan Open-End Mut. Fund Litig.*, 743 F. Supp. 2d 744, 761 (W.D. Tenn. 2010), where a party utterly fails to plead any facts to support a plausible claim and simply parrots the standard of liability, dismissal is appropriate, *see Graham v. Barriger*, 699 F. Supp. 2d 612, 635 (S.D.N.Y. 2009) (following *Twombly* and *Iqbal* to hold that Plaintiffs may not rely on "control person allegations [which] are limited to legal conclusions and therefore are not entitled to the presumption of truth") (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009)).  Plaintiffs' allegations of control state mere legal conclusions and should be dismissed as a matter law.

## VIII.   The TAL Lacks Authority to Bring Class Action Litigation.

Plaintiffs cannot overcome the narrow scope of the language in the Probate Court's Order authorizing the TAL to represent trusts and custodial accounts for which Regions Bank served as trustee, and which purchased shares in the Funds.  (Pls.' Opp. at 94-97.)  While the Order places no restriction on the TAL's ability to pursue claims on behalf of the trusts it purports to represent, a plain reading of the Order reveals no language giving the TAL authority to pursue class action claims on behalf of a broader class consisting of all shareholders who purchased shares in the RHY Fund.  (MK/MAM Mem. at 59-60.)

Plaintiffs suggest that any trustee would normally possess the authority to serve as a class representative, and that such authority should be imputed to the TAL in the absence of any express language to the contrary.  (*See* Pls.' Opp. at 96-97.)  Plaintiffs, however, cite no authority for this proposition.  While the TAL may have standing to pursue claims on behalf of the TAL Subclass, it does not follow that the TAL may pursue claims on behalf of all investors in the RHY Fund.  This is particularly true given the specific wording of the Probate Court's Order from which the TAL derives its authority to pursue the claims at issue.

**IX.    Plaintiffs' "Notice of Filing Supplemental Authority" Must Be Disregarded.**

Plaintiffs have filed copies of the certain regulatory consent orders in a "Notice of Filing Supplemental Authority." (*See* Doc. No. 216.) Plaintiffs assert that the orders "set[] forth findings of fact that directly track or are otherwise consistent with Plaintiffs' allegations. . . ." (*Id.* at 2.) Plaintiffs' purported supplemental authority is improperly submitted and must be disregarded by the Court in connection with the instant motion.

"[A] plaintiff may not shore up a deficient complaint through extrinsic documents submitted in opposition to a defendant's motion to dismiss." *Madu, Edozie & Madu P.C. v. Socketworks Ltd. Nigeria*, 265 F.R.D. 106, 122-23 (S.D.N.Y. 2010); s*ee also Johnson v. Metro. Gov't of Nashville & Davidson County*, 2008 WL 3163531, at *6 (M.D. Tenn. Aug. 4, 2008). Plaintiffs' CAC does not refer to the consent orders and, as Defendants have pointed out, the regulatory actions themselves are premised on factual allegations that include mutual funds not at issue in this action. (*See* MK/MAM Mem. at 10-11.)

Plaintiffs' supplemental findings likewise should be disregarded in connection with consideration of Defendants' motion to dismiss because findings in a settlement agreement or consent order do not have preclusive effect and generally are inadmissible as evidence of liability in a separate action. *See, e.g., In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, *5 (S.D.N.Y. Apr. 18, 2006) (noting that, on a motion to dismiss, that "statements made . . . in the settlement documents [with the SEC and NASD] are not law; they are rather untested assertions made by litigants"); *see also Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 U.S. Dist. LEXIS 112503, *19-20 (N.D. Ga. Apr. 23, 2008) (SEC consent decree found inadmissible where the defendants "were not permitted to challenge [the SEC's] findings by examining the witnesses that the SEC relied on and . . . did not have the opportunity to present their own evidence.").

Litigants often settle lawsuits for reasons that have nothing to do with the merits of the allegations, and therefore, courts correctly refuse to consider settlements such as the consent orders as evidence of wrongdoing.  *See, e.g., In re Merrill Lynch & Co, Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking references to a complaint filed by the SEC against Defendants in federal court, holding that "references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) of the Federal Rules of Civil Procedure."); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893-94 (2d Cir. 1976) (explaining that a "consent decree entered into by the SEC . . . was the result of private bargaining, [where] there was no hearing or rulings or any form of decision on the merits . . ."). This Court likewise should not consider the consent orders here.

## **CONCLUSION**

For the reasons set forth herein and in Defendants' opening Memorandum, it is respectfully requested that this Court dismiss the CAC and Consolidated Actions with prejudice.

DATED this 15th day of August 2011

46

Respectfully submitted,

BASS BERRY & SIMS PLC

/s/ Matthew M. Curley
Michael L. Dagley
Matthew M. Curley
Britt K. Latham
W. Brantley Phillips, Jr.
150 Third Avenue South, Suite 2800
Nashville, TN 37201
(615) 742-6200

Shepherd D. Tate
Michael A. Brady
BASS BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, TN 38103-3672
(901) 543-5900

*Attorneys for Morgan Asset Management, Inc., Morgan Keegan & Company, Inc., and MK Holding, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2011, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following and/or served the following via U.S. Mail:

**BRANSTETTER STRANCH JENNINGS, PLLC**
J. GERARD STRANCH, IV
227 Second Avenue, North
Nashville, TN 37201

**SUTHERLAND ASBILL & BRENNAN, LLP**
S. LAWRENCE POLK
999 Peachtree Street NE
Atlanta, GA 30309

**LABATON SUCHAROW LLP**
JOEL H. BERNSTEIN
LOUIS GOTTLIEB
DAVID J. GOLDSMITH
STEFANIE J. SUNDEL
MICHAEL WOOLLEY
140 Broadway
New York, NY 10005

**SULLIVAN & CROMWELL LLP**
DAVID B. TULCHIN
DAVID E. SWARTS
125 Broad Street
New York, New York  1004

**PEARSON SIMON WARSHAW & PENNY, LLP**
GEORGE S. TREVOR
44 Montgomery Street, Suite 2450
San Francisco, CA 94104

**MAYNARD COOPER & GALE PC**
PETER S. FRUIN
2400 Regions Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL  35203

**CABANISS JOHNSTON GARDNER DUMAS & O'NEAL LLP**
CRAWFORD S. MCGIVAREN
R. CARLTON SMYLY
Suite 700, Park Place Tower
2001 Park Place North
Birmingham, AL 35203

**PURSLEY LOWERY MEEKS LLP**
R. HAL MEEKS
260 Peachtree Street NW
Atlanta, GA 30303

**PAUL HASTINGS JANOFSKY & WALKER LLP**
KEVIN C. LOGUE
75 E. 55th Street
New York, NY  10022

/s/ Matthew M. Curley_____

48