IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| IN RE REGIONS MORGAN KEEGAN SECURITIES, DERIVATIVE & ERISA LITIGATION<br><br>This Document Relates to:<br><br>*In re Regions Morgan Keegan Closed-End Fund Litigation,*<br><br>No. 07-cv-02830-SHM-dkv | No. 09-md-02009-SHM |

**PLAINTIFFS' MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR FINAL APPROVAL OF
PROPOSED SETTLEMENT AND PLAN OF ALLOCATION OF
<u>NET SETTLEMENT FUND AND FOR FINAL CLASS CERTIFICATION</u>**

Joel H. Bernstein
David J. Goldsmith
Nicole M. Zeiss
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
(212) 907-0700

J. Gerard Stranch, IV (BPR # 023045)
BRANSTETTER, STRANCH
  & JENNINGS, PLLC
227 Second Avenue North
Nashville, Tennessee 37201
(615) 254-8801

*Counsel for Lead Plaintiffs
Lion Fund, L.P., Dr. J. Samir
Sulieman and Larry Lattimore*

[Additional counsel listed below]

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................................. iii

Preliminary Statement ........................................................................................................... 1

The Court's Preliminary Approval
Order and the Pre-Hearing Notice Program.......................................................................... 3

ARGUMENT .......................................................................................................................... 4

I.      STANDARDS FOR FINAL APPROVAL
        OF CLASS ACTION SETTLEMENTS ........................................................................ 4

II.     THE PROPOSED $62 MILLION SETTLEMENT
        IS FAIR, REASONABLE, AND ADEQUATE
        AND SHOULD BE APPROVED ................................................................................... 5

        A.      The Settlement Amount Is Fair in View
                of the Best Possible Recovery at Trial and
                the Myriad Risks of Continued Litigation .......................................................... 5

        B.      Plaintiffs Face Substantial Risks in Establishing
                Loss Causation, Damages and Liability............................................................... 9

                1.      Risks Concerning Loss Causation and Damages....................................... 9

                2.      Risks Concerning Liability ...................................................................... 11

                        (a)     Risks of Proving That Kelsoe and the
                                Funds Made Material Misstatements of
                                Fact and Acted With Fraudulent Intent....................................... 12

                        (b)     Risks of Proving That Morgan Keegan and
                                RFC Were Controlling Persons of the Funds .............................. 15

        C.      The Settlement Is the Product of Extensive
                and Informed Arm's-Length Negotiations
                Facilitated by a Respected Private Mediator ...................................................... 16

        D.      Plaintiffs Conducted Meaningful Pre-Mediation
                Discovery and Entered Into the Settlement With a
                Clear View of the Strengths and Weaknesses of the Case................................... 18

        E.      Continued Litigation Would Be Complex and Long and
                Would Consume Substantial Judicial and Private Resources.............................. 20

i

F.     The Judgment of Experienced Counsel Supports Approval of the Settlement ....................................................................... 21

G.     The Public Interest Warrants Approval of the Settlement .................................... 22

III.    THE PROPOSED PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED .................................................. 23

IV.    THE COURT SHOULD GRANT FINAL CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ..................................................... 26

Conclusion ........................................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) ............................................................15

*In re American Business Financial*
    *Services*, *Inc. Noteholders Litigation*,
    No. 05-232, 2008 WL 4974782 (E.D. Pa. Nov. 21, 2008) ....................10

*Amgen v. Connecticut Retirement Plans & Trust Funds*,
    No. 11-1085, 2013 WL 691001
    (U.S. Feb. 27, 2013).................................................................................22

*In re Blech Securities Litigation*,
    No. 94-7696 (RWS), 2003 WL 1610775
    (S.D.N.Y. Mar. 26, 2003) ........................................................................18

*In re Canadian Superior Securities Litigation*,
    No. 09-10087 (SAS), 2011 WL 5830110
    (S.D.N.Y. Nov. 16, 2011) ..........................................................................7

*In re Cardinal Health Inc. Securities Litigation*,
    528 F. Supp. 2d 752 (S.D. Ohio 2007) ...................................................17

*In re Cardizem CD Antitrust Litigation*,
    218 F.R.D. 508 (E.D. Mich. 2003) ...........................................17, 21, 22

*In re Cendant Corp. Litigation*,
    264 F.3d 201 (3d Cir. 2001).......................................................................8

*City of Roseville Employees' Retirement*
    *System v. Horizon Lines, Inc.*,
    442 F. App'x 672 (3d Cir. 2011) ............................................................15

*In re Cylink Securities Litigation*,
    274 F. Supp. 2d 1109 (N.D. Cal. 2003) ....................................................7

*In re Delphi Corp. Securities,*
    *Derivative & "ERISA" Litigation*,
    248 F.R.D. 483 (E.D. Mich. 2008) ................................................ *passim*

*Denney v. Jenkens & Gilchrist*,
    230 F.R.D. 317 (S.D.N.Y. 2005) .............................................................17

*In re Enron Corp. Securities,*
  *Derivative & "ERISA" Litigation,*
  No. MDL-1446, 2008 WL 4178151
  (S.D. Tex. Sept. 8, 2008) ................................................................................25

*Erica P. John Fund, Inc. v. Halliburton Co.,*
  131 S. Ct. 2179 (2011) .............................................................................9, 15

*In re First Marblehead Corp. Securities Litigation,*
  639 F. Supp. 2d 145 (D. Mass. 2009) ...............................................................10

*In re Flag Telecom Holdings, Ltd. Securities Litigation,*
  No. 02-3400 (CM), 2010 WL 4537550
  (S.D.N.Y. Nov. 8, 2010) ...........................................................................7, 8

*Freeman v. Laventhol & Horwath,*
  915 F.2d 193 (6th Cir. 1990) ........................................................................26

*Frymire-Brinati v. KPMG Peat Marwick,*
  2 F.3d 183 (7th Cir. 1993) ..........................................................................18

*In re Gilat Satellite Networks, Ltd.,*
  No. 02-1510 (CPS), 2007 WL 2743675
  (E.D.N.Y. Sept. 18, 2007) ..........................................................................7

*In re Global Crossing Securities & ERISA Litigation,*
  225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................9, 23

*Gordon v. Dadante,*
  336 F. App'x 540 (6th Cir. 2009) ..................................................................4

*Granada Investments, Inc. v. DWG Corp.,*
  962 F.2d 1203 (6th Cir. 1992) ....................................................................4, 5

*Herman & MacLean v. Huddleston,*
  459 U.S. 375 (1983) ................................................................................25

*Hicks v. Morgan Stanley & Co.,*
  No. 01-10071 (RJH), 2005 WL 2757792
  (S.D.N.Y. Oct. 24, 2005) ...........................................................................7

*In re Ikon Office Solutions, Inc. Securities Litigation,*
  194 F.R.D. 166 (E.D. Pa. 2000) ....................................................................25

*In re Initial Public Offering Securities Litigation,*
  243 F.R.D. 79 (S.D.N.Y. 2007) ......................................................................7

iv

*In re Interpublic Securities Litigation*,
   No. 02-6527 (DLC), 2004 WL 2397190
   (S.D.N.Y. Oct. 26, 2004) .................................................................................6

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011).............................................................................14, 15

*Local 295/Local 851 IBT Employer Group Pension*
   *Trust & Welfare Fund v. Fifth Third Bancorp*,
   731 F. Supp. 2d 689 (S.D. Ohio 2010) .......................................................13

*Lonardo v. Travelers Indemnity Co.*,
   706 F. Supp. 2d 766 (N.D. Ohio 2010).........................................................22

*In re Lupron Marketing & Sales Practices Litigation*,
   No. 01-10861 (RGS), 2005 WL 2006833
   (D. Mass. Aug. 17, 2005) ............................................................................11

*In re Lupron Marketing & Sales Practices Litigation*,
   228 F.R.D. 75 (D. Mass. 2005)....................................................................11

*Manners v. American General Life Insurance Co.*,
   No. 98-0266, 1999 WL 33581944
   (M.D. Tenn. Aug. 11, 1999) ..........................................................................5

*In re Mego Financial Corp. Securities Litigation*,
   213 F.3d 454 (9th Cir. 2000) .........................................................................5

*In re Merrill Lynch & Co. Research*
   *Reports Securities Litigation*,
   246 F.R.D. 156 (S.D.N.Y. 2007) ...................................................................8

*In re Merrill Lynch & Co. Research*
   *Reports Securities Litigation*,
   No. 02 MDL 1484, 2007 WL 313474
   (S.D.N.Y. Feb. 1, 2007) .................................................................................7

*In re Merrill Lynch Tyco Research*
   *Reports Securities Litigation*,
   249 F.R.D. 124 (S.D.N.Y. 2008) ...................................................................7

*In re The Mills Corp. Securities Litigation*,
   265 F.R.D. 246 (E.D. Va. 2009) ..............................................................11, 12

*In re Nationwide Financial Services Litigation*,
   No. 08-00249, 2009 WL 8747486
   (S.D. Ohio Aug. 19, 2009) .......................................................................11, 21, 22

*In re Omnivision Technologies, Inc. Securities Litigation,*
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...................................................8, 10

*In re Packaged Ice Antitrust Litigation,*
   No. 08 MDL 01952, 2011 WL 6209188
   (E.D. Mich. Dec. 13, 2011)....................................................................23

*Plumbers & Steamfitters Local 773 Pension Fund v.*
   *Canadian Imperial Bank of Commerce,*
   694 F. Supp. 2d 287 (S.D.N.Y. 2010).....................................................13

*In re Portal Software, Inc. Securities Litigation,*
   No. 03-5138 (VRW), 2007 WL 4171201
   (N.D. Cal. Nov. 26, 2007)......................................................................7

*In re Rite Aid Corp. Securities Litigation,*
   146 F. Supp. 2d 706 (E.D. Pa. 2001) .......................................................8

*In re Southeastern Milk Antitrust Litigation,*
   No. 08-1000, 2012 WL 2236692
   (E.D. Tenn. June 15, 2012)........................................................16, 17, 22

*In re Telectronics Pacing Systems Inc. Accufix*
   *Atrial "J" Leads Products Liability Litigation,*
   137 F. Supp. 2d 985 (S.D. Ohio 2001) ....................................................20

*In re Telik, Inc. Securities Litigation,*
   576 F. Supp. 2d 570 (S.D.N.Y. 2008)......................................................9

*Thompson v. RelationServe Media Inc.,*
   610 F.3d 628 (11th Cir. 2010) ..............................................................15

*In re Tronox, Inc. Securities Litigation,*
   No. 09-6620 (SAS), 2010 WL 2835545
   (S.D.N.Y. June 29, 2010).......................................................................26

*In re Tyco International, Ltd. Multidistrict Litigation,*
   535 F. Supp. 2d 249 (D.N.H. 2007)........................................................11

*UAW v. Ford Motor Co.,*
   No. 07-74730, 2006 WL 1984363
   (E.D. Mich. July 13, 2006) ....................................................................20

*UAW v. General Motors Corp.,*
   497 F.3d 615 (6th Cir. 2007) ...............................................................4, 5

*In re Veeco Instruments, Inc. Securities Litigation*,
No. 05 MDL 0165 (CM), 2007 WL 4115809
(S.D.N.Y. Nov. 7, 2007) ........................................................................................7

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)................................................................................6, 17

*Williams v. Vukovich*,
720 F.2d 909 (6th Cir. 1983) ................................................................................21

*In re WorldCom, Inc. Securities Litigation*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)...................................................................10

*In re WorldCom, Inc. Securities Litigation*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................................................16

## Statutes & Rules

Securities Act of 1933 § 11,
15 U.S.C. § 77k............................................................................................. *passim*

15 U.S.C. § 77k(b)(3)(A) & (C) .............................................................................16

Securities Exchange Act of 1934 § 10(b),
15 U.S.C. § 78j(b) ........................................................................................ *passim*

28 U.S.C. § 1292(b) ..............................................................................................14

Fed. R. Civ. P. 23(e) ...............................................................................................1

Fed. R. Civ. P. 23(e)(2)............................................................................................4

## Other Authorities

Ellen M. Ryan & Laura E. Simmons,
*Securities Class Action Settlements:*
*2011 Review and Analysis* (Cornerstone Research 2012)....................................6, 7

Editorial, *A Class Action in the Public Interest*,
N.Y. Times, Mar. 3, 2013 ......................................................................................22

**<u>Preliminary Statement</u>**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Court's January 4, 2013 Order Preliminarily Approving Settlement and Providing for Notice (the "Preliminary Approval Order"), Lead Plaintiffs Lion Fund, L.P., Dr. J. Samir Sulieman, and Larry Lattimore, on behalf of the Class,[1] and C. Fred Daniels, in his capacity as Trustee *ad Litem* for the Leroy McAbee, Sr. Family Foundation Trust, on behalf of the TAL Subclass (collectively, "Plaintiffs"), respectfully submit this memorandum of law in support of their motion for final approval of the proposed Settlement of this class action, approval of the Plan of Allocation of the Net Settlement Fund, and final certification of the Class and TAL Subclass for purposes of the Settlement.

The Settlement provides for the gross payment of Sixty-Two Million Dollars in cash ($62,000,000.00) by and on behalf of Defendants for the benefit of the Class and TAL Subclass. The Settlement represents an extraordinary benefit that falls well within a range of reasonableness in light of the myriad risks of continued litigation—in particular, the significant risks inherent in proving the required elements of causation, damages, scienter and material misstatements as well as controlling person liability.

The merits of the claims, which center on complex and arguably subjective questions concerning, among other things, the degree of undisclosed investment risk of the four Regions Morgan Keegan Closed-End Funds, the fair valuation of hundreds of millions of dollars' worth of asset-backed and other structured finance securities held by Funds amid the 2007 "meltdown" of the credit markets, the proper diversification and classification of the Funds' assets, and the state of mind of the Funds' Senior Portfolio Manager, Defendant James C. Kelsoe, Jr. ("Kelsoe"), are sharply disputed. The value of the claims, which center on equally complex and

---

[1] Capitalized terms not otherwise defined herein have the meanings set forth and defined in the Stipulation and Agreement of Settlement, dated October 12, 2012 (ECF No. 260, the "Settlement Agreement").

1

expert-dependent questions concerning the proper method of estimating damages, the causes of price movements of shares that trade freely on the secondary market but whose value relates to the Funds' Net Asset Values per share ("NAVs"), and the extent to which the collapse of the Funds resulted from the realization of undisclosed risks, revelation of undisclosed facts, or macroeconomic factors coinciding with the "credit crisis," also are sharply disputed.

While Plaintiffs are confident in the merits of the claims, Defendants have mounted vigorous defenses that add substantial risk to Plaintiffs' ability to prove liability and damages at trial.  Nonetheless, Plaintiffs have secured a Settlement that represents a robust percentage of the potential recovery at trial and provides cash relief to Class members now, and in accordance with a fair and reasonable Plan of Allocation.

An agreement to settle this action was reached only after lengthy and informed arm's-length negotiations facilitated by Professor Eric D. Green, a respected private mediator, and after Lead Plaintiffs reviewed voluminous materials and associated data including millions of pages of nonpublic Morgan Keegan documents.  The formal terms and conditions of the Settlement, which required attention to various nonroutine issues bearing on the TAL's representation of the TAL Subclass, were painstakingly negotiated over an extended period and reflect a carefully crafted compromise.  The Settlement and Plan of Allocation should be approved.[2]

---

[2] A summary of the allegations and claims, the procedural history of the action and the events that led to the Settlement, and other matters are discussed in the accompanying Declaration of David J. Goldsmith in Support of Plaintiffs' Motion for Final Approval of Proposed Settlement and Plan of Allocation of Net Settlement Fund and for Final Class Certification and Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses (the "Counsel Declaration" or "Counsel Decl.").

**The Court's Preliminary Approval**
**Order and the Pre-Hearing Notice Program**

Plaintiffs filed the Settlement Agreement and moved for preliminary approval on October 12, 2012 (ECF Nos. 261-263).  On January 4, 2013, after a hearing, this Court issued the Preliminary Approval Order (ECF No. 276).[3]  *See* Counsel Decl. ¶¶ 5-6.

Pursuant to and in compliance with the Preliminary Approval Order, beginning on January 18, 2013, The Garden City Group, Inc. ("GCG"), the Court-appointed Claims Administrator, caused the Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses (the "Notice") and Proof of Claim and Release form to be mailed to all Class members who could be identified by reasonable effort.  *See* GCG Aff., Ex. 2,[4] at ¶¶ 5-8 & Ex. A thereto.  A total of 98,399 Notice packets have been mailed as of March 7, 2013.  *Id.* ¶ 8.  On January 18, 2013, the Notice and Proof of Claim form were also posted on the case-dedicated website established by GCG for purposes of this Settlement, *id.* ¶ 10, and the website of Plaintiffs' Lead Counsel.  Counsel Decl. ¶¶ 8-9.  Accordingly, the Notice and Proof of Claim were made publicly available 62 days before the deadline for Class members to object or opt-out of the action, and a full 83 days before the Settlement Hearing.

The Notice provides means by which Class members or other interested persons can call, e-mail, or write to GCG or Lead Counsel with inquiries.  As of March 5, 2013, the toll-free telephone line staffed by GCG has received 2,508 calls from potential Class members and other interested persons.  GCG Decl., Ex. 2, at ¶ 13.

On January 24, 2013, the Summary Notice of Pendency of Class Action and Proposed Settlement and Motion for Attorneys' Fees and Expenses (the "Summary Notice") was published

---

[3] For ease of reference, the Preliminary Approval Order (without its own attachments) is annexed to the Counsel Declaration as Exhibit 1.

[4] Citations to "Ex. ___" herein refer to exhibits to the Counsel Declaration.

in *Investor's Business Daily*, and on January 25, 2013 was issued over *PR Newswire*, a national

business-oriented wire service. *Id.* ¶ 9 & Exs. B and C thereto.

## ARGUMENT

I.  **STANDARDS FOR FINAL APPROVAL
    OF CLASS ACTION SETTLEMENTS**

Rule 23(e) of the Federal Rules of Civil Procedure provides that the claims of a certified

class may be settled only with the approval of the Court, and only on a finding, after reasonable

notice and a hearing, that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P.

23(e)(2); *see UAW v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

Courts in this Circuit look to several factors to guide this inquiry, including:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration
> of the litigation; (3) the amount of discovery engaged in by the parties; (4) the
> likelihood of success on the merits; (5) the opinions of class counsel and class
> representatives; (6) the reaction of absent class members;[5] and (7) the public
> interest.

*Id.* (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v.*

*Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983)); *see also Gordon v. Dadante*, 336 F. App'x 540,

549 (6th Cir. 2009).

This Court "enjoys wide discretion in assessing the weight and applicability of these

factors," *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992), and indeed

"may choose to consider only those factors that are relevant to the settlement at hand and may

weigh particular factors according to the demands of the case."  *In re Delphi Corp. Sec.*,

*Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 496 (E.D. Mich. 2008) (citations omitted).  While

---

[5] With respect to this factor, Class members have until March 22, 2013 to request exclusion from the Class or object to the matters to be considered during the Settlement Hearing.  Plaintiffs will file a brief responding to any timely objections received and addressing opt-outs no later than April 2, 2013.  *See* Preliminary Approval Order, Ex. 1, at ¶¶ 10, 14 ,19.

the Court must not "decide the merits of the case or resolve unsettled legal questions," the Court should "weig[h] the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *UAW*, 497 F.3d at 631 (citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)).

The Court's task ultimately "is not to decide whether one side is right or even whether one side has the better of [the] arguments. . . .  The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *Id.* at 632.  In assessing this question, the Court must also consider "the federal policy favoring settlement of class actions." *Id.*; *see also Granada*, 962 F.2d at 1203 ("Settlements are welcome in cases such as this . . . .  Absent evidence of fraud or collusion, such settlements are not to be trifled with.").

## II.   THE PROPOSED $62 MILLION SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

### A.   The Settlement Amount Is Fair in View of the Best Possible Recovery at Trial and the Myriad Risks of Continued Litigation

In evaluating the fairness of a settlement, the fundamental question is how the value of the settlement compares to the amount the class potentially could recover at trial, discounted for risk, delay and expense.  In this regard, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted); *see also Manners v. American Gen. Life Ins. Co.*, No. Civ. A. 98-0266, 1999 WL 33581944, at *20 (M.D. Tenn. Aug. 11, 1999) (same) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 463-64 (2d Cir. 1982)).  Indeed, "[t]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case

and the concomitant risks and costs necessarily inherent in taking any litigation to completion[.]" *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 119 (2d Cir. 2005).

The proposed $62 million Settlement is well-within a range of reasonableness in light of the best possible recovery at trial and the risks of continued litigation. According to analyses prepared for settlement purposes by Plaintiffs' consulting loss causation and damages expert, Chad W. Coffman, CFA of Global Economics Group, using the "index" methodology discussed below, the maximum aggregate damages Plaintiffs could have obtained at trial is estimated to be $339,279,091. *See* Counsel Decl. ¶ 41.

The $62 million gross settlement represents 18.3 percent of this estimated damages amount. This percentage, particularly in view of the risks and uncertainties discussed below, falls well within the range of possible approval. Courts have generally approved other settlements in PSLRA cases that recover a comparable or far smaller percentage of maximum damages. *See*, *e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) ("The Settlement Fund is approximately $40.3 million. The settlement thus represents a recovery of approximately 6.25% of estimated damages. This is at the higher end of the range of reasonableness of recovery in class actions securities litigations."); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *8 (S.D.N.Y. Oct. 26, 2004) ($96 million settlement fund reflecting "ten to twenty percent" of estimated damages "sits comfortably within the range of reasonableness").

An updated statistical study published by Cornerstone Research recently found that between 1996 and 2010, court-approved securities class action settlements (1,166 settlements) recovered a median of 3.3 percent of "estimated damages." *See* Ellen M. Ryan & Laura E. Simmons, *Securities Class Action Settlements: 2011 Review and Analysis*, at 7, 18 (Cornerstone

Research 2012) (Ex. 4).[6]  Similarly, all settlements during 2011 (65 settlements) recovered a median of 2.1 percent of such damages.  *Id.* at 7, 18.  Cornerstone found that where, as here, maximum estimated damages are between $250 million and $499 million, settlements during 1996-2010 and 2011 recovered a median of only 2.5 percent and 1.2 percent of such damages, respectively.  *Id.* at 7.  Settlements between 1996 and 2011 in which the SEC commenced a related administrative proceeding or enforcement action (285 settlements) recovered a median 3.7 percent of such "estimated damages."  *Id.* at 14.  Finally, Cornerstone looked at settlements in credit crisis-related actions during 2009-2011.  Those settlements, 17 percent of which included corresponding SEC action and nearly half of which included a related derivative action, recovered a median of $31.3 million, or 2.0 percent of estimated damages.  *Id.* at 16.

Viewed as a percentage of the potential recovery at trial, therefore, this Settlement provides a gross recovery that appears to be multiples greater than court-approved PSLRA settlements in general.[7]  Plaintiffs submit that a settlement of such magnitude clearly falls within a range of reasonableness.  *See Delphi*, 248 F.R.D. at 497 (approving settlement representing 22% of plaintiffs' damages estimate, and observing that "[s]everal noteworthy class action

---

[6] Cornerstone describes "estimated damages" essentially as a "modified version of a calculation method historically used by plaintiffs in securities class actions."  Ex. 4 at 6; *see also id.* at 22 n.8.

[7] Several courts have relied upon earlier versions of the Cornerstone Research study in approving securities class action settlements.  *See, e.g., In re Canadian Superior Sec. Litig.*, No. 09 Civ. 10087 (SAS), 2011 WL 5830110, at *2 (S.D.N.Y. Nov. 16, 2011) (approving settlement representing 8.5% of plaintiffs' maximum damages estimate); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (CM), 2010 WL 4537550, at *20 (S.D.N.Y. Nov. 8, 2010) (20% of maximum damages); *In re Merrill Lynch Tyco Research Reports Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. 2008) (3% of estimated damages); *In re Portal Software, Inc. Sec. Litig.*, No. C 03-5138 VRW, 2007 WL 4171201, at *3 (N.D. Cal. Nov. 26, 2007) (25% of maximum damages); *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05 MDL 0165 (CM), 2007 WL 4115809, at *12 & n.2 (S.D.N.Y. Nov. 7, 2007) (23.2% of maximum damages); *In re Gilat Satellite Networks, Ltd.*, No. CV 02-1510 (CPS), 2007 WL 2743675, at *12 (E.D.N.Y. Sept. 18, 2007) (10% of maximum damages); *Merrill Lynch*, 2007 WL 313474, at *10 (6.25% of estimated damages); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (3.8% of damages); *see also In re Cylink Sec. Litig.*, 274 F. Supp. 2d 1109, 1115 (N.D. Cal. 2003) (noting that value of the Cornerstone study "lies in the standard [it] afford[s] by which to make comparisons of settlements across cases"); *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 94 n.120 (S.D.N.Y. 2007) (citing Cornerstone study: "A review of securities class action settlements indicates that the median settlement recovery in 2005 was approximately three percent of plaintiffs' estimated damages.").

authorities have stated that the average securities fraud class action settles for between 3% and 15% of the damages suffered by the class").[8]

Defendants' contentions regarding damages confirm that the $62 million Settlement recovery is an excellent result. Morgan Keegan's own damages model estimated that maximum potential damages, *before* the exclusion of losses caused by factors other than the alleged fraud, were approximately $275 million. *See* Jan. 3, 2013 Hearing Transcript, Ex. 5, at 47:5-11. The Settlement represents 22.6 percent of this high-end amount. *See In re Flag Telecom Holdings, Ltd. Sec. Litig*, No. 02 Civ. 3400 (CM), 2010 WL 4537550, at *20 (S.D.N.Y. Nov. 8, 2010) (settlement for more than 20% of potential damages under the "most favorable" damages scenario was "well within" a range of reasonableness).

Defendants also contend that any damage estimate or award must be further reduced by offsets totaling $172.5 million: (a) approximately $62 million in dividends paid in cash to RHY shareholders during the Class Period, thus reducing recoverable damages on Plaintiffs' claims under Section 11 of the Securities Act of 1933; (b) $50 million of the total payments by Morgan Keegan in the settlement with State regulators; (c) the $10.5 million in disgorgement paid by Morgan Keegan to the SEC in connection with the SEC settlement; and (d) approximately $50 million in damages suffered by investors who have opted-out of the Class by bringing individual arbitration cases. Plaintiffs disagree with these contentions, but if a jury (assuming a favorable verdict on liability) were to side with Defendants, Plaintiffs' maximum damages estimate would

---

[8] *See also In re Cendant Corp. Litig*., 264 F.3d 201, 242 n.22 (3d Cir. 2001) (observing that approved settlement recoveries in securities class actions typically range from 1.6% to 14% of claimed damages); *In re Omnivision Techs., Inc. Sec. Litig*., 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (settlement yielding 6% of potential damages after deducting fees and costs was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *In re Rite Aid Corp. Sec. Litig*., 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that class action settlements since 1995 typically recovered between 5.5% and 6.2% of estimated losses); *In re Merrill Lynch & Co. Research Reports Sec. Litig*., 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving $125 million settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions").

drop to $166.78 million.  The Settlement represents a very robust 37.2 percent of that amount.  *See In re Telik*, *Inc*. *Sec*. *Litig*., 576 F. Supp. 2d 570, 580 (S.D.N.Y. 2008) (settlement for 25% of damages was "a percentage well above that in most securities class actions").  Finally, if a jury were to award $275 million based on Morgan Keegan's model, minus the $172.5 million in offsets sought by Defendants, the maximum award *before* accounting for share price declines caused by external factors would be $102.5 million.  The Settlement represents more than 60 percent of that amount.  This factor strongly supports final approval of the Settlement.

### B.    Plaintiffs Face Substantial Risks in Establishing Loss Causation, Damages and Liability

#### 1.    Risks Concerning Loss Causation and Damages

Loss causation requires proof of a "'causal connection between the material misrepresentation and the [economic] loss' suffered by investors."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) (quoting *Dura Pharms*., *Inc*. *v*. *Broudo,* 544 U.S. 336, 342 (2005)).  Once causation is established, damage estimation remains "a complicated and uncertain process, typically involving conflicting expert opinion about the difference between the purchase price and the [share]'s 'true' value absent the alleged fraud."  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (citation omitted).

Plaintiffs faced significant risks with respect to proving loss causation and damages at trial.  Plaintiffs' damages model used a methodology that measures the extent to which the Funds underperformed the Funds' benchmark index, the Lehman Brothers Ba U.S. High Yield Index (the "Index"), to a statistically significant degree.  By this method, damages essentially represent the difference between the loss suffered by Class members in connection with their purchases and sales of Fund shares and the amount they would have lost had they invested an equivalent amount in the Index.  Defendants have criticized this methodology, and would contend on

summary judgment and at trial that the model incorrectly equates a decline in the Funds' share prices to loss causation, fails to identify a causal connection between the alleged misstatements and any price declines, and finds damages during time periods where no corrective disclosures are alleged to have occurred.  Defendants further contend, citing *In re DVI Securities Litigation*, No. 03-5336, 2010 WL 3522090, at *12 (E.D. Pa. Sept. 3, 2010), that one court has rejected a similar damages analysis by Plaintiffs' expert.

Moreover, Defendants and their experts will likely contend on summary judgment and at trial that the price declines in the Funds' shares—particularly where the NAV was set by the Funds' Boards of Directors and the share prices tended to move in tandem with the NAVs—were all caused by the sudden, "overnight" collapse of global credit markets in mid-2007, and not by Defendants' alleged misstatements.  *See In re First Marblehead Corp. Sec. Litig*., 639 F. Supp. 2d 145, 165 (D. Mass. 2009) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by fraud decreases.").[9]  Defendants also contend that Kelsoe's 262 alleged "price adjustments" in the carrying values of certain portfolio assets had no material impact upon the Funds' NAVs or, accordingly, the prices of Fund shares.

The parties' competing opinion testimony would inevitably reduce the trial of these issues to a risky "battle of the experts."  Juries, particularly those tasked with weighing complex financial and statistical evidence, are unpredictable.  Although Plaintiffs believe that Mr. Coffman's damages estimates and underlying analyses are well-supported, a jury potentially

---

[9] *See also In re American Bus. Fin. Servs*., *Inc. Noteholders Litig.*, No. 05-232, 2008 WL 4974782, at *8 (E.D. Pa. Nov. 21, 2008) (noting, in approving settlement, defendants' "argu[ment] that other factors like the subprime crisis, not their alleged misrepresentations and omissions, caused the classes' harm"); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 338 (S.D.N.Y. 2005) (approving settlement where "defendants contested the extent to which the decline in the prices of WorldCom securities was due to the WorldCom accounting fraud as opposed to other market forces"); *Omnivision*, 559 F. Supp. 2d at 1041-42 ("The amount Plaintiffs might recover if they prevailed at trial is uncertain.  A number of factors, including general market conditions . . . may have affected the portion of the damages attributable to Defendants' purportedly misleading statements.").

could reject or minimize his opinions and credit those of Defendants' experts.  *See In re Nationwide Fin. Servs. Litig.*, No. 08-CV-00249, 2009 WL 8747486, at *3 (S.D. Ohio Aug. 19, 2009) ("Acceptance of expert testimony is always far from certain, no matter how qualified the expert, inevitably leading to a battle of the experts.").  Even assuming a jury finding of complete liability (which is not guaranteed), Plaintiffs have no assurance that the jury would award more than $62 million and that the award would be upheld on appeal.  *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 260-61 (D.N.H. 2007) ("[E]ven if the jury agreed to impose liability, the trial would likely involve a confusing 'battle of the experts' over damages. If, faced with conflicting expert testimony, the jury chose to embrace the most conservative estimate of damages, then the ultimate award might turn out to be less than the proposed settlement.").  And Plaintiffs cannot entirely discount the possibility that a jury would find some or all Defendants liable, but award token damages or none at all—particularly where, as discussed below, the Morgan Keegan Defendants and Defendant Regions Financial Corporation ("RFC") are alleged to have been controlling persons of the Funds but not primary violators.  *See In re Lupron Mktg. & Sales Prac. Litig.*, No. 01-CV-10861 RGS, 2005 WL 2006833, at *4 (D. Mass. Aug. 17, 2005) ("History is replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages.").  These risks strongly support final approval of the Settlement.

### 2.      Risks Concerning Liability

"As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication."  *In re Lupron Mktg. & Sales Prac. Litig.*, 228 F.R.D. 75, 97 (D. Mass. 2005).  Moreover, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."  *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 256 (E.D. Va. 2009) (citation omitted).  Plaintiffs are confident in the merits of the claims and their prospects

of success on summary judgment and before a jury.  Nonetheless, the proceedings in this Court

and the confidential record developed for mediation purposes suggest that Defendants have

liability defenses that potentially could prevail at or prior to trial, or on appeal.

**(a)      Risks of Proving That Kelsoe and the
Funds Made Material Misstatements of
Fact and Acted With Fraudulent Intent**

Plaintiffs allege that the Funds' reports filed publicly with the SEC materially

misrepresented the level of credit risk of the Funds' underlying asset pools and, accordingly, the

investment risk of purchasing Fund shares, by (a) representing that the Funds' valuation policies

and procedures were reliable and that the "fair value" of portfolio securities where market

quotations are not readily available would be determined in accordance therewith; (b) assuring

investors that the Funds' asset pools would remain broadly diversified across a wide range of

asset types and would not become more than 25 percent concentrated in the securities of

companies in the "same industry"; (c) falsely classifying certain asset-backed securities ("ABS")

and mortgage-backed securities ("MBS") as "corporate bonds" or "preferred stock," making the

portfolios appear more diversified and thus less risky than they actually were; and (d) holding

out the Index as an appropriate comparator to the Funds' risk profile, when the assets held by the

Funds were far riskier than those composing the Index.  Plaintiffs further allege that Kelsoe, in

order to forestall declines in the Funds' NAVs, artificially propped-up and smoothed NAV by

overvaluing the prices of certain of the Funds' ABS and MBS assets by issuing 262 "price

adjustments," assigning arbitrary values that deviated materially from fair value.

Defendants have argued, however, and would contend on summary judgment and at trial,

that the Funds consistently disclosed that the Funds invest a majority of their assets in below

investment-grade debt securities (commonly referred to as "junk bonds") and that their expected

use of leverage involved a high degree of risk and that stockholders can lose some or all of their

12

investment.  Defendants would also contend that the Funds clearly disclosed the asset type of each of its holdings every quarter, and that MBS and ABS are categories of securities under SEC regulations and thus the Funds' portfolio concentration was always comfortably within the applicable 25 percent investment restriction.  *See Local 295/Local 851 IBT Employer Grp. Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 727 (S.D. Ohio 2010) ("[C]utting strongly against a finding of scienter is the fact that much of the information that Plaintiffs claim was concealed was actually reported.").

Defendants would further contend that the Index was selected to allow investors to compare the Funds' returns, not as an indicator of risk, that the Index was the best-suited option available at the relevant times, and that the Index was not chosen to intentionally mislead investors.  Defendants would further contend that Kelsoe and the Funds never knowingly inflated the value of their assets because "fair valuation" is a subjective process requiring the exercise of judgment, that the proper valuation of the Funds' assets during an unprecedented liquidity crisis presented unusual and unforeseen challenges, and that the third-party quotes Kelsoe received during this time were often unrealistically low.  Finally, Defendants would contend that any inflation of the Funds' NAVs through Kelsoe's "price adjustments" was immaterial and thus the result of good-faith judgment, not fraud.  *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) ("[F]undamental disagreements with Defendants' business judgments in a tumultuous economic downturn . . . are not actionable under Section 10(b) and Rule 10(b)-5.").  While Plaintiffs have substantial responses to these contentions, the uncertainty of how the Court or a jury would resolve such factual issues supports approval of the Settlement.

Beyond these fact-intensive disputes, Kelsoe would contend that he never "made" any of the alleged false statements in the first place.  In *Janus Capital Group*, *Inc*. *v. First Derivative Traders*, 131 S. Ct. 2296 (2011), the Supreme Court held that the sole "maker" of an alleged false statement in a mutual fund prospectus for purposes of a fraud claim under Section 10(b) of the Securities Exchange Act of 1934 is the fund itself, and not the investment adviser.  *Id.* at 2302.  The Court noted the argument that the mutual fund and its investment adviser have a "well-recognized and uniquely close relationship," but specifically declined the "invitation to disregard the corporate form."  *Id.* at 2304.  The Court also noted that the investment adviser, like Defendant Morgan Asset Management ("MAM") here, may have been significantly involved in preparing the prospectuses, but the statements in the prospectuses were solely attributed to and thus "made" solely by the mutual fund.  *Id.* at 2304-05.

Plaintiffs' Section 10(b) claims are asserted against the Funds and Kelsoe, and not MAM or the other Morgan Keegan Defendants.[10]  (Plaintiffs' approach to pleading their Section 10(b) claims was vindicated somewhat by the *Janus* decision decided four months later.)  Based on *Janus*, however, Defendants would contend that Kelsoe did not "make" any of the alleged misstatements for Section 10(b) purposes because he was an employee of MAM, not the Funds, he did not sign the SEC filings, and the "Letters to Shareholders" in Fund reports that he did sign were not alleged to be false or misleading.  Because *Janus* was decided after Defendants filed their motions to dismiss, this question was not litigated at the pleading stage, and Defendants have since moved under 28 U.S.C. § 1292(b) to certify this question (and certain statute of limitations questions) for interlocutory appeal to the Sixth Circuit.  *See* ECF Nos. 250-251.

---

[10] The Court, in its March 30, 2012 Opinion deciding Defendants' motions to dismiss, upheld Plaintiffs' Section 10(b) claims as against Kelsoe and the Funds but dismissed the claims as against the other three Officer Defendants.  *See* ECF No. 246, at 17.

If Defendants were to prevail on this issue in this Court and in the Sixth Circuit, the Funds would be the sole defendants charged with Section 10(b) violations. This posture would make it more difficult for Plaintiffs to establish that the Funds acted with scienter. *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc*., 442 F. App'x 672, 676 (3d Cir. 2011) (plaintiff failed to plead scienter as against company defendant because "there was no individual at [the company] who made actionable statements with scienter"). Plaintiffs would likely proceed against the Funds on a "corporate scienter" theory, as discussed as pages 18-20 of this Court's March 30, 2012 Opinion, but success would not be guaranteed. *See* Jan. 3, 2013 Hearing Transcript, Ex. 5 at 31:8-11 (Court remarked that corporate scienter theory was invoked solely for purposes of motion to dismiss).[11] Moreover, the Funds have consistently maintained that they were blameless investment vehicles, and in fact were the "victims" of Kelsoe's rogue behavior. And even if a jury were to find the Funds liable under Section 10(b) and award substantial damages, collecting such a judgment would not be assured because the Funds apparently have no assets other than those owned by the shareholders themselves. *See also Janus*, 131 S. Ct. at 2299 (noting that the mutual fund at issue "has no assets apart from those owned by the investors").

**(b)     Risks of Proving That Morgan Keegan and RFC Were Controlling Persons of the Funds**

As noted, Plaintiffs' Section 10(b) claims are asserted against the Funds and Kelsoe. The Morgan Keegan Defendants and RFC are sued solely as controlling persons under Section 20(a)

---

[11] Even if Kelsoe were found to have made false statements, and with scienter, it remains a question of fact whether his scienter could be imputed to the Funds. *See* March 30, 2012 Opinion at 18 (noting that "the scope of the agency relationship between Kelsoe and the Funds is a question of fact inappropriate for this review"). Kelsoe was an employee of MAM, not the Funds, and was not a director or officer at Morgan Keegan. The typical securities-fraud scenario in which the scienter of a senior executive acting within the scope of his authority is imputed to the company is not found here. *See Thompson v. RelationServe Media Inc.*, 610 F.3d 628, 635 (11th Cir. 2010) ("Corporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them."); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) (scienter of controlling officer generally attributed to company to establish Section 10(b) liability).

of the Exchange Act.  In particular, Plaintiffs allege that RFC controlled the three Morgan

Keegan Defendants: Morgan Keegan & Co., MAM, and MK Holding Inc.; that MK Holding

controlled MAM; and that Morgan Keegan & Co. and MAM in turn controlled the Funds.[12]

Defendants, and particularly RFC, have argued, and would contend on summary

judgment and at trial, that these parent-subsidiary relationships are far too attenuated to support

joint-and-several liability under a controlling person theory.  Although the Court upheld

Plaintiffs' Section 20(a) claims at the pleading stage as raising factual issues requiring discovery

(*see* March 30, 2012 Opinion at 21), the Court or a jury potentially could find (assuming a

finding of primary violations by the Funds or Kelsoe) that neither RFC nor the Morgan Keegan

Defendants "controlled" the Funds.  Such a result would dismiss the only defendants able to

satisfy a litigated judgment, and potentially leave the Class with little or no recovery.  In sum,

this factor strongly supports final approval of the Settlement.

### C.   The Settlement Is the Product of Extensive and Informed Arm's-Length Negotiations Facilitated by a Respected Private Mediator

"The Court must also make sure that any settlement is the product of arm's length

negotiations as opposed to collusive bargaining."  *In re Southeastern Milk Antitrust Litig.*, No.

08-MD-1000, 2012 WL 2236692, at *4 (E.D. Tenn. June 15, 2012).  "Without evidence to the

contrary," this Court may presume that the negotiations were conducted in good faith and that

the settlement was reached without collusion.  *Delphi*, 248 F.R.D. at 501.

That presumption is entirely proper here.  The Settlement is the product of extensive and

informed arm's-length negotiations before Professor Eric D. Green, a nationally recognized

---

[12] Morgan Keegan & Co. is also named in Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act for having acted as an underwriter of the public offering of the RHY Fund.  Assuming that the jury found that the offering documents were materially misleading, Morgan Keegan potentially could defeat this claim by showing that it conducted adequate due diligence into the veracity of the statements at issue.  *See* 15 U.S.C. § 77k(b)(3)(A) & (C); *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) (authoritative opinion on liability standards for section 11 claims against underwriters).

private mediator.[13]  The parties submitted comprehensive mediation statements on merits and

damages issues and convened for two full days in October 2011, but did not reach an agreement

despite good faith efforts.  In January 2012, the parties agreed to reconvene, and did so in April

2012 after exchanging supplemental mediation submissions.  The April 2012 session, which, like

the earlier sessions, was marked by Professor Green's persistent efforts in challenging the

parties' positions and urging them to recognize litigation risks and make reasonable concessions,

resulted in an agreement-in-principle at the end of a long day.  *See* Counsel Decl. ¶¶ 32-39.

　　　　The extended nature of the settlement discussions, Professor Green's sustained

involvement, and the initial breakdown in the negotiations strongly support a finding of

procedural fairness.  *See Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 336-37 (S.D.N.Y.

2005) ("There is no indication of collusion between [the parties]; indeed, on more than one

occasion, it appeared that negotiations would break down."); *Southeastern Milk*, 2012 WL

2236692, at *4 n.6 (participation of mediator showed that settlement was negotiated at arm's-

length); *Delphi*, 248 F.R.D. at 501 (same).  Professor Green, with the consent of all parties, has

also submitted a declaration attesting to the procedural integrity of this Settlement.  Declaration

of Eric D. Green, Ex. 3; *see Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 117 (2d Cir.

2005) (crediting settlement affidavit from Professor Green); *Delphi*, 248 F.R.D. at 498 (similarly

crediting mediator's views expressed as part of settlement approval submissions).  This factor

strongly supports final approval of the Settlement.

---

[13] *See*, *e.g.*, *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 756 (S.D. Ohio 2007) (noting final approval of $600 million settlement following negotiations that "involved a nationally recognized mediator, Professor Eric Green"); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) ("[The] negotiations and the ultimate Settlement Agreement were closely monitored by Professor Eric D. Green, an experienced and respected mediator appointed by the Court.").

**D.      Plaintiffs Conducted Meaningful Pre-Mediation**
**Discovery and Entered Into the Settlement With a**
**Clear View of the Strengths and Weaknesses of the Case**

Plaintiffs negotiated the Settlement on a well-informed basis and with a thorough

understanding of the merits and value of the parties' claims and defenses.  Before and during the

settlement negotiations leading to the agreement-in-principle—separate and apart from the

factual investigation undertaken for purposes of filing the Complaint—Lead Plaintiffs reviewed,

among other evidence and information:

- More than 7.7 million pages of nonpublic e-mails, valuation-related
materials and other confidential internal documents (nearly 650,000
documents in total) produced by the Morgan Keegan Defendants for
purposes of mediation;

- The SEC's Order Making Findings and Imposing Remedial Sanctions and
a Cease-and-Desist Order and Imposing Suspension in *In re Morgan Asset
Management, Inc.*, Exchange Act Release No. 64720, Admin. Proc. File
No. 3-13847 (S.E.C. June 22, 2011), the public administrative and cease-
and-desist proceedings instituted against Defendants Morgan Asset
Management ("MAM"), Morgan Keegan, Kelsoe and Weller (*see* ECF
No. 216-1);

- The Consent Orders entered into in June 2011 in the Joint Administrative
Proceedings brought by the Alabama Securities Commission, the
Kentucky Department of Financial Institutions, the Mississippi Secretary
of State Securities and Charities Division, the Securities Commissioner of
South Carolina, and the Tennessee Commissioner of Commerce and
Insurance against MAM, Morgan Keegan, Kelsoe and other individuals
(*see* ECF Nos. 216-2 to 216-11), as well as the similar Consent Order
entered into in October 2011 by the Georgia Securities Commissioner
(ECF No. 241);[14]

---

[14] The findings of fact and judgments consented-to in connection with Morgan Keegan's settlements with the
SEC and State securities regulators potentially could be ruled inadmissible before or at the trial of this action.  *See In
re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *10-11 (S.D.N.Y. Mar. 26, 2003) (excluding
SEC consent judgments before trial under Fed. R. Civ. P. 408 where respondents consented to order without
admitting or denying the findings therein); *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993)
(district court erred in admitting factual findings of State securities regulator to which respondent consented but
neither admitted nor denied).

- A sophisticated damages and loss causation report and analysis by Plaintiffs' consulting expert, together with numerous other confidential analyses prepared for purposes of mediation;

- Comprehensive initial and supplemental mediation statements submitted by Defendants, which included detailed discussion of liability issues, criticism of Plaintiffs' damage analyses, proffers of required offsets to damages, and expert materials and analyses contending, among other things: (a) that massive credit downgrades and the liquidity crisis caused the dramatic declines in the Funds' NAVs; (b) that other high-yield bond funds suffered heavy losses during the financial crisis; (c) that actual sales of assets held by the Funds indicated that the reported carrying values were not overstated; (d) that the SEC's own different approaches to setting NAV demonstrate the difficulty in fair valuing securities in 2007; and (e) that Kelsoe's valuation of Fund assets, and the resulting NAV, deviated immaterially from how the SEC would have valued the Funds' assets;

- Plaintiffs' own initial and supplemental mediation submissions, which included analyses of, among other things, the SEC and State Consent Orders and the nonpublic documents produced by Morgan Keegan;

- The complete report of the SEC's valuation expert submitted in the SEC Administrative Proceeding;

- Comprehensive mediation statements submitted by the parties in the Derivative Action; and

- The complete briefing on Defendants' motions to dismiss, totaling 269 pages exclusive of exhibits (ECF Nos. 197-1, 198-1, 200-1, 201-1, 202-1, 213, 223, 225, 228, 229, 230); this Court's March 30, 2012 Opinion granting those motions in part and denying them in part (ECF No. 246); and Defendants' motion to amend the Opinion and for interlocutory appeal (ECF Nos. 250-251).

*See* Counsel Decl. ¶¶ 34-36, 41.

This voluminous information and data concerning liability and damages issues, which includes both documentary evidence and detailed narratives and analyses by the parties and others, enabled Plaintiffs to competently evaluate the strengths and weaknesses of the claims and associated litigation risks, and accordingly to enter into the Settlement on a fully informed basis. *Cf. Delphi*, 248 F.R.D. at 498 (plaintiffs' investigation of their factual allegations and review of

"hundreds" of documents obtained through bankruptcy and SEC proceedings supported approval of settlement); *see also UAW v. Ford Motor Co.*, No. 07-74730, 2006 WL 1984363, at *25 (E.D. Mich. July 13, 2006) ("[T]he absence of formal discovery is not an obstacle [to settlement approval], so long as the parties and the Court have adequate information in order to evaluate the relative positions of the parties.").  This factor strongly supports final approval of the Settlement.

### E.      Continued Litigation Would Be Complex and Long and Would Consume Substantial Judicial and Private Resources

Without a settlement, the anticipated complexity, cost and duration of continued litigation would be considerable.  These are "major factors" to be considered in assessing the fairness of the Settlement, *Delphi*, 248 F.R.D. at 497, and, indeed, "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them."  *In re Telectronics Pacing Sys. Inc. Accufix Atrial "J" Leads Prods. Liab. Litig.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001) (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000)).

Plaintiffs have devoted substantial resources to examining the merits and value of the claims, and entered into the Settlement on a well-informed basis.  In view of the procedural posture of this action, however, the costs and duration of further motion practice addressed to the pleadings, class certification, fact and expert discovery, summary judgment motions, trial preparation, the trial itself, post-trial motions, and any appeals would vastly exceed the time and money already spent.  "Avoiding such unnecessary expenditure of time and resources clearly benefits all parties and the Court."  *Delphi*, 248 F.R.D. at 498.  While denying liability, Defendants considered their risks and options and agreed to settle now, thereby avoiding further litigation and a trial that might culminate nonetheless in a settlement before final judgment.

Given the uncertain prospects of success, settlement at this time is highly beneficial to the Class.  While Plaintiffs are prepared to resume litigation full-tilt if the Court declines to approve the Settlement, Plaintiffs believe that a settlement reached in the middle of discovery or on the courthouse steps would be only incrementally greater than this Settlement.  And given the time value of money, the value of this Settlement could well exceed a larger settlement years down the road.  If the Court declines to approve the Settlement and Defendants obtain summary judgment or a favorable verdict, the Class will be left with no recovery, and only after years of additional and costly proceedings.  *See In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003) ("Experience proves that, no matter now confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict, particularly in complex . . . litigation.").  The $62 million Settlement, however, provides tangible and certain relief to the Class now, "undiminished by further expenses, and without delay, costs, and uncertainty of protracted litigation." *Nationwide*, 2009 WL 8747486, at *5.  This factor strongly supports final approval of the Settlement.

### F. The Judgment of Experienced Counsel Supports Approval of the Settlement

Where, as here, the Settlement is the result of arm's-length bargaining following meaningful discovery and analysis, the Court may defer to "the judgment of experienced counsel who has competently evaluated the strength of his proofs."  *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983); *see also Nationwide*, 2009 WL 8747486, at *5 ("The view of experienced counsel favoring the settlement is entitled to great weight.").

Plaintiffs' counsel believes the Settlement is fair, adequate and reasonable in view of the risks and costs of continued litigation.  It is respectfully submitted that Lead Counsel, and all

Plaintiffs' counsel, are experienced and able lawyers in this area of practice. *See* Counsel Decl.

Exs. 6-C, 7-C, and 8-C. This factor strongly supports final approval of the Settlement.

> **G.** **The Public Interest Warrants Approval of the Settlement**

Finally, the Settlement is consistent with the public interest. There is a well-recognized

public interest in the settlement of disputed claims that, like the claims asserted here, require

substantial federal judicial resources to supervise and resolve. *See*, *e.g.*, *Delphi*, 248 F.R.D. at

501; *Cardizem*, 218 F.R.D. at 530 (noting "strong public interest" in settling class actions

because they are "notoriously difficult and unpredictable") (citation omitted); *Southeastern Milk*,

2012 WL 2236692, at *4; *Nationwide*, 2009 WL 8747486, at *8. This Settlement will conclude

one of many lawsuits in this multidistrict litigation, and will provide certain recovery to

thousands of Class members whose investment losses did not justify individual action. *See*

*Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 782 (N.D. Ohio 2010) (public interest

served by classwide recovery "that, but for this litigation, would almost certainly have gone

uncompensated"); *see also* Editorial, *A Class Action in the Public Interest*, N.Y. Times, Mar. 3,

2013, at 10 (noting, in response to the Supreme Court's decision in *Amgen v. Connecticut*

*Retirement Plans & Trust Funds*, No. 11-1085, 2013 WL 691001 (U.S. Feb. 27, 2013), that

settlements in private securities class actions yielded more than $8 billion in 2007 alone, and

stating that such cases "advance justice for the class members and are a crucial means of

enforcing the securities laws"). There is no contravening public interest that would justify

deviating from the federal policy encouraging settlement of complex class action litigation such

as this. *See Delphi*, 248 F.R.D. at 501.

This factor, like the others discussed above, strongly supports final approval of the

Settlement. Plaintiffs accordingly submit that the Settlement is fair, reasonable, and adequate

and should be approved.

### III.   THE PROPOSED PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE APPROVED

Approval of a plan of allocation of settlement proceeds is governed by the same standards of fairness and reasonableness applicable to the settlement as a whole.  *See*, *e.g.*, *In re Packaged Ice Antitrust Litig.*, No. 08-MDL-01952, 2011 WL 6209188, at *15 (E.D. Mich. Dec. 13, 2011). "When formulated by competent and experienced class counsel," a plan of allocation "need only have a 'reasonable, rational basis.'"  *Global Crossing*, 225 F.R.D. at 462.  "Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable."  *Packaged Ice*, 2011 WL 6209188, at *15 (citations omitted).

The Net Settlement Fund will be distributed to Authorized Claimants, *i.e.*, members of the Class who submit timely and valid Proofs of Claim, in accordance with the Plan of Allocation set forth in the Notice.  The Plan of Allocation treats all Class members in a similar manner: everyone who submits a valid and timely claim, and who has not excluded himself or herself from the Class, receives a *pro rata* share of the Net Settlement Fund in the proportion that the Class member's recognized loss bears to the total of all recognized losses.  The "Recognized Loss," as used in the Plan, is not market loss.  Rather, it is a calculation used to arrive at a weighted loss figure for the purpose of calculating an Authorized Claimant's *pro rata* participation in the Net Settlement Fund.

The Plan of Allocation was developed in consultation with Plaintiffs' damages and causation expert, and is consistent with Plaintiffs' allegations and their expert's causation and damages analyses prepared for mediation purposes.  The Plan is intended to recompense losses incurred in connection with purchases of Fund shares during the portion of the Class Period when there was statistically significant underperformance of the Funds' NAVs relative to the

23

Funds' benchmark Index.[15]  The Plan also accounts for the substantial dividends paid on Fund shares during the Class Period by including the value of dividends received as part of the total value received by the Class member.  The Plan compares a Class member's total returns on his or her investment in the Funds, including dividend income, with the returns of the Index, which likewise included periodic income such as interest and dividends.  By comparing total returns in this manner, the end result is that dividend income received from the Funds reduces Recognized Loss *only* to the extent that such dividend income *exceeds* the interest, dividend, or other income that would have been earned as a result of an investment in the Index at the same time and during the same period.  In sum, Recognized Loss generally equals the difference between (a) the amount of loss suffered on the Class member's purchases and sales of Fund shares, on a total return basis, and (b) the amount that would have been lost (or gained), on a total return basis, had the Class member invested in the Index.  Plaintiffs submit that this approach is fair and reasonable to the Class as a whole.

The Plan includes certain other terms that also properly account for the varying claims of Class members.  Class members who purchased RHY shares have claims under both Section 11 of the Securities Act and Section 10(b) of the Exchange Act.  Class members who purchased RMH, RSF and RMA shares have Section 10(b) claims only.  The Recognized Loss for RHY

---

[15] Plaintiffs' expert determined that for the RMH, RSF and RMA Funds, November 15, 2006, and for the RHY Fund, July 13, 2007, was the first day on which there was a statistically significant underperformance in the Funds' NAVs per share relative to the Index.  Accordingly, the Plan provides no recovery for shares sold before those dates. The Plan similarly provides no recovery for shares purchased on or after August 14, 2007, the date the Funds publicly disclosed that they would retain an independent valuation consultant in order to properly value their portfolio securities.  Lead Plaintiffs believe that such shares would be subject to risks and uncertainties in connection with establishing the reliance required for the theories of liability alleged for the Class in the Complaint. These limitations are also consistent with the timing of (a) Kelsoe's alleged "price adjustments," issued between January and July 2007; (b) the alleged overconcentration of the Funds' assets in structured finance securities as of March 31, 2007; (c) the Funds' alleged misclassification of their asset-backed securities holdings as corporate bonds or preferred stock in SEC reports filed between December 2006 and December 2007; and (d) the sharp and sustained decline in the Funds' share prices beginning in mid-2007.  *See* Complaint, ECF No. 186, at ¶¶ 15-16, 22, 29, 81 (chart), 88, 90-91, 92 (tables), 94-97, 139-153, 165, 167, 172, 176.

shares is multiplied by 1.25 under the Plan, thus enhancing the Recognized Claims of Class members with Securities Act claims by 25 percent over those with only Exchange Act claims. The multiplier recognizes the fact that Section 11 claims do not require proof of scienter at trial, *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983), while not unduly reducing the total recovery to Class members with Section 10(b) claims. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, 2008 WL 4178151, at *5 n.13 (S.D. Tex. Sept. 8, 2008) (approving use of 1.25 multiplier for class members with Section 11 versus Section 10(b) claims); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) (1.5 multiplier).[16]

Additionally, for shares of any of the Funds purchased or acquired by a member of the TAL Subclass, the Recognized Loss Amount will be multiplied by a factor of 1.5. This multiplier primarily reflects the fact that members of the TAL Subclass are releasing additional claims in the Settlement that are unique to them.[17]

---

[16] The multiplier also provides for straightforward claims administration while avoiding the risk of a windfall to Class members with Section 11 claims if a relatively small number of claims were to be submitted against a separate Section 11 allocation pool. *See Enron*, 2008 WL 4178151, at *8 ("[A] single pool of funds with use of differential multipliers eliminates the possibility of windfall for some of the § 11 claims that would arise if there were separate pools and a low claims rate for one of the pools.").

[17] As the Court is aware, the TAL Subclass exists because Regions Bank, a nonparty corporate affiliate of certain Defendants, purchased or acquired shares of the Funds in its fiduciary capacity as trustee or custodian for over 200 trusts and custodial accounts (collectively, "trusts"). When investors in the Funds commenced litigation against Defendants, Regions Bank had an acknowledged conflict of interest in pursuing claims as a fiduciary on behalf of its trusts against its own corporate affiliates. Consequently, the TAL was appointed by the Probate Court of Jefferson County, Alabama as a temporary special fiduciary for the limited and specific purpose of pursuing claims on behalf of Regions Bank's trusts that otherwise would have been available to and pursued by Regions Bank itself in its capacity as trustee. The trusts within the scope of the TAL's appointment include those that comprise the TAL Subclass. Among the claims within the scope of the TAL's authority are state-law claims arising from agreements that Regions Bank (as trustee and in other fiduciary capacities) entered into with Defendant MAM for MAM to provide investment management services for Regions Bank's trusts, including members of the TAL Subclass. Such claims are available solely to TAL Subclass members and not other members of the Class. Because these claims are encompassed within the release in the Settlement Agreement, the Plan of Allocation includes this enhancement to the Recognized Losses of members of the TAL Subclass. Since it is estimated that TAL Subclass members held less than two percent of the total shares eligible to participate in the Settlement, the multiplier is expected to have a negligible effect on settlement distributions to other Class members.

Finally, for shares of RMH, RSF, or RMA acquired directly in the 2003 or 2004 initial public offerings of those Funds (and held as of November 15, 2006), Recognized Loss is reduced by 90 percent.  This is because shares of these Funds, as noted above, have no Section 11 claims, and Section 10(b) claims based on IPO purchases and that rely on the fraud-on-the-market theory are subject to the defense that the primary market for IPO shares is not efficient or developed. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (no presumption of reliance for Section 10(b) claims based on purchases of newly issued municipal bonds); *In re Tronox, Inc. Sec. Litig.*, No. 09 Civ. 6620 (SAS), 2010 WL 2835545, at *11 (S.D.N.Y. June 29, 2010) (barring Section 10(b) claims based on purchases of common stock in IPO because market is not efficient or developed).  Recognized Losses for aftermarket purchases are not discounted. *See id.* at *11 (claims based on purchases of IPO stock in aftermarket are not barred).  Plaintiffs submit that the Plan of Allocation is fair and reasonable and should be approved.

## IV.  THE COURT SHOULD GRANT FINAL CLASS CERTIFICATION FOR SETTLEMENT PURPOSES

The Court previously granted preliminary class certification for settlement purposes.  *See* Preliminary Approval Order, Ex. 1, at ¶¶ 4-5; Preliminary Approval Brief, ECF No. 262, at 13-20.  Because nothing has occurred since then to cast doubt on whether the applicable prerequisites of Rule 23 are met, the Court should finally certify the Class and TAL Subclass for settlement purposes and appoint Lead Counsel as Class Counsel.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court grant final approval to the proposed Settlement, approve the Plan of Allocation of the Net Settlement Fund, grant final class certification for settlement purposes, and enter the proposed Final Judgment and

Order of Dismissal and proposed Order Approving Plan of Allocation of Net Settlement Fund submitted herewith.[18]

Dated:  March 8, 2013

Respectfully submitted,

LABATON SUCHAROW LLP

By:  */s/ David J. Goldsmith*
Joel H. Bernstein
*jbernstein@labaton.com*
David J. Goldsmith
*dgoldsmith@labaton.com*
Nicole M. Zeiss
*nzeiss@labaton.com*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477

*Lead Counsel for Lead Plaintiffs*
*Lion Fund, L.P., Dr. J. Samir*
*Sulieman and Larry Lattimore*

J. Gerard Stranch, IV (BPR #023045)
*gstranch@branstetterlaw.com*
BRANSTETTER, STRANCH
  & JENNINGS, PLLC
227 Second Avenue North
Nashville, Tennessee  37201
Telephone: (615) 254-8801
Facsimile:  (615) 250-3937

*Liaison Counsel for Lead Plaintiffs*

---

[18] The proposed Final Judgment submitted herewith does not list any opt-outs.  An updated Final Judgment including a list of timely and valid opt-outs will be submitted to the Court on April 2, 2013, after the March 22 deadline for opting-out of the Class.

27

George S. Trevor
*gtrevor@pswplaw.com*
PEARSON, SIMON, WARSHAW
  & PENNY, LLP
44 Montgomery Street, Suite 2450
San Francisco, California  94104
Telephone: (415) 433-9000
Facsimile:  (415) 433-9008

*Additional Counsel for Plaintiffs*